VOLUME I
PAGES 1-130
EXHIBITS: Per Index

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING
and PHILLIP KING,
Plaintiffs

v. C.A. NO.: 06-258-S

STAPLES, INC., IZZY DESIGN,
JSJ CORPORATION, JOHN DOE
COMPANY,
Defendants

* * * * * * *

DEPOSITION of PAMELA J. McGEE, a witness called on behalf of Izzy Design and JSJ Corporation, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the State of Rhode Island, at the offices of Zizik, Powers, O'Connell, Spaulding & Lamontagne, 40 Westminster Street, Providence, Rhode Island, on Thursday, February 1, 2007, commencing at 10:11 a.m.



tabbies
EXHIBIT
D

Page 10

A. Yes, it is.
Q. And how long has it been Sensata?
A. Not quite a year yet. April, we bought Sensata. Or Sensata bought TI.
Q. And when you say TI, you're referring to Texas Instruments?
A. Yes.
Q. How long did you work for Texas Instruments before it became Sensata?
A. Twenty-five years.
Q. Has that been a full-time position for you?
A. Yes.
Q. When Sensata purchased TI, did your job title change?
A. No.
Q. So what is your job title now?
A. Material handler. Which isn't really what I do.
Q. You mean you do more than the job description?
A. Oh, yes.
Q. What does a material handler do in your case?
A. I order supplies; and when it comes in, I put it away.
Q. What types of supplies do you order?

Page 11

A. Spare parts for the machinery and for machines that they want to build.
Q. Semi-conductors, things like that?
A. Yes.
Q. Are you responsible for ordering any office supplies?
A. Yes.
Q. All right. What types of office supplies would you order?
A. Pens, pencils, paper, tapes. .
Q. What about furniture?
A. No.
Q. Have you ever been responsible for ordering furniture in your capacity as a material handler --
A. No.
Q. -- at TI?
Do you know who is currently responsible for ordering furniture?
A. It's over in Purchasing.
Q. Okay. Which is a different building than where you are?
A. Yes.
Q. Okay. Which building are you in now?

Page 12

A. I'm in Building 12. They call it the Operations Center.
Q. Were you in that same building at the time that Mary Ann King had her accident?
A. Yes.
Q. As you sit here today, do you remember the date of the accident that we're here about?
A. No. I do not.
Q. Okay. In order to come in to give testimony, did you review any documents to refresh your memory?
A. No, I didn't.
Q. Okay. And if I were to suggest to you it was in June of 2003 --
A. Yes.
Q. -- does that sound accurate?
A. Yes, it does.
Q. Okay. So back in June of 2003, what were your hours at TI?
A. 7 to 3:30.
Q. Is that still the same?
A. Yes.
Q. And when you were working as a material handler 7 to 3:30 in the Building No. 12, who

Page 13

was in your immediate proximity?
A. Just Mary Ann.
Q. Okay. What was her job title?
A. Purchasing assistant.
Q. Do you know what her duties were?
A. She would take care of the store that we had and she would order all the supplies, which is what I do now. The same thing, ordering spare parts for the equipment.
Q. Was Mary Ann responsible for ordering any furniture?
A. No.
Q. Okay. That, again, was a separate department?
A. Yes.
Q. Okay. And during the time, let's say in the last ten years that you've done this job, have you had other people working next to you besides Mary Ann King?
A. On an off shift.
Q. Okay.
A. The other guy Kevin. He'd come in around three. So I'd have that half-hour overlap with him. But customers would come and go.
Q. Generally it was just you and Mary Ann in this

