VOLUME I
PAGES 1-94
EXHIBITS: Per Index

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING
and PHILIP KING,
Plaintiffs,

v. C.A. No.: 06-258-S

STAPLES, INC., IZZY DESIGN,
JSJ CORPORATION, JOHN DOE
COMPANY,
Defendants.

* * * * * * *

DEPOSITION OF JIM DREWS, a witness called on behalf of Izzy Design and JSJ Corporation, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the Commonwealth of Massachusetts, at the offices of Zizik, Powers, O'Connell, Spaulding & Lamontagne, 40 Westminster Street, Providence, Rhode Island, on Wednesday, March 7, 2007, commencing at 10:01 a.m.

EXHIBIT G

Page 14

Q. Where is that company located?
A. They're not anymore. They were in North Carolina, but they're out of business now.
Q. What kind of chair was that, the Miller Axis?
A. What's typically classified as an office task chair.
Q. The Superior Centron, would you also characterize that as an office task chair?
A. Yes.
Q. I'm assuming that you from time to time visited the Staples -- or strike that -- from time to time visited the Texas Instruments facilities that you dealt with?
A. The Attleboro facility only.
Q. Did you ever see what type of chairs were there that people were using -- strike that. It's a horrible question.
When you were there, did you observe chairs other than the Miller Axis and the Superior Centron?
A. Yes.
Q. And I think you said you don't know what types of chairs those were?
A. I do know the types of chairs. What I had

Page 15

said before, I believe, is that I don't know who they bought them from.
Q. Fair enough. What types of chairs did you observe at the Attleboro facility?
A. Herman Miller and Steelcase.
Q. Would you also characterize those as office task chairs?
A. Yes.
Q. Would it be fair to say that the Miller Axis, the Superior Centron, the Herman Miller and the Steelcase chairs, although they might have distinctions and some differences, were fairly similar in terms of function?
MR. ESKEY: I object.
MR. MURPHY: Objection.
A. I don't know. I can't speak to the -- to the functions of the other two chairs.
Q. You're not familiar with the details?
A. I'm not familiar with them.
Q. Okay. Did all chairs purchased at the Attleboro facility after you became involved in the 1997-1998 time frame, did all chairs at that facility received come through Staples or did some come from other TI facilities?

Page 16

A. Could you repeat the time frame you said?
Q. Sure. I don't want to go back before you were involved, and I think you said you first started selling chairs and office furniture for Staples to TI in the 1997-1998 time frame. Right?
A. That's correct.
Q. All right. So after that point in time, did all chairs that the Attleboro facility purchased -- were they purchased through you?
MR. MURPHY: Objection.
A. I don't know that.
Q. Did you ever hear that the chairs were coming from another source other than Staples?
A. With regard to -- with regard to Superior chairs, some of those chairs were procured through their Dallas facility. They were still allowed to buy the other two chairs, the Steelcase and the Herman Miller. And that's -- I don't know if they still bought those.
Q. But you were not an authorized dealer for Steelcase and Herman Miller?
A. That's correct.

Page 17

Q. And when I say "you," you know I mean Staples?
A. Yes.
Q. My understanding about Steelcase and Herman Miller -- I don't know whether you have an understanding or not -- is that they have specific dealers around the country that are authorized to sell their product and that's the only way anyone purchases their product.
MR. MURPHY: Objection to the form.
A. I don't know their -- their specific sales strategy.
Q. All right. You just know that wasn't something that you were selling?
A. I know that Staples can't sell those lines.
Q. And you may have already said this, and forgive me if I'm asking this again. But are you aware that Texas Instruments at the Attleboro facility did purchase Herman Miller and Steelcase product, "product" being chairs, after the 1997-1998 time frame?
A. I don't know that.
Q. You don't remember if you ever saw any new Herman Miller or Steelcase chairs after that time?

Page 30

A. That's what I did.
Q. Okay. Did you take the chair with you away from Texas Instruments?
A. Not at that time.
Q. Okay. Let's focus on when you first went out there. What specifically did you do with respect to this chair the first time you saw it?
A. I took the number from the -- the control number from the bottom of the chair and -- and made a note as to the parts that it needed and then left.
Q. How did you come to believe that the chair you were dealing with was the one that had been involved in Ms. King's accident?
A. Because I had been told that.
Q. Did someone point you to a specific chair and say, "Hey, that's it" or --
A. The chair was in the corner of her general office area, wrapped or circled off with a yellow tape, as I recall, so that nobody else would use it.
Q. Do you recall who pointed you in the direction or told you that was the chair?

