IN THE UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

MARY ANN KING and PHILLIP KING, )
Plaintiffs, )
vs. )
STAPLES, INC., IZZY DESIGN; JSJ ) No. 06-258-S
CORPORATION; JOHN DOE )
COMPANY, )
Defendants. )

The 30(b)(6) deposition of IZZY DESIGN by DANIEL VUKCEVICH, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before LISA O'BRIEN, CSR No. 84-3822, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 2170, 222 West Adams Street, Chicago, Illinois, on the 18th day of July, A.D. 2007, at 2:00 p.m.

EXHIBIT H

Page 18

Superior, were you reporting to Dan?
A. Yes.
Q. And then at Izzy, when you began at Izzy, who did you report to?
A. Initially I reported to Eric Johnson. I think that was less than six months.
Q. Okay. And then who did you report to after that?
A. Chuck Saylor.
Q. Can you spell his last name?
A. Yeah. S-a-y-l-o-r.
Q. Okay. And did that change?
A. No.
Q. At present you still report to Mr. Saylor?
A. Yes.
Q. And what's Mr. Saylor's job title?
A. President and founder of Izzy.
Q. So do I have this right, that you were one of the, sort of, first employees of Izzy when Izzy was formed and you went over to Izzy?
A. Yeah, I was among the first group.
Q. Okay. And at that time how many employees were there?

Page 19

A. When I probably -- I am guessing. There were probably five or six employees ahead of me.
Q. And now how many employees are there?
A. Now total, Izzy employs around 220 people.
Q. In 2003, how many employees, approximately, were there?
A. I would -- I am not sure what the corporate structure was in 2003. So I -- it may have been 200 -- well, between 150 to 200 or -- it still may have been the small core group.
Q. Okay. Now, if I were to ask you to draw an organizational chart for Izzy, is that something that you can describe for us?
A. Present day or at what time period?
Q. Start when Izzy began in about 2001, 2002.
A. I don't think I could do it for 2001. We -- no, I don't think I could.
Q. Okay. When Izzy started out, what were its operational divisions within Izzy, if you will?
A. Within -- when Izzy first started out, the operational divisions were the Belton site, the Spring Lake site.

Page 20

Q. Okay. And what functions were performed at each of those sites?
A. Each site had -- again, what time period, I guess?
Q. Pretty much when Izzy started.
A. When Izzy started? When Izzy first started, each site had customer service, quality, operations, purchasing, accounting, sales, marketing. I may be forgetting a few, but the traditional structure.
Q. Were there manufacturing or assembly divisions at either Belton or Spring Lake?
A. Yes. Sorry. When I say operations, I am referring to manufacturing. Both sites have manufacturing.
Q. Okay. And was there any relation to the operational facilities, the manufacturing facilities, in Belton and those of Superior?
A. We used the same building to manufacture Izzy branded furniture.
Q. And did you use the same production facilities and equipment?
A. Yes.
Q. Were the same personnel operating that

Page 21

equipment for both Izzy lines and Superior lines?
A. Yes.
Q. And is Superior still in existence?
A. I don't know the corporate structure of -- where Superior is. The Superior brand still exists.
Q. Okay. But in terms of the division itself, at a certain point did Izzy take over the production of chairs, the Superior line of chairs?
A. Yes. Izzy manufactures Superior branded chairs.
Q. Okay. And is it fair to say that since Izzy didn't exist until 2001, 2002, obviously, it wasn't manufacturing Superior branded chairs before that time, correct?
A. Yes.
Q. Okay. At what point in time did Izzy actually become responsible for manufacturing that line of chairs?
A. I am not sure when -- I am not sure. It would be between 2002 and 2004.
Q. Okay. What brands were manufactured in Spring Lake in 2002?
A. Counter Point brand. Counter Point.

Page 22

chair. I put it on the chair, you know, like as a means of transportation.
Q. Okay. And did you see any screws in the area?
A. There was two broken screws. The heads of the screws were off the chair. As a matter of fact, I think somebody -- I think she was looking for them. Pamela was looking for them. I don't know. I don't remember.
Q. When you say "two broken screws," where were those? Still in the chair or on the floor?
A. The broken screws were in the chair. The heads of the screws were gone as if they were sheared.
Q. So the screws were still in the base of the chair?
A. Right, the threaded portion of the screws were still in the chair.
Q. Okay.
A. Because, to my knowledge, the back of the chair was into the mechanism that controls for the tilt. And the two screws held the chair, the back of the chair to that mechanism.
And that's what let go, was that -- not the mechanism but the -- the mechanism may

