UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

MARY ANN KING
and PHILLIP KING

VS. C.A. NO. 06-258 S

STAPLES, INC.; IZZY DESIGNS;
JSJ CORPORATION; JOHN DOE
COMPANY

DEPOSITION OF NATALIA MENDES, a Witness in the above-entitled cause, taken on behalf of the Defendant, before Jeanne M.S. Derham, RMR, Approved Reporter in and for the State of Rhode Island, at the offices of Hanson Curran LLP, 146 Westminster Street, Providence, Rhode Island on March 20, 2007, at 4:55 p.m.

APPEARANCES:

DeLuca & Weizenbaum, Ltd.
BY: MICHAEL T. ESKEY, ESQ.
Counsel for the Plaintiff

Hanson, Curran LLP
BY: JAMES T. MURPHY, ESQ.
Counsel for Defendant Staples, Inc.

Zizik, Powers, O'Connell, Spaulding & Lamontagne, P.C.
BY: DONNA M. LAMONTAGNE, ESQ.
Counsel for Defendant Izzy Designs

REPORTING ASSOCIATES
SHORTHAND REPORTERS
10 DORRANCE STREET
PROVIDENCE, RI 02903

EXHIBIT
tabbies
J

776e3936-9895-4b9f-a543-445ff1a1bf9a

Q. Do you know who worked on the other two shifts?
A. I don't.
Q. Now, so there would be three shifts all together?
A. Right, but I don't know if that was in 2003. At one point there was three shifts. In 2003 it might have been just first shift, maybe first and second because I had to reduce gradually. It went from three to one.
Q. Was this because of --
A. Layoffs and --
Q. -- because of the impending sale?
A. At that point we didn't know it was going to be sold. It was because of reduction in the manufacturing and we moved manufacturing overseas so there was no need to have so many parts, therefore the need to reduce the people.
Q. But at some point or another there were three shifts and then it was two shifts and finally one shift?
A. One, yes.
Q. And those folks working the other shift or shifts would use the same chairs, the same



table, the same computer?
A. Correct.
Q. From time to time would you be involved in investigations of accidents in the work place?
A. If it happened under my organization, yes.
Q. Did you have an organizational chart for your organization?
A. Yes.
Q. Do you still have a copy of that?
A. It's been changed so much.
Q. With respect to your duties, did your duties include the ordering or the oversight of ordering of office equipment?
A. Yes.
Q. Now, with respect to the building 12 where Mary Ann worked in the crib, who was responsible for ordering the chairs, for example, for that department?
A. All the chairs were ordered through purchasing which is my other organization that I also was responsible for in coordination with our Safety Department.
Q. Who was in charge of the Safety Department in June of 2003?



A. I believe it was Al Brown.
Q. He does not work for Sensata, I understand?
A. That's correct.
Q. Was he one of the laid off people?
A. No. He actually quit. Well, he found another job so he left.
Q. Do you know whether or not at certain times during the course of your employment at Texas Instruments, supplies, office supplies such as chairs and tables, came through a Texas Instruments system in Texas to arrive at its various facilities such as Attleboro?
MR. ESKEY: Objection.
A. I don't know where they came from but I know they were delivered.
Q. You don't know where they came from?
A. No.
Q. Do you know whether or not Staples always delivered office equipment to Attleboro during the 20 or so years that you worked at Texas Instruments?
MR. ESKEY: Objection.
A. I believe they did.
Q. What do you base that belief on?
A. Because they were the supplier we engaged



with to buy those types of items.
Q. Do you know when Staples was first engaged to supply those types of items?
A. No, I don't. It was before my -- before I took over the position.
Q. You took over that position when?
A. As Purchasing Manager in 2000.
Q. Do you know if there were any records maintained during the Texas Instrument days while you were there showing when that transition or when Staples began supplying those things?
A. I don't know.
Q. Do you know if there are any records at Sensata that go back to the Texas Instruments days of supplying or requisitioning office equipment?
A. No, there are none. I know, because we went into Oracle and we lost all those records.
Q. Can you tell us what Oracle is?
A. ERP system, Enterprise something system. It's where we order our stuff.
Q. So you know that from at least 2000 until the transition to Sensata, you got your office equipment through Staples?



