IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

C.A. NO. 06-258 S

MARY ANN KING
and PHILLIP KING,

Vs.

STAPLES, INC., IZZY DESIGNS;
JSJ CORPORATION;
JOHN DOE COMPANY,

---

DEPOSITION of ALAN E. BROWN, JR., taken on behalf of the Defendant, Staples, Inc., pursuant to the Federal Rules of Civil Procedure, before Kristen M. Bengtson, RPR, Notary Public in and for the State of Rhode Island, at the offices of: Hanson Curran LLP, 146 Westminster Street, Providence, Rhode Island, on Monday, May 21, 2007, at 4:30 p.m.

APPEARANCES:

DeLuca & Weizenbaum, Ltd.
BY: MICHAEL T. ESKEY, ESQUIRE
Counsel for the Plaintiffs

Hanson Curran LLP
BY: JAMES T. MURPHY, ESQUIRE
Counsel for Staples, Inc.

Zizik, Powers, O'Connell, Spaulding & Lamontagne, P.C.
BY: DONNA M. LAMONTAGNE, ESQUIRE
Counsel for Izzy Designs and JSJ Corporation

REPORTING ASSOCIATES
Shorthand Reporters
10 Dorrance Street
Providence, RI 02903
(401) 351-1660

EXHIBIT K

a1ec4f1

Page 22

time, on the index of the Incident Investigation Procedure, it actually identifies these different steps as Step D1, and Step D2; is that correct?
A. Correct.
Q. And it provides references to pages that describe precisely what to do?
A. Correct.
Q. Okay. And there's a New York Times rule that's listed on page one of Exhibit A. Was that your idea or is that Ford Motor Company's?
A. Not specifically my idea.
Q. It is?
A. No, not specifically.
Q. But you would agree when you write something, it could become a public document so you want to be sure that it's clear what you're talking about?
A. That it's factual, yes.
Q. So it was your goal in conducting or in helping this investigation to make sure that it was factual, fact driven and clearly explained?
A. Correct.
Q. Okay. Rather than having opinions and guesses filter into it; is that right?
A. Correct.
Q. Because your goal was to find the root cause of

Page 23

what happened with this chair and this lady, correct?
A. Correct.
Q. So it wouldn't happen again?
A. Correct.
Q. On page two of Exhibit C, still -- I think we're still on the first meeting of the 10th of June?
A. Yes.
Q. It mentions in the first full paragraph that the meeting continued with Al and Ed explaining to the rest of the team that Al, Ed and myself went to the location of the incident on Thursday, June 5, 2003, to do an initial assessment of the situation?
A. Correct.
Q. Now, the myself, would that have been Yolanda Robinson, the recorder, or some other person, if you know?
A. My best recollection is it was Natalia Mendes.
Q. And Ed would be Ed Picard?
A. Yes.
Q. And the location of the incident was where, if you recall?
A. It was in the Building 12 tool crib, second floor.
Q. All right. In there, it says on the next

Page 24

sentence, "We found --" and, by the way, if I read anything incorrectly, let me know, okay? The next sentence says that "We found that someone from the manufacturing area had removed the chair from the area and attempted to repair it." Do you see that? This second sentence, that first full paragraph of page two. It would be right there.
A. Correct.
Q. My question to you, Mr. Brown, is do you know who that someone was who had removed the chair?
MR. ESKEY: I object.
A. I do not recall.
Q. You don't know who it is?
A. (The deponent shook head.)
Q. All right. Do you know what attempts, if any, had been made to repair it?
A. I don't recall it being repaired.
Q. Okay. Do you recall the source of the information that's set forth in this report that we found that someone from the manufacturing area had removed the chair?
A. I believe it was discussed. I don't know that we found the chair repaired.
Q. But did you find the chair?
A. Yes. It was on the outside of the crib with some

