**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| MARY ANN KING<br>and PHILLIP KING<br>Plaintiffs,<br><br>v.<br><br>STAPLES INC.; IZZY DESIGN;<br>JSJ CORPORATION;<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | <br><br><br><br>C.A. No.: 06-258-S |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

This is a product liability action. Plaintiff, Mary Ann King, claims that she sustained serious, permanent injuries as a proximate result of the collapse of a defective and negligently designed and marketed Superior Centron office chair manufactured and sold by defendants JSJ Corporation, Izzy Design, and Staples, Inc.

Now before the Court is JSJ and Izzy's motion for summary judgment. Reduced to its essence, JSJ and Izzy claim that they are entitled to summary judgment for two reasons, both of which relate to the fact that the chair that broke apart on Ms. King cannot be located.[1] First, JSJ and Izzy claim that, without the chair, Ms. King cannot prove that they

---

[1] JSJ additionally contends that it is entitled to summary judgment because it never manufactured or sold chairs under the Superior or Superior Centron name. That, according to JSJ Corporation, was the work of its related and subsidiary, but legally separate, entities JSJ *Seating* Corporation (which conducted business under the names "Superior Chaircraft Corporation" and "Superior Chair") and JSJ Seating Company Texas, L.P., which succeeded JSJ Seating Corp. In response to JSJ's wrong-party claim, plaintiff filed a motion to amend the complaint to name JSJ Seating Corp. and JSJ Seating Company Texas, L.P., as proper parties replacing the misnamed JSJ Corp. Anticipating under the circumstances, and for the grounds set forth in the motion to amend, that the Court will allow the proper-party substitution, the use of "JSJ" in the within memorandum refers to that JSJ entity or entities which defendant admits sold Superior Centron chairs prior to 2003 under the names Superior Chaircraft and Superior Chair.

manufactured and sold it. Second, JSJ and Izzy claim that, without the chair, Ms. King cannot prove that her injuries were caused by a defect or negligence in connection with the product.

There is no merit to JSJ and Izzy's and summary judgment motion. Its principal flaw is JSJ and Izzy's misinformed insistence that without the broken chair, which was apparently discarded by Ms. King's employer, "[p]laintiff [can] never prove that Izzy or JSJ manufactured the chair" and "cannot establish a causal connection between the alleged chair defect and King's injury." Def. Mot. at 1-2. JSJ and Izzy's unrelenting reliance on the Ms. King's "inability to locate the chair" is plainly misplaced. While the best evidence of the identity of a product manufacturer and the existence of a defect may be the product itself, cases in which a product is lost, destroyed, or otherwise unavailable, but in which courts nonetheless find that there is sufficient direct or circumstantial evidence to create a jury question precluding summary judgment are legion. *See, e.g., Payton v. Abbott Labs,* 780 F.2d 147, 157-58 (1st Cir. 1985)(notwithstanding facts that plaintiff's mother could not remember brand of DES that she took and that original prescription could not be located, circumstantial evidence was sufficient to support jury finding that defendant manufactured 25 mg. DES pills ingested by plaintiff's mother).

JSJ and Izzy's challenges to the sufficiency of the evidence that Ms. King was injured as a result of a defective chair manufactured and sold by them share common and fatal flaws—they rely on disputed facts and an upside-down view of the summary judgment record that ignores evidence favorable to Ms. King and draws all reasonable inferences in their favor. As a result, JSJ and Izzy's "Statement of Undisputed Facts" is more wish list than fact. Made up almost entirely of disjointed, out-of-context fragments from discovery depositions, defendants' misbranded statement overlooks the fact that, properly viewed in a

light most favorable to Ms. King, the summary judgment record contains abundant evidence on which a juror could reasonably conclude that Ms. King's injuries proximately resulted from the collapse of a defective and negligently designed and marketed Superior Centron chair manufactured and sold by defendants JSJ and Izzy.

Contrary to defendants' ill conceived statement of "undisputed" facts, the deposition testimony, documents produced in discovery, and affidavits taken in their entirety show *at the very least* that there are genuine issues of material fact precluding summary judgment on issues of product identification and defect. For these reasons, detailed below, the Court ought to deny defendants' motion for summary judgment.

## FACTS[2]

Viewed in a light most favorable to Ms. King and with all reasonable inferences drawn in her favor, the summary judgment record supports the following. JSJ and Izzy design, manufacture, and sell office chairs. Metzger Affidavit at ¶¶ 4-5; Vukcevich Dep. at 26-32; Record Appendix[3] ("RA") at 1-5. One such chair—the "Superior" brand "Centron" product line—is an office chair that JSJ first marketed in 1996. Vukcevich Dep. at 28-31; RA at 6-7. The back of a Superior Centron chair is attached to a control mechanism under the seat by a curved piece of steel called a "J-bar." Vukcevich Dep. at 31-32; RA at 8.

From 1996 through 1998, JSJ designed the J-bar to be secured to the under-seat control mechanism by two screws. Vukcevich Dep at 57; RA at 9. The screws were

[2] The within statement contains additional undisputed facts precluding summary judgment and facts which deny, controvert, and dispute defendants' Statement of Undisputed Facts. To the extent the within statement is at variance with facts alleged in defendants' Statement of Undisputed Facts, it is intended by plaintiff to "otherwise controvert" them in accordance with D.R.I. LR Cv. 56(a)(3)&(4).

