**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| MARY ANN KING<br>and PHILLIP KING<br>Plaintiffs | :<br>:<br>:<br>: | |
| v. | : | C.A. No.: 06-258-S<br>: |
| STAPLES INC.; IZZY DESIGN;<br>JSJ CORPORATION;<br>JOHN DOE COMPANY<br>Defendants | :<br>:<br>: | |

**PLAINTIFFS' RECORD APPENDIX**

Plaintiffs,
By their Attorneys,

/s/ Michael T. Eskey

Amato A. DeLuca (#0531)
Miriam Weizenbaum (#5182)
Michael T. Eskey (#3035)
**DELUCA & WEIZENBAUM, LTD.**
199 North Main Street
Providence, RI 02903
(401) 453-1500
(401) 453-1501 Fax
**tim@delucaandweizenbaum.com**

Dated: December 10, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MARY ANN KING<br>and PHILLIP KING<br><br>v.<br><br>STAPLES INC.; IZZY DESIGN<br>JSJ CORPORATION;<br>JOHN DOE COMPANY | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No.: 06-258S |

## AFFIDAVIT OF MICHAEL D. METZGER

Michael D. Metzger, being duly sworn upon his oath, hereby states as follows:

1. I am familiar with the facts upon which this affidavit is based and can testify thereto if required.

2. I am the Vice President, Chief Financial Officer, Treasurer and Secretary of JSJ Corporation. I have been a corporate officer of JSJ Corporation since 1985.

3. It is my understanding that Plaintiffs in this matter have alleged that JSJ Corporation sold a Superior Centron Chair that plaintiffs allege was involved in Mary Ann King's accident. JSJ Corporation has never manufactured or sold chairs under the Superior or Superior Centron name.

4. From 1988 until December 15, 2000, JSJ Corporation owned 100% of the stock of JSJ Seating Corporation, a separate corporation that at various times conducted business under the names Superior Chaircraft Corporation and Superior Chair. JSJ Seating Corporation was reorganized as a limited partnership in 2000, with Counter Point Furniture Products, Inc. owning 1% and JSJ Asia-Pacific Corporation owning 99%. Effective December 31, 2000 the

statutory conversion to that partnership became effective, with the new name of JSJ Seating Company Texas, L.P.

5. It is my understanding that JSJ Seating Company Texas, LP and the predecessor entity, JSJ Seating Corporation, sold Superior Centron chairs prior to 2003.

**FURTHER AFFIANT SAYETH NAUGHT.**

Michael D. Metzger

Michael D. Metzger

Sworn and subscribed to
before me this 28th day
of September, 2007.

Deborah K. Kendra
Notary Public
Deborah K. Kendra
Muskegon County, MI
Acting in Ottawa County, MI

117174

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MARY ANN KING and PHILLIP KING, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| STAPLES, INC., IZZY DESIGN; JSJ | ) | No. 06-258-S |
| CORPORATION; JOHN DOE | ) | |
| COMPANY, | ) | |
| Defendants. | ) | |

The 30(b)(6) deposition of IZZY DESIGN by DANIEL VUKCEVICH, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before LISA O'BRIEN, CSR No. 84-3822, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 2170, 222 West Adams Street, Chicago, Illinois, on the 18th day of July, A.D. 2007, at 2:00 p.m.

Page 26

A. Yes.
Q. What was the nature of those contacts?
A. Recalling -- I mean, the most relevant that I can think of would be related to lean manufacturing and Toyota Production System. They were -- JSJ helped support a lot of change efforts at Superior.
Q. And you reported to them the progress of those changes?
A. Yes. They also supported us, so they -- they helped out on our shop floor. So we would interact with them. They would have a project in our facility and we would work together, and we were essentially the customer in that relationship.
Q. I see. Now, I just want to go over some general matters.
Is it fair to say that Izzy is in the business of designing office furniture?
A. Yes. Design and manufacturer of office furniture, and distribution.
Q. Okay. Distribution includes sales to customers, correct?
A. Yes.
Q. Okay. And Izzy has been in that business

Page 27

since 2001, 2002?
A. Yes.
Q. Okay. And -- now, before that, when you worked for Superior, Superior was also in the business of designing, producing, and distributing office furniture, correct?
A. Specifically chairs.
Q. Okay. Superior was just limited in its products to chairs?
A. Yes.
Q. Okay. And how long was Superior in that business?
A. If my dates are a little bit off, I won't be surprised, but I believe it was started in 1972.
Q. Okay. And that whole time, was it your understanding that they were a division of JSJ Corp?
A. No. No, they were privately -- privately owned by a Belton -- by a Texas family, and then I believe JSJ -- I believe the relationship with JSJ started, I think, in 1988.
Q. JSJ acquired Superior?
A. Again --
MR. STUBENVOLL: I object to form, foundation.
BY THE WITNESS:

Page 28

A. I am not familiar with the corporate structure.
BY MR. ESKEY:
Q. Okay. But at certain -- a certain point, Superior became a division of JSJ Corp, correct?
A. Yes.
Q. Now, as part of its business, Superior designed office chairs --
A. Yes.
Q. -- to your knowledge?
A. Yes.
Q. And Superior also manufactured office chairs?
A. Yes.
Q. And sold office chairs?
A. Yes.
Q. One of the office chairs that Superior designed, manufactured, and sold was the Superior brand or line of chairs, correct?
A. Yes.
Q. Okay. And one of those chairs in that line was the Centron office chair, correct?
A. Yes.
Q. And that's what's referred to as the task

Page 29

chair?
A. Yes. Just to clarify, the product family was Centron. There were multiple chairs within the Centron product family.
Q. Okay.
A. So there were some task chairs and some guest chairs, and there were other forms of Centron.
Q. Okay. So -- and that was Superior's business, to manufacture and sell and design those chairs, correct?
A. Yes.
Q. Okay. And within that family of Centron -- Superior Centron chairs, there's a task chair, correct?
A. Yes.
Q. And what is a task chair by definition, distinguishing it from the other chairs?
A. A task chair is designed for long-term sitting; eight hours a day, you know, where a worker is going to be at a desk, performing desk functions all day. So a task chair is generally designed to have a lot of adjustment features to it.
Q. Okay. And what distinguishes the task chair from an executive chair?

Page 30

A. This may be just industry specific, but our -- maybe our view of the market, but when we look at an executive chair, it will generally have a higher design; not necessarily more functionality. And it -- it may not necessarily be for a longer term sit.

Q. Okay. And what distinguishes a task chair from a guest chair?

A. A guest chair will generally be more rigid, like a four-legged chair, because you will occasionally sit down. You won't be there for eight hours. You will sit there for ten minutes. So the comfort model may not necessitate an eight-hour sit.

Q. Okay. And when did the Centron family of chairs first roll out in terms of production?

A. 1996.

Q. Okay. And that includes the task chair?

A. Yes.

Q. Now, at that time in 1996 -- I have just been referring to it as generically Superior -- but do you know precisely what Superior's corporate name was at that time?

A. I don't. And I am aware that there were

Page 31

a few -- there were other names, so I am not sure what it was in 1996.

Q. Okay. So for purposes of this deposition, we will just continue to refer to it generically as Superior.

A. Yes.

Q. Whatever it was called in 1996 or '97 or '98, if that name, indeed, changed -- and I don't know whether it did or not -- it's your understanding today that when I refer to Superior, it's generically referring to whatever entity was in existence --

A. Yes.

Q. -- at the time? Okay.

Now, when the Superior Centron task chair was first produced in 1996, is it your understanding that the back of the chair was connected to the chair by a J-bar?

A. Yes.

Q. Okay. And can you explain to us how the J-bar actually attaches to the chair?

A. Sure. The Centron specifically?

Q. Yes.

A. Okay. The steel J-bar, basically, is

Page 32

drilled and tapped with a hole. That steel J-bar is inserted into the control mechanism or the seat mechanism, and then two -- two bolts, screws, pass through the control mechanism into the threaded hole, into the steel J-bar, and that connects the J-bar to the seat mechanism.

Q. Okay. So in 1996, when the Superior Centron chair was first produced, the J-bar was designed so that the -- it would be attached to the chair by two screws?

A. Yes.

Q. Okay. And beginning in 1996, the Superior Centron task chair, beginning at that time, for that chair, users of Superior -- users of those chairs reported problems with loose backs; is that correct?

A. I'm not -- in 1996?

Q. Yes.

A. I'm not sure about the time frame. We did get some feedback of loose backs in the first few years. I'm not sure about 1996.

Q. Okay. At a certain point after 1996, Superior also learned that users were complaining of loose screws on Superior Centron task chairs,

Page 33

correct?

A. Looking back through our -- through our documents, I think the feedback was loose backs, and -- which may have attributed to the loose screws. But I think the feedback we were getting from customers was loose Centron backs.

Q. Okay. You referred to looking back over documents. What documents have you looked back over to prepare yourself for this deposition?

A. The same documents that we sent to you.

Q. Okay. And so I've got documents that are Bates stamped IZ, I think for Izzy, from 1 through -- I have this written down somewhere -- 2357. And they are all on the table here before me. Did you review all of these documents?

A. No, not in detail.

Q. Okay. Did you at least put your eyeballs on every single one of these pages, flipping through them?

A. No.

Q. Okay. What of these documents did you concentrate on, if any?

A. I looked over the engineering change notices, the -- what we call the QTS report, and the

Page 26

A. Yes.
Q. What was the nature of those contacts?
A. Recalling -- I mean, the most relevant that I can think of would be related to lean manufacturing and Toyota Production System. They were -- JSJ helped support a lot of change efforts at Superior.
Q. And you reported to them the progress of those changes?
A. Yes. They also supported us, so they -- they helped out on our shop floor. So we would interact with them. They would have a project in our facility and we would work together, and we were essentially the customer in that relationship.
Q. I see. Now, I just want to go over some general matters.
Is it fair to say that Izzy is in the business of designing office furniture?
A. Yes. Design and manufacturer of office furniture, and distribution.
Q. Okay. Distribution includes sales to customers, correct?
A. Yes.
Q. Okay. And Izzy has been in that business

Page 27

since 2001, 2002?
A. Yes.
Q. Okay. And -- now, before that, when you worked for Superior, Superior was also in the business of designing, producing, and distributing office furniture, correct?
A. Specifically chairs.
Q. Okay. Superior was just limited in its products to chairs?
A. Yes.
Q. Okay. And how long was Superior in that business?
A. If my dates are a little bit off, I won't be surprised, but I believe it was started in 1972.
Q. Okay. And that whole time, was it your understanding that they were a division of JSJ Corp?
A. No. No, they were privately -- privately owned by a Belton -- by a Texas family, and then I believe JSJ -- I believe the relationship with JSJ started, I think, in 1988.
Q. JSJ acquired Superior?
A. Again --
MR. STUBENVOLL: I object to form, foundation.
BY THE WITNESS:

Page 28

A. I am not familiar with the corporate structure.
BY MR. ESKEY:
Q. Okay. But at certain -- a certain point, Superior became a division of JSJ Corp, correct?
A. Yes.
Q. Now, as part of its business, Superior designed office chairs --
A. Yes.
Q. -- to your knowledge?
A. Yes.
Q. And Superior also manufactured office chairs?
A. Yes.
Q. And sold office chairs?
A. Yes.
Q. One of the office chairs that Superior designed, manufactured, and sold was the Superior brand or line of chairs, correct?
A. Yes.
Q. Okay. And one of those chairs in that line was the Centron office chair, correct?
A. Yes.
Q. And that's what's referred to as the task

Page 29

chair?
A. Yes. Just to clarify, the product family was Centron. There were multiple chairs within the Centron product family.
Q. Okay.
A. So there were some task chairs and some guest chairs, and there were other forms of Centron.
Q. Okay. So -- and that was Superior's business, to manufacture and sell and design those chairs, correct?
A. Yes.
Q. Okay. And within that family of Centron -- Superior Centron chairs, there's a task chair, correct?
A. Yes.
Q. And what is a task chair by definition, distinguishing it from the other chairs?
A. A task chair is designed for long-term sitting; eight hours a day, you know, where a worker is going to be at a desk, performing desk functions all day. So a task chair is generally designed to have a lot of adjustment features to it.
Q. Okay. And what distinguishes the task chair from an executive chair?

A. This may be just industry specific, but our -- maybe our view of the market, but when we look at an executive chair, it will generally have a higher design; not necessarily more functionality. And it -- it may not necessarily be for a longer term sit.

Q. Okay. And what distinguishes a task chair from a guest chair?

A. A guest chair will generally be more rigid, like a four-legged chair, because you will occasionally sit down. You won't be there for eight hours. You will sit there for ten minutes. So the comfort model may not necessitate an eight-hour sit.

Q. Okay. And when did the Centron family of chairs first roll out in terms of production?

A. 1996.

Q. Okay. And that includes the task chair?

A. Yes.

Q. Now, at that time in 1996 -- I have just been referring to it as generically Superior -- but do you know precisely what Superior's corporate name was at that time?

A. I don't. And I am aware that there were



a few -- there were other names, so I am not sure what it was in 1996.