it goes up and down. I don't know.
Q. Was it the same kind of chair that Pam (sic) had?
A. That Mary Ann had?
Q. I'm sorry. That Mary Ann had, yes.
A. She had a smaller, lower chair more for a desk. Mine was for working at a high counter. But they were the same model.
Q. When you say "they were the same model," what do you mean?
A. I think they were made by Imperial, if I'm not mistaken. I'm not too sure on that.
Q. And the back of the chair, what does it look like?
A. It's kind of oval backing. It's not that big. It's only like that (indicating).
Q. Okay. And is the back connected to the base?
A. With a bar that comes down to go underneath the bottom of the seat.
Q. Okay. And the back of your chair looks the same as the back of Mary Ann's chair?
A. Hers was a lot higher, her back. It would go from the bottom up sort of like this chair, where mine had the bar that went up more and



then the top of the backing was up higher.
Q. Okay. So yours was a smaller oval back?
A. Yes.
Q. And hers was a higher back chair?
A. Right.
Q. Okay. So then fair to say they weren't the same model?
A. No, I guess they're not the same model. But I guess they're Imperial chairs. That's what my boss had told me.
Q. Okay. And when did your boss tell you that?
A. When this was all happening, when she had the accident.
Q. Okay. So you believe the manufacturer of the chair was Imperial?
A. I believe so.
Q. Okay. Were there several different kinds of chairs around the building?
A. Basically they're all the same, just different colors, maybe different shapes. But they got rid of all the older chairs and replaced them with all these new chairs.
Q. Okay. When did they do that?
A. I'm not too sure on that. It might have been



in the late '90s.
Q. Okay. And was there anyplace on the site at Texas Instruments where chairs were kept?
A. That were bad or --
Q. Just any particular place.
A. No.
Q. So to your knowledge, if there was a chair purchased for use at Texas Instruments, it was put into use, there were none that were stored there?
A. Right. Only in Safety where they had samples so you could go and pick out what style you wanted.
Q. Okay. Do you know who was working in Safety back in June of 2003?
A. Dean Chapman, Bob Brown, Bob Hammersley, Bill Reed and Tammy Morrissey.
Q. Morrissey?
A. Yes.
Q. Are any of those people still there?
A. Yes.
Q. Who is still there?
A. Tammy is still there. That's it. The rest are gone.



Q. And are there still samples of chairs when you go to Safety for you to be able to choose from if you have an issue?
A. No. We don't have a Safety area now.
Q. Okay. And when you said all the old chairs were replaced in the late 1990s --
A. Mm-hmm.
Q. -- do you know if there was one particular department that was in charge of that shift?
A. It was Purchasing.
Q. Okay. And is there anyone working in Purchasing now that was there in 2003?
A. Yes.
Q. Who?
A. Natalia Mendes.
Q. Okay. Now, when you went to Building 12 in 2001 and you started using the chair that you had, were there any kind of instructions that came with it?
A. Not on mine. It was taken off.
Q. Okay. Did you have any instructions anywhere in the vicinity, in your desk or anything like that?
A. Mary Ann did in her office.

Page 26

time the chair got there to the time that Mary Ann fell, the tag was still hanging on it?
A. I really don't know.
Q. Okay. Did the tag stay on there for any length of time at all?
A. I just remember when it first came over that it had the tag. And then after that, I just didn't pay attention anymore.
Q. Okay. And before this accident happened in June of '03, to your knowledge had Mary Ann had any problems with the chair?
A. The first chair that they had brought over after the orange one was a faulty chair that wouldn't stay locked into place. So they came and got that one and brought her another one.
Q. Okay. So the one she eventually fell off of was actually the third chair --
A. Yes.
Q. -- that you saw her use?
A. Yes.
Q. Okay. What did the first one look like?
A. The first one was the orange one.
Q. Okay.
A. And then the second one was identical to the

Page 27

third one, the blue -- the blue chairs.
Q. Okay. And when you say it was a faulty chair and it wouldn't lock into place, how do you know that?
A. Because she would lock it into place and sit back and then it would like let go on her. And then she'd have to fix it again. It would happen quite often.
Q. Okay. How long did she have that chair?
A. Not long. I would say no more than two weeks.
Q. Okay. And what did she eventually do about that, if anything?
A. She called Ed again and he brought her another chair.
Q. Okay. And the third chair that came in, how long did she have that before the accident?
A. I don't really know. Probably -- I can assume.
Q. Well, if you can give me your best estimate, but I don't want you to guess.
A. Okay. I'm gonna say about four months.
Q. Okay. And during that time, to your knowledge, did she have any problem with the chair?