Page 31

A. I don't know that now.
Q. What condition was the chair in --
MR. ESKEY: I object.
Q. -- at that time?
A. There was a seat and base assembly that was still assembled, and then the back was laying on top of the chair.
Q. What parts did you determine you needed to order to repair it?
A. I ordered a control mechanism. With that comes a "J" bar which attaches to the back and then later attaches that to the control mechanism.
Q. Did you take any pictures of the chair?
A. I did not.
Q. All right. So you ordered the parts. I assume that takes some time to be delivered?
A. Usually -- yes, it does. Usually about a week.
Q. And was that the case with respect to this chair and these parts?
A. As I recall.
Q. All right. What did you do next with respect to this chair?

Page 32

A. When the parts come in, they'll be shipped to my office. When those arrive, then I go take the chair from the facility and repair it and then return it to the facility.
Q. And did you do that with respect to the chair we've just been talking about?
A. Yes, I did.
Q. Do you recall how long after your initial visit it was before you went and -- well, strike that.
You took the chair from the TI facility at some point?
A. At the point that the parts came in to me.
Q. And where did you take the chair?
A. I take it to my garage and I did the repair there.
Q. Do you remember how long it was after you ordered the parts that this took place?
A. Are you asking me from -- from the time I ordered the parts until the time the parts came in?
Q. Until you went and took the chair.
A. I don't know exactly.
Q. When you took the chair back to your garage,

Page 33

what specifically did you do?
A. I take it to my garage because it's kind of -- a bit of a noisy process that isn't really appropriate for an office.
There's a press fit between the cylinder and the base and the cylinder and the control mechanism, and that needs to be pounded out. You need to spray it with WD-40 and then it needs to be pounded out. Typically a two-pound sledgehammer works best for that.
But that's a noisy process. They don't usually like you to do that in the office, so that's the reason that I take it out of there.
So I unscrew -- I unscrew the base -- the control mechanism from the seat base and then tip it over and bang the control mechanism off the cylinder. I put the new control mechanism onto the base of the chair, the seat base of the chair, screw that on, and then put the -- remove the "J" bar from the -- from the back assembly and put the new "J" bar on and then screw the "J" bar with the back

Page 38

Q. And was such a mark on this chair?
A. I don't remember.
Q. Would it be fair to say that you don't know whether that chair had been -- or strike that.
Would it be fair to say that you don't know whether Texas Instruments had performed any modifications to that chair or repairs to that chair before Ms. King's accident?
MR. ESKEY: I object.
A. I don't know that.
Q. How do you adjust the back height on a Superior Centron chair?
A. There's a mechanism. It's kind of like a ratchet mechanism. It's made of an aluminum and plastic. And it allows you to sit in the chair; and while you sit in the chair, you can ratchet it up five or six notches. When you get to the top, it drops all the way back down and you can start again a notch at a time.
Q. So basically, you can adjust the back height on a Superior Centron by lifting up or pushing down on the back?
A. Lifting up only. You lift up a notch at a

Page 39

time till it gets to the height you want. If you go by it, you just go to the top, that releases it and it drops all the way down on its own. And then you start again a notch at a time till you get to the spot you like.
Q. Okay. So there's no knob on a Superior Centron chair that you would turn to adjust the back height. Correct?
A. No, there is not.
Q. Did you ever deal with a company called Izzy Design?
A. Yes.
Q. What year did you begin to have any dealings with Izzy Design?
A. I don't know exactly.
Q. Have you spoken to Mary Ann King since June of 2003?
A. Since the accident?
Q. Yes.
A. No.
Q. Has she made any effort to contact you?
MR. MURPHY: Objection.
A. Excuse me. And I should -- I should go back. I don't remember that. I may well have spoken