Page 23

have let go first; and then when the chair -- when the back collapsed, it might have snapped the screws.
Q. But you don't know that?
A. I don't know that.
Q. All right. When you saw the chair --
A. It was sitting without a back.
Q. The J-bar was connected to the top of the chair or still to the base?
MR. ESKEY: Objection.
A. The back -- the rest and the J -- is that what they call it, the J-bar? That goes underneath and connects to that mechanism on the adjusting part of the chair and its two screws. Well, from there back was off the chair. Those two screws are what failed.
Q. Okay. So the screws themselves were still in the chair?
A. The broken portion was still in the chair. The heads were -- the half that broke was gone, off the chair.
Q. Okay. Did you ever find the screw heads?
A. Yes, we found the two screws. I had -- I had all four pieces after. I had the two screw

Page 24

tops and the two threaded portions, which I didn't save of course because what difference would it have made. But, I mean, I suppose it would have made a difference now.
But I just threw things away and then put new screws in. And the chair was whatever, wherever it went. It went the way of the other chairs.
Q. So when you took it, you brought it to your tool crib?
A. Mm-hmm.
Q. You put two new screws in?
A. Well, yeah, within a period of time. I don't know how long, but I didn't -- it wasn't -- it wasn't a priority to fix the chair. But I believe it was -- I believe I fixed it before anybody else looked at it.
Q. Okay. Did anybody ever ask you what you did with the chair?
A. Yeah, Dean Chapman, who was the head of Safety, he asked me and I just said, "Oh, I fixed it." And he says, "Oh." That really wasn't a big issue, I guess.
Q. Did Ed Picard ever talk to you about the

Page 25

chair?
A. I used to always talk to Dean because he was more involved with me than the other Safety people. He was always in my area because he was always coming over to check on equipment and machinery.
Because we had a tool room that was always in a -- it was always in a safety, you know, situation where people were getting hurt and stuff so they were constantly over there. So Dean was the one I dealt with.
I may have spoke to -- I don't know. I spoke to them all. You know, I spoke to everybody over there, but I don't recall if I spoke to him about the chair or not. I know Dean was -- I know Dean was interested, but he was always interested in safety issues.
Q. So would you say you repaired that chair within the first week?
A. I would say, yes.
Q. Okay. And then you put it back into Mary Ann's area?
A. No, I left it out in the hallway. I wheeled it out of my area and put it -- we had a

Page 30

A. This may be just industry specific, but our -- maybe our view of the market, but when we look at an executive chair, it will generally have a higher design; not necessarily more functionality. And it -- it may not necessarily be for a longer term sit.
Q. Okay. And what distinguishes a task chair from a guest chair?
A. A guest chair will generally be more rigid, like a four-legged chair, because you will occasionally sit down. You won't be there for eight hours. You will sit there for ten minutes. So the comfort model may not necessitate an eight-hour sit.
Q. Okay. And when did the Centron family of chairs first roll out in terms of production?
A. 1996.
Q. Okay. And that includes the task chair?
A. Yes.
Q. Now, at that time in 1996 -- I have just been referring to it as generically Superior -- but do you know precisely what Superior's corporate name was at that time?
A. I don't. And I am aware that there were

Page 31

a few -- there were other names, so I am not sure what it was in 1996.
Q. Okay. So for purposes of this deposition, we will just continue to refer to it generically as Superior.
A. Yes.
Q. Whatever it was called in 1996 or '97 or '98, if that name, indeed, changed -- and I don't know whether it did or not -- it's your understanding today that when I refer to Superior, it's generically referring to whatever entity was in existence --
A. Yes.
Q. -- at the time? Okay.
Now, when the Superior Centron task chair was first produced in 1996, is it your understanding that the back of the chair was connected to the chair by a J-bar?
A. Yes.
Q. Okay. And can you explain to us how the J-bar actually attaches to the chair?
A. Sure. The Centron specifically?
Q. Yes.
A. Okay. The steel J-bar, basically, is