776e3936-9895-4b9f-a543-445ff1a1bf9a

Page 18

A. Correct.
Q. You don't know precisely what happened before 2000?
A. Nope.
Q. Do you know a man named Jim Drews?
A. Yes, I do.
Q. When's the last time you saw him?
A. I see him every week.
Q. Why is that?
A. Because he is our sales account rep.
Q. Do you remember when you first met him?
A. I first met Jim when he was part of MacIsaac I believe which is a company that Staples acquired so that was a long time ago.
Q. At one point he worked for MacIsaac and then Staples bought MacIsaac?
A. Correct.
Q. So you got Jim Drews as the Staple guy after that?
A. Yes.
Q. Ed Picard, do you know a man named Ed Picard?
A. Yes. He was my supervisor.
Q. Does he still work at Sensata?
A. No, he retired.
Q. Do you know where he lives these days?

Page 19

A. No, I don't.
Q. Kevin White, does that name ring a bill?
A. Kevin I believe was another person that worked another shift, yes.
Q. Another shift but in the crib?
A. Yes.
Q. Does he still work at Sensata?
A. No.
Q. Do you know what happened to him?
A. No.
Q. Do you know if he got another job or retired?
A. I hope he got another job but --
Q. You don't know what it is?
A. No.
Q. I take it -- I could be wrong but I'm going to ask you, did you play any role in the selection of what chairs would be in work places such as the crib?
A. No.
Q. That was a decision made by somebody else?
A. Yes.
Q. Do you know personally who made those decisions?
A. I personally don't know.
Q. I'm talking about back in the Texas

Page 20

Instruments days.
A. Correct.
Q. Now, you're aware I take it that in June of 2003 Mary Ann King had an incident or accident with a chair in her work place at Texas Instruments?
A. Yes.
Q. When did you first learn of that accident?
A. I'd have to say right away.
Q. Why do you say that?
A. Because they are instructed to notify the supervisor right away when something like that happens. Maybe she didn't notify me directly. They notified Ed Picard which was her immediate supervisor and then he notified me, but we were notified right away.
Q. Do you recall precisely who notified you?
A. Either Mary Ann or Ed. That's the only two people that could have done it. I don't recall which one.
Q. With respect to Mary Ann and you, where does that fit into the --
A. She didn't report directly to me. She reported to Ed Picard which was my supervisor and he had responsibility for overseeing a

Page 21

few people and he reported to me.
Q. Did you speak with Mary Ann after her accident?
A. Several times.
Q. Did you ever see the chair after the accident?
A. I believe I saw it once.
Q. When you saw it, do you remember where it was?
A. It was still in her office.
Q. In the crib?
A. In the crib, yes.
Q. In the cubicle?
A. Correct.
Q. Can you describe that chair, what it looked like when you saw it?
A. You've got to be kidding. I know that the back was off. That's why we were saving the chair.
Q. Okay.
A. And it was in the corner, but that's all I remember.
Q. Was the back completely off?
A. I believe it was, yes.
Q. And Ms. Mendes, this may sound like a really

Page 22

difficult question, do you know where that
chair is today?
A. No.
Q. Do you know where it might be? Do you have
any idea where it might be?
A. Somewhere in the trash but God knows where.
With all the downsizing we did, I have no
idea.
Q. For all you know, it was thrown away but you
don't even know that; is that fair to say?
A. No.
Q. It's just gone?
A. Gone.
Q. You mentioned you spoke with Mary Ann King
several times after this incident. Why was
that?
A. We have a very good relationship and as an
employer I felt like I had to check on her
when she was out so we kept in touch when she
was out, having surgery or treatment or
whatever it was.
Q. Did she ever come back to work at all after
that accident?
A. She did for -- for a short period of time
because then I had to lay her off. That's

Page 23

the time we were downsizing. She fell into
the category that --
Q. Of the layoff?
A. The layoff.
Q. What was the category, how did that work as
to who got laid off and who didn't get laid
off?
A. There was a criteria we had to follow and she
fell into that criteria. It was seniority.
It was performance. It was absenteeism. It
was different things that we had to look at.
Q. You'd go through those checks and balances
and make a determination that this person
would or would not be laid off?
A. Correct.
Q. She was in the layoff category?
A. Correct.
Q. About what percentage of the people at the
Texas Instruments facility were laid off as a
result of the --
A. I don't know the percentage but I can tell
you in my organization I had to lay off 20
people in two years.
Q. 20 people out of how many?
A. 30.