Page 25

equipment that was staged to be removed from the building.
Q. So it was outside of the crib, which is a room essentially?
A. It was a caged-in area, yes, yeah.
Q. Was it in a hallway?
A. Yes.
Q. How did you find it, how was it found?
A. We were looking for it. We knew it was out of there, and the people had removed it from the area.
Q. And it was going to be discarded otherwise?
A. Yes.
Q. And it goes on to say in the minutes that the chair was immediately placed in a secure location inside the store room with yellow caution tape around it?
A. Correct.
Q. So was it put back in the crib?
A. Yes, it was.
Q. Do you recall where in the crib it was put?
A. It was a very small area. I don't recall exactly where it was.
Q. And the yellow caution tape, is this the kind of thing you see at --



a1ec4f19-6446-4065-83d0-69f56bd15152

Page 26

A. Yes.
Q. -- an accident scene or a police scene?
A. Yes, it is.
Q. And it says a sign was posted indicating that the chair was broken and not to be used?
A. Correct.
Q. Do you know who made the sign?
A. I believe I did.
Q. It was just on a piece of cardboard, for example, is that what it was?
A. I think I did it in Power Point.
Q. So it was a piece of paper?
A. Yes.
Q. Then it goes on to say, "In looking at the chair, it was found that the seat of the chair would move freely and would not stay in the locked position." Do you see that language?
A. Correct, yes.
Q. Did you look at the chair?
A. Yes, I did.
Q. Is that what you found?
A. Yes.
Q. Can you explain what you mean by it would move freely and not stay in a locked position?
A. The seat pan would adjust with the back of that

Page 27

chair would go into a free motion where you could lean back in it, and the seat pan would tilt and the back of the chair would tilt and then you could lock it into a position. And it was intended to stay there, the design was for it to stay there, but it would slip forward.
Q. Now, seat pan, is that the part that I sit on?
A. Yes.
Q. My butt is sitting on?
A. Yes.
Q. That's the seat pan, okay. So you found that it would not stay in the locked position?
A. Yes.
Q. But it would move forward.
A. It was at rest in a forward, I believe.
Q. At that time when you first saw the chair, was the back still on the chair?
A. I don't believe so.
Q. All right. Where was the back?
A. It was with the chair.
Q. With it but not --
A. I don't recall it being on it.
Q. I'm not going to ask you to guess.
A. No, I don't recall it being on it.
Q. It also goes on to say in the next sentence, "We

Page 28

also noticed that several screws were missing." Did you notice that screws were missing?
A. We couldn't locate the screws.
Q. Could you locate places where screws, you felt, should have been but weren't?
A. Yes.
Q. Can you tell me where those locations were.
A. We had looked at another chair, we had looked at a similar chair, the same model, and saw the two screws were in. I believe we found one screw on the floor.
Q. Do you know if it was to that chair or not?
A. It was the same type of screw that was in the chair.
Q. Sometimes we belabor things and we miss the obvious, but the chair that you were looking at that you had this yellow caution tape put around, what kind of chair was that?
A. Superior Centron.
Q. And the chair that you looked at for comparison was another Superior Centron?
A. Yes, it was.
Q. Do you recall what color this chair was that you were concerned with?
A. No, I don't.

Page 29

Q. It goes on to say that "Pam indicated that on today, June 10th, she had located one of the screws on the floor near the computer stand." This is Pam McGee, I take it?
A. Yes.
Q. Did you look at, did you see this, any screw or screws that she --
A. That one screw, yes.
Q. Were you able to determine what it went to?
A. That's the one I was just speaking about that we, looked like the screw that was in the Superior Centron.
Q. Did you attempt to put it back in the chair?
A. No, I didn't.
Q. But it looked similar to it?
A. Yes.
Q. Where on the -- and this is near the computer stand?
A. Yes.
Q. Would this be the computer stand where Mary Ann King worked?
A. Yeah. That was the only computer stand in that area, that I recall.
Q. There's another sentence here, it says, "Ed informed the team that he would retrieve the screw