[3] Plaintiff's Record Appendix ("RA") contains materials relevant to plaintiff's opposition to defendants' motion for summary judgment. For ease of reference, the RA is consecutively numbered in the lower center margin.

intended to permanently attach the J-bar (and thus the back of the chair) to the seat. Vukcevich Dep. at 134-135; RA at 10. The screws were not designed to loosen or back out. Vukcevich Dep. at 136; RA at 11.

From 1996 to 2003, JSJ sold over 13,000 Superior Centron chairs—about 10,000 of which were sold to Texas Instruments ("TI"). Vukcevich Dep. at 159-60; RA at 12. In April 1997, an independent facility—SGS U.S. Testing Co., Inc.—performed various tests for JSJ on a sample chair of the same type as the Superior Centron to assess its compliance with national standards for general purpose office chairs. IZ 00144[4]; RA at 13. One of the tests performed—the back durability test—was intended to simulate the action over time of a person leaning against the back of the chair. Vukcevich Dep. at 117; RA at 14. If, subjected to the forces of the test, a chair does not break, deform, or otherwise fail, it passes. *Id.* As reported by SGS, the Superior Centron chair failed when, one-quarter of the way through the test, "the two screws attaching the control mechanism to the seat base sheared off." IZ 00148, Vukcevich Dep. 115-117; RA at 15-16.

In addition to the failure of the screws during the back durability test, in the first few years after the Superior Centron chair was introduced to the market, JSJ received "feedback" from customers that they were encountering problems with "loose Centron backs." Vukcevich Dep. at 32-33; RA at 17. During that time, JSJ's biggest customer for Centron chairs—TI—reported problems with loose backs and loose screws attaching the J-bar to Centron chairs. Vukcevich Dep. at 57-58, 69; DeYoung[5] e-mail 9/21/00; RA at 18-21.

---

[4] Izzy produced numerous documents in response to a request for production by plaintiff, which materials were numbered consecutively in the lower right corner, preceded by "IZ"—presumably an abbreviation for Izzy.

[5] Dave DeYoung was Chief Financial Officer of JSJ's SuperiorFurniture in September 2000. Vukcevich Dep. at 98-99.

Whether in response to the failure of the screws during the April 1997 back durability test, to customer feedback concerning problems with loose backs, or both, JSJ initiated an engineering change process, which resulted in a decision in September 1998 to modify the design of the attachment of the J-bar to the chair "so that a third screw can be used for more integral strength between control and j-bar." IZ 00912; Vukcevich Dep. at 66-67, 118; RA at 22-24. As an interim measure until J-bars with a new hole pattern could be produced, JSJ developed a so-called "TI Field Fix," which consisted of installing a third screw with a heavy fender washer and a drop of "Loc-tite" in a hole located between the two existing J-bar mounting screws. IZ 00152; IZ 00915; Vukcevich Dep. at 67-72; RA at 25-28.

In December 1998, SGS U.S. Testing performed back durability testing on a sample Centron chair "w/3rd Screw for TI Field Fix" and reported that it passed "without any apparent structural breakage or loss of serviceability." IZ 00152-00153; RA P29-P30.

On December 29, 1998, JSJ incorporated the TI Field Fix into an Engineering Change Notice, the purpose of which was to add a third screw attaching the J-bar to all Centron chairs manufactured after December 29, 1998. IZ 00915; RA P31; Vukcevich Dep. 67-69, 83; RA at 32-33. As with the "TI Field Fix," the December 1998 modification was intended to be "a temporary change until the J-bars with the new hole pattern come in." IZ 00915; RA 34. While the new J-bars were not used in production until May 2000, beginning December 29, 1998, all Centron chairs were manufactured with three screws attaching the J-bar to the under-seat control mechanism. IZ 00914; Vukcevich Dep. 71-73; RA at 35-36.

While the third-screw design change provided an answer to the loose back problem for Centron chairs manufactured after December 29, 1998, customers continued to report problems with loose backs on Centron chairs made from 1996-1998. Vukcevich Dep. at

142; DeYoung e-mail 9/21/00; RA at 37-38. For instance, in addition to loose back problems at its North Texas facilities, TI reported two injuries related to backrests that became loose and fell off Centron chairs at its Tucson site. Sensata (TI) response to subpoena; Vukcevich Dep. at 145; RA at 201-211; 39.

For its bigger customers, like TI, JSJ responded in 2000 by "performing inspections and service to the screws attaching the J-bar" for all Centron chairs at TI's Texas facilities. DeYoung e-mail 9/21/00; RA at 40. For the rest of its customers, on September 29, 2000, JSJ sent them a letter with a so-called Product Bulletin by certified mail, notifying them that Centron chairs manufactured before December 29, 1998, could have problems with "screws attaching the back J-bar to the control [working] loose." Ltr. 9/29/00, IZ 01843, 01852; RA. 41, 43. The letter advised customers to inspect the chairs in accordance with the directions on the Product Bulletin, and to notify JSJ's SuperiorFurniture "if any screws are loose." *Id.*; Product Bulletin IZ 01927; RA at 42. JSJ's SuperiorFurniture offered to remedy problems "at its own cost" and encouraged its customers provide information concerning the loose-screw problem to the ultimate purchasers of Centron chairs. IZ 01843; RA at 44. Those customers that responded were sent a third screw, regardless of whether they reported a loose screw/back problem. *See, e.g.,* IZ 01843, 1846, 1926-27; RA at 44-47.