Q. Okay. So for purposes of this deposition, we will just continue to refer to it generically as Superior.

A. Yes.

Q. Whatever it was called in 1996 or '97 or '98, if that name, indeed, changed -- and I don't know whether it did or not -- it's your understanding today that when I refer to Superior, it's generically referring to whatever entity was in existence --

A. Yes.

Q. -- at the time? Okay.

Now, when the Superior Centron task chair was first produced in 1996, is it your understanding that the back of the chair was connected to the chair by a J-bar?

A. Yes.

Q. Okay. And can you explain to us how the J-bar actually attaches to the chair?

A. Sure. The Centron specifically?

Q. Yes.

A. Okay. The steel J-bar, basically, is



drilled and tapped with a hole. That steel J-bar is inserted into the control mechanism or the seat mechanism, and then two -- two bolts, screws, pass through the control mechanism into the threaded hole, into the steel J-bar, and that connects the J-bar to the seat mechanism.

Q. Okay. So in 1996, when the Superior Centron chair was first produced, the J-bar was designed so that the -- it would be attached to the chair by two screws?

A. Yes.

Q. Okay. And beginning in 1996, the Superior Centron task chair, beginning at that time, for that chair, users of Superior -- users of those chairs reported problems with loose backs; is that correct?

A. I'm not -- in 1996?

Q. Yes.

A. I'm not sure about the time frame. We did get some feedback of loose backs in the first few years. I'm not sure about 1996.

Q. Okay. At a certain point after 1996, Superior also learned that users were complaining of loose screws on Superior Centron task chairs,



correct?

A. Looking back through our -- through our documents, I think the feedback was loose backs, and -- which may have attributed to the loose screws. But I think the feedback we were getting from customers was loose Centron backs.

Q. Okay. You referred to looking back over documents. What documents have you looked back over to prepare yourself for this deposition?

A. The same documents that we sent to you.

Q. Okay. And so I've got documents that are Bates stamped IZ, I think for Izzy, from 1 through -- I have this written down somewhere -- 2357. And they are all on the table here before me. Did you review all of these documents?

A. No, not in detail.

Q. Okay. Did you at least put your eyeballs on every single one of these pages, flipping through them?

A. No.

Q. Okay. What of these documents did you concentrate on, if any?

A. I looked over the engineering change notices, the -- what we call the QTS report, and the

Page 30

A. This may be just industry specific, but our -- maybe our view of the market, but when we look at an executive chair, it will generally have a higher design; not necessarily more functionality. And it -- it may not necessarily be for a longer term sit.
Q. Okay. And what distinguishes a task chair from a guest chair?
A. A guest chair will generally be more rigid, like a four-legged chair, because you will occasionally sit down. You won't be there for eight hours. You will sit there for ten minutes. So the comfort model may not necessitate an eight-hour sit.
Q. Okay. And when did the Centron family of chairs first roll out in terms of production?
A. 1996.
Q. Okay. And that includes the task chair?
A. Yes.
Q. Now, at that time in 1996 -- I have just been referring to it as generically Superior -- but do you know precisely what Superior's corporate name was at that time?
A. I don't. And I am aware that there were

Page 31

a few -- there were other names, so I am not sure what it was in 1996.
Q. Okay. So for purposes of this deposition, we will just continue to refer to it generically as Superior.
A. Yes.
Q. Whatever it was called in 1996 or '97 or '98, if that name, indeed, changed -- and I don't know whether it did or not -- it's your understanding today that when I refer to Superior, it's generically referring to whatever entity was in existence --
A. Yes.
Q. -- at the time? Okay.
Now, when the Superior Centron task chair was first produced in 1996, is it your understanding that the back of the chair was connected to the chair by a J-bar?
A. Yes.
Q. Okay. And can you explain to us how the J-bar actually attaches to the chair?
A. Sure. The Centron specifically?
Q. Yes.
A. Okay. The steel J-bar, basically, is

Page 32

drilled and tapped with a hole. That steel J-bar is inserted into the control mechanism or the seat mechanism, and then two -- two bolts, screws, pass through the control mechanism into the threaded hole, into the steel J-bar, and that connects the J-bar to the seat mechanism.
Q. Okay. So in 1996, when the Superior Centron chair was first produced, the J-bar was designed so that the -- it would be attached to the chair by two screws?
A. Yes.
Q. Okay. And beginning in 1996, the Superior Centron task chair, beginning at that time, for that chair, users of Superior -- users of those chairs reported problems with loose backs; is that correct?
A. I'm not -- in 1996?
Q. Yes.
A. I'm not sure about the time frame. We did get some feedback of loose backs in the first few years. I'm not sure about 1996.
Q. Okay. At a certain point after 1996, Superior also learned that users were complaining of loose screws on Superior Centron task chairs,

Page 33

correct?
A. Looking back through our -- through our documents, I think the feedback was loose backs, and -- which may have attributed to the loose screws. But I think the feedback we were getting from customers was loose Centron backs.
Q. Okay. You referred to looking back over documents. What documents have you looked back over to prepare yourself for this deposition?
A. The same documents that we sent to you.
Q. Okay. And so I've got documents that are Bates stamped IZ, I think for Izzy, from 1 through -- I have this written down somewhere -- 2357. And they are all on the table here before me. Did you review all of these documents?
A. No, not in detail.
Q. Okay. Did you at least put your eyeballs on every single one of these pages, flipping through them?
A. No.
Q. Okay. What of these documents did you concentrate on, if any?
A. I looked over the engineering change notices, the -- what we call the QTS report, and the

Q. Okay. Next one is "Date manufactured," correct?
A. Yes.
Q. So that's pretty self-explanatory.
The next is "TI model number."
A. Yes.
Q. And did -- looking at that TI model number that's in the column in the first row on Page 801, what does that indicate to you, if anything?
A. Unfortunately, this is where, because of the way the data was sorted, it's not completely clear to me. But looking back through the data and our records, I believe that we were selling a few different model numbers to TI ending in numbers like 301, 302, 303. So I would expect to see that -- I do see some of that, but it doesn't all follow. So I am not sure -- I am not sure what model numbers -- let me back up a step.
Again, looking back through the data, knowing about the TI relationship, we created specific model numbers for TI. So although it was the Centron chair that we sold commercially as well, it also had a separate TI model number that --



essentially, it was important for TI in managing their product or their inventory.
Q. Okay. So, now, is it your understanding, though, looking at this number, that that's a Centron chair?
A. I can't -- this number doesn't make a lot of sense to me. Again, some look familiar, but I think it's because of the way the columns were generated.
Q. Okay. Who at Izzy or Superior or JSJ would have most information to be able to tell us what that number translates to in terms of the Centron chair, if it, in fact, refers to a Centron chair?
A. Because of the way this is sorted, I don't believe anyone can. The 4024, that's our commercial number. So that does -- I know that translates. And I would infer -- I would guess that some of these -- but because there's numbers missing, I don't think anybody can say -- like 302, based on looking at the past information, 302, those look like familiar numbers.
Q. Now, other than computer generated information, are there any other documents that were



generated either at the time the customer complained or that can be generated now, which would identify the model number of the product about which the customer is complaining?
A. Looking at these reports now and the QTS system, we could sort by model numbers. But I think the way QTS works, we might miss some of the parts issues because if -- if TI required a part number be generated for each order then we wouldn't be able -- I think that's why we stayed with the problem code, because TI was requiring -- was requiring specific part numbers. So we might -- the sort may not be as comprehensive, if we only looked at 301, 302, 303.
Q. Okay. I am looking at Page 802 in the -- the 13th row down -- sorry, it's the 12th row down. There's a problem code of V11. So that's a third problem code. And in the description, it says, among other things, "Loose Centron screw. Keep TI service part." I'm going to show you that.
A. Okay.
Q. Now, with that information, and then looking at the model designation, are you able to tell what type of chair that is?
A. I'm not. But I think -- this is a --



this is a -- this number, I understand, is a chair. All these other numbers, because they are not familiar to me, I'm guessing that they created part numbers for service parts. So instead of putting in the model number when they received the call, they were putting in parts orders, and that's why all these numbers look unfamiliar.
Q. Okay.
A. And that's another example -- that one is -- that's a full chair. This is a full chair. I believe that's a full chair. These other ones are not familiar.
Q. Okay. Well, let me back up a minute.
Now, the Superior Centron chairs, the task chairs that were manufactured before December 29th of 1998, were designed so that the J-bar was secured with two screws, correct?
A. That's my understanding.
Q. Okay. And before that time, December 29th of 1998, did Superior receive complaints about loose backs or problems with the screws attaching the J-bar to the Superior Centron chairs, to your knowledge?
A. My understanding was we were -- this is

Q. Okay.
A. They would calibrate it periodically, but I'm not sure what we were doing at the time for specification.
Q. Okay. So before 1998, there's at least no indication, as far as the documents that you have reviewed, which documents the amount of torque that was to be applied in tightening down those screws?
A. Right. Yes. And then the practice that I'm describing would be sometime after 2000 where we standardized on guns. So I am not sure even what guns they were using.
Q. Okay. Now, was there any investigation that you're aware of into why the screws were loosening or backing out before December 1998?
A. I'm not aware of how they went about it -- of how they investigated their issues.
Q. Do you know whether an investigation was conducted?
A. I don't. I don't know what process it was. I would say because there was -- because it led to an action, I would assume somebody was investigating it.
Q. Okay. Will you agree with me that the



screws were not designed to loosen or back out?
A. I agree.
Q. And that those screws were designed to permanently secure and attach the J-bar to the control mechanism, correct?
A. Yes.
Q. Okay.
A. Because of the way it's manufactured, it is -- it is acceptable for field repair. So -- so with, you know, the proper amount of force you can separate the back and, you know, replace a back or replace a seat and not replace the entire chair.
Q. Well, but that would require loosening the screws, correct?
A. Right. Right.
Q. So that would be an intentional act of loosening the screws?
A. Exactly. Yes.
Q. But other than that circumstance where you're performing a repair and you intend to loosen the screws, you would agree with me that the screws were designed to permanently affix the J-bar to the control mechanism, correct?
A. Yes.



Q. They weren't designed to back out in any way?
A. Yes.
Q. And that a loose back, if it was resulting from loosened or backed out screws, was not the design intent for that J-bar, correct?
A. Yes.
Q. All right. Now --
MR. STUBENVOLL: I object to form, foundation on that last one. But go ahead.
BY MR. ESKEY:
Q. What prevented the screws from loosening or backing out in the design, as you're aware of it, based on your review of the materials?
MR. STUBENVOLL: I object based on time.
BY THE WITNESS:
A. A nylon patch was applied to two of the screws, and then what I saw in the -- as part of the temporary solution, they used a -- I think they called it a Fender washer, which is -- has teeth to it. So it's designed to not let the -- not let the screw back out, basically. And I believe in addition to the Fender washer on that temporary solution, they applied Lock-tight -- a few drops of



Lock-tight.
BY MR. ESKEY:
Q. Okay. The nylon patch on the screw, was that nylon patch applied to the screws that were initially used in '96, in the chair?
A. From the documents, it looks like it was.
Q. Okay. And what document did you see that in?
A. The new screw -- I'm sorry, 878.
Q. Page 878?
A. Yes.
Q. Okay. Could you read into the record what you are referring to?
A. Uh-huh. "The new screw is shorter and easily identified by the blue nylon locking patch on the threads."
Q. Okay. Now, that refers to a new screw. What was the date of that engineering change notice?
A. January of '96.
Q. Okay. Was that new screw replacing another screw that was used in production?
A. Yes.
Q. And do you know whether the screw that it replaced also had a nylon patch on it?

Q. Okay.
A. They would calibrate it periodically, but I'm not sure what we were doing at the time for specification.
Q. Okay. So before 1998, there's at least no indication, as far as the documents that you have reviewed, which documents the amount of torque that was to be applied in tightening down those screws?
A. Right. Yes. And then the practice that I'm describing would be sometime after 2000 where we standardized on guns. So I am not sure even what guns they were using.
Q. Okay. Now, was there any investigation that you're aware of into why the screws were loosening or backing out before December 1998?
A. I'm not aware of how they went about it -- of how they investigated their issues.
Q. Do you know whether an investigation was conducted?
A. I don't. I don't know what process it was. I would say because there was -- because it led to an action, I would assume somebody was investigating it.
Q. Okay. Will you agree with me that the



screws were not designed to loosen or back out?
A. I agree.
Q. And that those screws were designed to permanently secure and attach the J-bar to the control mechanism, correct?
A. Yes.
Q. Okay.
A. Because of the way it's manufactured, it is -- it is acceptable for field repair. So -- so with, you know, the proper amount of force you can separate the back and, you know, replace a back or replace a seat and not replace the entire chair.
Q. Well, but that would require loosening the screws, correct?
A. Right. Right.
Q. So that would be an intentional act of loosening the screws?
A. Exactly. Yes.
Q. But other than that circumstance where you're performing a repair and you intend to loosen the screws, you would agree with me that the screws were designed to permanently affix the J-bar to the control mechanism, correct?
A. Yes.