Page 28

A. No. Not that I know of.
Q. That wasn't the chair that kept locking?
A. Unlocking.
Q. Unlocking?
A. No, it wasn't. This one seemed to be okay.
Q. Okay. Did anyone ever come to take a look at that third chair?
A. After the accident they did.
Q. Okay. But not before?
A. Not before.
Q. Okay. Do you know where the third chair came from?
A. Safety.
Q. Okay. And again, Ed brought it over?
A. Yes.
Q. All right. Did that chair have a tag on it?
A. I don't recall.
Q. Okay. Did that chair look newer to you?
A. Yes, it did.
Q. Okay. Do you know if it was a chair that had been used anywhere before?
A. I don't know.
Q. Okay. Is it possible if a chair is in Safety that it had been used in other locations?

Page 29

MR. ESKEY: I object.
A. Yes.
Q. And you don't remember if the third chair had a tag on it or not?
A. I'm not too sure on that one.
Q. Okay. At any time before this fall, did you ever have occasion to touch Mary Ann's chair and look at it?
A. I've sat in it. So there was no problems with it for me.
Q. Okay. And to your knowledge, this third chair was not the one that had kept locking and unlocking?
A. Right.
Q. And can you describe for me what the third chair looked like?
A. It was the dark blue, the regular type of office chair with the arms. And it also reclined.
Q. Was it a high back or a low back?
A. High back.
Q. Do you know where the levers were to move it up and down?
A. Underneath the bottom of the seat.

Q. What did Mary Ann sit in?
A. They had gotten another chair.
Q. Was it the same type of chair?
A. Yes, it was.
Q. Okay. Same look, high back?
A. Identical.
Q. Okay. Is that one still there?
A. I don't know. Like I said, they piled up so many chairs and threw out so many of them, I really don't know what happened to that chair. It could still be there because there's so many of them that look alike on site.
Q. Okay. Hard to keep track of which one is which. Is that fair to say?
A. Right. They're all the same.
Q. Yours was different, though. Correct?
A. Right. Because it was for a high workbench area.
Q. Okay. How many different looking chairs would you say there are on the site?
MR. ESKEY: I object.
A. That I've seen in the past? Maybe eight or nine different styles.
Q. Okay. Do you know where the chairs are



purchased from?
A. I heard it's through Staples.
Q. Okay. And where did you hear that from?
A. Mary Ann and Natalia Mendes.
Q. When did Mary Ann tell you that?
A. When all -- right after this all happened.
Q. Okay. So before this happened, did you know that the chairs came from Staples?
A. No, I didn't.
Q. Okay. And the information you learned from Natalia Mendes about Staples, what was that?
A. The information? That that's where they were purchased.
Q. Okay. And when did you learn that from Natalia?
A. When we had a safety meeting after the accident, they call it an 8D investigation where all of us get together and discuss exactly what happened.
Q. Okay. And during one of those meetings, Natalia said she believed the chairs that are in that area came from Staples?
A. Yes.
Q. Okay. And you had mentioned the name Jim



Drews.
A. Yes.
Q. He works for Staples?
A. Yes. He's our sales rep.
Q. Okay. And how long has Jim been the sales rep, if you know?
A. I really don't know.
Q. Okay. Does Jim have an office on site at TI?
A. No. No. He would just come in when people would call him in. And a lot of the sales reps would come in at least once a week.
Q. Okay. And have you had any conversations with Jim Drews about this incident with Mary Ann?
A. Just on her health. That's it.
Q. Okay. And when did those take place?
A. It was when we were Sensata, I had bumped into him and he had asked me how she was doing. And that was it.
Q. And what did you say?
A. At that time she wasn't doing too well, so I told him that's when she had the allergic reaction to an antibiotic and was losing her hair. So it wasn't that long ago.
Q. Okay. When's the last time you saw Mary Ann?