Page 40

with her because I know she came back there for a short period of time at TI, and I may have spoken with her at some point during that.
Q. Do you recall speaking to her about the accident?
A. No, I don't.
Q. The chair that we've been talking about that you repaired, did it appear to have been -- strike that.
Did anyone ever tell you, other than your attorney, where Ms. King -- or where that chair came from?
MR. ESKEY: I object.
Q. That's a poor question. Ms. King, I'll represent to you, testified that she had some problems with a previous chair and the one that was involved in her accident, whatever, wherever it was, was something that one of her supervisors obtained for her to use. Did anyone ever tell you that before this case was filed?
MR. ESKEY: I object.
MR. MURPHY: Objection. You may

Page 41

answer.
A. No.
Q. Do you have any knowledge as to where the chair involved in Ms. King's accident may have been obtained from by Texas Instruments?
A. Only from deposition I viewed this morning.
Q. Do you know what happened to that chair? Do you know where it is now?
A. I do not.
Q. Do you recall when you returned that chair, approximately, to Texas Instruments?
A. In terms of a date?
Q. Yes.
A. I don't.
Q. Can you give me an estimate in terms of once you picked it up and performed the repairs how long after that it would have been before you returned it to Texas Instruments?
A. The day after I picked it up, it would have been returned to them. It only takes a day for me to fix them.
Q. Okay. And what was done with it after that you don't know?
A. I don't.

Page 42

Q. The control on the Superior Centron, do you know who manufactures the control?
A. I don't.
Q. How many levers does that have on it?
MR. ESKEY: I object.
A. Three, I think.
Q. Do you know which side?
A. There's one on the left front that controls the sliding seat mechanism. There's one on the right front that's -- on the original design that was a tilt forward mechanism. There's one in the middle that adjusts the height of the chair.
Excuse me, there's four. There's one in the back on the -- there's three on the right side. The one in the back adjusts the tilt tension function -- excuse me, the tilt lock mechanism.
Q. Do you remember on the Miller Axis chairs, do you remember who manufactured the control on those chairs?
A. I don't.
Q. Do you remember how many levers that control had?

Page 43

A. I don't on that one.
Q. Do you remember how the back height adjustment was accomplished on the Miller Axis chair?
A. The same way as on the Superior Centron.
MR. STUBENVOLL: Let's take a quick break.
MR. MURPHY: Okay.
(Recess taken)
MR. STUBENVOLL: Just a couple more questions.
THE WITNESS: I think I misspoke in one of my answers.
MR. STUBENVOLL: Sure. Go ahead.
THE WITNESS: You at one point asked me if I had any knowledge that they ever repaired chairs. And in general, yes, they did repair some chairs at some point in time. It was after this accident, though, that I was aware of that.
MR. STUBENVOLL: Okay.
Q. I want to go back to this chair and the repairs you performed on it. And I just want to make sure I have this straight. You replaced the control that was on the chair

Page 44

with a different one.
A. Yes.
Q. Was it the same model control as the original?
A. Exactly? No.
Q. Okay. What was different about it?
A. There was a redesign done on the chair and so the paddles were slightly different. But I would -- and they -- they changed some of -- they changed -- they updated the functionality.
That lever on the front that I mentioned that had a tilt forward function was no longer on there. And they revised the tilt lock mechanism so that it locked better than in the previous design. As well, they needed to provide a new "J" bar because that "J" bar now attached to the control with four screws rather than two screws.
Q. Okay. You said that one of the levers was eliminated?
A. Yeah, there was -- there were four levers on the original design.
Q. And that was the control that was on Ms. King's chair?

Page 45

A. To my recollection.
Q. Okay.
A. The front lever on the right-hand side as you sit in the chair would allow the chair to tilt forward four or five degrees, I think. Some folks find that more comfortable. They eliminated that in the new design. That tilt forward was eliminated.
MR. STUBENVOLL: Pass the witness.
EXAMINATION BY MR. ESKEY:
Q. Mr. Drews, my name is Tim Eskey. I represent Mary Ann King. And I'll try not to go over the same areas that Mr. Stubenvoll has covered here, but I'll apologize in advance for a certain amount of overlap.
Now, you mentioned that there was an original design in your testimony. Was there a point in time at which you became aware that the design of the Superior chair had changed?
A. Yes.
Q. Okay. And what point in time was that?
A. I don't remember exactly.
Q. Okay. Now, the original design, what was the original design?