Page 32

drilled and tapped with a hole. That steel J-bar is inserted into the control mechanism or the seat mechanism, and then two -- two bolts, screws, pass through the control mechanism into the threaded hole, into the steel J-bar, and that connects the J-bar to the seat mechanism.
Q. Okay. So in 1996, when the Superior Centron chair was first produced, the J-bar was designed so that the -- it would be attached to the chair by two screws?
A. Yes.
Q. Okay. And beginning in 1996, the Superior Centron task chair, beginning at that time, for that chair, users of Superior -- users of those chairs reported problems with loose backs; is that correct?
A. I'm not -- in 1996?
Q. Yes.
A. I'm not sure about the time frame. We did get some feedback of loose backs in the first few years. I'm not sure about 1996.
Q. Okay. At a certain point after 1996, Superior also learned that users were complaining of loose screws on Superior Centron task chairs,

Page 33

correct?
A. Looking back through our -- through our documents, I think the feedback was loose backs, and -- which may have attributed to the loose screws. But I think the feedback we were getting from customers was loose Centron backs.
Q. Okay. You referred to looking back over documents. What documents have you looked back over to prepare yourself for this deposition?
A. The same documents that we sent to you.
Q. Okay. And so I've got documents that are Bates stamped IZ, I think for Izzy, from 1 through -- I have this written down somewhere -- 2357. And they are all on the table here before me. Did you review all of these documents?
A. No, not in detail.
Q. Okay. Did you at least put your eyeballs on every single one of these pages, flipping through them?
A. No.
Q. Okay. What of these documents did you concentrate on, if any?
A. I looked over the engineering change notices, the -- what we call the QTS report, and the

Page 66

Q. Do you know of anyone?
A. A lot of the manufacturing personnel were there, and I believe Ken Ahlburg was there at the time, and a lot of the other support functions.
Q. Okay. Well, in September of '98, based on your review of the materials, in September '98 you would agree with me that a decision was made to change the design of the attachment of the J-bar to the chair, correct?
A. Yes.
Q. And the decision was made at that time to add a third screw, correct?
A. Yes.
Q. Okay. And in September of 1998, an engineering change notice was issued that specified beginning in February of 1999 that a third screw would be added to secure that J-bar to the chair, correct?
A. Yes.
Q. Okay. So --
A. I think all the dates you just said, I believe, are correct. It sounds like the right time frame.
Q. Okay. Subject to verification by the

Page 67

documents.
A. Okay.
Q. I believe I'm representing that correctly.
A. Okay. Yes.
MR. STUBENVOLL: I'll object, if you want.
BY MR. ESKEY:
Q. Now, in December of 1998, there was some testing that was done of the Superior Centron chairs with the third screw. Is that also correct?
A. In September there was testing done with the third screw?
Q. In December of '98.
A. Yes, I think I saw that.
Q. Okay. And at that time, with a third screw in it, the chair passed the durability test, correct?
A. Yes.
Q. Okay. Now, the durability test is one that is specified for compliance with ANSI and BIFMA requirements, correct?
A. Yes.
Q. There's a standard on durability of backs for office chairs, correct?

Page 68

A. Yes.
Q. And that standard specifies a certain number of cycles have to be done, a certain test has to be done to the back to ensure it is durable; is that right?
A. Yes.
Q. And there are other standards; ANSI standards and BIFMA standards as well?
A. There's one BIFMA standard, and within the BIFMA standard -- relative to seating.
Q. Right.
A. Within the BIFMA standard there's multiple clauses.
Q. Okay. And each of those clauses is a different aspect of the chair then that has to comply with -- or be -- hold up to certain tests, correct?
A. Yes.
Q. Now, that testing that was done on the Centron chair with the third screw, on the test -- in the test materials itself, it documented that it was for a TI field fix. Did you note that?
A. I saw that, yes.
Q. Okay. What significance, if any, did

Page 69

that notation have to you?
A. Related to what I had understood about TI reporting problems with loose backs, I assume that that TI field fix was a reference to the third screw to fix the loose backs.
Q. Okay. So is it fair to say that at least before December of 1998, that Texas Instruments was reporting problems with loose backs and, ultimately, that resulted in testing with a third screw, correct?
MR. STUBENVOLL: I object, form, foundation.
BY THE WITNESS:
A. Based on my understanding, probably, yes.
BY MR. ESKEY:
Q. Okay. Do you have any understanding of when Texas Instruments first began to report problems with the loose backs?
A. I don't.
Q. And do you know if any other customers, other than Texas Instruments, before 1998, were reporting problems with loose backs before December -- strike that. Let me start again.
Before December of 1998, do you know if there were any other customers than Texas

Page 70

Instruments who were reporting problems with loose backs with Centron chairs?
A. I don't know.
Q. Who within Izzy, JSJ or Superior today would know that?
A. I don't believe anybody is with the company anymore that would know that.
Q. How about Ken Ahlburg? Would he know?
A. At the time he was in a sales capacity. So he was not -- he wasn't involved in -- in any of this. But he might, but I don't believe so.
Q. Are there any documents or records that you are aware of that would record complaints of problems with the Centron chairs before September of 1998?
MR. STUBENVOLL: Form, foundation.
BY THE WITNESS:
A. I'm not sure when QTS was implemented, but my understanding is QTS would do that if it -- if it was in existence at the time.
BY MR. ESKEY:
Q. And before the QTS system, you are not aware of any way in which complaints were documented?