Page 24

Q. Two thirds of your work force you had to lay
off?
A. Correct.
Q. It must not have been a pleasant job.
A. No, it was not. Some of them with 45 years
of seniority.
MR. MURPHY: I'm going to show you --
mark this as Exhibit A.
(Photocopy of pictures of two chairs
were received in evidence as Defendant's
Exhibit for identification.)
Q. I'm going to hand you what's been marked as
Exhibit A. As you can see, it has pictures
of two chairs. Do you see that?
A. Yes.
Q. Do either of those chairs look at all like
the chair that Mrs. King was sitting in when
she was hurt?
MR. ESKEY: Objection.
A. I don't remember.
Q. You don't know?
A. By looking at them, I can't tell you.
Q. You can't tell me whether it was the one on
the left, the one on the right, or either of
them or both of them?
A. Either one. No, I don't.

Page 25

Q. Do you know what type of chair it was from
any descriptive standpoint?
A. No. I heard it was a Superior chair. That
is all I heard.
Q. From whom did you hear that?
A. I believe from Jim Drews and Al Brown.
Q. At some point an 8D incident investigation
was conducted.
A. Correct.
Q. Let me ask you, Ms. Mendes. What is an 8D
investigation?
A. Since that was the only one I've done in 28
years, I should remember but it's a process
that our Safety Department makes us go
through when there is some type of incident.
Q. Did you ever receive any training on how to
conduct an 8D investigation?
A. No, because I didn't have to.
Q. Was there a manual or was there some booklet
or guide book to tell you how to do this?
A. For the people that do it, which was the
Safety Department, I'm sure they do have it.
I don't have any knowledge of it.
Q. But an 8D investigation was done with respect
to Mary Ann King's incident?


776e3936-9895-4b9f-a543-445ff1a1bf9a

Page 30

of explained how this investigation would be done?
A. Correct.
Q. When you were involved in the meetings, the meetings you were at, do you remember what your role was, what you actually did?
A. Listen.
Q. That's what you did?
A. Pretty much.
Q. Did you take any notes?
A. No.
Q. You just sort of sat there and observed but didn't take an active role?
A. Correct.
Q. There's a note on the second page in the full paragraph about four -- three lines down. It says, "We found that someone from the manufacturing area had removed the chair from the area and attempted to repair it." Do you know who that was?
MR. ESKEY: Objection.
A. No.
Q. Do you know where it was removed to?
A. Nope.
Q. It then says that it was immediately placed

Page 31

in a secure location inside the storeroom with yellow caution tape. Do you know where that storeroom is?
A. I believe it was in the same place where they used to work.
Q. In the crib?
A. Right, in the crib.
Q. And a sign was posted on it. Did you ever see that sign?
A. I don't recall.
Q. Who was doing the follow-up after these meetings, was it principally Al who was doing that?
MR. ESKEY: Objection.
A. That was Al.
Q. So if somebody was looking for screws or trying to find out what needed to be done, he was sort of doing that?
A. Taking the lead, yes.
Q. There's on the next paragraph down it mentions John, I guess it would be John Elliott, had asked the team had Mary Ann ever informed the supervisor she was in need of a chair. Do you see that line? Then Ed indicated she had about six months to a year

Page 32

but shortly thereafter informed him she had located a chair on site. Do you see that?
A. Yes.
Q. Do you have any personal knowledge as to where on site she located that chair or how she came by the chair?
MR. ESKEY: Objection.
A. No idea.
Q. You don't know. Under this it says, "Al will take pictures of the area/chair." Do you see that?
A. Yes.
Q. Did you ever see any pictures of the area or the chair?
A. I don't remember.
Q. You don't recall whether they actually did take the pictures or not?
A. No, I don't.
Q. To your knowledge, you can't specifically remember actually seeing the photographs of the chair?
A. No.
Q. Next item says, "Al will have a new newsletter article put out explaining the chair procedures." Do you see that?

Page 33

A. Yes.
Q. Did you ever see the newsletter?
A. Yes, that was done.
Q. How was that distributed?
A. I believe it was in a news bulletin.
Q. By e-mail or --
A. Right. We have a news bulletin that goes out every day with different subjects.
Q. Does that go out over the computer?
A. Right.
MR. MURPHY: I'm going to mark this item as exhibit C.
(News bulletin was received in evidence as Defendant's Exhibit C for identification.)
Q. My question to you, Ms. Mendes, take a look at it, several pages, is this the news bulletin?
A. I remember this part, the second page.
Q. You remember the second page. Why do you remember that?
A. Because I think I thought it was funny.
Q. The pictures?
A. Yes.
Q. So you actually saw the news bulletin?
A. Yes.


776e3936-9895-4b9f-a543-445ff1a1bf9a