a1ec4f19-6446-4065-83d0-69f56bd15152

from the store room and provide it to Al for him to try and determine if it was the original manufacturer's screw." Do you see that?
A. Yes.
Q. Did you try to do that?
A. Yes, that's right.
Q. Were you able to determine if it was, in fact?
A. Couldn't tell if it was the original manufacturer's. It looked similar to the screw that was in the other Superior chair.
Q. Now, these hex, not hex -- are these Phillips head screws or slot screws or something else?
A. I believe it's a hex head screw. I'm not sure.
Q. The next sentence, Mr. Brown, I'm going to ask you about specifically says, "Al informed the group that based on the information that he was able to retrieve from the chair, it was manufactured in 1996." Do you see that?
A. Yes.
Q. Did you, in fact, retrieve information from the chair that assisted you in dating its manufacture?
A. With Jim Drews, yes.
Q. You had his assistance?
A. Yes.
Q. Where was this information that you retrieved from



the chair? Where was it located on the chair?
A. It was under the chair, under the seat pan, I believe.
Q. How were you able to determine that it was 1996?
A. Jim gave me that information as I recall, Jim Drews.
Q. Was there a code, was there sort of a code that was on this? Was it a label -- strike that.
A. I believe Jim, Jim knew the system of marking what was familiar with it and said that he was able to.
Q. To date it?
A. Yes.
Q. Did you see the label yourself?
A. I believe I did, but I don't recall specifically now where I'd say yes, I did.
Q. Can you describe the label for us.
A. I can't specifically describe that label.
Q. Were you familiar with that type of label on chairs?
A. Yes, I've looked at many chairs from adjusting chairs and measuring people for chairs and testing chairs.
Q. Are you familiar with what's known as a T code?
A. Not by that name, no.
Q. Are you familiar with any type of coding for



determining from where chairs come and when they're made and data concerning chairs?
A. Jim explained the coding to me briefly as he was going through it, but it's not something that I held onto.
Q. Can you recall what he told you about the coding?
A. He told me that he could take, get the date of manufacture out of it.
Q. And he related back to you that this was a 1996 manufactured chair?
A. Yes.
Q. Were you able to determine when the chair was shipped to the Attleboro Sensors division of Textron?
A. No. Texas Instruments.
Q. Texas Instruments. I'm sorry.
A. No.
Q. Were you yourself personally able to determine from where this chair was shipped?
A. No.
Q. So you don't know where it came from?
A. No, I do not.
Q. You just know it was a Superior Centron chair?
A. Yes.
Q. Based on what you learned from Mr. Drews, you



understand it was manufactured in 1996?
A. Correct.
Q. There's some language in the next paragraph about John. Do you see, "John asked the team had Mary Ann ever..."?
A. Yes.
Q. Were you present during any of these discussions where other --
A. Discussing John?
Q. Yeah. Where it says, "John asked" and "Ed indicated."
A. Yes, that was during the meeting.
Q. So you were present to hear these things?
A. Yes.
Q. Is there anything about the -- Well, strike that. I'm maybe getting ahead of ourselves here.
Was it your understanding, Mr. Brown, that when Mary Ann first began using the chair, it had already been used somewhere else at Texas Instruments?
A. As part of this process, yes, that's what I understood.
Q. Okay. So she had gotten it, but it came from -- it wasn't a brand new chair?
A. No.