JSJ expected "a 20% or lower response rate" to its letter and Product Bulletin, and set a "budget for field servicing costs associated with this issue accordingly." DeYoung e-mail 9/21/00 (response rate); RA at 48. In spite of this and the fact that numerous letters were returned "undeliverable" and that many customers (retailers and distributors) responded that they had no records identifying ultimate users, JSJ's SuperiorFurniture and Izzy, its successor, made no additional attempts to notify ultimate users of the loose-screw and -back problems with Superior Centron chairs. Vukcevich Dep. 73-74, 100-106, 164

(re: notification letter and product bulletin); IZ 01852, 01861, 01863, 01945 (examples of customers reporting that ultimate users cannot be located); IZ 01859 (example of letter and bulletin returned "undeliverable"; RA at 49-59.

In spite of the fact that it knew that its September 2000 letter and Product Bulletin did not reach hundreds if not thousands of ultimate users of Superior Centron chairs, JSJ and Izzy did not initiate a voluntary recall, issue a press release, publish a notice in a newspaper or other public media, or notify any government agency or consumer protection organization of the loose-screw problems with the Centron chairs manufactured between 1996 and 1998. Vukcevich Dep. at 102-106; RA at 60-61.

On June 2, 2003, Mary Ann King worked at a TI facility in Attleboro, Massachusetts as a purchasing assistant. As she leaned back in her chair to speak with a co-worker, Pam McGee, the back of her chair broke off from its seat, causing her to fall and injure her back. King Dep. I at 32-33; RA at 62-63. Ms. King testified at deposition that she believed the failed chair was a "Superior" chair because "that was pretty much all that [TI] bought." King Dep. I at 35; RA at 64. Ms. King observed that the metal bar with the back attached to it had come off the chair. King Dep. I at 47; RA at 65. The next day, Ms. King was given "a different style chair—it wasn't a Superior chair," and the chair that broke was placed outside the door of her work area. King Dep. I at 95-96, King Dep. II at 119-120; RA at 66-68. After that day, Ms. King went out on medical leave for several weeks. When she returned to work in July 2003, she had a new chair, and did not see the chair that broke apart on her. King Dep. I at 114, King Dep. II at 119-120; RA at 69-72.

When asked at deposition about the levers and knobs used to adjust the broken chair, Ms. King gave the best description she could, but indicated that she wasn't positive in her recollection because "[i]t's been so long." King Dep. I 42-43; RA at 73-74. When

questioned whether she had any problems with the chair before it broke apart, Ms. King testified that while it would occasionally slip into the reclining position, it did not have a loose back. King Dep. I at 41-43, King Dep. II at 51; RA at 75-78.

Ms. King additionally testified at deposition that, if shown a picture, she could identify the same type of chair that broke apart on her. King Dep. I at 142; RA 79. Recently, Ms. King was presented with pictures of a Superior Centron chair taken at the time of the incident and published with an electronic newsletter sent to TI Attleboro employees, instructing them how to identify and inspect a Superior Centron chair. King Affidavit at 1; RA at 80-85. From these images, Ms. King positively identified the chair that broke apart on her as a Superior Centron. *Id.*

Ms. King's co-worker, Pam McGee, testified based on what a co-worker told her that she believed the chair that broke on Ms. King was made either by "Imperial" or "Superior," but that she was "not too sure on that." McGee Dep. at 18, 71-72, 93; RA at 86-89. Ms. McGee described the chair as a "dark blue, regular type of office chair with arms. And, it also reclined" and had a "[h]igh back." McGee Dep. at 29; RA at 90-91.

Ms. McGee also testified that Russell Loxley from maintenance took the chair after the incident and attempted to repair it. McGee Dep. at 32-33, 44-45, 96-97; RA at 92-94. According to Ms. McGee, the chair was then returned to McGee and King's work area, where Ms. McGee's boss, Ed Picard, tagged it and set it aside until Jim Drews, a salesman, inspected and collected it. McGee Dep. at 44-48; RA at 95-96. Ms. McGee testified that she saw the chair again, briefly, when Mr. Drews, who repaired it, brought it back into her area, where Mr. Picard picked it up. McGee Dep. at 54-55, 97; RA at 97-98. After Mr. Picard took it, she did not see it again.

Ms. McGee testified that she was familiar with Ms. King's chair and could identify the same type of chair if she saw it again. McGee Dep. at 82; RA at 99. From photographs of two office chairs—one a Superior Centron, the other a "Miller"—Ms. McGee identified the Superior Centron as the type of chair that broke on Ms. King. McGee Dep. at 82-86; RA at 100-102.