Q. They weren't designed to back out in any way?
A. Yes.
Q. And that a loose back, if it was resulting from loosened or backed out screws, was not the design intent for that J-bar, correct?
A. Yes.
Q. All right. Now --
MR. STUBENVOLL: I object to form, foundation on that last one. But go ahead.
BY MR. ESKEY:
Q. What prevented the screws from loosening or backing out in the design, as you're aware of it, based on your review of the materials?
MR. STUBENVOLL: I object based on time.
BY THE WITNESS:
A. A nylon patch was applied to two of the screws, and then what I saw in the -- as part of the temporary solution, they used a -- I think they called it a Fender washer, which is -- has teeth to it. So it's designed to not let the -- not let the screw back out, basically. And I believe in addition to the Fender washer on that temporary solution, they applied Lock-tight -- a few drops of



Lock-tight.
BY MR. ESKEY:
Q. Okay. The nylon patch on the screw, was that nylon patch applied to the screws that were initially used in '96, in the chair?
A. From the documents, it looks like it was.
Q. Okay. And what document did you see that in?
A. The new screw -- I'm sorry, 878.
Q. Page 878?
A. Yes.
Q. Okay. Could you read into the record what you are referring to?
A. Uh-huh. "The new screw is shorter and easily identified by the blue nylon locking patch on the threads."
Q. Okay. Now, that refers to a new screw. What was the date of that engineering change notice?
A. January of '96.
Q. Okay. Was that new screw replacing another screw that was used in production?
A. Yes.
Q. And do you know whether the screw that it replaced also had a nylon patch on it?

Page 158

question and answer read back?
(WHEREUPON, the record was read by the reporter.)
BY MR. ESKEY:
Q. And 778 through 780, we've discussed that already. That was the QRT report. That was the first QRT report, correct?
A. QTS, I think.
Q. QTS. Sorry.
781 and 782 we've discussed. That's the hang tag information?
A. Yes.
Q. 783 to 800 --
MS. MICHELS: What were those numbers?
MR. ESKEY: 783 through 800.
BY MR. ESKEY:
Q. Can you tell me what these documents are, if you know? Again, if you don't know, just say you don't know.
A. Yeah, in reviewing the documents yesterday, we noticed that these -- we intended to run all of the -- all the sales of the Centron chair. So we ran for all our model numbers from 4000 to 4154, so it generated these 3200 chairs.

Page 159

What we saw today, basically, is that we felt like this under-represented the full number of chairs. So this is -- this is, basically, the sales from Superior under the model numbers 4000 to 4200.
Q. Okay.
A. It does not necessarily represent TI sales.
Q. Okay. So -- I'm just trying to understand then.
A. Sure.
Q. TI sales would be greater than what's indicated on Page 783?
A. Yes.
Q. Okay. Do you know how much greater?
A. We looked at it briefly this morning to get an idea. But I think -- and the model codes were 301 through 303. I think the -- I think there are another 10,000 chairs over the same time period.
Q. Okay. So, again, ballpark -- I'm not holding you to an exact figure. Then back of the napkin, there are about 13,000 chairs that were sold to Texas Instruments from 1996 through 2003 in the Centron family?
A. No. The way I understand it is about

Page 160

10,000 chairs were sold to Texas Instruments. Probably these 3100 were shipped to other customers.
Q. I see.
A. So a total of 13,000 chairs, with 10,000 going to Texas Instruments.
Q. Okay. And the balance of them to other customers?
A. Yes.
Q. Okay. Now, in terms of the actual model represented, were all those Superior Centron, but within that -- strike that.
Those 13,000, was that Superior Centron chairs?
A. Yes.
Q. Okay. And do we have any way of being able to break that down in terms of how many task chairs as opposed to guest chairs, and things like that?
A. Yes, we could rerun the report for a particular model.
Q. Okay. But that's, basically, all models in the Centron family?
A. Yes.
Q. 13,000?

Page 161

A. Yes.
Q. Okay. Pages 810 through 825, can you tell me what that represents?
A. This is where -- I would need to spend some time to -- and do this again, because if -- now that I look at this, he did run it by a customer. So this may have been TI sales. I know from our reasonability that it was a lot higher than that. So it is closer to 13,000 chairs. What they tried to run over here --
Q. Just for the record, you are referring to 783?
A. 783.
Q. Okay.
A. And then when I look at 810, I think what he was trying to do was run the rest of the sales.
Q. Okay. But at any rate, when you say he was trying to run it, who would that be?
A. The sales administrator.
Q. Who was that?
A. His name is Dan Vrant. He was running these reports for Ken and I, basically.
Q. All right. But at any rate, there is a method by which you could verify --

REPORT OF TEST

SGS® SGS U.S. Testing Company Inc.

291 Fairfield Avenue
Fairfield, NJ 07004
Tel: 201-575-5252
Fax: 201-575-8271

REPORT NUMBER: 121260
DATE: May 8, 1997
PAGE 1 OF 6

CLIENT: Superior Chaircraft
JSJ Seating Corp.
One Industrial Park Drive
Belton, Texas 76513

SUBJECT: Office Chair Evaluation

AUTHORIZATION: Client's P.O. Number 45685 dated April 10, 1997.

SAMPLE ID: Three (3) multi-function office chairs, was received on April 8, 1997 and identified by the Client as:

"Model 4154 - Revolving Chair"
Centrun

TEST PROCEDURE: ANSI/BIFMA X5.1-1993
"American National Standard for Office Furnishings - General Purpose Office Chairs - Tests".

TEST DATES: April 17, 1997 to April 29, 1997.

PREPARED BY:

Hiten Pandya, Manager
Products Evaluation

SIGNED FOR THE COMPANY BY:

Frank Pepe, Vice President
Operations

lv

Member of the SGS Group

ANALYTICAL SERVICES • PERFORMANCE TESTING • STANDARDS EVALUATION • CERTIFICATION SERVICES

SGS U.S. TESTING COMPANY INC. REPORTS ARE FOR THE EXCLUSIVE USE OF THE CLIENT TO WHOM THEY ARE ADDRESSED. ANYONE RELYING ON SUCH REPORTS SHOULD UNDERSTAND ALL OF THE DETAILS OF THE ENGAGEMENT. REPORTS REFLECT RESULTS ONLY OF THE STANDARDS OR PROCEDURES IDENTIFIED TO THE TESTS CONDUCTED AND ARE LIMITED TO THE SAMPLES TESTED. TEST RESULTS MAY NOT BE INDICATIVE OF THE QUALITIES OF THE LOT FROM WHICH THE SAMPLE WAS TAKEN. SGS U.S. TESTING COMPANY INC. HAS NOT CONDUCTED ANY QUALITY CONTROL PROGRAM FOR THE CLIENT. NEITHER THE NAME, SEALS, MARKS NOR INSIGNIA OF SGS U.S. TESTING COMPANY INC. MAY BE USED IN ANY ADVERTISING OR PROMOTIONAL MATERIALS WITHOUT THE PRIOR WRITTEN APPROVAL OF SGS U.S. TESTING COMPANY INC. THIS REPORT SHALL NOT BE REPRODUCED EXCEPT IN FULL WITHOUT THE WRITTEN PERMISSION OF THE SGS U.S. TESTING COMPANY INC. SAMPLES NOT DESTROYED IN TESTING ARE DISPOSED OF AFTER 30 DAYS.

Page 114

the Eon -- the Eon as a basis to say that we felt good about the construction of Centron as well.
Q. Okay. And so now what --
A. Oh, I'm sorry, to answer your question about why did I include this test report, because the samples -- 592 is the synchro-tilt. So in that -- on this test report, it shows a pass, and that's why we -- that's how we validated the synchro-tilt control.
Q. Okay. So it's your testimony that as far as that test summary report is concerned, the component that is the same as in the Centron family, passed, but it was -- at least the component that failed, we don't know whether that's the same as the Centron one?
A. I know the mechanism is not. As far as the bolts, I am not sure. But in that -- in my notes I tried to identify the shared components of Centron. That's the only -- that's the only summary I provided. So there's other information in there but, you know, that was my intent.
Q. Okay. And that summary page that's on the front of that series, which is page 55, you generated that?

Page 115

A. Uh-huh.
Q. Yes?
A. Yes.
Q. Okay. And that's just a summary of all the test results that are from pages 56 through 123; is that correct?
A. Yes.
Q. Okay. Now, the other ones, the other test results, pages -- page 124, there's another summary on page 124. Did you generate that as well?
A. Yes.
Q. And there's a report here -- it's test number 121260 -- where two screws sheared off and there was a failure of the back durability test. Do you see that summary?
A. The second one?
Q. Yes.
A. Yes.
Q. Could you find that report?
A. Sure. Okay.
Q. Okay. Now, what was the date of that report?
A. May 8, '97.
Q. Okay. And what type of chair was that --

Page 116

was tested in that report?
A. Centron.
Q. Okay. And what was the failure on the back durability test?
A. From the notes, it says the two screws attached to the control mechanism to the seat base sheared off.
Q. Okay. And are you familiar with the back durability test and how that's performed?
A. Yes.
Q. Can you describe to us generally what happens?
A. Yes. The back is basically cycled through its normal range of motion, and when -- 16 inches off of the seat, you affix an arm, and you cycle it through its normal range of motion. And at the end of its normal range of motion you apply 100 pounds of force, 16 inches above the seat, perpendicular to the back. And when -- at the time the industry standard was -- to these tests, the industry standard was 120,000 pulls directly in the center of the chair back.
What happened in 2003, the industry standard changed to where you do 80,000 in the

Page 117

center and then you do 20,000 to the right and 20,000 to the left. But I believe all the same efforts are in the current standards, as far as the force applied.
Q. So just in lay terms -- just to interrupt for a second -- that's simulating someone leaning back against the chair?
A. Yes. It's -- yeah, applying a lot of force, but yes.
Q. You apply a lot of force. You go through a number of cycles applying a lot of force to the back of the chair?
A. Right.
Q. If the chair doesn't break or deform or have any other failure mode, then it passes the test; is that essentially right?
A. Yes.
Q. Okay. And this chair that was tested in '97, the two bolts sheared off, correct?
A. That's what it looks like.
Q. Okay. Now, following that failure and report, do you know what action, if any, was taken by Superior in response to that? Is there any documentation?

SGS U.S. Testing Company Inc.

REPORT NUMBER: 121260
DATE: May 8, 1997
PAGE 5 OF 6

REPORT OF TEST

CLIENT: Superior Chaircraft

TEST PROCEDURES AND RESULTS: Continued

13. Stability Test - Dynamic

Rear Stability. The chair was placed on the test platform with the prescribed 173 pound weight strapped in the seat. All adjustments were set to provide the most unstable conditions for rearward stability.

A 1/2 inch obstruction was fixed against the casters and a rearward force was applied in the plane of the top of the weight until the total load was transferred to the rear supports.

The unit complied with the minimum requirement of 20 lbf requiring 44 lbf to lift the front supports off the platform.

Front Stability. The weight of the chair was recorded after which it was placed on the test platform with all adjustments set to provide the most unstable condition for forward stability.

A 1/2 inch obstruction was fixed against the casters and a downward force was applied at 45° to the test platform by attaching a strap over the front portion of the seat.

The force was increased until the total load was transferred to the front supports.

The minimum requirement to raise the rear supports off the platform is 40% of the unit total weight. The sample complied with this requirement, a load of 21 lbf causing the supports to lift, the chair weighing 38 pounds.

16. Back Durability Test - Cyclic - Type I

The unit was placed on a test platform in an upright position and restrained from movement. A 100 lb dead load was placed on the seat.

If adjustable features were available, all adjustments were set at the midpoint of the normal range.

A cycling device was attached to the center of the back 16 inches above the seat. The cycling device was adjusted to apply a force of 100 lbs 90° to the plane of the back. The device was set-up to be cycled for a total of 120,000 cycles at a rate of 5 to 40 cycles per minute.

After completing about 31,000 cycles, the two screws attaching the control mechanism to the seat base sheared off. The tested sample does not comply with the requirements of this test.

IZ 00148

Page 114

the Eon -- the Eon as a basis to say that we felt good about the construction of Centron as well.
Q. Okay. And so now what --
A. Oh, I'm sorry, to answer your question about why did I include this test report, because the samples -- 592 is the synchro-tilt. So in that -- on this test report, it shows a pass, and that's why we -- that's how we validated the synchro-tilt control.
Q. Okay. So it's your testimony that as far as that test summary report is concerned, the component that is the same as in the Centron family, passed, but it was -- at least the component that failed, we don't know whether that's the same as the Centron one?
A. I know the mechanism is not. As far as the bolts, I am not sure. But in that -- in my notes I tried to identify the shared components of Centron. That's the only -- that's the only summary I provided. So there's other information in there but, you know, that was my intent.
Q. Okay. And that summary page that's on the front of that series, which is page 55, you generated that?