A. Maybe two weeks ago. I just saw him in passing.
Q. No. My question was, when's the last time you saw Mary Ann?
A. Oh, Mary Ann. When she came home -- oh, God, what month was that? It was when she came home for her deposition.
Q. Okay. Do you still keep in touch with her?
A. I haven't talked to her in a little over a month. So I mean, occasionally, yes, just to see how each other is doing.
Q. Okay. You know her address and number in Florida?
A. Yes. I don't know her address off the top of my head, but I do have it.
Q. Okay. To your knowledge, were any chairs from Texas Instruments ever taken off site to be fixed?
A. Not that I know of. Well, Mary Ann's chair because Jim Drews took it.
Q. Okay. When did he take it?
A. After her accident, about a month after he came in and took the chair. And then I don't know whatever became of it after that. I'd

Page 54

heard he had repaired it and then brought it back, but he had to take it through Safety first.
Q. Okay. So to your knowledge, it was repaired in some way?
A. Yes.
Q. And then brought back for use at TI?
A. Yes.
Q. Okay. But you don't know where or what happened to it after that?
A. No. I do not.
Q. In terms of the maintenance of the chairs before this accident in June of 2003, were chairs brought to Safety, fixed, and then brought back into the use?
A. I don't know.
Q. Okay. The maintenance guys were responsible for taking care of any problems with the chairs?
A. Yes.
Q. If there was a problem with a chair, would it go to a maintenance guy before it went to Jim Drews?
A. I don't know how they were supposed to

Page 55

actually have that work. I believe so.
Q. Okay. When this chair broke that Mary Ann was on, did you see any broken metal?
A. No, I did not.
Q. Okay. When Jim brought it back, did you ever see it again?
A. Yes, he did bring it back into our room, but then Ed came and got it and then I don't know. So it was brief, very brief.
Q. Okay. So Jim brought it back from Staples. You're sure about that?
A. Yes.
Q. And then Ed came and took it.
A. Right.
Q. And you never saw it again after that?
A. No, I did not.
Q. Okay. Now, you took part in the safety meetings, the 8D meetings you talked about after?
A. I went to two of the meetings.
Q. Do you know how many they had?
A. No, I don't.
Q. Were these 8D meetings a routine that TI did for years?

Page 56

A. Yes. Whenever there was an accident.
Q. Okay. And do you remember when the first one was after this accident?
A. God, I did have paperwork on it but --
Q. All right. You guys are given copies of the 8D reports if you go to the meeting?
A. Yes.
Q. Is that correct?
A. Mm-hmm.
Q. And did you save the ones involved --
A. I did, but I don't think I have it any longer.
Q. Okay.
MS. LAMONTAGNE: I'm gonna have these marked.
(Defendants' Exhibit 2 marked for identification)
Q. I'm gonna show you what I've had marked collectively as Exhibit 2. And there are eight pages here. Just take your time and look through it and see if those documents look familiar to you.
A. Okay.
(Witness reviews documents)
A. This is all very familiar to me except for the

Page 57

part where I found the screw. I didn't find a screw.
Q. Okay. So you're referring to page 2 that I've shown you?
A. Yes.
Q. Okay. And just for the record, we're referring to the 8D report dated June 10th, 2003. Is that correct?
A. Yes.
Q. Okay. And when it talks about the chronology of events, how Ed received a call from Mary Ann on Monday, June 2nd --
A. Mm-hmm.
Q. -- at approximately 2:10 p.m., does that make you think that the accident was later or you still believe it was around lunchtime?
A. I thought it was around lunchtime.
Q. Okay. And again, I'm not showing you this to try to confuse you in any way. It's just that sometimes things can refresh your memory.
A. Right.
Q. Okay. The rest of that you've taken the time to read and that looks accurate to you?
A. Yes.