Page 71

A. No formal way, that I'm aware.
Q. Did you inquire as to -- before the deposition today, did you inquire as to the method by which complaints or problems were recorded before the QTS system came into place?
A. I didn't.
Q. Now, on December 29th of 1998, a temporary change was made to add a third screw, together with a washer to attach the J-bar to the chair, correct?
A. Yes, I saw that.
Q. Okay. And this temporary fix was ultimately discontinued in May 2000, correct?
A. Yes, I believe so.
Q. Okay. Now, in May of 2000, was the Centron chair redesigned so that there was a permanent solution to the attachment of the J-bar to the chair that had a third screw involved?
A. From my understanding of the documents, it looks like the third screw without the washer was what went on the chair in May of 2000 -- or, sorry, May of -- was that '97? Was that '98?
Q. I said May of 2000.
A. I'm sorry.

Page 72

Q. That was in my question, but I don't mean to imply if you have a different date in mind.
A. No, I'm sorry. Could you repeat the question?
Q. Okay. So when the temporary fix was discontinued in May of 2000, was that because it was a permanent third screw solution, to your knowledge?
A. Yes.
Q. Okay. And how was the third screw solution in May of 2000 different than what was pre-existing from the end of '98 through 2000?
MR. STUBENVOLL: Form, foundation.
BY MR. ESKEY:
Q. In other words, what was the difference between the temporary and the permanent third screw solution?
A. From reading the ECNs, I thought that the, what you were referring to as the permanent third screw solution was actually done in, I believe, in '98, so that the temporary fix you are referring to was on a smaller time period than that.
Q. Okay.
A. I may have read that -- I may have read the dates incorrectly, but --

Page 73

Q. Okay. But at any rate, you would agree with me that from December 29th of 1998, there was a temporary third screw solution?
A. Yes.
Q. And that involved a washer?
A. Yes.
Q. And at a certain point after that, then a permanent fix came in --
A. Yes.
Q. -- in which there was a third screw, but no washer, correct?
A. Yes.
MR. STUBENVOLL: I will just object to the form. The documents with respect to dates and time will speak for themselves.
MR. ESKEY: Right.
BY MR. ESKEY:
Q. Okay. But at least that's your understanding?
A. Yes.
Q. Okay. Now, in September or October of 2000, a letter and a product bulletin were sent by certified mail to customers notifying them of problems with loose screws attaching the J-bars to

Page 74

chairs, correct?
A. Yes.
Q. Now -- and that letter was actually dated September 29, 2000, and came from Ken Ahlburg, right?
A. Right.
Q. Okay. And the problem notification letter, if I can refer to it in that way, reported that the loose screw problem concerned Centron chairs that were manufactured before December 29th of 1998, correct?
A. Yes.
Q. Okay.
MS. MICHELS: Do you have a Bates stamp number for that letter?
MR. ESKEY: There are a few of them. There's one at 1843.
BY MR. ESKEY:
Q. Now --
MR. STUBENVOLL: Just for the record, we should probably mark not only that one but the other two documents. On a break we can clear that up.
MR. ESKEY: I may ultimately, depending on how much we go through, mark or at least agree -- I

Page 75

mean, we all have copies of these documents. They have all been Bates stamped. Whether we mark or agree to, you know, mark the entire set as an exhibit or mark them individually, we can talk about at a break.
MR. STUBENVOLL: Okay. We've been going for about an hour and a half.
MR. ESKEY: Sure. You want to take a quick break?
(WHEREUPON, a recess was had.)
BY MR. ESKEY:
Q. Sir, we were talking about the problem notification letter that went out in late September, early October of 2000, correct?
A. Yes.
Q. All right. Now, did you have any role in the process of notification at that time?
A. I recall being involved in discussions at the time Fritz Myer was president, Dan Buchweitz was the vice president, and I know we all discussed the letter and knew it was happening.
Q. Okay. So Fritz Myer you mentioned, he was president of what, Superior?
A. Superior.