some other entity, through some other system; do you know?
A. I don't know.
Q. You don't know.
MR. ESKEY: I object.
Q. You yourself don't know where this chair actually came from originally?
A. No, I do not.
Q. But Al, meaning yourself, and Jim Drews did go to the location of the incident to look at the chair?
A. Yes.
Q. And you were able to determine with him, I take it, that the seat panel was broken; is that correct?
A. Yes.
Q. And that the spring for the back panel was out of adjustment?
A. Yes.
Q. And "As loose as possible," it says here. What does that mean?
A. I didn't write the minutes.
Q. Okay, okay. That's not your word, those aren't your words?
A. None of these are my words. This is all from the recorder and the team champion putting things



together.
Q. But you would agree that it was loose?
A. Yes, it was loose.
Q. And it says here, "He," Jim, "did not know the life of the chair but agreed to go back to the manufacturer, Superior, and get paperwork on how to take care of them"?
A. Yes.
Q. Did he do that?
A. Yes, he did.
Q. It goes on to say that "With each chair, the manufacturer provides an information card about the chair under each seat panel." Is that your understanding?
A. Yes, as explained to me by Jim Drews.
Q. But in this case, there was no paper card under the chair; it had been removed at some point?
MR. ESKEY: I object.
A. I don't know.
Q. Okay. Well, I'll read you what it says. It says, "But in this case, the paper card had been removed." Do you see that?
A. Yes.
Q. Was that your understanding, that with respect to Mary Ann's chair, at some point before you saw it,



the card had been removed?
A. The card was not there.
Q. Okay. So it wasn't there?
A. When I was there.
Q. And you don't know when it --
A. The card was not there when I was there.
Q. You don't know if it was ever there, but at least when you looked at it, it wasn't there; is that fair to say?
A. Yeah. As I remember it right now, yes.
Q. Then it goes on to indicate here, as you said, that they had been using two screws and had since changed the policy to include three and they were willing to provide those screws to Texas Instruments?
A. Yes.
Q. Did you yourself make any adjustments to any chairs at Texas Instruments after this?
A. Adjustments?
Q. Yes, putting in screws or --
A. No.
Q. -- doing any repairs?
A. No, I didn't.
Q. The next page, it goes on to say that "Jim and Al did look at the other Superior chair that was from



the same location and noticed that a screw was missing." Is this the same chair you were talking about before the one that you compared Mary Ann's to or --
A. I don't believe that was the one that we compared it to.
Q. But you did see another Superior chair with a missing screw?
A. Yes.
Q. And that was taken out of service?
A. Yes.
Q. Then you discussed with the team immediate containment actions?
A. Yes.
Q. Could you tell us what an immediate containment action is?
A. It's what we're going to do immediately to make sure that this doesn't happen again, this incident or this type of incident, while the investigation is ongoing.
Q. So that no one else gets hurt; is that correct?
A. Yes.
Q. But this is the first time, to your knowledge, a person had been hurt with respect to this type of chair?



a1ec4f19-6446-4065-83d0-69f56bd15152

Page 74

giving you our e-mail addresses, I don't have any other questions. I'll send you over to counsel.

CROSS-EXAMINATION:

Q. (By Ms. Lamontagne) Hi, Mr. Brown.
A. Hello.
Q. My name is Donna Lamontagne. We met briefly before the deposition started. I just have very few questions for you.
A. Okay.
Q. The screws for Mary Ann King's chair were never found; is that correct?
A. Correct.
Q. And the one screw that's discussed in the 8D investigations was determined that it was not a correct screw for the chair; is that correct?
A. I don't recall that. I believe it was similar to the manufacturer's screw, but --
Q. Direct your attention to Exhibit C again and the June 17th, 2003, do you see on page one in paragraph two --
A. Yes.
Q. -- the second sentence, "It was determined that the screw was not the correct screw for the chair." Does that refresh your recollection?