Al Brown, a senior safety specialist for TI Attleboro, headed an investigation of the chair incident. Brown Dep. at 3-5; RA at 103-104. Mr. Brown identified the chair that broke apart on Ms. King as a Superior Centron. Brown Dep. at 9, 28, 32; RA at 105-107. Mr. Brown testified that on June 5, 2003—three days after the incident—he, and others, went to inspect the chair, but found that someone from the "manufacturing area" had removed and attempted to repair it. Brown Dep. at 23-24; RA at 108. According to Mr. Brown, they located the chair in the hallway outside Ms. King's work area, put it back in Ms. King's work area, put yellow "caution" tape around it, and posted a sign indicting that it was broken and was not to be used. Brown Dep. at 24-26; RA at 109-110.

Mr. Brown testified that he did not "believe" that the back was on the chair when he first saw it. Brown Dep. at 27; RA at 110. With the assistance of Mr. Drews, a salesman from Staples who had been supplying Centron chairs to TI Attleboro since 1997-98, Mr. Brown determined from a label underneath the seat of the Centron chair that it had been manufactured in 1996. Brown Dep. at 30-31; RA at 111. Mr. Brown contacted the manufacturer of the Superior Centron chair—JSJ's SuperiorFurniture—and learned of the third screw field fix. Through Mr. Drews, TI ordered a box of 500 screws from Superior, because none of Centron chairs at TI Attleboro had a third screw. Brown Dep. at 45, 76, 83-85, 111-112; RA 112-115.

After speaking with the manufacturer, Mr. Brown contacted his safety counterpart at TI in Dallas and learned for the first time that the Texas facilities had encountered similar problems with loose Centron backs and had their chairs inspected and retrofitted with a third screw several years earlier. Brown Dep. at 80-82; RA at 116-117.

Mr. Brown took photographs of a Superior Centron chair of the same type that broke on Ms. King and incorporated them into an electronic newsletter sent to TI employees, notifying them of the problem with loose Centron screws and backs, and instructing them on how to identify and inspect their chairs. Brown Dep. at 36-44; Inspection Guidelines; RA at 118-124. Mr. Brown's photographs were also incorporated into a final investigation report. Final Rpt.; RA at 125-128. These are the photographs that Ms. King viewed and used to identify the type of chair that broke apart and injured her as a Superior Centron chair. *See,* King Affidavit; RA at 129-130. Mr. Brown and the investigation team ultimately concluded that Ms. King's chair broke because of a design flaw that permitted the screws attaching the J-bar to the chair to loosen and back out. Brown Dep. at 49, 88-95; 8D meeting minutes and findings; RA at 131-138.

Jim Drews worked for Staples Business Advantage as an account manager since 1994. Drew Dep. at 6-7; RA at 139-140. Beginning in 1997-98, Mr. Drews began supplying Superior Centron chairs to TI Attleboro. Drews Dep. at 10-13; RA at 141. Mr. Drews testified that before he obtained the account, TI Attleboro procured some of its Superior chairs from TI's Dallas facility. Drews Dep. at 16, 84-85; RA at 142-143.

According to Mr. Drews, the Superior chairs came partially assembled; the seat, control mechanism, and J-bar were factory assembled as a unit, and were required to be pieced together with the pneumatic cylinder, chair base and casters. Drew Dep. at 22; RA at 144. As such, the J-bar/seat back assembly was not assembled by the customer. When,

after 1997-98, TI Attleboro had a problem with a Superior Centron chair, Mr. Drews would inspect it, take the model number from the chair, and order parts if the chair could be repaired. Drew Dep. at 24; RA at 145. Mr. Drews' brother performed the repairs until he passed away in 2000; thereafter, Mr. Drews made repairs. Drew Dep. at 24-25; RA at 146.

Shortly after Ms. King's chair broke, Mr. Drews learned what had happened and was called to inspect and repair it. Drew Dep. at 28; RA at 147. Following his usual practice, Mr. Drews obtained the manufacturer's control number from the bottom of the chair, ordered replacement parts, and repaired the chair. Drew Dep. at 29-30; RA at 148-149.

When Mr. Drews first saw the chair, which he identified as a Superior Centron, it was in the corner of Ms. King's office area, "circled off with yellow tape" so that nobody would use it. Drew Dep. at 30, 35; RA at 150-151. The seat and base were still assembled, but the back was sitting on top of the chair. Drew Dep. at 31; RA at 152. Mr. Drews ordered a control mechanism, which came with a J-bar attached. Drew Dep. at 31; RA at 153. When the replacement parts arrived, Mr. Drews returned to TI, retrieved the chair, and took it to his garage to repair it. Drew Dep. at 32-33; RA at 154. On completing the repair, Mr. Drews returned the chair to TI at 33; RA at 155.

Like Ms. King and Ms. McGee, Mr. Drews recalled that the fabric of the chair that broke on Ms. King was blue. Drew Dep. at 34; RA at 156. Mr. Drews recalled that the chair was "used." Drew Dep. at 85; RA at 157. From his inspection of the chair, Mr. Drews knew that the back of the chair had fallen off. Drew Dep. at 36; RA at 158. While he observed that the J-bar was not attached to the chair, Mr. Drews could not recall whether the screws that attach the J-bar to the chair were present when he inspected and repaired it. Drew Dep. at 48; RA at 159.