Page 115

A. Uh-huh.
Q. Yes?
A. Yes.
Q. Okay. And that's just a summary of all the test results that are from pages 56 through 123; is that correct?
A. Yes.
Q. Okay. Now, the other ones, the other test results, pages -- page 124, there's another summary on page 124. Did you generate that as well?
A. Yes.
Q. And there's a report here -- it's test number 121260 -- where two screws sheared off and there was a failure of the back durability test. Do you see that summary?
A. The second one?
Q. Yes.
A. Yes.
Q. Could you find that report?
A. Sure. Okay.
Q. Okay. Now, what was the date of that report?
A. May 8, '97.
Q. Okay. And what type of chair was that --

Page 116

was tested in that report?
A. Centron.
Q. Okay. And what was the failure on the back durability test?
A. From the notes, it says the two screws attached to the control mechanism to the seat base sheared off.
Q. Okay. And are you familiar with the back durability test and how that's performed?
A. Yes.
Q. Can you describe to us generally what happens?
A. Yes. The back is basically cycled through its normal range of motion, and when -- 16 inches off of the seat, you affix an arm, and you cycle it through its normal range of motion. And at the end of its normal range of motion you apply 100 pounds of force, 16 inches above the seat, perpendicular to the back. And when -- at the time the industry standard was -- to these tests, the industry standard was 120,000 pulls directly in the center of the chair back.
What happened in 2003, the industry standard changed to where you do 80,000 in the

Page 117

center and then you do 20,000 to the right and 20,000 to the left. But I believe all the same efforts are in the current standards, as far as the force applied.
Q. So just in lay terms -- just to interrupt for a second -- that's simulating someone leaning back against the chair?
A. Yes. It's -- yeah, applying a lot of force, but yes.
Q. You apply a lot of force. You go through a number of cycles applying a lot of force to the back of the chair?
A. Right.
Q. If the chair doesn't break or deform or have any other failure mode, then it passes the test; is that essentially right?
A. Yes.
Q. Okay. And this chair that was tested in '97, the two bolts sheared off, correct?
A. That's what it looks like.
Q. Okay. Now, following that failure and report, do you know what action, if any, was taken by Superior in response to that? Is there any documentation?

Page 30

A. This may be just industry specific, but our -- maybe our view of the market, but when we look at an executive chair, it will generally have a higher design; not necessarily more functionality. And it -- it may not necessarily be for a longer term sit.
Q. Okay. And what distinguishes a task chair from a guest chair?
A. A guest chair will generally be more rigid, like a four-legged chair, because you will occasionally sit down. You won't be there for eight hours. You will sit there for ten minutes. So the comfort model may not necessitate an eight-hour sit.
Q. Okay. And when did the Centron family of chairs first roll out in terms of production?
A. 1996.
Q. Okay. And that includes the task chair?
A. Yes.
Q. Now, at that time in 1996 -- I have just been referring to it as generically Superior -- but do you know precisely what Superior's corporate name was at that time?
A. I don't. And I am aware that there were

Page 31

a few -- there were other names, so I am not sure what it was in 1996.
Q. Okay. So for purposes of this deposition, we will just continue to refer to it generically as Superior.
A. Yes.
Q. Whatever it was called in 1996 or '97 or '98, if that name, indeed, changed -- and I don't know whether it did or not -- it's your understanding today that when I refer to Superior, it's generically referring to whatever entity was in existence --
A. Yes.
Q. -- at the time? Okay.
Now, when the Superior Centron task chair was first produced in 1996, is it your understanding that the back of the chair was connected to the chair by a J-bar?
A. Yes.
Q. Okay. And can you explain to us how the J-bar actually attaches to the chair?
A. Sure. The Centron specifically?
Q. Yes.
A. Okay. The steel J-bar, basically, is

Page 32

drilled and tapped with a hole. That steel J-bar is inserted into the control mechanism or the seat mechanism, and then two -- two bolts, screws, pass through the control mechanism into the threaded hole, into the steel J-bar, and that connects the J-bar to the seat mechanism.
Q. Okay. So in 1996, when the Superior Centron chair was first produced, the J-bar was designed so that the -- it would be attached to the chair by two screws?
A. Yes.
Q. Okay. And beginning in 1996, the Superior Centron task chair, beginning at that time, for that chair, users of Superior -- users of those chairs reported problems with loose backs; is that correct?
A. I'm not -- in 1996?
Q. Yes.
A. I'm not sure about the time frame. We did get some feedback of loose backs in the first few years. I'm not sure about 1996.
Q. Okay. At a certain point after 1996, Superior also learned that users were complaining of loose screws on Superior Centron task chairs,

Page 33

correct?
A. Looking back through our -- through our documents, I think the feedback was loose backs, and -- which may have attributed to the loose screws. But I think the feedback we were getting from customers was loose Centron backs.
Q. Okay. You referred to looking back over documents. What documents have you looked back over to prepare yourself for this deposition?
A. The same documents that we sent to you.
Q. Okay. And so I've got documents that are Bates stamped IZ, I think for Izzy, from 1 through -- I have this written down somewhere -- 2357. And they are all on the table here before me. Did you review all of these documents?
A. No, not in detail.
Q. Okay. Did you at least put your eyeballs on every single one of these pages, flipping through them?
A. No.
Q. Okay. What of these documents did you concentrate on, if any?
A. I looked over the engineering change notices, the -- what we call the QTS report, and the

Q. Okay. Next one is "Date manufactured," correct?
A. Yes.
Q. So that's pretty self-explanatory.
The next is "TI model number."
A. Yes.
Q. And did -- looking at that TI model number that's in the column in the first row on Page 801, what does that indicate to you, if anything?
A. Unfortunately, this is where, because of the way the data was sorted, it's not completely clear to me. But looking back through the data and our records, I believe that we were selling a few different model numbers to TI ending in numbers like 301, 302, 303. So I would expect to see that -- I do see some of that, but it doesn't all follow. So I am not sure -- I am not sure what model numbers -- let me back up a step.
Again, looking back through the data, knowing about the TI relationship, we created specific model numbers for TI. So although it was the Centron chair that we sold commercially as well, it also had a separate TI model number that --



essentially, it was important for TI in managing their product or their inventory.
Q. Okay. So, now, is it your understanding, though, looking at this number, that that's a Centron chair?
A. I can't -- this number doesn't make a lot of sense to me. Again, some look familiar, but I think it's because of the way the columns were generated.
Q. Okay. Who at Izzy or Superior or JSJ would have most information to be able to tell us what that number translates to in terms of the Centron chair, if it, in fact, refers to a Centron chair?
A. Because of the way this is sorted, I don't believe anyone can. The 4024, that's our commercial number. So that does -- I know that translates. And I would infer -- I would guess that some of these -- but because there's numbers missing, I don't think anybody can say -- like 302, based on looking at the past information, 302, those look like familiar numbers.
Q. Now, other than computer generated information, are there any other documents that were



generated either at the time the customer complained or that can be generated now, which would identify the model number of the product about which the customer is complaining?
A. Looking at these reports now and the QTS system, we could sort by model numbers. But I think the way QTS works, we might miss some of the parts issues because if -- if TI required a part number be generated for each order then we wouldn't be able -- I think that's why we stayed with the problem code, because TI was requiring -- was requiring specific part numbers. So we might -- the sort may not be as comprehensive, if we only looked at 301, 302, 303.
Q. Okay. I am looking at Page 802 in the -- the 13th row down -- sorry, it's the 12th row down. There's a problem code of V11. So that's a third problem code. And in the description, it says, among other things, "Loose Centron screw. Keep TI service part." I'm going to show you that.
A. Okay.
Q. Now, with that information, and then looking at the model designation, are you able to tell what type of chair that is?
A. I'm not. But I think -- this is a --



this is a -- this number, I understand, is a chair. All these other numbers, because they are not familiar to me, I'm guessing that they created part numbers for service parts. So instead of putting in the model number when they received the call, they were putting in parts orders, and that's why all these numbers look unfamiliar.
Q. Okay.
A. And that's another example -- that one is -- that's a full chair. This is a full chair. I believe that's a full chair. These other ones are not familiar.
Q. Okay. Well, let me back up a minute.
Now, the Superior Centron chairs, the task chairs that were manufactured before December 29th of 1998, were designed so that the J-bar was secured with two screws, correct?
A. That's my understanding.
Q. Okay. And before that time, December 29th of 1998, did Superior receive complaints about loose backs or problems with the screws attaching the J-bar to the Superior Centron chairs, to your knowledge?
A. My understanding was we were -- this is

Page 58

from -- my understanding is we were receiving feedback from TI.
Q. Okay. Now, my question is, looking at these QTS reports right here, is there any information on those QTS reports before December 29, 1998, that Superior was receiving feedback from TI?
A. All these issue dates are after -- after those dates.
MR. STUBENVOLL: Just for the record, he is referring to the two documents you have been showing him.
MR. ESKEY: That we referred to as the QTS reports.
MR. STUBENVOLL: Right.
BY MR. ESKEY:
Q. Given your -- strike that.
Would you expect there to be some QTS reports or some information available in the database for quality that would document the information that Superior had received from Texas Instruments before December 29th of 1998 about problems with loose backs with Superior Centron chairs?
A. Because I am not -- I'm not sure when QTS

Page 59

was actually launched. I can certainly provide that later. So I don't know that issues in that time period would be part of QTS. I'm assuming that Ken and the Texas team, when they went to look for problem codes, they ran everything relevant within QTS. But the date that we implemented QTS I'm not sure about. I'm not sure that they would be in there. If it was implemented and we received a call, it would be in QTS.
Q. Well, it looks like these companies were pretty good about documenting problems and reports of problems that they received from customers; is that correct?
A. From my experience, since QTS has been around, we've had -- we've had the ability to track calls when we've actually shipped out parts. But -- because I wasn't involved before 2000, I'm not sure what year QTS was implemented. I know it was implemented as what we call an add-on. But it's a separate system that was implemented.
Q. Well, outside of the QTS system, do you have any knowledge of, beginning in 1996, when the Superior Centron family came out, if a customer had a problem with a chair, loose back on the chair, for

Page 60

example, in 1996, '97, or '98, and they called Superior, whether there would be any documentation of that call or problem?
A. If we have it, it would be part of QTS, if QTS was around. I am just not sure if QTS was around in that time period.
Q. Okay.
A. From company, you know, lore or company history, I don't believe there was a quality -- a quality tracking system in place like this before QTS.
Q. Now, you've seen the engineering change notices, correct?
A. Yes.
Q. Okay. That's another thing that you focused on here. What's an engineering change notice?
A. An engineering change notice is a device that our organization uses that when we make a change to a product to communicate the change to all the -- to the entire organization.
Q. Okay. Now, preceding the actual publication of an engineering change notice, there's some process that, I'm assuming, takes place that

Page 61

leads up to the actual publication of this to the company, correct?
A. Yes.
Q. Okay. Can you tell us -- can you describe that process preceding the actual publication of the change notice?
A. Yes.
MR. STUBENVOLL: I object, form, foundation based on timing but --
BY THE WITNESS:
A. The engineering change request, ECR, that's the process you are referring to.
BY MR. ESKEY:
Q. Okay. How is that generated?
A. Unfortunately, for this time period I can't tell you their process. I could tell you our current process.
Q. Okay. Why don't we start there.
A. At Izzy in 2007, anybody can, essentially, generate an engineering change request, and it's a form that looks similar to the engineering change notice and other request. You identify what you would like to change and why, and then what the impact will be on, you know, the



ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087 800.708.8087 FAX 312.704.4950

Q. Do you know of anyone?
A. A lot of the manufacturing personnel were there, and I believe Ken Ahlburg was there at the time, and a lot of the other support functions.
Q. Okay. Well, in September of '98, based on your review of the materials, in September '98 you would agree with me that a decision was made to change the design of the attachment of the J-bar to the chair, correct?
A. Yes.
Q. And the decision was made at that time to add a third screw, correct?
A. Yes.
Q. Okay. And in September of 1998, an engineering change notice was issued that specified beginning in February of 1999 that a third screw would be added to secure that J-bar to the chair, correct?
A. Yes.
Q. Okay. So --
A. I think all the dates you just said, I believe, are correct. It sounds like the right time frame.
Q. Okay. Subject to verification by the



documents.
A. Okay.
Q. I believe I'm representing that correctly.
A. Okay. Yes.
MR. STUBENVOLL: I'll object, if you want.
BY MR. ESKEY:
Q. Now, in December of 1998, there was some testing that was done of the Superior Centron chairs with the third screw. Is that also correct?
A. In September there was testing done with the third screw?
Q. In December of '98.
A. Yes, I think I saw that.
Q. Okay. And at that time, with a third screw in it, the chair passed the durability test, correct?
A. Yes.
Q. Okay. Now, the durability test is one that is specified for compliance with ANSI and BIFMA requirements, correct?
A. Yes.
Q. There's a standard on durability of backs for office chairs, correct?