G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 58

Q. In terms of you being the only witness to it?
A. Right.
Q. Not thinking that -- you thought at that point at least that Mary Ann was okay?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. Okay. And you also had indicated that Mary Ann herself was laughing about what had occurred?
A. Yes, she was.
Q. Okay. Now, on page 2, you made mention that it seemed accurate to you except for the part where it says, "Pam had located one of the screws on the floor near the computer stand."
A. I did not.
Q. Okay. So even reading this, it does not refresh your memory that you may have found a screw?
A. Right. I thought I had heard it was Kevin White who found a screw, second shift.
Q. Oh, okay. So you heard that there may have been a screw found --
A. Right.

Page 59

Q. -- but it was by Kevin White?
A. Right.
Q. Okay. And when did you hear that?
A. When I had come back from vacation.
Q. Okay. So it was soon after?
A. Yes.
Q. Okay. Does the rest of page 2 look accurate to you?
A. Yes, it does.
Q. Okay. Were you there when it was directed that Al was supposed to take pictures of the chair?
A. Yes.
Q. Okay. Do you know if that was ever done?
A. I do not know.
Q. Okay. Have you ever seen pictures of the chair?
A. No.
Q. Did Mary Ann ever go to any of the safety meetings?
A. She went to one.
Q. She went to one, okay. There's a reference to Mary Ann on the one dated July 9th, 2003, which would be page 8 of the package.

Page 60

A. What page was that?
Q. The last page.
A. The last page?
Q. Yes. See it's dated July 9th?
A. Oh, July 9th. Mm-hmm.
Q. It indicates that the meeting opened with Mary Ann.
A. Yes.
Q. Do you have a recollection of being at that meeting?
A. Yes, I was.
Q. Okay. And does that refresh your recollection that as of July 9th, 2003, a little over a month after the accident, Mary Ann was at least back to work for purposes of this meeting?
A. Right.
Q. Okay. Do you know if Mary Ann worked that day?
A. She did.
Q. Okay. Now --
(Cell phone interruption)
THE WITNESS: I'm sorry. Let me shut that off.

Page 61

(Discussion off the record)
Q. Now, to your knowledge, when Mary Ann fell, did she hit her head at all?
A. Not that I know of.
Q. Okay. And that would be consistent with the June 17th, 2003 report where it says, "When asked if she hit her head in the fall, she informed Natalia that she did not."
A. Right. She didn't. I don't recall her hitting her head.
Q. You thought you saved her from hitting her head?
A. Yeah, her head never went down that low so...
Q. To your knowledge, Mary Ann was seen at the medical department at TI?
A. Yes.
Q. Okay. Have you ever seen a copy of that medical evaluation?
A. No.
Q. Was that ever made part of any of the safety meetings?
A. No.
Q. Okay. There's a discussion here about Ed and your retrieving the screw again.



G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 62

A. Mm-hmm.
Q. Do you see that?
A. Yes.
Q. It said, "Ed went back to the location of the incident and retrieved the screw that Pam found on June 10th." Let's assume it's the screw that Kevin found.
A. Mm-hmm.
Q. "It was determined that the screw was not the correct screw for the chair." Do you know who tried to see if it was the correct screw for the chair?
A. No, I do not know.
Q. Okay. John Elliot, he's a site safety rep.
A. Yes.
Q. Correct?
A. Mm-hmm.
Q. What was his role in terms of this accident? Did he just attend the meetings?
A. He was in charge of the meeting. He held the meeting.
Q. Okay. Is he in charge of this area that you've called Safety?
A. He was, yes.