Page 76

Q. Okay. And you mentioned also Buchweitz. What was his name?
A. Dan Buchweitz.
Q. Dan Buchweitz. He was vice president of Superior?
A. Yes.
Q. Vice president of what?
A. I believe he was VP of operations.
Q. Okay. And where are those individuals now, today?
A. Unfortunately, Fritz Myer passed away in 2002, I think. And I'm not -- Dan Buchweitz, I don't know where he is. I had heard he was in North Carolina, but I am not sure.
Q. Okay.
A. I haven't talked to him in a few years.
Q. All right. So what was your role in the discussions at that time?
A. I would say listening and learning. I'm not sure I was adding much value.
Q. How about Donna Caswell? Was she there?
A. She was the customer service manager.
Q. And is she still with the company?
A. She is.

Page 77

Q. I am going to have to ask you which company she's with. Is she with Izzy Design now?
A. She is.
Q. And what about Diana Gonzales?
A. I'm not sure if Diana is still with us or not. I seem to recollect that she -- she's no longer in customer service, but she may be a manufacturing person now.
Q. Okay. But in September of 2000 she was in customer service, to your recollection?
A. Yes, I believe that's right. She was -- when I was referring to the technical customer service person earlier --
Q. Yes.
A. -- she was that person.
Q. So she would have knowledge about the quality system and notifications of problems with loose backs?
A. Yes.
Q. Okay. Now I'm going to show you what's been Bates stamped as page 1885. It's an e-mail. I just ask you to have a look at that. Read it to yourself.
A. Okay.

Page 170

yourself familiar with the general functionality of the control on the Centron from the time it was introduced in 1996 up through 2003?
A. Yes.
Q. You worked at the Superior facility while you were a JSJ employee, right?
A. Yes.
Q. And you worked for Superior Furniture for sometime?
A. Yes.
Q. And at least in preparation for this deposition, you've reviewed the engineering change notice and other documents relating to the Centron?
A. Yes.
Q. Based upon your knowledge, did the Centron chair -- strike that.
How do you adjust, from the beginning it came into being up until the end of 2003, how do you adjust the height on a Centron chair?
A. The back height adjuster, it's called the touch lift.
Q. And we should differentiate -- let me stop you there. Let's start with the height of the back.

Page 171

A. Okay.
Q. Do you adjust the height of the back differently than you adjust the height of the cylinder?
A. Yes.
Q. Okay. How do you adjust the height of the back on a Centron?
A. The height of the back, you just -- you, basically, ratchet the back, similar to these chairs. You ratchet the back up. And when it gets to the top position, you let it go, and it free falls to the bottom again.
Q. Is there any type of knob that's used to adjust the height on the Centron chair?
A. No.
Q. Has there ever been?
A. No.
Q. How do you adjust the height of the cylinder; the height at which you are sitting on a Centron?
A. The right paddle you pull up on and release your weight, and the chair raises. And then when you want to go down, you pull up on the cylinder and sit on the chair.

Page 172

Q. Are there any levers -- have there ever been any levers on a Centron that you push in and turn to lock in or lock out?
A. Push in and turn, no.
Q. We talked earlier -- and I think this is fairly clear from the questioning -- but in terms -- you have referred to divisions of JSJ.
As you sit here today, do you know technically what the corporate structure is?
A. No.
Q. You said earlier, I believe, that you thought, at least in the '70s or before the late '80s, Superior Chair, whatever the entity was, was owned by one Texas family.
A. I probably did say one family. I'm not sure if that's right or not.
MR. STUBENVOLL: That's it.
FURTHER EXAMINATION
BY MR. ESKEY:
Q. I just have one follow-up.
Mr. Stubenvoll was asking you about the control mechanisms on the Superior Centron chairs. Do you remember that?
A. Yes.

Page 173

Q. Okay. Is there a mechanism whereby you can tilt back in the chair and lock it in a tilt-back position?
A. Yes. This mechanism you can -- you can lock it -- you can recline and lock it.
Q. Okay. And you can also -- is there another mechanism whereby then you can put it in the upright position again and lock it in the upright position?
A. Yes. The left paddle, you flip the paddle to lock it in different positions.
MR. ESKEY: Okay. I don't have any further questions.
MR. STUBENVOLL: Thanks. Reserve.
FURTHER DEPONENT SAITH NOT.