Page 75

A. I know -- my recollection was that it was similar to the screw that was in the chair, but --
Q. Do you know where the information was obtained that said it was not the correct screw for the chair?
A. I believe it was Ed Picard.
Q. Do you know whether or not Ed Picard played any role in getting this chair for Mrs. King?
A. No, I don't.
Q. Ed never told you that he got the chair for her?
A. No. I believe she received the chair from somewhere else or found the chair. I believe he did not purchase the chair for her.
Q. No one knows where the chair came from?
A. No.
Q. Do you know where the chair is now?
A. No, I have no idea.
Q. Do you know what happened to it after you had looked at it?
A. No, I don't. I don't recall what happened to the chair.
Q. There was a reference to another chair in that area. When Mr. Murphy asked you about Superior chair in the same location, noticed that a screw was missing. That was on, I think, page two of

Page 76

the same --
A. Yes.
Q. -- note. You mentioned that a screw was missing. Would that have been one screw missing or were there supposed -- were there two and then there wasn't a third?
A. My recollection is that we did not have any of the chairs with three screws on the site.
Q. Okay.
A. The newest chair that we had still had two screws, so I believe it was just the one screw missing out of that chair.
Q. Did any of the other chairs that had two screws have any problems?
MR. ESKEY: I object.
A. Not that I recall. Can I ask a question on that? Do you mean the problems with the --
Q. With the --
A. -- back of the chair coming off? No.
Q. Did TI ever inspect these chairs before Mary Ann King's accident in any kind of systematic fashion?
A. No, not that I recall.
Q. It wasn't part of your job duties before this incident?
A. No, it wasn't.

Page 77

Q. Was there a policy in place to have someone go over with the employees the instruction cards when they got the chairs?
A. No, we did not.
Q. When someone came to your safety department to get a chair, would they take it with them --
A. No.
Q. -- or would you then deliver it to the area?
A. They would only choose which chair they wanted to order, that was it. We had a selection of chairs there, we'd fit them to the desk, measure them and they'd choose which model they wanted to order. That would be ordered through a purchasing system within their own business group, not through the safety department.
Q. Would there be any way of tracking how long Mary Ann King had the chair that eventually broke?
A. I would have no idea on that. There were no systems to track chairs assigned to people.
Q. You mentioned that there was a problem with the screws backing out over time. The chair that Mary Ann was on was seven years old, correct, at least based on what you were able to --
A. Based on what I was told, yes.
Q. And we don't know if there were screws missing in

Page 86

A. I don't recall.
Q. But, at any rate, that was the solution that you determined after investigating the Mary Ann King chair incident?
A. That was the solution that I learned about from the presentation in Dallas. They told me, Paul Schwab told me that they received that information from Superior and that also Jim Drews had informed us of some.
Q. Okay. Now, after that point, were there any more incidents of chair backs on Superior chairs having problems?
A. I recall an incident in Building 1, and I can't remember if it was the back of the chair. I just, I remember something in Building 1 had happened, but I'm not sure if the chair had broken apart or if the screw came out of it. I'm just not clear enough on it, but I believe there was an incident in Building 1 where a screw came out of a chair, the same chair.
Q. A Superior chair?
A. Yes.
Q. Was there any documentation about the inspections?
A. We left it up to the individual to do the inspection. Certain areas, production floors --

Page 87

and not just specific to Superior. We did every chair on the site. Certain production areas, rather than having each operator do their own chair inspection, would have individuals out of maintenance or support technicians go through an area and do every chair and mark them, label them.
Q. Okay. Now, if someone identified as a result of the inspection a loose screw in a Superior chair, what would they do?
A. They were told to mark the chair where they did not use it and notify us.
Q. Then who would come and inspect the chair?
A. I would call Jim Drews.
Q. Did Mr. Drews then, to the extent that it was possible, make repairs on chairs?
A. Yes.
Q. Do you recall how many chairs fell into that category?
A. I don't recall. I do recall that we had more failures with the locking mechanism or issues with the locking mechanisms not holding in place than we did with the chairs, the back falling off a chair.
Q. Now, when the chair broke on Mary Ann King and you first saw the chair, did you inspect the chair at

Page 88

that time?
A. Yes.
Q. Now, you said that the back was not fixed to the chair, correct?
A. I believe it was still off. As I recall it, it was still off when we got there.
Q. Now, did you try and match up the back, the J bar, to the bottom of the chair?
A. I don't think we did until Jim was there, so no, I don't recall doing that.
Q. Now, when you looked at the chair, when you first inspected it, for that model chair there were two screws that affixed the J bar to the bottom of the chair, correct?
A. Correct.
Q. Did you see either of those two screws?
A. No.
Q. So both screws were missing; you just didn't find them anywhere, correct?
A. Right.
Q. So you weren't able to determine whether at the time of the incident there was one screw or two screws holding the J bar to the seat of the chair?
A. No, we couldn't say that. We could not say that there were one or two.