While he recorded the manufacturer's control number on a piece of paper when he saw the chair with Al Brown, Mr. Drews discarded the paper after completing the repair, and could not recall at his deposition whether the chair was sold to TI before or after 1997. Drew Dep. at 37, 57-59; RA at 160-162. Because the chair was still under warranty, the manufacturer supplied the replacement parts without charge. Drew Dep. at 61-62; RA at 163-164. Mr. Drew testified that the manufacturer also supplied a box of 500 screws "to better attach to the – to the control – the 'J' bar to the control mechanism" on TI Attleboro's other Superior Centron chairs. Drew Dep. at 66-67; RA at 165.

When presented with the photographs taken by Al Brown that were incorporated into the newsletter notifying TI employees of the problem with loose Centron screws and backs, Mr. Drews identified as a "Superior" the same chair depicted in the photograph that Ms. King and Ms. McGee testified was the type of chair that broke apart on Ms. King. Drew Dep. at 75-76; RA at 166.

In June 2000, Russell Loxley worked at TI Attleboro as an engineering technician. Loxley Dep. at 6; RA at 167-168. His tool room was across from Ms. King's work area. Loxley Dep. at 8; RA at 169. Mr. Loxley testified that he took the chair that broke apart on Ms. King from her work area on the day of the incident to repair it. Loxley Dep. at 10, 17-18; RA at 170-172. While it was not part of his job description, he was often asked to look and chairs and determine whether they could be repaired or should be discarded. Loxley Dep. at 10-13; RA at 173. Most of the time, Mr. Loxley discarded them. Loxley Dep. at 12, 15-17; RA at 174-175. While waiting for Mr. Loxley to look at them, broken chairs were piled up on pallets in an empty assembly area outside Ms. King's work area. Loxley Dep. at 12-13; RA at 176. There, the chairs were secured with clear plastic "pallet wrap" so they "couldn't be removed" from the pallets. Loxley Dep. at 13; RA at 177. When the chairs

were discarded, they were taken on the pallets outside, to the dumpster. Loxley Dep. at 52-53; RA at 178. Ms. King's chair was never placed by the dumpster. Loxley Dep. at 53; RA at 179.

Mr. Loxley could not remember the kind of chair that broke on Ms. King and could not identify it from photographs, but he recalled that it as an adjustable office chair, with arms and casters—"a typical office chair." Loxley Dep. at 21, 55, 64-66, 69; RA at 180-183. Mr. Loxley testified that he also remembered the "J-bar going underneath," "the screws holding it in," that "there was a knob * * * for the adjustment of the pressure on the back of the chair," and that it had an adjustment lever to tilt the chair." Loxley Dep. at 73-74; RA at 184-185.

Mr. Loxley observed that the back had come off the chair and that the heads of the screws that secured the J-bar to the chair "were gone as if they had sheared." Loxley Dep. at 22-23, 58-60; RA at 186-187. From his examination of the chair, Mr. Loxley concluded that "[t]hose two screws are what failed." Loxley Dep. at 23; RA at 188. He did not believe that it had been previously repaired. Loxley Dep. at 40; RA at 189.

Mr. Loxley removed the failed screws, re-attached the back with new screws, and returned the chair to the hallway, to a little area in the corner between his work area and Ms. King's area, where he kept other materials and "junk that he used to pile up." Loxley Dep. at 25-26, 58-64, 67; RA at 190-194. Mr. Loxley believes he told Ms. King that it was there if she needed it, and that he never did anything with it again. Loxley Dep. at 26; RA at 195. Mr. Loxley testified that the chair sat there for "a while," but he could not say how long; it could have been a month "or shorter" and could have been taken away by "Safety" and put back again. Loxley Dep. at 30-32, 68; RA at 196-197. The only other chairs in that area were "a couple" that Mr. Loxley had placed there after looking at them to determine

whether they could be fixed. Loxley Dep. at 68-69; RA at 198. Importantly, Mr Loxley testified that the only chairs other than Ms. King's that were in the same area were not office chairs like Ms. King's, but were "assembly chairs" or "high chairs." Loxley Dep. at 68-69; RA at 198.

Mr. Loxley did not remember seeing a chair taped off with yellow tape or in Ms. King's work area, but testified that it could have been cordoned off in the back corner of Ms. King's work area (where he "usually didn't go"). Loxley Dep. at 32, 66; RA at 199-200.

## SUMMARY JUDGMENT STANDARDS

The moving party in a motion for summary judgment must meet a high standard. *See, e.g., Thyssen Plastik Anger KG v. Induplas, Inc.,* 576 F.2d 400 (1st Cir. 1978). Summary judgment is only appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P 56(e). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dept. of Justice,* 355 F.3d 6, 19 (1st Cir. 2004).

In ruling on a summary judgment motion, a court must view all facts and draw all inferences in the light most favorable to the nonmoving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991); *see also, e.g., Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir. 1995)("[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage.").

The court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 135 (2000). This is so, because credibility determinations, the weighing of the evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Id.*

To defeat a properly supported motion for summary judgment, the nonmoving party must do nothing more than establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir. 1993). Thus, the non-movant need only establish the existence of at least one fact in issue that is both genuine and material. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir. 1990)(citations omitted). "If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing." *Ramirez-Velez v. Centro Cardiovascular De Puerto Rico,* 2007 WL 3146618, *1 (D.P.R. 2007)(citing *Suarez v. Pueblo Int'l,* 229 F.3d 49, 53 (1st Cir. 2000)).