A. Yes.
Q. And that standard specifies a certain number of cycles have to be done, a certain test has to be done to the back to ensure it is durable; is that right?
A. Yes.
Q. And there are other standards; ANSI standards and BIFMA standards as well?
A. There's one BIFMA standard, and within the BIFMA standard -- relative to seating.
Q. Right.
A. Within the BIFMA standard there's multiple clauses.
Q. Okay. And each of those clauses is a different aspect of the chair then that has to comply with -- or be -- hold up to certain tests, correct?
A. Yes.
Q. Now, that testing that was done on the Centron chair with the third screw, on the test -- in the test materials itself, it documented that it was for a TI field fix. Did you note that?
A. I saw that, yes.
Q. Okay. What significance, if any, did



that notation have to you?
A. Related to what I had understood about TI reporting problems with loose backs, I assume that that TI field fix was a reference to the third screw to fix the loose backs.
Q. Okay. So is it fair to say that at least before December of 1998, that Texas Instruments was reporting problems with loose backs and, ultimately, that resulted in testing with a third screw, correct?
MR. STUBENVOLL: I object, form, foundation.
BY THE WITNESS:
A. Based on my understanding, probably, yes.
BY MR. ESKEY:
Q. Okay. Do you have any understanding of when Texas Instruments first began to report problems with the loose backs?
A. I don't.
Q. And do you know if any other customers, other than Texas Instruments, before 1998, were reporting problems with loose backs before December -- strike that. Let me start again.
Before December of 1998, do you know if there were any other customers than Texas

**From:** Dave De Young
**Sent:** Thursday, September 21, 2000 1:03 PM
**To:** Nelson Jacobson
**Cc:** Ken Ahlburg; Janet De Young
**Subject:** Budget for Field Service Costs Associated with Early Centron Chair Production

Nelson,

I spoke with Ken, and here are his thoughts on this topic. He is working with Wade and Patricia to include $20,000 in estimated field service costs in the 2001 budget. The notification to the field will take the form of service notice and an offer to provide service.

Background:

Approximately 8,000 Centrons Shipped to 269 Dealer/Customers. This excludes TI models of a similar make that are present on the TI and Raytheon sites. Issue relates to screws in J-bar at point of attachment to control. In certain circumstances the screws in early production models have come out, which releases the J-bar and the back comes off the chair.

Actions Taken:

The biggest customers of the early Centron production (that employed this method of J-bar attachment) were TI and by acquisition Raytheon. We have responded to their concerns by performing inspections and service to the screws attaching the J-bar. Our inspection and services to these models was performed by our employees or servicing dealers. The work was performed based on our instructions.

Recommended Action:

Send a service notice to the field. We expect a 20% or lower response rate, and have based our budget for field servicing costs associated with this issue accordingly.

Dave D.

SuperiorFurniture

# ENGINEERING CHANGE NOTICE

| Distribution: | | | | ISSUED BY: D. Shove | DATE 09/15/98 | ECN NO. 40Z |
|---|---|---|---|---|---|---|
| | F. MYERS | | S. EDDY | | | |
| | W. JESSUP | x | M. HOWELL | PROD/DEV. APPROVAL | DATE | ENG. REQ. NO. |
| | D. GOODE | | D. CASWELL | | | |
| | P. SHEAMER | | G. GRACE | MFG./ENG. APPROVAL | DATE | PAGE 1 OF 1 |
| x | R. MILTON | x | J. Kelly-DeYoung | | | |
| | P. WINKLER | x | D. O'BRIEN | QUALITY APPROVAL | DATE | PRODUCT LINE Centron |
| x | R. GOULARTE | x | D. CONNELL | | | |
| x | R. GRACE | x | P. RODRIGUEZ | RELEASE | WILL AFFECT | TOOLING/COMPONENTS |
| x | J. CABALLERO | x | J. DORAN | x Information | Interchangeability | Tooling - |
| x | C. CLEVELAND | | W SPEER/J HARMON | Data Base Release | Inventory | Lead Time 4-12 weeks |
| x | K. WEST | X | J. JACKSON | Tool Release | x Product Cost | Cost Date |
| | M. MILLIKAN | x | J. PARNELL | Purchase Release | x Tooling | $1,200 |
| x | J. VOYLES | x | R. SHIRLEY | x Drawing Release | Data Base | Component - |
| | G. ALTON | | UBX | Test Report ___Yes _x_No | | Lead Time ______ |
| x | M. WEST | | C-POINT (Spahr) | Report No.: | | Cost Date |

The purpose of this ECN is to position third hole in j-bars so that a third screw can be used for more integral strength between control and j-bar. There will need to be one, R8350, screw added for the third hole in the j-bar to the Centron bills as soon as production of the new hole position is available.

**Models Affected**

4021, 4022, 4024, 4054, 2100301, 2100302, 2100303

**Drawing Revisions**

| Part Number | Rev | Description |
|---|---|---|
| R951004 | F | F1: REDRAWN FROM CADKEY TO PRO/E WITH REVISIONS<br>F2: DIM .75 FROM HOLE TO HOLE WAS 1.188 FROM EDGE |
| R951005 | F | F1: REDRAWN FROM CADKEY TO PRO/E WITH REVISIONS<br>F2: DIM .75 FROM HOLE TO HOLE WAS 1.188 FROM EDGE |
| 4022 | A | A1: ADDED SCREW R8350 |

ENGINEERING CHANGE NOTICE EFFECTIVITY - BY MATERIALS

| Ship Schedule | Established by | Date |
|---|---|---|
| Feb 1 99 approx | Andy Jackson | 12/11/98 |

We have 500 R951004 and 250 R951005 at Byford

IZ 00912

Page 66

Q. Do you know of anyone?
A. A lot of the manufacturing personnel were there, and I believe Ken Ahlburg was there at the time, and a lot of the other support functions.
Q. Okay. Well, in September of '98, based on your review of the materials, in September '98 you would agree with me that a decision was made to change the design of the attachment of the J-bar to the chair, correct?
A. Yes.
Q. And the decision was made at that time to add a third screw, correct?
A. Yes.
Q. Okay. And in September of 1998, an engineering change notice was issued that specified beginning in February of 1999 that a third screw would be added to secure that J-bar to the chair, correct?
A. Yes.
Q. Okay. So --
A. I think all the dates you just said, I believe, are correct. It sounds like the right time frame.
Q. Okay. Subject to verification by the

Page 67

documents.
A. Okay.
Q. I believe I'm representing that correctly.
A. Okay. Yes.
MR. STUBENVOLL: I'll object, if you want.
BY MR. ESKEY:
Q. Now, in December of 1998, there was some testing that was done of the Superior Centron chairs with the third screw. Is that also correct?
A. In September there was testing done with the third screw?
Q. In December of '98.
A. Yes, I think I saw that.
Q. Okay. And at that time, with a third screw in it, the chair passed the durability test, correct?
A. Yes.
Q. Okay. Now, the durability test is one that is specified for compliance with ANSI and BIFMA requirements, correct?
A. Yes.
Q. There's a standard on durability of backs for office chairs, correct?

Page 68

A. Yes.
Q. And that standard specifies a certain number of cycles have to be done, a certain test has to be done to the back to ensure it is durable; is that right?
A. Yes.
Q. And there are other standards; ANSI standards and BIFMA standards as well?
A. There's one BIFMA standard, and within the BIFMA standard -- relative to seating.
Q. Right.
A. Within the BIFMA standard there's multiple clauses.
Q. Okay. And each of those clauses is a different aspect of the chair then that has to comply with -- or be -- hold up to certain tests, correct?
A. Yes.
Q. Now, that testing that was done on the Centron chair with the third screw, on the test -- in the test materials itself, it documented that it was for a TI field fix. Did you note that?
A. I saw that, yes.
Q. Okay. What significance, if any, did

Page 69

that notation have to you?
A. Related to what I had understood about TI reporting problems with loose backs, I assume that that TI field fix was a reference to the third screw to fix the loose backs.
Q. Okay. So is it fair to say that at least before December of 1998, that Texas Instruments was reporting problems with loose backs and, ultimately, that resulted in testing with a third screw, correct?
MR. STUBENVOLL: I object, form, foundation.
BY THE WITNESS:
A. Based on my understanding, probably, yes.
BY MR. ESKEY:
Q. Okay. Do you have any understanding of when Texas Instruments first began to report problems with the loose backs?
A. I don't.
Q. And do you know if any other customers, other than Texas Instruments, before 1998, were reporting problems with loose backs before December -- strike that. Let me start again.
Before December of 1998, do you know if there were any other customers than Texas

Page 118

A. From the documents that I reviewed, we added a third screw in '98. I don't know if it was a result of this test or a result of customer feedback.
Q. Okay. Is there any -- strike that.
Now, testing is within your job duties now, correct?
A. Yes.
Q. If today you received a failure report like that, what would you -- what action would you take in response?
MR. STUBENVOLL: Form, calls for speculation. Go ahead.
BY THE WITNESS:
A. I would work with our engineering team to identify a countermeasure and implement the countermeasure, test it and validate that it's a good solution and eventually it should become an engineering change.
BY MR. ESKEY:
Q. Okay. Now, would you expect that same process to have taken place in 1997 in response to the receipt of that kind of failure report?
MR. STUBENVOLL: I object to form and

Page 119

foundation.
BY THE WITNESS:
A. Yeah, I would expect that the engineers were thinking that way. How they documented it or how they validated it, I'm not sure.
BY MR. ESKEY:
Q. Okay. Now, who were the -- strike that.
How many engineers were working for Superior at that time?
A. I'm not sure. I mean, I'm not sure how many people were in the engineering department in '98.
Q. So there was an engineering department?
A. A product engineering department.
Q. Okay. And when you came on in 2000, how many engineers were in the product engineering department?
A. I will guess. And I would include technicians, not degreed engineers and model makers. It would be, maybe, five.
Q. Okay. And a report like that failure report in '97, you would agree with me there would be some investigation into that -- what happened and what caused the failure, correct?

Page 120

A. Yes.
MR. STUBENVOLL: Form, foundation.
BY THE WITNESS:
A. Yes.
BY MR. ESKEY:
Q. Okay. And was there a practice with respect to documenting that investigation -- that type of investigation that you were aware of that existed in 2000?
A. No, I'm not aware of it.
Q. Were any of the engineers who were there in 1997 also there in 2000 in the product engineering department?
A. The name that I saw that I recognized was James Lawrence, and then Ron Watson.
Q. Okay. Now, James Lawrence, is he still with the company?
A. No.
Q. Okay. Do you know where he lives?
A. I don't.
Q. Do you know where he lived at the time?
A. I don't.
Q. Somewhere in Texas?
A. Yes, somewhere in Texas, but he was

Page 121

driving in every day so --
Q. Right. Okay.
Now, when there's going to be a product change that's going to have some -- that's going to result in notification of customers, as occurred with the loose back product notice that went out in September of 2000, does management get involved in that decision?
MR. STUBENVOLL: I object, form, foundation.
BY THE WITNESS:
A. In this case I know they did. I mean, I know that Fritz and Dan were all discussing the problem.
BY MR. ESKEY:
Q. Okay. And is there anything in the materials that you have reviewed that indicated whether or not they were participating in the decision as to add the third screw?
A. Oh, as to whether to add the third screw, no, I'm not -- I have not seen anything in the documents.
Q. Okay. And was there anything that you saw in the documents that indicated whether they participated in the decision to send out a product

REPORT OF TEST

SGS® SGS U.S. Testing Company Inc.

291 Fairfield Avenue
Fairfield, NJ 07004
Tel: 973-575-5252
Fax: 973-575-8271

**REPORT NUMBER:** 117861-R1
**DATE:** December 29, 1998
**PAGE 1 OF 2**

**CLIENT:** Superior Chaircraft
One Industrial Park Drive
Belton, Texas 76513

**SUBJECT:** Office Chair Evaluation

**AUTHORIZATION:** Client's Purchase Order Number PO54250 dated December 11, 1998.

**SAMPLE ID:** One (1) sample was received on December 4, 1998 and identified by the Client as: "4024 Slider w/3rd Screw for TI Field Fix".

**TEST PROCEDURE:** ANSI/BIFMA X5.1-1993
"American National Standard for Office Furnishings - General Purpose Office Chairs - Tests".

Test Requested: Test No. 11 - Tilt Mechanism Test

Test No. 17 - Back Durability Test

**TEST DATES:** December 11, 1998 to December 29, 1998.

**CONCLUSION:** The submitted sample complied with both the Tilt Mechanism and Back Durability (200,000 Cycle) test requirements without any apparent structural breakage or loss of serviceability.

**PREPARED BY:**

Hiten Pandya
Hiten Pandya, Manager
Products Evaluation

**SIGNED FOR THE COMPANY BY:**

Gabriel Falla, Vice President
Operations

lv

Member of the SGS Group

ANALYTICAL SERVICES · PERFORMANCE TESTING · STANDARDS EVALUATION · CERTIFICATION SERVICES
SGS U.S. TESTING COMPANY INC. REPORTS ARE FOR THE EXCLUSIVE USE OF THE CLIENT TO WHOM THEY ARE ADDRESSED. ANYONE RELYING ON SUCH REPORTS SHOULD UNDERSTAND ALL OF THE DETAILS OF THE ENGAGEMENT, REPORTS REFLECT RESULTS ONLY OF THE STANDARDS OR PROCEDURES IDENTIFIED TO THE TESTS CONDUCTED AND ARE LIMITED TO THE SAMPLES TESTED. TEST RESULTS MAY NOT BE INDICATIVE OF THE QUALITIES OF THE LOT FROM WHICH THE SAMPLE WAS TAKEN. SGS U.S. TESTING COMPANY INC. HAS NOT CONDUCTED ANY QUALITY CONTROL PROGRAM FOR THE CLIENT. NEITHER THE NAME, SEALS, MARKS NOR INSIGNIA OF SGS U.S. TESTING COMPANY INC. MAY BE USED IN ANY ADVERTISING OR PROMOTIONAL MATERIALS WITHOUT THE PRIOR WRITTEN APPROVAL OF SGS U.S. TESTING COMPANY INC. THIS REPORT SHALL NOT BE REPRODUCED EXCEPT IN FULL WITHOUT THE WRITTEN PERMISSION OF THE SGS U.S. TESTING COMPANY INC. SAMPLES NOT DESTROYED IN TESTING ARE DISPOSED OF AFTER 30 DAYS.