Page 63

Q. Okay. He was, he's not anymore?
A. He's not there anymore.
Q. Okay. Any idea where he lives?
A. No.
Q. Okay. Al Brown.
A. Mm-hmm. Yes.
Q. He also attended these meetings?
A. Yes, he did.
Q. What was his position?
A. He was our safety coordinator, if I recall correctly.
Q. Would he be directly under John?
A. Yes.
Q. And to your knowledge, did Al ever inspect the chair?
A. Not that I know of.
Q. Okay. So at this meeting, at least it was determined that the screw that was found was not the original correct screw for the chair.
A. Right.
Q. Okay. Do you know what happened to that screw?
A. No, I do not.
Q. Okay. Do you see where it says, "Pam informed

Page 64

the group that Mary Ann had attempted to lock the chair so the back panel would not recline but it would not stay in the locked position"?
A. Correct.
Q. Okay. You were talking about the chair that she eventually fell off of?
A. I can't really recall. I must have been. I'd have to say yes.
Q. Okay.
A. Mm-hmm.
Q. Does that refresh your recollection that Mary Ann may have been having a problem with the chair not staying in the locked position?
A. Yes.
Q. Okay. Does that refresh your recollection as to whether or not anybody may have come and looked at the chair before this accident?
A. No one came to look at it before that I know of.
Q. Okay. Did you ever see Pete Sauer talking to Mary Ann about working on the chair?
A. He didn't even work there then.
Q. Okay. And does this refresh your recollection at all about how long the chair was in the

Page 65

area?
A. You mean after the accident, how long it --
Q. Before.
A. Before.
MR. ESKEY: I object.
A. I really can't say for sure how long.
Q. Okay. Do you still believe that the chair that she eventually fell off of didn't have any issue with reclining, it was only the second chair that you had described?
A. Can you repeat that?
Q. Sure. Do you still believe that the chair that she eventually fell off of never had an issue with reclining, it was only the previous chair that you described?
MR. ESKEY: I object.
A. Yes.
Q. Okay. So when it says, "Pam informed the group that Mary Ann had attempted to lock the chair so the back panel would not recline but it would not stay in the locked position," you think you may have been describing the previous chair?
MR. ESKEY: I object.

Page 66

A. Yes.
Q. Okay. It also says that Al and Jim went to the location to look at the damaged chair. Were you there when they did that?
A. I don't believe I was.
Q. Okay. At least according to this, it indicated that the back was out of adjustment and as loose as possible. Did you ever see the chair as described in this paragraph?
A. Can you ask your question again, please?
Q. Sure. It describes the chair that Al and Jim looked at as being totally out of adjustment and as loose as possible.
A. Yes.
Q. Now, you had said before the fall the chair looked fine to you; after Jim fixed it, it looked fine.
A. Right.
Q. It was just in the corner.
A. Right.
Q. Okay. Did you ever see it as they've described it here, totally out of adjustment and as loose as possible?
MR. ESKEY: I object.

Page 67

A. No. I never looked that closely at it. But I know that they did put it in the back of the room and taped it off.
Q. Okay. Now, it also says that the information card that the manufacturer puts in had been removed from this chair. Do you know anything about that?
A. No.
Q. Okay. You had mentioned that Mary Ann had some instructions for the chair.
A. Right.
Q. Do you know where she got those?
A. I know one of the chairs came over with instructions still attached to it on the bottom. But to say if it was the first chair or the second chair, I can't give an honest answer on that, which one it was.
Q. Okay. The screws that go under the chair, did you ever see any of those?
A. No, I did not.
Q. Okay. And about one month after this accident when you said the chair was taken away by Ed, you've never seen it after that?
A. Right.

Page 68

Q. And through any conversations you've had with people at TI about this, have you learned where the chair is?
A. We've all been wondering what happened to it. We just thought that it got piled up with all the other chairs and thrown out.
Q. Okay. Nobody knows where this chair is?
A. Right.
Q. After the safety meeting where Mary Ann was there at the end of -- sorry, the beginning of July 2003, to your knowledge, were there any other safety meetings about it?
A. Not that I know of.
Q. Okay. When Mary Ann came back to work part-time, was she capable of carrying out her duties during the time that she was there?
A. She was in a lot of pain. So to do her job she'd get really antsy sitting too long or even standing too long. She was very uncomfortable.
Q. Before this accident, you had worked with Mary Ann for 15 years?
A. No. Actually, I only worked with Mary Ann from 2001.