Page 89

Q. Did you conclude as a result of your examination of the chair that the screws had come out of the place where they were to affix the J bar to the bottom of the chair?
A. I believe we concluded that the chair was supporting Mary Ann daily for some period of time, and then on that day the back fell off of it, and we couldn't find any screws so we looked at it and said there most likely would have been something retaining this in at some point.
Q. There had to have been screws at some point, because otherwise the J bar wouldn't stay on the chair, correct?
A. Correct.
Q. When you came and inspected the chair, you saw that the J bar was off and you couldn't find the screws, correct?
A. Correct.
Q. On the basis of that information, did you conclude that the screws had come out of the chair?
A. Yes.
Q. Now, Mr. Murphy asked you about the minutes, and I just wanted to ask you a couple of more questions about that, of the 8D incident investigation. And on the minutes for June 17th, 2003, on page two,

A. No.
Q. So it would just have stayed somewhere in Attleboro, as far as you know?
A. Yes.
MR. MURPHY: That's it. Thank you.

RECROSS-EXAMINATION:
Q. (By Ms. Lamontagne) Just a couple of follow-ups. Who was that Power Point disseminated to, just the safety committee?
A. It was -- it wouldn't have been sent out to anyone electronically. It would have been presented at the meeting, but it would have been either on a common drive and a server within the safety department, and also I believe in this case the supervisor had started the development of that, which would have been Ed Picard. So it would have been on Ed's, either his C drive, his hard drive, or on a server that he worked off of.
Q. Do you know if the photos that you took were ever printed?
A. They were -- they may have been printed for purposes of the 8D meetings to bring to the meeting rather than bring the chair, but other than that, they were just imported into the Power



Points.
Q. You talked about seeing the chair itself with your own eyes on roughly three occasions?
A. Yes.
Q. The first time you saw that chair was June 5th; is that correct?
A. I believe so.
Q. So three days after the incident?
A. I believe so, yes.
Q. When you first saw the chair, it was in the hallway with other things meant to be discarded, correct?
A. Correct.
Q. And there was a mention of someone from the manufacturing area that had attempted to repair it, at least in the minutes. Did you ever try to talk to anyone in the manufacturing area to find out what had happened during those three days before you looked at the chair?
A. No, I didn't. That was, I believe Ed Picard had that assignment in the 8D investigation.
Q. Do you have any idea what happened to the chair during those three days?
A. No, I do not.
MS. LaMONTAGNE: That's all.



MR. MURPHY: What we're trying to get at in the questions is is there any way in the world we can get a copy of that Power Point presentation that was presented?
THE DEPONENT: I was looking for it myself before I came here.
MR. MURPHY: You don't know where we can find one?
THE DEPONENT: I don't know.
MR. MURPHY: We'll go off the record. Have you got other questions?
MR. ESKEY: I have just one more question.

RECROSS-EXAMINATION:
Q. (By Mr. Eskey) The camera that you used to take the pictures, was that a digital camera?
A. Yes.
MR. ESKEY: Thank you.
MR. MURPHY: I think we're done except to give you our e-mail addresses so you can e-mail us what you have. Thank you for your patience. Page two of Exhibit D should be the first page --
THE DEPONENT: Yes.
MR. MURPHY: -- of that publication you



put together?
THE DEPONENT: Yes.
MR. MURPHY: Thank you.
(The deposition of Alan E. Brown concluded at 6:56 p.m.)