## ARGUMENT

**I. The summary judgment record contains abundant evidence to support a jury finding that JSJ and Izzy manufactured and sold the chair that broke apart on Ms. King; as such, summary judgment is precluded on the issue of product identification.**

There is no merit to defendants' claim that without the chair that broke apart on Ms. King, plaintiffs can "never prove that Izzy or JSJ manufactured [it]." Def. Mot. at 1. While it is axiomatic that a plaintiff in a products liability case must prove that his or her injuries were caused by a product manufactured or sold by the defendant, the fact that the product in question has been lost, consumed, or destroyed is not, as defendants here suggest, automatically fatal to the plaintiff's case so long as he or she is able to offer sufficient direct or circumstantial evidence that he or she was injured by defendant's product. *See, e.g., Clift v. Vose,* 848 A.2d 1130, 1132 (R.I. 2004)(per curiam)(while observing that it is "[i]t is axiomatic that a plaintiff must prove that the proximate cause of his or her injuries was the defendant's product," Court noted that such proof may be by competent circumstantial evidence); *Payton*

*v. Abbott Labs,* 780 F.2d 147, 157-58 (1st Cir. 1985)(notwithstanding facts that plaintiff's mother could not remember brand of DES that she took and that original prescription could not be located, circumstantial evidence was sufficient to support jury finding that defendant manufactured 25 mg. DES pills ingested by plaintiff's mother); *Horne v. Liberty Furniture Co.,* 452 So. 2d 204, 208 (La. Ct. App. 1984)(although there was conflicting evidence which might indicate otherwise, where evidence showed that defendant's chairs were in the area where the incident occurred, where co-worker took pictures of chair which collapsed and injured plaintiff, and where defendant's representative identified chair in photograph as manufactured by defendant, record contained ample evidence to support trial judge's conclusion that collapsed chair was manufactured by defendant).

Indeed, judgment as a matter of law on the product-identification element is precluded where there is sufficient record evidence to establish a jury question on the issue whether the defendant manufactured or sold the product at issue. *See, e.g., Steber v. Kohn,* 149 F.2d 4, 8-9 (7th Cir. 1945)(directed verdict for defendant reversed where sufficient circumstantial evidence introduced to establish jury question whether defendant manufactured shoe dye which caused injury to user where dye container was discarded and salesman testified that he did not sell dye to cobbler, but cobbler offered testimony from which juror could reasonably infer that dye was defendant's product); *Kim v. Ingersoll Rand, Co.,* 921 F.2d 197, 198-99 (8th Cir. 1990)(verdict for plaintiff affirmed where sufficient direct and circumstantial evidence was introduced to support jury finding that defendant manufactured compressed air hammer that injured plaintiff).

Thus, where an American Airlines employee was severely burned when a barrel of paint stripper erupted, the court in *Thrasher v. B&B Chem. Co., Inc.,* 2 F.3d 995, 997-98 (10th Cir. 1993), reversed summary judgment for the defendant chemical supplier, which the

district court granted based on a finding that plaintiff could not positively identify defendant as the supplier of the paint stripper. Concluding that the record contained sufficient circumstantial proof that defendant supplied the paint stripper in spite of the facts that (a) the drum could not be located; (b) plaintiff testified that the exploded barrel was green and white, whereas defendant's barrels were black, or black and white, and (c) American Airlines used other brands of paint stripper, the court reasoned that a jury could reasonably find that defendant supplied the paint stripper that injured plaintiff based on the following: (1) plaintiff testified that he recalled working exclusively with chemical drums with defendant's initials on them in the months before the explosion; (2) plaintiff's employer ordered large quantities of stripper from defendant before the explosion and there was no evidence that it purchased from another supplier in several months before the incident; and (3) plaintiff's co-worker recalled replacing the exploded barrel with one that was black and had a white top. 2 F.3d at 997.

Likewise, in spite of evidence indicating otherwise, and notwithstanding the fact that plaintiffs conceded that they could produce no direct evidence identifying which one of the three defendants manufactured the DPT vaccine they claimed was defective and caused their son's death, the court in *Chapman v. American Cyanamid Co.,* 861 F.2d 1515, 1520 (11th Cir. 1988) reversed summary judgment in favor of one of three vaccine manufacturers where it concluded that because invoices from the physician's office that administered the vaccine showed that it only purchased vaccine from that manufacturer during the time when the child received his vaccination, the record contained sufficient circumstantial evidence from which a reasonable juror could conclude that the vaccine administered was manufactured by that defendant.