SuperiorFurniture

# ENGINEERING CHANGE NOTICE

Distribution:

| | | | | | |
|---|---|---|---|---|---|
| | F. MYERS | | S. EDDY | x | J. VOYLES |
| | D. BUCHWEITZ | x | M. HOWELL | x | K. WEST |
| | W. JESSUP | | D. CASWELL | | C. CLEVELAND |
| x | D. O'BRIEN | x | G. GRACE | | M. MILLIKAN |
| x | D. CONNELL | | P. WINKLER | | G. ALTON |
| x | R. GRACE | | D. GOODE | | M. WEST |
| x | J. CABALLERO | | P. SHEAMER | | |
| | P. RODRIGUEZ | x | R. GOULARTE | | |
| x | R. MILTON | x | J. Kelly-DeYoung | | |
| x | J. DORAN | x | R.L. VARGAS | | |
| x | J. HARMON | | | | |
| | W SPEER | | | | |
| | J. JACKSON | | | | |
| x | R. SHIRLEY | | UBX | | C-POINT (Spahr) |
| | J. PARNELL | | | | |

| ISSUED BY: | DATE | ECN NO. |
|---|---|---|
| Rachel Shirley | 12/29/98 | 40AC |
| PROD. DEV. APPROVAL [signature] | DATE 12/29/98 | ENG. REQ. NO. |
| MFG. ENG. APPROVAL | DATE | PAGE 1 OF 1 |
| QUALITY APPROVAL [signature] | DATE [illegible] | PRODUCT LINE Centron |

| RELEASE | | WILL AFFECT | | TOOLING/COMPONENTS |
|---|---|---|---|---|
| x | Information | | Interchangeability | Tooling - |
| x | Data Base Release | | Inventory | Lead Time ____ |
| | Tool Release | | Product Cost | Cost Date |
| | Purchase Release | | Tooling | |
| | Drawing Release | x | Data Base | Component - |
| Test Report __Yes __No | | | | Lead Time ____ |
| Report No.: | | | | Cost Date |

The purpose of this ECN is to add a third screw and washer for assembling the J-bar to the control on the Centron chairs.
The third screw will be added in production effective 12/29/98. The screw goes in the hole location between the two currently used j-bar/control mounting screws. Use a heavy fender washer R8018 and a drop of Loc-tite when assembling.

**Models Affected:**
4021
4022
4024
4054

**BOM Changes:**
Add:
(1) R8273 Screw, MS, 1/4-20x1-1/2" tqs blk, dog pt
(1) R8018 Fender washer, 1/4"IDx1"ODx0.05-0.08"THK

This will be a temporary change until the J-bars with the new hole pattern come in (see ECN 40Z). Once the new J-bars are in house another ECN will be issued to eliminate the heavy fender washer and go back to the originally specified 1" screw.

IZ 00915

ENGINEERING CHANGE NOTICE EFFECTIVITY - BY MATERIALS

| Ship Schedule | Established by | Date |
|---|---|---|
| 12/29/98 | [signature] | 12/29/98 |

Page 66

Q. Do you know of anyone?
A. A lot of the manufacturing personnel were there, and I believe Ken Ahlburg was there at the time, and a lot of the other support functions.
Q. Okay. Well, in September of '98, based on your review of the materials, in September '98 you would agree with me that a decision was made to change the design of the attachment of the J-bar to the chair, correct?
A. Yes.
Q. And the decision was made at that time to add a third screw, correct?
A. Yes.
Q. Okay. And in September of 1998, an engineering change notice was issued that specified beginning in February of 1999 that a third screw would be added to secure that J-bar to the chair, correct?
A. Yes.
Q. Okay. So --
A. I think all the dates you just said, I believe, are correct. It sounds like the right time frame.
Q. Okay. Subject to verification by the

Page 67

documents.
A. Okay.
Q. I believe I'm representing that correctly.
A. Okay. Yes.
MR. STUBENVOLL: I'll object, if you want.
BY MR. ESKEY:
Q. Now, in December of 1998, there was some testing that was done of the Superior Centron chairs with the third screw. Is that also correct?
A. In September there was testing done with the third screw?
Q. In December of '98.
A. Yes, I think I saw that.
Q. Okay. And at that time, with a third screw in it, the chair passed the durability test, correct?
A. Yes.
Q. Okay. Now, the durability test is one that is specified for compliance with ANSI and BIFMA requirements, correct?
A. Yes.
Q. There's a standard on durability of backs for office chairs, correct?

Page 68

A. Yes.
Q. And that standard specifies a certain number of cycles have to be done, a certain test has to be done to the back to ensure it is durable; is that right?
A. Yes.
Q. And there are other standards; ANSI standards and BIFMA standards as well?
A. There's one BIFMA standard, and within the BIFMA standard -- relative to seating.
Q. Right.
A. Within the BIFMA standard there's multiple clauses.
Q. Okay. And each of those clauses is a different aspect of the chair then that has to comply with -- or be -- hold up to certain tests, correct?
A. Yes.
Q. Now, that testing that was done on the Centron chair with the third screw, on the test -- in the test materials itself, it documented that it was for a TI field fix. Did you note that?
A. I saw that, yes.
Q. Okay. What significance, if any, did

Page 69

that notation have to you?
A. Related to what I had understood about TI reporting problems with loose backs, I assume that that TI field fix was a reference to the third screw to fix the loose backs.
Q. Okay. So is it fair to say that at least before December of 1998, that Texas Instruments was reporting problems with loose backs and, ultimately, that resulted in testing with a third screw, correct?
MR. STUBENVOLL: I object, form, foundation.
BY THE WITNESS:
A. Based on my understanding, probably, yes.
BY MR. ESKEY:
Q. Okay. Do you have any understanding of when Texas Instruments first began to report problems with the loose backs?
A. I don't.
Q. And do you know if any other customers, other than Texas Instruments, before 1998, were reporting problems with loose backs before December -- strike that. Let me start again.
Before December of 1998, do you know if there were any other customers than Texas

Instruments who were reporting problems with loose backs with Centron chairs?
A. I don't know.
Q. Who within Izzy, JSJ or Superior today would know that?
A. I don't believe anybody is with the company anymore that would know that.
Q. How about Ken Ahlburg? Would he know?
A. At the time he was in a sales capacity. So he was not -- he wasn't involved in -- in any of this. But he might, but I don't believe so.
Q. Are there any documents or records that you are aware of that would record complaints of problems with the Centron chairs before September of 1998?
MR. STUBENVOLL: Form, foundation.
BY THE WITNESS:
A. I'm not sure when QTS was implemented, but my understanding is QTS would do that if it -- if it was in existence at the time.
BY MR. ESKEY:
Q. And before the QTS system, you are not aware of any way in which complaints were documented?



A. No formal way, that I'm aware.
Q. Did you inquire as to -- before the deposition today, did you inquire as to the method by which complaints or problems were recorded before the QTS system came into place?
A. I didn't.
Q. Now, on December 29th of 1998, a temporary change was made to add a third screw, together with a washer to attach the J-bar to the chair, correct?
A. Yes, I saw that.
Q. Okay. And this temporary fix was ultimately discontinued in May 2000, correct?
A. Yes, I believe so.
Q. Okay. Now, in May of 2000, was the Centron chair redesigned so that there was a permanent solution to the attachment of the J-bar to the chair that had a third screw involved?
A. From my understanding of the documents, it looks like the third screw without the washer was what went on the chair in May of 2000 -- or, sorry, May of -- was that '97? Was that '98?
Q. I said May of 2000.
A. I'm sorry.



Q. That was in my question, but I don't mean to imply if you have a different date in mind.
A. No, I'm sorry. Could you repeat the question?
Q. Okay. So when the temporary fix was discontinued in May of 2000, was that because it was a permanent third screw solution, to your knowledge?
A. Yes.
Q. Okay. And how was the third screw solution in May of 2000 different than what was pre-existing from the end of '98 through 2000?
MR. STUBENVOLL: Form, foundation.
BY MR. ESKEY:
Q. In other words, what was the difference between the temporary and the permanent third screw solution?
A. From reading the ECNs, I thought that the, what you were referring to as the permanent third screw solution was actually done in, I believe, in '98, so that the temporary fix you are referring to was on a smaller time period than that.
Q. Okay.
A. I may have read that -- I may have read the dates incorrectly, but --



Q. Okay. But at any rate, you would agree with me that from December 29th of 1998, there was a temporary third screw solution?
A. Yes.
Q. And that involved a washer?
A. Yes.
Q. And at a certain point after that, then a permanent fix came in --
A. Yes.
Q. -- in which there was a third screw, but no washer, correct?
A. Yes.
MR. STUBENVOLL: I will just object to the form. The documents with respect to dates and time will speak for themselves.
MR. ESKEY: Right.
BY MR. ESKEY:
Q. Okay. But at least that's your understanding?
A. Yes.
Q. Okay. Now, in September or October of 2000, a letter and a product bulletin were sent by certified mail to customers notifying them of problems with loose screws attaching the J-bars to

**SGS U.S. Testing Company Inc.**

291 Fairfield Avenue
Fairfield, NJ 07004
Tel: 973-575-5252
Fax: 973-575-8271

REPORT NUMBER: 117861-R1
DATE: December 29, 1998
PAGE 1 OF 2

REPORT OF TEST

**CLIENT:** Superior Chaircraft
One Industrial Park Drive
Belton, Texas 76513

**SUBJECT:** Office Chair Evaluation

**AUTHORIZATION:** Client's Purchase Order Number PO54250 dated December 11, 1998.

**SAMPLE ID:** One (1) sample was received on December 4, 1998 and identified by the Client as: "4024 Slider w/3rd Screw for TI Field Fix".

**TEST PROCEDURE:** ANSI/BIFMA X5.1-1993
"American National Standard for Office Furnishings - General Purpose Office Chairs - Tests".

<u>Test Requested:</u> Test No. 11 - Tilt Mechanism Test

Test No. 17 - Back Durability Test

**TEST DATES:** December 11, 1998 to December 29, 1998.

**CONCLUSION:** The submitted sample complied with both the Tilt Mechanism and Back Durability (200,000 Cycle) test requirements without any apparent structural breakage or loss of serviceability.

**PREPARED BY:**

Hiten Pandya, Manager
Products Evaluation

**SIGNED FOR THE COMPANY BY:**

Gabriel Falla, Vice President
Operations

lv

Member of the SGS Group

ANALYTICAL SERVICES • PERFORMANCE TESTING • STANDARDS EVALUATION • CERTIFICATION SERVICES

SGS U.S. TESTING COMPANY INC. REPORTS ARE FOR THE EXCLUSIVE USE OF THE CLIENT TO WHOM THEY ARE ADDRESSED. ANYONE RELYING ON SUCH REPORTS SHOULD UNDERSTAND ALL OF THE DETAILS OF THE ENGAGEMENT. REPORTS REFLECT RESULTS ONLY OF THE STANDARDS OR PROCEDURES IDENTIFIED TO THE TESTS CONDUCTED AND ARE LIMITED TO THE SAMPLES TESTED. TEST RESULTS MAY NOT BE INDICATIVE OF THE QUALITIES OF THE LOT FROM WHICH THE SAMPLE WAS TAKEN. SGS U.S. TESTING COMPANY INC. HAS NOT CONDUCTED ANY QUALITY CONTROL PROGRAM FOR THE CLIENT. NEITHER THE NAME, SEALS, MARKS NOR INSIGNIA OF SGS U.S. TESTING COMPANY INC. MAY BE USED IN ANY ADVERTISING OR PROMOTIONAL MATERIALS WITHOUT THE PRIOR WRITTEN APPROVAL OF SGS U.S. TESTING COMPANY INC. THIS REPORT SHALL NOT BE REPRODUCED EXCEPT IN FULL WITHOUT THE WRITTEN PERMISSION OF THE SGS U.S. TESTING COMPANY INC. SAMPLES NOT DESTROYED IN TESTING ARE DISPOSED OF AFTER 30 DAYS.

SGS® SGS U.S. Testing Company Inc.

REPORT NUMBER: 117861-R1
DATE: December 29, 1998
PAGE 2 OF 2

REPORT OF TEST

CLIENT: Superior Chaircraft

TEST RESULTS:

Summary of Results:

| Test No. | Description | Results |
|---|---|---|
| 11 | Tilt Mechanism Test - Cyclic | Complies |
| 16 | Back Durability Test - Cyclic - Type I - (Modified) | Complies |

TEST PROCEDURES AND RESULTS:

The complete detailed procedures may be found in the referenced specification and are only summarized herein. The results obtained for each of the applicable tests are presented in their respective section describing the procedure below:

11. Tilt Mechanism Test - Cyclic

The unit was clamped on a test platform with adjustable features set at midpoint of adjustment.