Page 69

Q. Okay.
A. Okay.
Q. All right. So from the time in 2001 to the time this happened in 2003, had you ever known whether or not she had any other problems with her back or her neck?
A. Her neck, she did. And they said it was her setup. Or she told me it was her setup was wrong for her.
Q. Do you know whether or not she'd ever gotten any treatment for her lower back before this accident?
A. She was doing stretches, exercising.
Q. Okay. For her lower back?
A. Yes. Well, that was for her neck, not for her back.
Q. Okay. That's what I'm asking you.
A. Okay. No.
Q. To your knowledge, you don't know whether or not she ever got any treatment for her lower back before this accident?
A. Not to my knowledge.
Q. And when you said she was doing stretches, what is it that you observed?

A. Right.
Q. So there were Imperial chairs on site at Texas Instruments?
A. Yes.
Q. And the part where they document you saying that you found the screw, that's inaccurate in these reports. Correct?
A. Correct. They asked me to look for the screw, I couldn't find it. So supposedly he had asked the second shift, Kevin, to look for the screw. So that's why I'm thinking maybe in the minutes they mixed my name up with Kevin's name.
Q. Okay. So where it says, "Pam indicated that on today June 10th she located one of the screws on the floor" --
A. No.
Q. Okay. And so you don't remember finding a screw eight days later?
A. No.
Q. And you didn't tell the meeting --
A. No.
Q. -- that you found a screw eight days later?
A. No. Because I would have had to have given it



to them.
Q. Okay. And did you ever see any kind of label on the blue chair that said it was a Superior chair?
A. No.
Q. Okay. When Mary Ann was in the process of falling, you believe you stopped her from hitting the ground. Is that correct?
A. Yes.
MS. LAMONTAGNE: I don't have anything else.
MS. MICHELS: I just have a couple follow-ups.
EXAMINATION BY MS. MICHELS:
Q. You said that when Mary Ann fell, prior to her falling you had asked her a question, she "scooched" back in her chair, turned to you and started to lean back. Right? Is that yes?
A. Yes.
Q. Okay.
A. I'm sorry.
Q. Did she just lean back in her chair or did she maneuver the lever and begin to recline in the



chair?
A. No, she just leaned back.
Q. She just leaned back?
A. Yeah.
Q. She didn't do anything with the lever?
A. No.
MS. MICHELS: That's all I have.
MR. ESKEY: Just a couple.
EXAMINATION BY MR. ESKEY:
Q. The third chair that Mary Ann -- the one that broke, when that chair came to her work area, did it appear new to you?
A. Yes, it did.
Q. And do you recall at any time with respect to that chair seeing any labels on that chair?
A. I don't recall on that chair. I believe it was the second one I remember seeing the labels on.
Q. Okay. But the third chair, the one that broke, as you sit here today, can you tell me whether or not you saw any labels on that chair indicating who the manufacturer was?
A. No.
MR. ESKEY: That's all I have.



EXAMINATION BY MS. LAMONTAGNE:
Q. And you believe that Ed got that third chair for --
A. Yes.
Q. -- Mary Ann?
Were you at the meeting when Ed said that he thought Mary Ann had located a chair on site?
A. Yes, I was there.
Q. Okay.
A. And I told him I disagreed with him, he was wrong.
Q. Okay. So you think Ed got her the chair from somewhere on site?
A. Yes.
Q. Okay.
MS. MICHELS: I do have one more question.
EXAMINATION BY MS. MICHELS:
Q. When Mary Ann had her neck problems due to her work station setup --
A. Mm-hmm.
Q. -- I think that was in 2001, were you working with her at that time?