Numerous federal and state courts have issued similar decisions. *See, e.g.,Cunningham v. Quaker Oats Co.,* 107 F.R.D. 66, 74-75 (W.D.N.Y. 1985)(while parents did not see child put toy in mouth, evidence sufficient to support jury finding that child ingested defendant's product, which became lodged in child's throat causing severe hypoxic injuries, where emergency room physician "vaguely" recalled toy as object removed from child's throat, where child was playing with toy before incident, and where parents were given toy by hospital staff after removal of object from child's throat); *Drayton v. Jiffee Chemical Co.,* 413 F. Supp. 834, 835 (N.D. Ohio 1976)(notwithstanding inconsistencies in witness accounts, testimony of two witnesses identifying liquid drain cleaner as defendant's product sufficient to meet plaintiff's burden of proving that defendant's product was being used when child sustained facial disfigurement from chemical burn caused by spilled cleaner); *Ward v. Celotex Corp.,* 479 So. 2d 294, 295-96 (Fla. Dist. Ct. App. 1985)(evidence sufficient to establish question of fact for jury whether plaintiff exposed to defendant asbestos manufacturer's product where plaintiff's co-workers testified that plaintiff was, at times, near activities where asbestos was being used, some of which was manufactured by defendant); *Paripovich v. Hayden-Murphy Equipment Co.,* 358 N.W.2d 67, 71 (Minn. Ct. App. 1985)(circumstantial evidence sufficient to support finding that defendant supplied block and hook with defective safety latch which caused plaintiff's injury); *Danielson v. Richards Manufacturing Co.,* 206 Neb. 676, 681, 294 N.W.2d 858, 861 (1980)(circumstantial evidence sufficient to identify defendant as supplier of surgical instrument that broke during surgical procedure, injuring plaintiff, where instrument was sold by either one of two suppliers and plaintiff introduced testimony of surgeon that it was probably based on markings on instrument and sales invoices that defendant supplied failed instrument); *Wilder v. Amatex Corp.,* 314 N.C. 550, 553, 336 S.E.2d 66, 68 (1985)(summary judgment reversed where circumstantial evidence

consisting of testimony of plaintiff and co-workers sufficient to support finding that plaintiff had been exposed on various construction jobs to asbestos manufactured by defendant); *Otis v. Bausch & Lomb, Inc.,* 143 A.D.2d 649, 650, 532 N.Y.S.2d 933, 934 (N.Y. App. Div. 1988)(in spite of fact that plaintiff discarded lenses after injury, circumstantial evidence sufficient to create jury question on whether defendant was manufacturer of product precluded summary judgment where plaintiff was originally fitted with defendant's lenses and there was no evidence that she was supplied with any other brand).

Here, as in the above-cited authorities, in spite of inconsistencies in witness accounts and evidence indicating otherwise, viewed in a light most favorable to Ms. King, the summary judgment record contains ample evidence to create a jury question on the issue whether the chair that broke apart on Ms. King was JSJ and Izzy's product.

Ms. King testified that she believed the chair was a "Superior" because that was pretty much all that her employer purchased. Moreover, her testimony that it was blue corroborated the testimony of Ms. McGee and Mr. Drews, who also testified that the chair that Mr. Drews repaired and returned to Ms. King's work area was a blue Centon chair. Significantly, Ms. King identified her chair as the same as a Superior Centron chair depicted in photographs taken by Al Brown near the time of the incident. Notwithstanding her inability to recall and describe exactly the function and location of the levers used to adjust her chair, Ms. King's identification alone ought to be sufficient to create a jury question as to whether she was injured using defendants' product.

Ms. McGee similarly identified Ms. King's chair from Mr. Brown's photographs of Superior Centron chairs. Moreover, her description of Ms. King's chair corresponded with the appearance and features of a Centron. Al Brown located the chair in the hallway outside Ms. King's work area (where Russell Loxley said he put it) and, corroborating all witness

accounts, testified that someone from the "manufacturing area" had attempted to repair it. While there is an apparent discrepancy between the testimony of Mr. Loxley—who maintained that the chair was in one piece when he returned it to the hallway—and the recollection of Mr. Brown (and Mr. Drews) that the chair was in two pieces when Mr. Brown first saw it, the apparent conflict plainly presents a jury question on a material question of fact precluding summary judgment. A juror might reasonably resolve the apparent discrepancy in Ms. King's favor by finding that Mr. Loxley or someone else returned the chair to its broken condition so that the investigation team and Mr. Drews could examine it as it appeared after the incident or that Mr. Brown and Mr. Drews simply mis-recollected the condition of the chair when they first saw it. At any rate, it is undisputed that Mr. Drews repaired a blue Centron chair that Mr. Brown found where Mr. Loxley had left it and that, according to Mr. Loxley, it was the only office chair of its kind in the area. Significantly, when Mr. Drews returned the blue chair, briefly, to Ms. McGee and Ms. King's work area after repairing it, Ms. McGee observed that it was the same chair that broke apart on Ms. King.

In his deposition, Mr. Brown positively identified Ms. King's chair as a Superior Centron and was with Mr. Drews when he determined that the manufacturer's control number on the underside of the chair indicated that it was manufactured by defendants in 1996. Mr. Drews also positively identified the broken chair as a Superior Centron.

Based on the undisputed evidence concerning the loose back and screw problems associated with Centron chairs manufactured between 1996-1998, a juror could reasonably infer from the manner in which Ms. King's chair broke apart and the observations of Mr. Loxley concerning the shearing of screws, that the chair that broke apart on Ms. King was a Superior Centron.

While he could not remember the kind of chair that broke on Ms. King and could not identify it from photographs, Mr. Loxley's description of the J-bar and the controls on the chair that he repaired is further evidence on which a juror could reasonably conclude that the chair that failed on Ms. King was a Superior Centron manufactured and sold by defendants.