A cycling device was attached to the back with a 225 pound weight placed at the center of the seat.

The cycling device stroke was set to touch the front and rear stops without overriding either, allowing the unit to snap back.

The unit was cycled for 200,000 cycles at a rate of 5 to 40 cycles per minute.

*No structural breakage or loss of serviceability resulted.*

16. Back Durability Test - Cyclic - Type I - (Modified)

The unit was placed on a test platform in an upright position and restrained from movement. A 100 lb dead load was placed on the seat.

If adjustable features were available, all adjustments were set at the midpoint of the normal range.

A cycling device was attached to the center of the back 16 inches above the seat. The cycling device was adjusted to apply a force of 100 lbs, 90° to the plane of the back. The device was cycled for 200,000 cycles at a rate of 5 to 40 cycles per minute.

No structural breakage or loss of serviceability resulted.

*********

End of Report

IZ 00153

SuperiorFurniture

# ENGINEERING CHANGE NOTICE

Distribution:

| | | | | | |
|---|---|---|---|---|---|
| | F. MYERS | | S. EDDY | x | J. VOYLES |
| | D. BUCHWEITZ | x | M. HOWELL | x | K. WEST |
| | W. JESSUP | | D. CASWELL | | C. CLEVELAND |
| x | D. O'BRIEN | x | G. GRACE | | M. MILLIKAN |
| x | D. CONNELL | | P. WINKLER | | G. ALTON |
| x | R. GRACE | | D. GOODE | | M. WEST |
| x | J. CABALLERO | | P. SHEAMER | | |
| | P. RODRIGUEZ | x | R. GOULARTE | | |
| x | R. MILTON | x | J. Kelly-DeYoung | | |
| x | J. DORAN | x | R.L. VARGAS | | |
| x | J. HARMON | | | | |
| | W SPEER | | | | |
| | J. JACKSON | | | | |
| x | R. SHIRLEY | | UBX | | C-POINT (Spahr) |
| | J. PARNELL | | | | |

| ISSUED BY: | DATE | ECN NO. |
|---|---|---|
| Rachel Shirley | 12/29/98 | 40AC |
| PROD. DEV. APPROVAL [signature] | DATE 12/29/98 | ENG. REQ. NO. |
| MFG. ENG. APPROVAL | DATE | PAGE 1 OF 1 |
| QUALITY APPROVAL [signature] | DATE [handwritten] | PRODUCT LINE Centron |

| RELEASE | | WILL AFFECT | | TOOLING/COMPONENTS |
|---|---|---|---|---|
| x | Information | | Interchangeability | Tooling - |
| x | Data Base Release | | Inventory | Lead Time ______ |
| | Tool Release | | Product Cost | Cost Date |
| | Purchase Release | | Tooling | |
| | Drawing Release | x | Data Base | Component - |
| Test Report ___Yes ___No | | | | Lead Time ______ |
| Report No.: | | | | Cost Date |

The purpose of this ECN is to add a third screw and washer for assembling the J-bar to the control on the Centron chairs.

The third screw will be added in production effective 12/29/98. The screw goes in the hole location between the two currently used j-bar/control mounting screws. Use a heavy fender washer R8018 and a drop of Loc-tite when assembling.

**Models Affected:**

4021
4022
4024
4054

**BOM Changes:**

Add:

(1) R8273 Screw, MS, 1/4-20x1-1/2" tqs blk, dog pt
(1) R8018 Fender washer, 1/4"IDx1"ODx0.05-0.08"THK

This will be a temporary change until the J-bars with the new hole pattern come in (see ECN 40Z). Once the new J-bars are in house another ECN will be issued to eliminate the heavy fender washer and go back to the originally specified 1" screw.

IZ 00915

ENGINEERING CHANGE NOTICE EFFECTIVITY - BY MATERIALS

| Ship Schedule | Established by | Date |
|---|---|---|
| 12/29/98 | [signature] | 12/29/98 |

DANIEL VUKCEVICH, JULY 18, 2007



Q. Do you know of anyone?
A. A lot of the manufacturing personnel were there, and I believe Ken Ahlburg was there at the time, and a lot of the other support functions.
Q. Okay. Well, in September of '98, based on your review of the materials, in September '98 you would agree with me that a decision was made to change the design of the attachment of the J-bar to the chair, correct?
A. Yes.
Q. And the decision was made at that time to add a third screw, correct?
A. Yes.
Q. Okay. And in September of 1998, an engineering change notice was issued that specified beginning in February of 1999 that a third screw would be added to secure that J-bar to the chair, correct?
A. Yes.
Q. Okay. So --
A. I think all the dates you just said, I believe, are correct. It sounds like the right time frame.
Q. Okay. Subject to verification by the



documents.
A. Okay.
Q. I believe I'm representing that correctly.
A. Okay. Yes.
MR. STUBENVOLL: I'll object, if you want.
BY MR. ESKEY:
Q. Now, in December of 1998, there was some testing that was done of the Superior Centron chairs with the third screw. Is that also correct?
A. In September there was testing done with the third screw?
Q. In December of '98.
A. Yes, I think I saw that.
Q. Okay. And at that time, with a third screw in it, the chair passed the durability test, correct?
A. Yes.
Q. Okay. Now, the durability test is one that is specified for compliance with ANSI and BIFMA requirements, correct?
A. Yes.
Q. There's a standard on durability of backs for office chairs, correct?



A. Yes.
Q. And that standard specifies a certain number of cycles have to be done, a certain test has to be done to the back to ensure it is durable; is that right?
A. Yes.
Q. And there are other standards; ANSI standards and BIFMA standards as well?
A. There's one BIFMA standard, and within the BIFMA standard -- relative to seating.
Q. Right.
A. Within the BIFMA standard there's multiple clauses.
Q. Okay. And each of those clauses is a different aspect of the chair then that has to comply with -- or be -- hold up to certain tests, correct?
A. Yes.
Q. Now, that testing that was done on the Centron chair with the third screw, on the test -- in the test materials itself, it documented that it was for a TI field fix. Did you note that?
A. I saw that, yes.
Q. Okay. What significance, if any, did



that notation have to you?
A. Related to what I had understood about TI reporting problems with loose backs, I assume that that TI field fix was a reference to the third screw to fix the loose backs.
Q. Okay. So is it fair to say that at least before December of 1998, that Texas Instruments was reporting problems with loose backs and, ultimately, that resulted in testing with a third screw, correct?
MR. STUBENVOLL: I object, form, foundation.
BY THE WITNESS:
A. Based on my understanding, probably, yes.
BY MR. ESKEY:
Q. Okay. Do you have any understanding of when Texas Instruments first began to report problems with the loose backs?
A. I don't.
Q. And do you know if any other customers, other than Texas Instruments, before 1998, were reporting problems with loose backs before December -- strike that. Let me start again.
Before December of 1998, do you know if there were any other customers than Texas

Q. Okay. So 1883, it looks like it's another letter dated September 26, 2000. So I guess I can ask Ken Ahlburg because he is the one who signed it for sure. But your understanding is that the product bulletin consisted of that second page, which is 1883. And what I'm more concerned with at present is whether this schematic was sent with that notification, which is 1881.
A. I honestly don't know.
Q. Okay. That's fair enough. If you don't know, you don't know.
So is it fair to say that the person with the most knowledge of that would be Ken Ahlburg?
A. Yes.
Q. Okay. Have you seen this drawing or schematic that's at 1881?
A. When we were reviewing the information before, I saw it. And I'm not sure if I saw it in 2000. I would imagine I did, but I don't recall it.
Q. Okay. Now, in 1881, there's -- it looks like there's an instruction, or however it's characterized. I will just read it. It says, "In these three locations there's a fastener (screw), that you should examine for tightness," and there



are arrows. Do you see that --
A. Uh-huh.
Q. -- in those three locations?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Okay. Now, in -- before December of 1998, there were only two screws, correct?
A. Yes.
Q. And then after December of 1998 there were three, correct?
A. Yes, from the records, I believe.
Q. Okay. Now, do you know who it was who decided that -- to add a third screw?
A. As I recall -- well, no, I'm sorry. Back in 1998, no. Ron Watson would have been the product development manager. So my view is he ultimately decided, but the entire team, I think you see on the ECN, really approved it.
Q. Okay. That was my next question. Who participated in that process and, you know, what led to that ECN? Can you tell from the ECN itself?
A. No, I can't.
Q. Okay. What can you tell us from the ECN



about who participated in the process in -- let's just find it here -- it looks like it's at 912, wherever that is. It's got to have a tag on it. That's all I can tell you.
Okay. Now, my copy isn't that legible, but -- in terms of some signatures. But are you familiar with this form, the engineering change notice?
A. Yes.
Q. And this is something that would be produced and generated in the ordinary course of business at Superior; is that your understanding?
A. Yes.
Q. Okay. There's a distribution list, it looks like, on the upper left-hand side of that, correct?
A. Yes.
Q. If the box is checked off, I assume that means it was distributed to that person?
A. That's my understanding.
Q. Okay. So who is R. Milton? Do you know who that is?
A. Ron Milton was with Izzy -- I'm sorry, was with Superior in 2000 as a product manager.



Q. Yes.
A. I know prior to that he had a couple different roles, so I'm not sure during this time period exactly what role he was in. But he was a product manager, was the last I worked with him.
Q. Okay. Is he with Izzy currently?
A. No.
Q. Okay. Is he with any of the JSJ divisions?
A. No.
Q. Okay. What about R --
A. Goularte?
Q. Goularte, G-o-u-l-a-r-t-e?
A. He was -- I know he was our plant manager in California, and prior to that he was in human resources. So at the time of this, I'm not sure what his exact role was.
Q. Okay. In looking at that distribution list, is there anyone on that distribution list who is still with Izzy or Superior or JSJ?
A. From the distribution, Caballero and Cleveland are still there.
Q. That's J. Caballero?
A. Yes.

SuperiorFurniture

# ENGINEERING CHANGE NOTICE

Distribution:

| | | | | | |
|---|---|---|---|---|---|
| | F. MYERS | | S. EDDY | x | J. VOYLES |
| | D. BUCHWEITZ | x | M. HOWELL | x | K. WEST |
| | W. JESSUP | | D. CASWELL | | C. CLEVELAND |
| x | D. O'BRIEN | x | G. GRACE | | M. MILLIKAN |
| x | D. CONNELL | | P. WINKLER | | G. ALTON |
| x | R. GRACE | | D. GOODE | | M. WEST |
| x | J. CABALLERO | | P. SHEAMER | | |
| | P. RODRIGUEZ | x | R. GOULARTE | | |
| x | R. MILTON | x | J. Kelly-DeYoung | | |
| x | J. DORAN | x | R.L. VARGAS | | |
| x | J. HARMON | | | | |
| | W SPEER | | | | |
| | J. JACKSON | | | | |
| x | R. SHIRLEY | | UBX | | C-POINT (Spahr) |
| | J. PARNELL | | | | |

| | | |
|---|---|---|
| ISSUED BY: Rachel Shirley | DATE 12/29/98 | ECN NO. 40AC |
| PROD. DEV. APPROVAL [signature] | DATE 12/29/98 | ENG. REQ. NO. |
| MFG. ENG. APPROVAL | DATE | PAGE 1 OF 1 |
| QUALITY APPROVAL [signature] | DATE [illegible] | PRODUCT LINE Centron |

| RELEASE | | WILL AFFECT | | TOOLING/COMPONENTS |
|---|---|---|---|---|
| x | Information | | Interchangeability | Tooling - |
| x | Data Base Release | | Inventory | Lead Time ______ |
| | Tool Release | | Product Cost | Cost Date |
| | Purchase Release | | Tooling | |
| | Drawing Release | x | Data Base | Component - |
| Test Report __Yes __No | | | | Lead Time ______ |
| Report No.: | | | | Cost Date |

The purpose of this ECN is to add a third screw and washer for assembling the J-bar to the control on the Centron chairs.

The third screw will be added in production effective 12/29/98. The screw goes in the hole location between the two currently used j-bar/control mounting screws. Use a heavy fender washer R8018 and a drop of Loc-tite when assembling.

**Models Affected:**

4021
4022
4024
4054

**BOM Changes:**

Add:

(1) R8273 Screw, MS, 1/4-20x1-1/2" tqs blk, dog pt
(1) R8018 Fender washer, 1/4"IDx1"ODx0.05-0.08"THK

This will be a temporary change until the J-bars with the new hole pattern come in (see ECN 40Z). Once the new J-bars are in house another ECN will be issued to eliminate the heavy fender washer and go back to the originally specified 1" screw.