Plainly there is abundant evidence in the summary judgment record to create a jury question on the issue whether Ms. King was injured while using JSJ and Izzy's Superior Centron chair. Summary judgment based on defendants' claim of insufficient proof of product identification is clearly unwarranted. As such, the Court ought to deny defendants' product-identification based motion for summary judgment.

## II. The summary judgment record contains sufficient evidence to support a jury finding that Ms. King was injured as a proximate result of a defect in the product or negligence by JSJ and Izzy.

JSJ and Izzy's claim that they are entitled to summary judgment because, without the chair, it is impossible for Ms. King to establish that her injuries were caused by a defect in the product is fundamentally misinformed. As with product identification, where the product is lost or otherwise unavailable, the existence of a product defect may be established by direct and circumstantial evidence. *See, e.g. Horne v. Liberty Furniture Co.,* 452 So. 2d 204, 208 (La. Ct. App. 1984)(evidence supported finding of defect based on expert testimony that collapsed chair was defectively glued where expert based opinion in part on photographs of broken chair taken after the incident); *Thrasher v. B&B Chem. Co., Inc.,* 2 F.3d 995, 997-98 (10th Cir. 1993)(circumstantial evidence that barrel which exploded and injured plaintiff was defective, while slim, presented jury question precluding summary judgment).

Notwithstanding the absence of the chair that broke apart on Ms. King, here, there is abundant record evidence to create jury questions on whether Ms. King's injuries resulted from a defect in the chair or negligence by JSJ and Izzy.

A product "defect" is a feature or condition which makes the product unsafe for its intended use. *See, e.g., Castrignano v. E.R. Squibb & Sons, Inc.,* 546 A.2d 775, 779 (R.I. 1988). JSJ designed the J-bar to be secured to the under-seat control mechanism by two screws. The screws were intended to permanently attach the J-bar (and thus the back of the chair) to the seat. The screws were not designed to loosen or back out. There is sufficient evidence on which a juror could reasonably conclude that the screws did not function as designed and, as such, resulted in Centron chairs that were unsafe for their intended use.

The two-screw design failed an industry-standard, back-durability test in 1997, when they sheared off in the same way that Mr. Loxley found that the screws on Ms. King's chair failed in 2003. In the first few years after the Superior Centron chair was introduced to the market, JSJ received "feedback" from customers that they were encountering problems with "loose Centron backs." Thereafter, JSJ initiated an engineering change process, which resulted in a decision in September 1998 to modify the design of the attachment of the J-bar to the chair "so that a third screw can be used for more integral strength between control and j-bar." As an interim measure, JSJ developed a so-called "TI Field Fix," which consisted of installing a third screw in the existing configuration. Because of the loose back/screw problems in the early Centron production models, and the risk that the backs could fall off during use, JSJ added a third screw to all Centron chairs manufactured after December 29, 1998. Notwithstanding, users of chairs made between 1996 and 1998 continued to experience problems. Indeed, two TI Tucson employees were injured when the backs fell off their Centron chairs. In September 2000, JSJ attempted to notify customers and users

that Centron chairs manufactured before December 29, 1998, could have problems with "screws attaching the back J-bar to the control [working] loose" and instructed them as to corrective measures.

These facts are clearly sufficient to raise a material issue of fact on whether the two-screw design used to attach the J-bars to Centron chairs between 1996 and 1998 rendered them unsafe for their intended use. As such, summary judgment on the issue of whether Ms. King's injuries were caused by a defect in her Centron chair is plainly unwarranted.

Two additional grounds support the denial of defendant's summary judgment motion on defect and causation grounds. First, as a threshold matter, plaintiff submits that in light of the fact that proof of a defect in this case is likely to be the subject of conflicting expert opinions, which opinions are not due to be disclosed before February 2008. Thus, while it would be appropriate for the Court to deny defendants' motion on the ground that the absence of the product is not automatically fatal to plaintiff's ability to prove defect and causation, it would be premature for the Court to consider summary judgment based on the sufficiency of plaintiff's proof of a product defect before expert disclosure.

A second reason to deny defendants' summary judgment motion on defect and causation grounds is that the evidence of JSJ and Izzy's response to its knowledge of the loose back problem in thousands of Centron chairs manufactured between 1996 and 1998 raises a question whether it acted negligently when it elected to notify customers and users of problems with Centron chairs by a method which, by its own estimates, would reach less than 20% of its customers, and even fewer ultimate users of those Centron chairs. *See, e.g., Castrignano v. E.R. Squibb & Sons, Inc.,* 546 A.2d 775, 782 (R.I. 1988)(under Rhode Island law, product is defective if a manufacturer or seller fails to warn of risks that may arise from use of the product; manufacturers and sellers have duty to warn of risks they should have known

or were reasonably foreseeable following the acquisition of new information); *see also,* RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY, § 10(b) (seller's duty to warn of product defects after time of sale).

## CONCLUSION

For the foregoing reasons, the Court ought to deny defendant JSJ and Izzy's motion for summary judgment.

Plaintiffs,
By their Attorneys,

/s/ Michael T. Eskey

Amato A. DeLuca (#0531)
Miriam Weizenbaum (#5182)
Michael T. Eskey (#3035)
**DELUCA & WEIZENBAUM, LTD.**
199 North Main Street
Providence, RI 02903
(401) 453-1500
(401) 453-1501 Fax