IZ 00915

ENGINEERING CHANGE NOTICE EFFECTIVITY - BY MATERIALS

| Ship Schedule | Established by | Date |
|---|---|---|
| 12/29/98 | [signature] | 12/29/98 |

SuperiorFurniture™

# ENGINEERING CHANGE NOTICE

Distribution:

| | | | | | |
|---|---|---|---|---|---|
| | F. MYERS | x | S. EDDY | x | J. VOYLES |
| | D. BUCHWEITZ | x | M. HOWELL | x | K. WEST |
| x | W. JESSUP | x | D. CASWELL | x | C. CLEVELAND |
| x | D. O'BRIEN | x | G. GRACE | x | M. MILLIKAN |
| x | D. CONNELL | x | P. WINKLER | x | G. ALTON |
| x | R. GRACE | x | D. GOODE | x | M. WEST |
| x | J. CABALLERO | x | P. SHEAMER | | |
| x | P. RODRIGUEZ | x | R. GOULARTE | | |
| x | R. MILTON | x | J. Kelly-DeYoung | | |
| x | J. DORAN | x | R.L. VARGAS | | |
| | J. HARMON | | | | |
| | W SPEER | | | | |
| x | J. JACKSON | | | | |
| x | R. SHIRLEY | | UBX | | C-POINT (Spahr) |
| x | J. PARNELL | | | | |

| | | |
|---|---|---|
| ISSUED BY: Rachel Shirley | DATE 12/18/98 | ECN NO. 40AB |
| PROD/DEV. APPROVAL [signature] | DATE 12/18/98 | ENG. REQ. NO. |
| MFG. ENG. APPROVAL | DATE | PAGE 1 OF 1 |
| QUALITY APPROVAL [signature] | DATE 12/15/98 | PRODUCT LINE Centron |

| RELEASE | | WILL AFFECT | | TOOLING/COMPONENTS |
|---|---|---|---|---|
| x | Information | | Interchangeability | Tooling - |
| x | Data Base Release | x | Inventory | Lead Time ______ |
| | Tool Release | | Product Cost | Cost Date |
| x | Purchase Release | | Tooling | |
| | Drawing Release | x | Data Base | Component - |
| Test Report __Yes __No | | | | Lead Time ______ |
| Report No.: | | | | Cost Date |

The purpose of this ECN is to release for production the 4001 loop arm. This arm will have the shorter bracket attachment and will be used on the Centron, Centron Basic, Performa 3, and Performa 2+ product lines.

<u>New Model Number:</u>
4001

<u>New Part Numbers:</u>

R931020R ARM. CENTRON LOOP, RIGHT
R931020L ARM, CENTRON LOOP, LEFT

150 pr Minimum Order

IZ 00914

ENGINEERING CHANGE NOTICE EFFECTIVITY - BY MATERIALS

| Ship Schedule | Established by | Date |
|---|---|---|
| March 1, 1999 | [signature] | 12/21/98 |

Page 70

Instruments who were reporting problems with loose backs with Centron chairs?
A. I don't know.
Q. Who within Izzy, JSJ or Superior today would know that?
A. I don't believe anybody is with the company anymore that would know that.
Q. How about Ken Ahlburg? Would he know?
A. At the time he was in a sales capacity. So he was not -- he wasn't involved in -- in any of this. But he might, but I don't believe so.
Q. Are there any documents or records that you are aware of that would record complaints of problems with the Centron chairs before September of 1998?
MR. STUBENVOLL: Form, foundation.
BY THE WITNESS:
A. I'm not sure when QTS was implemented, but my understanding is QTS would do that if it -- if it was in existence at the time.
BY MR. ESKEY:
Q. And before the QTS system, you are not aware of any way in which complaints were documented?

Page 71

A. No formal way, that I'm aware.
Q. Did you inquire as to -- before the deposition today, did you inquire as to the method by which complaints or problems were recorded before the QTS system came into place?
A. I didn't.
Q. Now, on December 29th of 1998, a temporary change was made to add a third screw, together with a washer to attach the J-bar to the chair, correct?
A. Yes, I saw that.
Q. Okay. And this temporary fix was ultimately discontinued in May 2000, correct?
A. Yes, I believe so.
Q. Okay. Now, in May of 2000, was the Centron chair redesigned so that there was a permanent solution to the attachment of the J-bar to the chair that had a third screw involved?
A. From my understanding of the documents, it looks like the third screw without the washer was what went on the chair in May of 2000 -- or, sorry, May of -- was that '97? Was that '98?
Q. I said May of 2000.
A. I'm sorry.

Page 72

Q. That was in my question, but I don't mean to imply if you have a different date in mind.
A. No, I'm sorry. Could you repeat the question?
Q. Okay. So when the temporary fix was discontinued in May of 2000, was that because it was a permanent third screw solution, to your knowledge?
A. Yes.
Q. Okay. And how was the third screw solution in May of 2000 different than what was pre-existing from the end of '98 through 2000?
MR. STUBENVOLL: Form, foundation.
BY MR. ESKEY:
Q. In other words, what was the difference between the temporary and the permanent third screw solution?
A. From reading the ECNs, I thought that the, what you were referring to as the permanent third screw solution was actually done in, I believe, in '98, so that the temporary fix you are referring to was on a smaller time period than that.
Q. Okay.
A. I may have read that -- I may have read the dates incorrectly, but --

Page 73

Q. Okay. But at any rate, you would agree with me that from December 29th of 1998, there was a temporary third screw solution?
A. Yes.
Q. And that involved a washer?
A. Yes.
Q. And at a certain point after that, then a permanent fix came in --
A. Yes.
Q. -- in which there was a third screw, but no washer, correct?
A. Yes.
MR. STUBENVOLL: I will just object to the form. The documents with respect to dates and time will speak for themselves.
MR. ESKEY: Right.
BY MR. ESKEY:
Q. Okay. But at least that's your understanding?
A. Yes.
Q. Okay. Now, in September or October of 2000, a letter and a product bulletin were sent by certified mail to customers notifying them of problems with loose screws attaching the J-bars to

A. I don't know. I would assume so because they were such a large customer. But I -- I'm not sure I saw that in the correspondence or -- and I'm not sure who the -- I'm not sure if Morgan was the point person at the time.
Q. So do you have any knowledge -- well, strike that.
You said you heard about two reports. Where did you hear that or who did you hear it from?
A. I'm not sure.
Q. So you don't really have any knowledge of before the product change occurred in -- at the end of 1998 how many reports were received from TI or from any other customer, correct?
A. No.
Q. But you do know that, based on the materials you reviewed, there were a number of complaints about loose backs on Centron chairs in 2000, correct?
A. Yes, I saw those.
Q. Okay. And before the product notice was issued in 2000, do you know how many reports of problems with loose backs were reported to Superior?
A. No, I don't know.



Q. Okay. Is there any documentation of any report of a problem from a customer with respect to a loose back for a Centron chair before the product notice in 2000?
A. The only problem -- the only place that I would -- that that would exist would be in the QTS reports. And, again, I'm not sure what year that we implemented that system. So I am assuming Ken and the team provided the relevant QTS report. We can certainly go back and check that.
Q. But at least as far as the QTS reports -- and I don't want to beat a dead horse. You've already looked at these a lot. I mean, is it fair to say that these QTS reports, at least as far as we can figure out today, concern reports after 2000?
For example, on the QTS report that begins on Page 778, if the issue date is correct, all of these reports are in October of 2000, which would be after the product notice, correct?
A. Right. I would go back to the issue date.
Q. Okay. And on this one, at least -- if you look at the "Date reprinted" column, which you indicated to me was the date of the report of the



problem, all of these -- it looks like 2002, 2003, 2003, 2002, 2003, and 2002. I don't see anything on this -- and feel free to check -- but I don't see anything on this before -- well, I see one in September of 2001. It looks like -- and some others in November and September of 2001. Those are the earliest ones.
But at any rate, you would agree with me that if that's correct in terms of the reporting date, that's also after the product notice?
A. Yes.
Q. Okay.
A. I'm sorry, after the product notice?
Q. Right, which was in --
A. I'm not sure --
Q. Which was in September, October of 2000, right?
A. That sounds -- okay. That sounds right, yes. I see what you are saying.
Q. Okay. So then we have no documentation of any reported problems from customers before the product change was made in '98, correct?
A. I don't believe so.
Q. And we have no documentation of any



customer problems before the product notice was sent out in October or -- September, October of 2000, correct?
A. I don't believe so, but I would want to go back to the Texas team and -- and see what other information, if there is any, is available in QTS.
Q. Okay. So you're going to make an effort -- and, I mean, I'll leave it to -- I would like you to make that effort, but I will leave it to your discussion with Mr. Stubenvoll as to what you do in that respect and what I do to follow it up. But if it's possible to verify whether there are any such complaints, I would like to see that.
I guess what my question is, is that if there were no reports of any customer problems with loose backs before the product notice was issued in 2000, then why would the company change the design and issue the product notices in the first place?
A. Well, before 2000? Well, issued the bulletin in 2000.
Q. Right.
A. Again, my recollection was we had heard about the two incidents at TI, and I think that's what stimulated the product bulletin.

**Ken Ahlburg**

**From:** Dave De Young
**Sent:** Thursday, September 21, 2000 1:03 PM
**To:** Nelson Jacobson
**Cc:** Ken Ahlburg; Janet De Young
**Subject:** Budget for Field Service Costs Associated with Early Centron Chair Production

Nelson,

I spoke with Ken, and here are his thoughts on this topic. He is working with Wade and Patricia to include $20,000 in estimated field service costs in the 2001 budget. The notification to the field will take the form of service notice and an offer to provide service.

Background:

Approximately 8,000 Centrons Shipped to 269 Dealer/Customers. This excludes TI models of a similar make that are present on the TI and Raytheon sites. Issue relates to screws in J-bar at point of attachment to control. In certain circumstances the screws in early production models have come out, which releases the J-bar and the back comes off the chair.

Actions Taken:

The biggest customers of the early Centron production (that employed this method of J-bar attachment) were TI and by acquisition Raytheon. We have responded to their concerns by performing inspections and service to the screws attaching the J-bar. Our inspection and services to these models was performed by our employees or servicing dealers. The work was performed based on our instructions.

Recommended Action:

Send a service notice to the field. We expect a 20% or lower response rate, and have based our budget for field servicing costs associated with this issue accordingly.

Dave D.

Page 142

A. I don't know. I would assume so because they were such a large customer. But I -- I'm not sure I saw that in the correspondence or -- and I'm not sure who the -- I'm not sure if Morgan was the point person at the time.
Q. So do you have any knowledge -- well, strike that.
You said you heard about two reports. Where did you hear that or who did you hear it from?
A. I'm not sure.
Q. So you don't really have any knowledge of before the product change occurred in -- at the end of 1998 how many reports were received from TI or from any other customer, correct?
A. No.
Q. But you do know that, based on the materials you reviewed, there were a number of complaints about loose backs on Centron chairs in 2000, correct?
A. Yes, I saw those.
Q. Okay. And before the product notice was issued in 2000, do you know how many reports of problems with loose backs were reported to Superior?
A. No, I don't know.

Page 143

Q. Okay. Is there any documentation of any report of a problem from a customer with respect to a loose back for a Centron chair before the product notice in 2000?
A. The only problem -- the only place that I would -- that that would exist would be in the QTS reports. And, again, I'm not sure what year that we implemented that system. So I am assuming Ken and the team provided the relevant QTS report. We can certainly go back and check that.
Q. But at least as far as the QTS reports -- and I don't want to beat a dead horse. You've already looked at these a lot. I mean, is it fair to say that these QTS reports, at least as far as we can figure out today, concern reports after 2000?
For example, on the QTS report that begins on Page 778, if the issue date is correct, all of these reports are in October of 2000, which would be after the product notice, correct?
A. Right. I would go back to the issue date.
Q. Okay. And on this one, at least -- if you look at the "Date reprinted" column, which you indicated to me was the date of the report of the

Page 144

problem, all of these -- it looks like 2002, 2003, 2003, 2002, 2003, and 2002. I don't see anything on this -- and feel free to check -- but I don't see anything on this before -- well, I see one in September of 2001. It looks like -- and some others in November and September of 2001. Those are the earliest ones.
But at any rate, you would agree with me that if that's correct in terms of the reporting date, that's also after the product notice?
A. Yes.
Q. Okay.
A. I'm sorry, after the product notice?
Q. Right, which was in --
A. I'm not sure --
Q. Which was in September, October of 2000, right?
A. That sounds -- okay. That sounds right, yes. I see what you are saying.
Q. Okay. So then we have no documentation of any reported problems from customers before the product change was made in '98, correct?
A. I don't believe so.
Q. And we have no documentation of any

Page 145

customer problems before the product notice was sent out in October or -- September, October of 2000, correct?
A. I don't believe so, but I would want to go back to the Texas team and -- and see what other information, if there is any, is available in QTS.
Q. Okay. So you're going to make an effort -- and, I mean, I'll leave it to -- I would like you to make that effort, but I will leave it to your discussion with Mr. Stubenvoll as to what you do in that respect and what I do to follow it up. But if it's possible to verify whether there are any such complaints, I would like to see that.
I guess what my question is, is that if there were no reports of any customer problems with loose backs before the product notice was issued in 2000, then why would the company change the design and issue the product notices in the first place?
A. Well, before 2000? Well, issued the bulletin in 2000.
Q. Right.
A. Again, my recollection was we had heard about the two incidents at TI, and I think that's what stimulated the product bulletin.