SuperiorChair * Pg 1/1

FROM : PACIFIC BUSINESS INTERIORS, INC PHONE NO. : 206 329 6174 Oct. 06 2000 05:34PM P1

SuperiorFurniture®

#206-323-1778

10/6/00 Both chairs were purchased as showroom samples and were about to be sold @ clearance. What should we do before selling?

Robert Anderson V.P./Corp Sec.

September 29, 2000

Pacific Business Ints.
1108 Nineteenth Ave East
Seattle, Wa 98112

Re: Centron Chairs Manufactured
Before December 29, 1998

Dear Customer:

We write to seek your assistance in providing important information to the ultimate users of Superior's Centron chairs manufactured before December 29, 1998. Enclosed you will find a Product Bulletin relating to reports that some users have noticed that screws attaching the back J-bar to the control have worked loose. It is Superior's intent to notify all ultimate purchasers and users of these chairs that they should inspect the chairs for this condition and notify Superior if any screws are loose. Superior will then remedy this condition at its own cost. We believe this is necessary in order to ensure that our customers receive a quality product and know that Superior stands behind its chairs.

Our records indicate that you purchased 2 Centron chairs. Details regarding those purchases are enclosed. We ask that you provide us with the names and addresses of the persons or entities that ultimately purchased these chairs. In the alternative, feel free to provide copies of this Bulletin (multiple copies are enclosed) directly to the ultimate purchasers of each chair. We do ask, however, that you advise us as to the specific persons or entities notified. Thank you for your assistance in ensuring that Superior customers continue to receive "superior products."

If you have any question, please feel free to call customer service at 1-800-551-3227.

Best regards,

Ken Ahlburg

CALLED REQUESTED HE CONTACT C.S. FOR PARTS. 10/11/00

Ken Ahlburg
SuperiorFurniture

One Industrial Park • Belton, TX 76513-1922 • Corporate Telephone 254-939-3517 • Corporate Fax 254-939-1630

IZ 01843

**SuperiorFurniture**

FAX - 708-547-8899
September 29, 2000
phone 708-547-8550

Sorry, not records AVAILABLE. Dan Palumbo purchasing

Office Furnishings LTD
725 South 25th Ave
Bellwood, IL 60104

Re: Centron Chairs Manufactured
Before December 29, 1998

Dear Customer:

We write to seek your assistance in providing important information to the ultimate users of Superior's Centron chairs manufactured before December 29, 1998. Enclosed you will find a Product Bulletin relating to reports that some users have noticed that screws attaching the back J-bar to the control have worked loose. It is Superior's intent to notify all ultimate purchasers and users of these chairs that they should inspect the chairs for this condition and notify Superior if any screws are loose. Superior will then remedy this condition at its own cost. We believe this is necessary in order to ensure that our customers receive a quality product and know that Superior stands behind its chairs.

Our records indicate that you purchased 5 Centron chairs. Details regarding those purchases are enclosed. We ask that you provide us with the names and addresses of the persons or entities that ultimately purchased these chairs. In the alternative, feel free to provide copies of this Bulletin (multiple copies are enclosed) directly to the ultimate purchasers of each chair. We do ask, however, that you advise us as to the specific persons or entities notified. Thank you for your assistance in ensuring that Superior customers continue to receive "superior products."

If you have any question, please feel free to call customer service at 1-800-551-3227.

Best regards,

Ken Ahlburg

Ken Ahlburg
SuperiorFurniture


J-BAR (1) SLIDES INTO MOVEMENT CONTROL (2)
2
1
SEE DETAIL A
THIS IS THE BOTTOM VIEW SHOWING BOTH COMPONENTS ASSEMBLED
DETAIL A
SCALE 1.000
IN THESE 3 LOCATIONS THERE IS A FASTENER (SCREW) THAT YOU SHOULD EXAMINE FOR TIGHTNESS.
Sifford Contract Interiors
1939 E. Phelps
Springfield, MO 65802
Missing this screw!

SuperiorChair * Pg 1/1

FROM : PACIFIC BUSINESS INTERIORS, INC PHONE NO. : 206 329 6174 Oct. 06 2000 05:34PM P1

SuperiorFurniture®

#206-323-1778

10/6/00 Both chairs were purchased as showroom samples and were about to be sold @ clearance. What should we do before selling?

Robert Anderson V.P./Corp Sec.

September 29, 2000

Pacific Business Ints.
1108 Nineteenth Ave East
Seattle, Wa 98112

Re: Centron Chairs Manufactured
Before December 29, 1998

Dear Customer:

We write to seek your assistance in providing important information to the ultimate users of Superior's Centron chairs manufactured before December 29, 1998. Enclosed you will find a Product Bulletin relating to reports that some users have noticed that screws attaching the back J-bar to the control have worked loose. It is Superior's intent to notify all ultimate purchasers and users of these chairs that they should inspect the chairs for this condition and notify Superior if any screws are loose. Superior will then remedy this condition at its own cost. We believe this is necessary in order to ensure that our customers receive a quality product and know that Superior stands behind its chairs.

Our records indicate that you purchased 2 Centron chairs. Details regarding those purchases are enclosed. We ask that you provide us with the names and addresses of the persons or entities that ultimately purchased these chairs. In the alternative, feel free to provide copies of this Bulletin (multiple copies are enclosed) directly to the ultimate purchasers of each chair. We do ask, however, that you advise us as to the specific persons or entities notified. Thank you for your assistance in ensuring that Superior customers continue to receive "superior products."

If you have any question, please feel free to call customer service at 1-800-551-3227.

Best regards,

Ken Ahlburg

CAlled requested he contact C.S. for parts. 10/11/00

Ken Ahlburg
SuperiorFurniture



IZ 01843

P43

**SuperiorFurniture**

#206-323-1778

10/6/00 Both chairs were purchased as showroom samples and were about to be sold @ clearance. What should we do before selling?

Robert Anderson V.P./Corp Sec.

September 29, 2000

Pacific Business Ints.
1108 Nineteenth Ave East
Seattle, Wa 98112

Re: Centron Chairs Manufactured
Before December 29, 1998

Dear Customer:

We write to seek your assistance in providing important information to the ultimate users of Superior's Centron chairs manufactured before December 29, 1998. Enclosed you will find a Product Bulletin relating to reports that some users have noticed that screws attaching the back J-bar to the control have worked loose. It is Superior's intent to notify all ultimate purchasers and users of these chairs that they should inspect the chairs for this condition and notify Superior if any screws are loose. Superior will then remedy this condition at its own cost. We believe this is necessary in order to ensure that our customers receive a quality product and know that Superior stands behind its chairs.

Our records indicate that you purchased 2 Centron chairs. Details regarding those purchases are enclosed. We ask that you provide us with the names and addresses of the persons or entities that ultimately purchased these chairs. In the alternative, feel free to provide copies of this Bulletin (multiple copies are enclosed) directly to the ultimate purchasers of each chair. We do ask, however, that you advise us as to the specific persons or entities notified. Thank you for your assistance in ensuring that Superior customers continue to receive "superior products."

If you have any question, please feel free to call customer service at 1-800-551-3227.

Best regards,

Called requested he contact C.S. for parts. 10/11/00

Ken Ahlburg

Ken Ahlburg
SuperiorFurniture

10/10/00 16:32 FAX 508 677 2855 SuperiorChair * Pg 1/1 SHAMROCK-BUSFURN 01

# BUSINESS FURNITURE OUTLET

*Division of SHAMROCK DISTRIBUTING, INC.*

FAX TRANSMITTAL SHEET

DATE: OCT. 10, 2000

No. OF PAGES (including coversheet): 1

COMPANY NAME: SUPERIOR FURNITURE

ATTENTION: KEN AHLBURG

FAX No.: 800-831-9821

PHONE No.:

FROM: BILL O'BRIEN JR.

REMARKS: RE: CENTRON CHAIR #4054 SHIPPED 8/22/96.

WE STILL HAVE THIS UNIT IN OUR SHOWROOM. IT HAS BEEN INSPECTED AND DOES NOT SHOW ANY EVIDENCE OF LOOSENING SCREWS

SINCERELY

Bill O'Brien Jr.

10/12/00

DIANE -

Could you send Bill screws anyway

Thanks

Ken

SHOWROOM: 381 Pleasant St. • Durfee Union Complex • Building 11 • Fall River, MA 02721
MAILING ADDRESS: P.O. Box 3693 • Fall River, MA 02722
Tel. (508) 677-2855 • Fax (508) 677-2856

IZ 01846

**SuperiorFurniture®**

12/29/00

September 29, 2000

I examined my sample chair a 2nd time when I cleaned my desk and found the drawings. I am missing the center screw only. The 2 outer screws appear to be tight. (See diagram)

Sifford Office Products
1939 E. Phelps
Springfield, MO 65802

Re: Centron Chairs Manufactured
Before December 29, 1998

Dear Customer:

We write to seek your assistance in providing important information to the ultimate users of Superior's Centron chairs manufactured before December 29, 1998. Enclosed you will find a Product Bulletin relating to reports that some users have noticed that screws attaching the back J-bar to the control have worked loose. It is Superior's intent to notify all ultimate purchasers and users of these chairs that they should inspect the chairs for this condition and notify Superior if any screws are loose. Superior will then remedy this condition at its own cost. We believe this is necessary in order to ensure that our customers receive a quality product and know that Superior stands behind its chairs.

Our records indicate that you purchased 1 Centron chair. Details regarding this purchase is enclosed. We ask that you provide us with the name and address of the person or entity that ultimately purchased this chair. In the alternative, feel free to provide copies of this Bulletin directly to the ultimate purchaser of this chair. We do ask, however, that you advise us as to the specific person or entity notified. Thank you for your assistance in ensuring that Superior customers continue to receive "superior products."

It is our sample chair in the showroom!

If you have any question, please feel free to call customer service at 1-800-551-3227.

Best regards,

Ken Ahlburg

Ken Ahlburg
Superior Furniture

One Industrial Park • Belton, TX 76513-1922 • Corporate Telephone 254-939-3517 • Corporate Fax 254-939-1630

IZ 01926

SuperiorChair * Pg 2/2

Dec 29 00 03:21p Siffords 417-866-5333 p.2




IZ 01927

**Ken Ahlburg**

**From:** Dave De Young
**Sent:** Thursday, September 21, 2000 1:03 PM
**To:** Nelson Jacobson
**Cc:** Ken Ahlburg; Janet De Young
**Subject:** Budget for Field Service Costs Associated with Early Centron Chair Production

Nelson,

I spoke with Ken, and here are his thoughts on this topic. He is working with Wade and Patricia to include $20,000 in estimated field service costs in the 2001 budget. The notification to the field will take the form of service notice and an offer to provide service.

Background:

Approximately 8,000 Centrons Shipped to 269 Dealer/Customers. This excludes TI models of a similar make that are present on the TI and Raytheon sites. Issue relates to screws in J-bar at point of attachment to control. In certain circumstances the screws in early production models have come out, which releases the J-bar and the back comes off the chair.

Actions Taken:

The biggest customers of the early Centron production (that employed this method of J-bar attachment) were TI and by acquisition Raytheon. We have responded to their concerns by performing inspections and service to the screws attaching the J-bar. Our inspection and services to these models was performed by our employees or servicing dealers. The work was performed based on our instructions.

Recommended Action:

Send a service notice to the field. We expect a 20% or lower response rate, and have based our budget for field servicing costs associated with this issue accordingly.

Dave D.

Page 70

Instruments who were reporting problems with loose backs with Centron chairs?
A. I don't know.
Q. Who within Izzy, JSJ or Superior today would know that?
A. I don't believe anybody is with the company anymore that would know that.
Q. How about Ken Ahlburg? Would he know?
A. At the time he was in a sales capacity. So he was not -- he wasn't involved in -- in any of this. But he might, but I don't believe so.
Q. Are there any documents or records that you are aware of that would record complaints of problems with the Centron chairs before September of 1998?
MR. STUBENVOLL: Form, foundation.
BY THE WITNESS:
A. I'm not sure when QTS was implemented, but my understanding is QTS would do that if it -- if it was in existence at the time.
BY MR. ESKEY:
Q. And before the QTS system, you are not aware of any way in which complaints were documented?

Page 71

A. No formal way, that I'm aware.
Q. Did you inquire as to -- before the deposition today, did you inquire as to the method by which complaints or problems were recorded before the QTS system came into place?
A. I didn't.
Q. Now, on December 29th of 1998, a temporary change was made to add a third screw, together with a washer to attach the J-bar to the chair, correct?
A. Yes, I saw that.
Q. Okay. And this temporary fix was ultimately discontinued in May 2000, correct?
A. Yes, I believe so.
Q. Okay. Now, in May of 2000, was the Centron chair redesigned so that there was a permanent solution to the attachment of the J-bar to the chair that had a third screw involved?
A. From my understanding of the documents, it looks like the third screw without the washer was what went on the chair in May of 2000 -- or, sorry, May of -- was that '97? Was that '98?
Q. I said May of 2000.
A. I'm sorry.

Page 72

Q. That was in my question, but I don't mean to imply if you have a different date in mind.
A. No, I'm sorry. Could you repeat the question?
Q. Okay. So when the temporary fix was discontinued in May of 2000, was that because it was a permanent third screw solution, to your knowledge?
A. Yes.
Q. Okay. And how was the third screw solution in May of 2000 different than what was pre-existing from the end of '98 through 2000?
MR. STUBENVOLL: Form, foundation.
BY MR. ESKEY:
Q. In other words, what was the difference between the temporary and the permanent third screw solution?
A. From reading the ECNs, I thought that the, what you were referring to as the permanent third screw solution was actually done in, I believe, in '98, so that the temporary fix you are referring to was on a smaller time period than that.
Q. Okay.
A. I may have read that -- I may have read the dates incorrectly, but --

Page 73

Q. Okay. But at any rate, you would agree with me that from December 29th of 1998, there was a temporary third screw solution?
A. Yes.
Q. And that involved a washer?
A. Yes.
Q. And at a certain point after that, then a permanent fix came in --
A. Yes.
Q. -- in which there was a third screw, but no washer, correct?
A. Yes.
MR. STUBENVOLL: I will just object to the form. The documents with respect to dates and time will speak for themselves.
MR. ESKEY: Right.
BY MR. ESKEY:
Q. Okay. But at least that's your understanding?
A. Yes.
Q. Okay. Now, in September or October of 2000, a letter and a product bulletin were sent by certified mail to customers notifying them of problems with loose screws attaching the J-bars to

Page 74

chairs, correct?
A. Yes.
Q. Now -- and that letter was actually dated September 29, 2000, and came from Ken Ahlburg, right?
A. Right.
Q. Okay. And the problem notification letter, if I can refer to it in that way, reported that the loose screw problem concerned Centron chairs that were manufactured before December 29th of 1998, correct?
A. Yes.
Q. Okay.
MS. MICHELS: Do you have a Bates stamp number for that letter?
MR. ESKEY: There are a few of them. There's one at 1843.
BY MR. ESKEY:
Q. Now --
MR. STUBENVOLL: Just for the record, we should probably mark not only that one but the other two documents. On a break we can clear that up.
MR. ESKEY: I may ultimately, depending on how much we go through, mark or at least agree -- I

Page 75

mean, we all have copies of these documents. They have all been Bates stamped. Whether we mark or agree to, you know, mark the entire set as an exhibit or mark them individually, we can talk about at a break.
MR. STUBENVOLL: Okay. We've been going for about an hour and a half.
MR. ESKEY: Sure. You want to take a quick break?
(WHEREUPON, a recess was had.)
BY MR. ESKEY:
Q. Sir, we were talking about the problem notification letter that went out in late September, early October of 2000, correct?
A. Yes.
Q. All right. Now, did you have any role in the process of notification at that time?
A. I recall being involved in discussions at the time Fritz Myer was president, Dan Buchweitz was the vice president, and I know we all discussed the letter and knew it was happening.
Q. Okay. So Fritz Myer you mentioned, he was president of what, Superior?
A. Superior.

Page 76

Q. Okay. And you mentioned also Buchweitz. What was his name?
A. Dan Buchweitz.
Q. Dan Buchweitz. He was vice president of Superior?
A. Yes.
Q. Vice president of what?
A. I believe he was VP of operations.
Q. Okay. And where are those individuals now, today?
A. Unfortunately, Fritz Myer passed away in 2002, I think. And I'm not -- Dan Buchweitz, I don't know where he is. I had heard he was in North Carolina, but I am not sure.
Q. Okay.
A. I haven't talked to him in a few years.
Q. All right. So what was your role in the discussions at that time?
A. I would say listening and learning. I'm not sure I was adding much value.
Q. How about Donna Caswell? Was she there?
A. She was the customer service manager.
Q. And is she still with the company?
A. She is.

Page 77

Q. I am going to have to ask you which company she's with. Is she with Izzy Design now?
A. She is.
Q. And what about Diana Gonzales?
A. I'm not sure if Diana is still with us or not. I seem to recollect that she -- she's no longer in customer service, but she may be a manufacturing person now.
Q. Okay. But in September of 2000 she was in customer service, to your recollection?
A. Yes, I believe that's right. She was -- when I was referring to the technical customer service person earlier --
Q. Yes.
A. -- she was that person.
Q. So she would have knowledge about the quality system and notifications of problems with loose backs?
A. Yes.
Q. Okay. Now I'm going to show you what's been Bates stamped as page 1885. It's an e-mail. I just ask you to have a look at that. Read it to yourself.
A. Okay.

notebook or took notes on a project change, or product change, where would those notes be kept?
MR. STUBENVOLL: I object, form, foundation.
BY THE WITNESS:
A. The engineer would have them. They are not -- Izzy or Superior, we don't retain those notebooks.
BY MR. ESKEY:
Q. Who is Dave De Young?
A. Dave De Young was the -- the chief financial officer at Superior.
Q. Okay. Is he still with JSJ, Superior or Izzy?
A. He's with JSJ.
Q. And who is Nelson Jacobson?
A. Today he is the -- he's at JSJ. He's the CEO of JSJ. I am not sure what he was at the time of -- of the different -- the different incidents.
Q. Okay. And is Janet De Young related to Dave?
A. Yes, it's his wife.
Q. Okay. And in September of 2000, what was her -- do you know what her position was?
A. I believe she was in HR at that point. I



believe she was the director of HR.
Q. With Superior?
A. Uh-huh.
Q. Okay. Nelson Jacobson in 2000, do you know what his position was?
A. To my recollection, I believe he was a vice president at JSJ with responsibility for the furniture group. And the furniture group was a few different furniture companies within JSJ. I may be wrong about the time period, but --
Q. Okay. And what about Jim H-u-y-g-e? How do you pronounce that?
A. Huyge.
Q. Jim Huyge, yes.
A. He was the risk manager at JSJ.
Q. Okay. Do you know if he's still with JSJ?
A. He's not.
Q. Do you know if he's with any JSJ affiliated company?
A. He's not.
Q. Okay.
A. I shouldn't say -- I think -- I believe he is with an insurance company. They may be



affiliated, meaning a customer/supplier relationship. I don't know.
Q. Okay. Do you know where he lives?
A. I think in Grand Haven, Michigan.
Q. Now, based on your review of these materials, the notices that the letter that we've been talking about, the -- well, how would you characterize that; product notification? What would you say that is?
A. I think we call it a product bulletin.
Q. Okay. The product bulletin that was sent on September 29th of 2000, those were sent out by certified mail, correct?
A. Yes.
Q. Okay. A lot of the materials that have been produced here, is it fair to say a significant portion of those materials concern the documentation of what happened with that notification?
A. Yes.
Q. There are a lot of -- I am looking at, for example, Page 1975. It looks like a green card that's come back from -- signed from a customer. And looking at this whole stack from 1975 through 2357, it looks similarly like green cards that were



sent out. Now, are those what -- do you have an understanding as to what that represents, those green cards?
A. My understanding is that it's the customer of -- you know, our customer receiving the product bulletin, so we had a date and time where we notified them.
Q. Okay. So you sent them out with a return receipt requested, and those are the return receipts?
A. Yes.
Q. Okay. And there were some other materials -- strike that.
In your review of the materials, were you able to determine how many customers were notified with the product notice?
A. I didn't review the number of green cards, no.
Q. And do you know how many were notified?
A. No, I don't know.
Q. Okay. Do you know if every customer was -- actually received the notice?
A. My understanding was when we sent out the -- and I would have to talk to Ken about this.



ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087 800.708.8087 FAX 312.704.4950

Page 102

But my understanding was we didn't -- some customers went out of business, so we didn't get a return receipt from every customer.
Q. Okay. Do you know what percentage of persons actually received the product notices as opposed to those that were returned undeliverable?
A. I don't.
Q. And who would know that? Would that be Ken?
A. Ken.
Q. Now, other than that product notice letter that was sent out in September, October of 2000, was there -- and any follow-up there may have been to those letters, was there any other attempt made to notify the ultimate users of the loose screw or loose back problems with the Superior Centron chairs?
A. My understanding, it was the other activity, plus the certified letters, where Morgan Howell was working with the customer -- with TI specifically, to work through their chairs.
Q. Who is that, Morgan Howell?
A. Morgan Howell, H-o-w-e-l-l. He was the account manager at the time.

Page 103

Q. He worked for who?
A. For Superior.
Q. He was what manager?
A. I believe he was called account manager. He was a salesperson.
Q. Oh, okay. And is Mr. Howell still with any JSJ Companies?
A. No.
Q. Do you know where he lives?
A. I don't.
Q. Where did he live at that time?
A. I always thought he was from the Belton area, but I don't know where.
Q. Okay. So getting back to the product notice itself. Beyond that -- sending out the product notice, and whatever follow-up there may have been to that, was there any other attempt made after that -- with all the customers who received notice, was there any attempt made after that to give any further notice of potential problems with loose backs in Superior Centron chairs?
A. Other than the, you know, the ongoing work with -- with TI, I don't -- I don't believe anything else relative to the other customers.

Page 104

Q. Okay. So there was no voluntary recall notice?
A. Just the product bulletin is what we sent out.
Q. Okay. Is it your understanding that that notice was a voluntary recall?
MR. STUBENVOLL: I object, form, foundation. That has legal connotations.
BY MR. ESKEY:
Q. Do you know what a voluntary recall is?
A. No. We sent a product bulletin to tell the customer about the chair.
Q. Okay. As an engineer, have you ever been involved in a product recall?
A. You should probably give me the definition of a product recall.
Q. Well, I guess it's just simpler than that. In any capacity since graduating from the University of Georgia, have you been involved --
A. Georgia Tech.
Q. -- Georgia Tech, excuse me -- have you been involved in a product recall?
A. Well, if there's a legal definition of "product recall," I am just not familiar with it

Page 105

myself. I have certainly serviced parts that have been out in the field.
Q. Okay. Was there any notice published in any newspaper or journal that you're aware of about these problems?
A. No.
Q. Was there a press release that was issued with respect to the loose back problem of Centron chairs?
A. No.
Q. I take it there was no notification to any government agency with respect to these loose back problems?
A. I don't believe so.
Q. Okay. Was --
A. Well -- no.
Q. Well, was there any notification to any nonprofit consumer protection organization?
A. No, not that I'm aware of.
Q. Was there any notification to any non-governmental organization concerned with product safety?
A. Not that I am aware of.
Q. Was there any notification to any

Page 106

consumer groups?
A. Not that I am aware of.
Q. There was testing, at least as far as the materials indicate, that took place after the addition of the third screw in December of 1998. Do you agree with that?
A. Yes.
Q. And do you also agree that there were -- in some of the tests, that the J-bar failed to meet the ANSI, BIFMA office chair back durability test?
MR. STUBENVOLL: I object to form, foundation. Go ahead.
BY THE WITNESS:
A. Okay. I think I saw one test where the back durability failed.
BY MR. ESKEY:
Q. And do you know -- well, were broken bolts involved in that failure?
A. The written description of the test mentions, you know -- I think it says -- I believe it says "Broken bolts."
Q. Okay. And from that report -- and we can find it here, if you like.
A. Sure. Yes.

Page 107

Q. Well, the reports are -- the testing reports, there's some at 124 through 188. And there's another set from pages 55 to 123. Did you look at all of those?
A. I'm not sure about those document numbers.
Q. Here is the first set, 55 through 123. And here's the second set, 124 through 188.
A. Okay.
Q. And the group that's collected the testing results in 55 to 123, those appear to be tests on Eon chairs. Did you notice that?
A. Yes.
Q. What are Eon chairs? How are they related, if they are related at all, to Centron chairs?
A. The Eon chairs is another product family at -- within Izzy, and it uses the same components.
Q. The same J-bar connected to the control mechanism?
A. Yes.
Q. And the same two-bolt or three-bolt --
A. Yes, same configuration.
Q. Okay.

Page 108

A. I would have to check explicitly about the J-bar itself, but it's the same mechanism and the same method of attachment. Because of the back shape, maybe it's a little bit longer or shorter but --
Q. Okay. Now, on page 106, there's a report. Just look at that for a minute.
A. Uh-huh.
Q. Does that report note any broken bolts?
A. I did see this when we were reviewing materials. It references broken bolts relative to the -- to the knee-tilt mechanism --
Q. Okay.
A. -- which is not -- which is not a Centron component.
Q. Okay. So that's completely different than the screws that we are talking about that attach to the J-bar, correct?
A. It could be screws -- it could be screws onto a control on a J-bar, but it's a different mechanism.
Q. I guess what I am trying to understand, though, is, is there any way to tell from that test summary report -- what's the date of that report, by

Page 109

the way?
A. January '04.
Q. Okay. Is there any way to tell from that report whether the screws that -- was it a shear --
A. We can see if there were pictures taken. The color copies exist at the test lab, so we could probably see a more clear picture. But this is the mode -- mode of failure.
Q. Okay. You are referring to the lower right-hand picture?
A. Yes. And I am --
Q. It has two circles on that. Is that indicating where the failure took place?
A. I believe so.
Q. Okay. And the circles look like they are on the J-bar itself, correct?
A. Yes. It looks like he missed -- that looks like the actual bolts, and he missed the circles, the test lab technician.
Q. Okay. So other than those bolts or screws that attach the J-bar to the control mechanism, are there any other bolts and screws on the J-bar, other than the ones on the back itself?
A. No. The ones from the J-bar to the back

Page 162

A. Yes, sir.
Q. -- how many Centron chairs were sold and -- of each type of model to Texas Instruments within that time and to all other customers?
A. Yes.
Q. All right. Now, 826 through 875, this just looks like reproductions of pages from the price list that we already have; the complete price list from '96 through 2003. Is that your understanding of those documents?
A. Yes. I also thought there were --
Q. It may be just the pages relevant to Centron.
A. There's also what we call cut sheets, which is just smaller brochures about the product.
Q. Okay. All right. 801 through 809 we've discussed. That's the other QTS report, the one that has TI issues on it. We missed that before. Let's see. Price catalogues we've discussed. The engineering change notices we've discussed.
972 through 1211, can you tell us what this is, if you are able to?
A. I believe this was sales of Centron to all customers.

Page 163

Q. Now, when you look at page 972, there's a -- in some of the first pages, there are copies of what looked like, again, return receipts from the post office. Do you know if these were -- at least when I looked at them, it suggested to me that these were possibly used in the sending out of a product bulletin in October of 2000. And when you look at the run date of that report, it looks like it was generated in October of 2000 as well.
Do you know if, in fact, that's what these were generated in connection with?
A. That's the way I understood it.
Q. Okay. And Ken may know more about that?
A. Yeah, Ken worked with the Texas group to put together this report and that report as well.
Q. Okay. And the report -- the next one and the final one would be from 1212 through 1528. That's not the final one but, again, these are more reports, and this has to do with the product -- to your understanding, the product bulletin?
A. Yeah, I believe it was all done in preparation for the product bulletin.
Q. Okay. And then finally -- we discussed this before -- 1529 through 1821. These are, again,

Page 164

documents generated in connection with the product bulletin?
A. I believe so.
Q. The notification of customers?
A. Yes, I believe so.
Q. Okay. And we already looked at 1975 through 2357 as well. It looks like the green cards that were proof of the mailing of the bulletins. At least those that were returned, correct?
A. That's what it looks like.
Q. Okay. There was other evidence that certain -- that product bulletins were undeliverable, right?
A. I -- that's what I understand.
Q. Okay. And there were documents in there that indicated that. And Ken would know more about that?
A. Yes.
Q. Okay.
MR. ESKEY: Great. I don't have any further questions at this time, subject to, again, reserving all the rights as I said at the top of the deposition.

Page 165

EXAMINATION
BY MS. MICHELS:
Q. I just want to clarify the record with a couple of questions.
You are here today to talk to us about the manufacture and the design of the Centron chair; is that correct?
A. No. As I understand it, I'm not here to talk to you on behalf of Izzy, but what --
Q. On behalf of Izzy, with respect to the design and the changes in the design of the Superior and the Centron chairs?
MR. STUBENVOLL: I'm just going to interpose an objection. He's here to discuss the topics --
BY MS. MICHELS:
Q. Right. Which includes the design?
A. Right.
Q. Okay. And we've gone through a number of documents that were produced by Izzy with respect to the request for production of documents by Mrs. King, which encompass more than the issues we have talked about within the deposition notice; is that correct?
MR. ESKEY: I object.

**SuperiorFurniture**

FAX - 708-547-8899

September 29, 2000

phone 708-547-8550

Office Furnishings LTD
725 South 25th Ave
Bellwood, IL 60104

Sorry, records not available. Dan Palumbo purchasing

Re: Centron Chairs Manufactured
Before December 29, 1998

Dear Customer:

We write to seek your assistance in providing important information to the ultimate users of Superior's Centron chairs manufactured before December 29, 1998. Enclosed you will find a Product Bulletin relating to reports that some users have noticed that screws attaching the back J-bar to the control have worked loose. It is Superior's intent to notify all ultimate purchasers and users of these chairs that they should inspect the chairs for this condition and notify Superior if any screws are loose. Superior will then remedy this condition at its own cost. We believe this is necessary in order to ensure that our customers receive a quality product and know that Superior stands behind its chairs.

Our records indicate that you purchased 5 Centron chairs. Details regarding those purchases are enclosed. We ask that you provide us with the names and addresses of the persons or entities that ultimately purchased these chairs. In the alternative, feel free to provide copies of this Bulletin (multiple copies are enclosed) directly to the ultimate purchasers of each chair. We do ask, however, that you advise us as to the specific persons or entities notified. Thank you for your assistance in ensuring that Superior customers continue to receive "superior products."

If you have any question, please feel free to call customer service at 1-800-551-3227.

Best regards,

Ken Ahlburg

Ken Ahlburg
SuperiorFurniture

SuperiorChair * Pg 1/1

SENT BY: RE ANDERSON & ASSOC; 11-21- 0 2:24PM; 812 232 5239 => SuperiorChair Main; #1/1

1240 HULMAN STREET, TERRE HAUTE, INDIANA 47802
812 234 6857 FAX: 812 232 5239

R.E. ANDERSON & ASSOCIATES, INC.

# Fax

| | | | |
|---|---|---|---|
| **To:** | KEN AHLBURG | **From:** | SUE MURPHY |
| **Fax:** | 254-939-1630 | **Pages:** | 1 |
| **Phone:** | | **Date:** | 11/21/00 |
| **Re:** | CENTRON CHAIRS | **CC:** | |

☐ **Urgent** ☑ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Recycle**

THIS IS IN REGARDS TO YOUR LETTER OF 11/23/00 REGARDING FAULTY CENTRON CHAIRS. YOUR RECORDS INDICATE THAT WE PURCHASED 3 IN 1996 AND 1 IN 1997. I STILL HAVE RECORD OF WHERE THE ONE PURCHASED IN 1997 MIGHT BE, BUT WE DON'T KEEP RECORDS MORE THAN 3 YEARS, AND I HAVEN'T A CLUE WHERE THEY MIGHT BE. THE ONE PURCHASED IN 1997 WAS SENT AS A SAMPLE CHAIR TO A SALES REPRESENTATIVE FOR US THAT LIVED IN INDIANAPOLIS AT THE TIME. HE NO LONGER IS WITH OUR COMPANY, BUT I WILL SEND A COPY OF YOUR LETTER TO HIS LAST KNOWN ADDRESS.

SORRY I COULDN'T BE MORE HELPFUL, BUT IF I ACQUIRE ANY MORE INFORMATION ON THE CENTRONS I WILL LET YOU KNOW!

IZ 01861

SuperiorChair * Pg 1/1

OCT-23-2000 10:12 1 2485473582 P.01/01

**SuperiorFurniture®**

These were all demo chairs, and we have no clue where they are

September 29, 2000

Hampton Products
Box 422 500 East Eleven Mile Road
Royal Oak, MI 48068

Re: Centron Chairs Manufactured
Before December 29, 1998

Dear Customer:

Hampton Products Inc.
500 East Eleven Mile Road
Royal Oak, Michigan 48068
(248) 547-0900 FAX:(248) 547-3582

We write to seek your assistance in providing important inform
Superior's Centron chairs manufactured before December 29,
Product Bulletin relating to reports that some users have notice
bar to the control have worked loose. It is Superior's intent to n ... purchasers and users of these chairs that they should inspect the chairs for this condition and notify Superior if any screws are loose. Superior will then remedy this condition at its own cost. We believe this is necessary in order to ensure that our customers receive a quality product and know that Superior stands behind its chairs.

Our records indicate that you purchased 6 Centron chairs. Details regarding those purchases are enclosed. We ask that you provide us with the names and addresses of the persons or entities that ultimately purchased these chairs. In the alternative, feel free to provide copies of this Bulletin (multiple copies are enclosed) directly to the ultimate purchasers of each chair. We do ask, however, that you advise us as to the specific persons or entities notified. Thank you for your assistance in ensuring that Superior customers continue to receive "superior products."

If you have any question, please feel free to call customer service at 1-800-551-3227.

Best regards,

Ken Ahlburg

Ken Ahlburg
SuperiorFurniture

One Industrial Park • Belton, TX 76513-1922 • Corporate Telephone 254-939-3517 • Corporate Fax 254-939-1630

TOTAL P.01

IZ 01863

Corporate Express®
A Buhrmann Company

Corporate Express Inc.
Illinois Division
2651 Carl Street
Elk Grove Village, IL 60007

Telephone
847 238-4200
Fax
847 238-4300

Ken Ahlburg
Superior Furniture
One Industrial Park
Belton, TX. 76513-1922

3/2/01

Dear Mr. Ahlburg,

We are in receipt of your letter dated November 13, 2000 informing Corporate Express (BT Office) of product defects. We regret to inform you the orders are too old for Corporate Express to identify the end users. We therefore are unable to notify them of the defects as you requested.

Thank you,

William V Reid
Director of Furniture Illinois/Iowa

IZ 01945

CERTIFIED MAIL

7000 0600 0026 8720 0644

NOT DELIVERABLE
AS ADDRESSED
UNABLE TO FORWARD

E.F. Corbin
1810 13th St.
Sacramento, CA 95814

SuperiorFurniture®

SuperiorFurniture®

ONE INDUSTRIAL PARK BELTON, TX 76513

IZ 01859

Page 102

But my understanding was we didn't -- some customers went out of business, so we didn't get a return receipt from every customer.
Q. Okay. Do you know what percentage of persons actually received the product notices as opposed to those that were returned undeliverable?
A. I don't.
Q. And who would know that? Would that be Ken?
A. Ken.
Q. Now, other than that product notice letter that was sent out in September, October of 2000, was there -- and any follow-up there may have been to those letters, was there any other attempt made to notify the ultimate users of the loose screw or loose back problems with the Superior Centron chairs?
A. My understanding, it was the other activity, plus the certified letters, where Morgan Howell was working with the customer -- with TI specifically, to work through their chairs.
Q. Who is that, Morgan Howell?
A. Morgan Howell, H-o-w-e-l-l. He was the account manager at the time.

Page 103

Q. He worked for who?
A. For Superior.
Q. He was what manager?
A. I believe he was called account manager. He was a salesperson.
Q. Oh, okay. And is Mr. Howell still with any JSJ Companies?
A. No.
Q. Do you know where he lives?
A. I don't.
Q. Where did he live at that time?
A. I always thought he was from the Belton area, but I don't know where.
Q. Okay. So getting back to the product notice itself. Beyond that -- sending out the product notice, and whatever follow-up there may have been to that, was there any other attempt made after that -- with all the customers who received notice, was there any attempt made after that to give any further notice of potential problems with loose backs in Superior Centron chairs?
A. Other than the, you know, the ongoing work with -- with TI, I don't -- I don't believe anything else relative to the other customers.

Page 104

Q. Okay. So there was no voluntary recall notice?
A. Just the product bulletin is what we sent out.
Q. Okay. Is it your understanding that that notice was a voluntary recall?
MR. STUBENVOLL: I object, form, foundation. That has legal connotations.
BY MR. ESKEY:
Q. Do you know what a voluntary recall is?
A. No. We sent a product bulletin to tell the customer about the chair.
Q. Okay. As an engineer, have you ever been involved in a product recall?
A. You should probably give me the definition of a product recall.
Q. Well, I guess it's just simpler than that. In any capacity since graduating from the University of Georgia, have you been involved --
A. Georgia Tech.
Q. -- Georgia Tech, excuse me -- have you been involved in a product recall?
A. Well, if there's a legal definition of "product recall," I am just not familiar with it

Page 105

myself. I have certainly serviced parts that have been out in the field.
Q. Okay. Was there any notice published in any newspaper or journal that you're aware of about these problems?
A. No.
Q. Was there a press release that was issued with respect to the loose back problem of Centron chairs?
A. No.
Q. I take it there was no notification to any government agency with respect to these loose back problems?
A. I don't believe so.
Q. Okay. Was --
A. Well -- no.
Q. Well, was there any notification to any nonprofit consumer protection organization?
A. No, not that I'm aware of.
Q. Was there any notification to any non-governmental organization concerned with product safety?
A. Not that I am aware of.
Q. Was there any notification to any

Page 106

consumer groups?
A. Not that I am aware of.
Q. There was testing, at least as far as the materials indicate, that took place after the addition of the third screw in December of 1998. Do you agree with that?
A. Yes.
Q. And do you also agree that there were -- in some of the tests, that the J-bar failed to meet the ANSI, BIFMA office chair back durability test?
MR. STUBENVOLL: I object to form, foundation. Go ahead.
BY THE WITNESS:
A. Okay. I think I saw one test where the back durability failed.
BY MR. ESKEY:
Q. And do you know -- well, were broken bolts involved in that failure?
A. The written description of the test mentions, you know -- I think it says -- I believe it says "Broken bolts."
Q. Okay. And from that report -- and we can find it here, if you like.
A. Sure. Yes.

Page 107

Q. Well, the reports are -- the testing reports, there's some at 124 through 188. And there's another set from pages 55 to 123. Did you look at all of those?
A. I'm not sure about those document numbers.
Q. Here is the first set, 55 through 123. And here's the second set, 124 through 188.
A. Okay.
Q. And the group that's collected the testing results in 55 to 123, those appear to be tests on Eon chairs. Did you notice that?
A. Yes.
Q. What are Eon chairs? How are they related, if they are related at all, to Centron chairs?
A. The Eon chairs is another product family at -- within Izzy, and it uses the same components.
Q. The same J-bar connected to the control mechanism?
A. Yes.
Q. And the same two-bolt or three-bolt --
A. Yes, same configuration.
Q. Okay.

Page 108

A. I would have to check explicitly about the J-bar itself, but it's the same mechanism and the same method of attachment. Because of the back shape, maybe it's a little bit longer or shorter but --
Q. Okay. Now, on page 106, there's a report. Just look at that for a minute.
A. Uh-huh.
Q. Does that report note any broken bolts?
A. I did see this when we were reviewing materials. It references broken bolts relative to the -- to the knee-tilt mechanism --
Q. Okay.
A. -- which is not -- which is not a Centron component.
Q. Okay. So that's completely different than the screws that we are talking about that attach to the J-bar, correct?
A. It could be screws -- it could be screws onto a control on a J-bar, but it's a different mechanism.
Q. I guess what I am trying to understand, though, is, is there any way to tell from that test summary report -- what's the date of that report, by

Page 109

the way?
A. January '04.
Q. Okay. Is there any way to tell from that report whether the screws that -- was it a shear --
A. We can see if there were pictures taken. The color copies exist at the test lab, so we could probably see a more clear picture. But this is the mode -- mode of failure.
Q. Okay. You are referring to the lower right-hand picture?
A. Yes. And I am --
Q. It has two circles on that. Is that indicating where the failure took place?
A. I believe so.
Q. Okay. And the circles look like they are on the J-bar itself, correct?
A. Yes. It looks like he missed -- that looks like the actual bolts, and he missed the circles, the test lab technician.
Q. Okay. So other than those bolts or screws that attach the J-bar to the control mechanism, are there any other bolts and screws on the J-bar, other than the ones on the back itself?
A. No. The ones from the J-bar to the back

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARY ANN KING
and PHILIP KING

VS. C.A. NO. 06-258 S

STAPLES, INC.; IZZY DESIGNS;
JSJ CORPORATION; JOHN DOE
COMPANY

DEPOSITION OF MARY ANN KING, taken on behalf of the Defendant, Staples Inc., Friday, November 17, 2006 at 1:10 p.m. pursuant to the Federal Rules of Civil Procedure at the office of Hanson Curran LLP, 146 Westminster Street, Providence, Rhode Island before Linda F. Oakley, RPR, Inc., Notary Public.

APPEARANCES:

DeLUCA & WEIZENBAUM, LTD.
BY: MICHAEL T. ESKEY, ESQ.
Counsel for the Plaintiffs

HANSON CURRAN LLP
BY: KELLY N. MICHELS, ESQ.
Counsel for Staples Inc.

ZIZIK, POWERS, O'CONNELL, SPAULDING & LaMONTAGNE
BY: DONNA LaMONTAGNE, ESQ.
Counsel for Izzy Designs and JSJ Corporation

CHRISTENSEN & EHRET, LLP
BY: ERIC D. STUBENVOLL, ESQ.
Co-counsel for Izzy Designs and JSJ Corporation

REPORTING ASSOCIATES
Westminster Square Building
10 Dorrance Street, Suite 617
Providence, RI 02903

people. So we ended up closing the business.
Q So it was open for about eighteen months or so?
A Yes.
Q What was your role?
A I was the president of the company.
Q What were your duties as president?
A To do pay--- make sure the payroll was called in, the hiring. And I went and bidded out the, you know, bidded on the jobs and paid the bills.
Q And what was Mr. Vose's role?
A He pretty much went out and made sure. He, you know, he was mainly hands-on, on the company.
Q Would he supervise the jobs as they were being done?
A He would supervise the jobs. He would go and make sure, and sometimes he would, you know, be one of the workers on the job.
Q He would actually perform the work?
A Yes.
Q And you said he got hurt?
A Yes.
Q Did he hurt himself by working at Hypro?
A No.
Q Or through some other way?
A He fell on the ice at a restaurant.
Q What were his injuries from falling on the ice?



A He needed surg--- knee surgery.
Q And because of that he couldn't perform his duties for Hypro anymore?
A Yeah. Because he had several operations on his knee. He's still having problems with it.
Q When you closed the business, did you close it, or did you sell it to somebody?
A No. We closed it. My broth--- brother-in-law, actually, took over the contracts that, you know, we had, which he is JS, Jen -- no. What was his company name? I forgot. He was out of Pawtucket. I forgot the company name, to tell you the truth, right now. My memory hasn't been too good lately.
Q That's okay. Is he still in business?
A Yes.
Q Out of Pawtucket?
A Yes.
Q What's his name?
A Carlos DaSilva.
Q And he took over the contracts that you had through your company?
A Yeah. Well, he had subbed some contracts to me. And I, when I couldn't do it, he ended up taking contracts back.
MS. MICHELS: If we could just take a



short recess.
(Ten-minute recess)
MS. MICHELS: Back on the record.
Q Mrs. King, do you recall the exact date that you were injured at Texas Instruments?
A Yes. June 6th. No. Yeah. June 2nd, '03. I meant to say 6th.
Q Why don't you tell me exactly what happened, how you hurt yourself.
A Okay. I was talking to my co-worker. She asked me a question. And her office was right outside mine. And I turned in the chair to answer a question. And then when I turned back, I was, you know, I leaned back. You know, I just leaned back on the chair, and the chair snapped.
Q Who was the co-worker you were trying to talk to?
A Pam McGee. She asked me a question.
Q And when you leaned back in the chair and it snapped, did you fall to the ground?
A I, when I, what happened was I was going down. And I pulled myself, and I'm jerked. And my arm hit the table. And my buttocks hit the floor probably, you know, I don't know how hard. It was like everything happened. And Pam ran after me, and she grabbed my arm and pulled me up.



Q Excuse me.
A And I pulled up because I knew what bar -- you know, they had bars in the back. And if I -- I didn't want to hit the bar. You know? So I was kind of jerking and pulling myself up.
Q Who had bars in the back? What do you mean by bars?
A The chair, the back of the chair. It had a bar that slid in. And it was on the floor. And, well, I didn't know if it was right behind me, but I didn't want to hit that bar because I probably would have broke my back in half 'cause it came up.
Q Was this bar in the back of the chair?
A It, you got the chair, the, you know, it's a blue part. And it, you know, it slid into the back of the chair. And it was, you know, it was screwed in.
Q Is this the bar that connects the seat to the actual back of the chair?
A Yeah.
Q Okay.
A Well, I think it connects the back of the chair into the seat.
Q Into the seat?
A (Deponent nods head in the affirmative)
Q Okay.
A If I'm, you know, I'm not positive, but I believe

that's how it went.
Q But that's the connecting part --
A Yeah.
Q -- between the seat and the back of the chair?
A Correct.
Q And you were conscious of the fact that that was on the floor, and you didn't want to hit it?
A Yes.
Q When you said that your arm hit the table, you indicated it was your right -- your left arm?
A My left arm.
Q Okay.
A Because I was, the door's here. And it was like the table was here.
Q This is the table that you were working at?
A Yeah.
Q So you caught yourself on the table?
A I, my arm banged on the table. And I slid down. You know, I pulled myself, you know, like trying to jerk myself. And then Pam ran after me.
Q But your bottom did hit the floor?
A Bottom hit the floor.
Q Were you able to get up right after that?
A Yeah. Pulled, Pam pulled me up, and I jumped right up.



Q You jumped right up onto your feet?
A Yeah. Well, it's like she, she grabbed me. And I, you know, and then I grabbed onto the table and pulled myself up with her help.
Q Did you feel any pain when you fell?
A Not, not at that point, no.
Q How about once you stood up? Did you feel any pain?
A Not at that point, no.
Q The chair that you fell out of, you said it was blue?
A Yes. Like a royal blue.
Q Do you know what type of chair it was?
A I believe it was a Superior chair.
Q Is Superior the type, the brand name?
A That's the mod--- brand.
Q The model?
A Because that was pretty much all we bought was Superior.
Q Do you know where the chair was purchased from?
A Staples.
Q How do you know that?
A Because that's where we purchased all, all our chairs. That's to my knowledge.
Q Had you actually put in the purchase order for this particular chair?
A No.



Q Where did this chair come from within the facility?
MR. ESKEY: Objection. But go ahead.
A My boss had given it to my second shift guy to bring into the area.
Q Who was your boss?
A Ed Picard.
Q And who was the gentleman that he gave it to?
A Kevin White.
Q Is Mr. Picard still at Texas Instruments?
A No.
Q Do you know where he is?
A I believe he lives in Cumberland, Rhode Island.
Q Do you know where he's working now?
A He's retired.
Q What about Kevin White? Is he still at T.I.?
A No.
Q Do you know where he's working now?
A I believe he's laid off right now.
Q Do you know where he lives?
A I'm not positive. I think it's East Providence. I'm not positive, though.
Q When did Ed give the chair to Kevin? Do you know?
A I don't know. I don't recall the date.
Q Was it around the same time as you -- well, let me ask you this. When did you take possession of the



chair to use it?
A I don't recall the date. I do know Kevin had -- we had a chair. Kevin used to use my chair at night. And the back of his chair broke. And then he talked to the, my boss about, you know, getting a new chair. And they ended up getting the chair. And I'm not sure where they got it from.
Q Did you say that he used to use your chair at night?
A Yeah. Periodically, every now and then he would use my computer. But he had his own chair, but sometimes he would have to go in to use my computer. It was faster.
Q Did he have the same type of position as you?
A No. He, he worked for me pretty much. He didn't do any preci--- any purchasing.
Q What was his position?
A He was a material handler.
Q What does that mean?
A They gave him, they gave that name to them because they did a lot of moving of heavy, you know, materials. They would bring the stuff shipping out to the dock, you know, to ship it out. And he would do inventories. And --
Q The chair that he had that broke, was that his chair or was that your chair that he used?

computer.
Q What was the purpose of you turning and rolling over to answer her question if you could see one another?
A Well, because I would have had to lean back like this because my computer faces this way with my back towards her. And I was trying to, you know, she asked me a work question. So I just turned the chair to talk to her. And then when we were done, when I was done answering her question, I turned the chair back. I was turning the chair back. As I was doing that, when I leaned back, that's when the chair snapped.
Q Would you --
A It actually rolled a little because I was, you know, trying to catch my feet, and it had wheels. You know, just not, not a lot, but it rolled back a little after that happened. And after it snapped, you know, it kind of like moved back a little.
Q After the chair snapped, did you inspect it at all?
A No. I called my boss. We were laughing a little. Because Pam's like, she's a little bit of a girl. And she was running towards me. Everything was like in slow motion. So we were nervously laughing. You know? And I forgot the rest of the question. My brain's not --



MR. ESKEY: She just asked whether you inspected the chair after you fell.
A (Continued) No, I didn't. My boss asked me to put it in a certain area so they can, you know, look at it.
Q But you yourself never looked at the chair to see what broke?
A No. I just knew the bar was on the floor, and I didn't check it out.
Q So the bar had actually come off from the chair?
A Yup.
Q And was lying on the floor?
A Yup. With the, with the bar sticking up.
Q Was the back of the chair still attached to the bar?
A Yes.
Q Okay. So the chair's now in two pieces, the seat and the wheels, the base of the chair?
A Yeah, and the arms.
Q And the arms, and then the bar with the back was a separate part --
A It was on --
Q -- lying on the floor?
A Yes.
Q What was the purpose of you calling the boss?
A To let him know that the chair broke, and that



I would need another chair to use.
Q So it wasn't to tell him that you were injured?
A Not at that point because I didn't feel any pain at that point.
Q Did he ask you if you were hurt?
A He said, "Are you all right?" I said, "Yeah." You know, "I'm all right."
Q Did he ask you to fill out any type of report?
A Not at that point, no.
Q Did you make any type of report on your own about what happened?
A Not, not at that point. It was towards the end of the day.
Q What time was it? Do you recall?
A I want to say, I think it was around 11:00, somewhere around lunchtime, or something like that.
Q What were the hours that you normally worked?
A Sometimes I worked 5:00 to 2:30 or 5:00 to 3:30.
Q 5:00 in the morning to 2:30 in the afternoon?
A And, you know, that was at times I did that, yeah.
Q So this occurred around lunch; if lunch was at noon, --
A Yeah.
Q -- that would be towards the end of your day?
A It was around -- yeah, it was around that time, yeah.



Q Besides calling Ed, your boss, did you call anyone else or tell anybody else about your fall?
A No. Just Pam and me, you know, myself and Pam talked about it. And we said, "Oh, thank God that you didn't hit the bar." And, you know, we laughed a little. We were all, we were both nervous. We were laughing. It was, like, jesus, you know, we're like.
Q Besides your bottom hitting floor, did any other part of your body hit the floor?
A No. Because I was crunched. So, like, my buttocks. She didn't -- you know, it happened so fast, like, I went. I kind of hit, and she pulled me up. It was like faster than -- she didn't actually see me hit the bottom, but she pulled me up.
(Mr. Eskey conferring privately with deponent)
THE DEPONENT: Okay.
Q When she helped you up, did she help you -- where did she touch you to help you up?
A She grabbed my right arm. And she, she grabbed with both hands, and she helped pull me up.
Q When you went home that night, did you experience any pain?
A On the ride home it started.
Q What started exactly?

Q Did both of those fusions take, do you know, from the third surgery?
A It's looking good. They did an x-ray. It looks good. But I'm still having, you know, while I was laid up when I should have been doing therapy, so.
Q But you were in the hospital for the infection?
A M-hm. (Deponent nods head in the affirmative)
MR. ESKEY: Yes?
A Yes.
MR. ESKEY: Okay.
THE DEPONENT: Thank you.
Q Have you made any type of claim or anything because of your infection?
A No.
Q Now, you made your Workers' Compensation claim after you were injured in 2003?
A Correct.
Q And you've been, after you stopped working in July 2003, you haven't been back, is that right?
A I went -- I went back in 2004.
Q In 2004, right?
A I went back part-time.
Q Right.
A I had a lot of vacation, so I took a lot of days out because the doctors wanted me to try it. And then



Dr. Breiding took me out for the month of August. Well, he took me off, out at the end of August. And my end date at TI was September 24th. So I had to go back one day just to sign my papers.
Q September 24th?
A Yeah.
Q And you haven't worked since?
A No.
Q Has Dr. Nordt said anything to you about going back to work?
A No. I'm collecting SSD right now. Been collecting that for a couple of years.
Q When you went back to work the day following your fall, was your chair still within your work area?
A I had had a different style chair -- it wasn't a Superior chair -- I had used until they pretty much put a chair in there. I guess Jim Drews brought a chair from Staples. He brought a chair in for me to use.
THE REPORTER: What was the last name, again? Jim?
THE DEPONENT: Drews, D r e w s, I believe.
Q Okay. My question, specifically, though, is when you came back to work the next day on June 3rd, was the



chair that broke still within your work area?
A It was put outside the door.
Q Okay. How long did it remain outside the door?
A Well, someone had picked it up and tried, tried to fix it.
Q Do you know who that was?
A I don't know their name, but my boss tracked it down. My boss, Ed Picard, tracked it down.
Q Okay. And were they able to fix it, whoever this person was?
A Not to my knowledge. I don't think it was totally fixed, no.
Q Do you know how long it remained outside your door?
A Well, they put it into my, into my storeroom with the tape around it stating not to use it.
Q Do you know who put it in your storeroom?
A I believe -- I wasn't there, but I believe maybe my boss, Ed Picard. I'm not sure.
Q And they put tape around the chair?
A Yes. Sorry.
Q How long did it remain in your storeroom? Do you know?
A I don't know.
Q Do you know what day it arrived into your storeroom?



A I, I don't know. I was out of work by the time they found it and brought it back.
Q What do you mean, found it and brought it back?
A The chair. That you're talking about the chair?
Q I'm talking about the chair. But what do you mean, they found it? Found it where?
A Well, remember I said it was outside the door?
Q Right.
A And someone took it and tried to fix it.
Q Okay.
A So they, you know, one of the guys working across from me says another guy had taken it, and they brought it back.
Q So they didn't try to fix it as it was outside your door?
A No.
Q They moved it to another location?
A They moved it to another location.
Q Tried to fix it?
A Yup.
Q And then eventually it was found at that other location?
A Yes.
Q And that's when they moved it into your storeroom?
A Correct.

VOLUME II
PAGES 1-145
EXHIBITS: None

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING and
PHILLIP KING,
Plaintiffs,

v. C.A. NO.: 06-258-S

STAPLES, INC., IZZY DESIGN,
JSJ CORPORATION, JOHN DOE
COMPANY,
Defendants.

* * * * * * *

CONTINUED DEPOSITION of MARY KING, a witness called on behalf of Izzy Design and JSJ Corporation, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the State of Rhode Island, at the offices of Zizik, Powers, O'Connell, Spaulding & Lamontagne, 40 Westminster Street, Providence, Rhode Island, on Wednesday, January 3, 2007, commencing at 1:15 p.m.

Q. To your knowledge, who took the pictures?
MR. ESKEY: Objection.
A. I don't know.
Q. Have you ever seen any pictures of the chair?
A. No.
Q. Okay. And you believe somebody fixed the chair after?
A. I believe so. Someone said that -- well, this is hearsay. I wasn't there. They called me up and asked me where the chair was, I said it was outside the door. And then they asked the gentleman across the way and they said, Oh, I don't know who the person was took it and he had put screws in it and fixed it. And then they took the chair off the floor and they brought it and Jim Drews took it. That's all I know.
Q. Your personal knowledge of what happened to the chair after was that you placed it where?
A. I placed it in an area -- we had red line, yellow line off a certain -- you know, certain materials and we place it right outside of the door, right outside my storeroom in that, you know, yellow square.



Q. So it was not inside the storeroom, it was outside the storeroom?
A. It was put outside the storeroom.
Q. And when you moved it there, was it still in two pieces?
A. Yes.
Q. At any point after that, did you see the chair in one piece?
A. No.
Q. At any point after that, do you know of anyone who physically touched the chair, the name of any person?
A. I don't know the name of any person who touched it.
Q. And you never saw the chair again. Is that fair to say?
A. Never saw it again after that.
Q. And even when you went back to work part-time and when you went back to work the next day, you didn't see the chair anymore?
A. No.
Q. Okay. And when you went --
A. Well, actually, the chair was outside the door when I went back the next day still.



Q. It had not been moved when you went back to work?
A. It had not been moved at that time.
Q. So for the second day you were there, the chair was there, but you didn't see anything happen to it?
A. No, it was still outside the door.
Q. The following day, which would have been June 4th, was the chair still there?
MR. ESKEY: Object. Asked and answered, go ahead.
A. As long as I was there, while I was there the chair was out in front of that door while I was in work.
Q. And then after June 5th, did you go back to work anymore?
A. I don't believe so. I forgot the date, but I do know when I went out of work that's when they came to look for the chair. So, you know, I'm not sure what date it was to tell you the truth.
Q. And you don't know who came and where they got it from or you don't know what happened to it after that?



A. No. I know Ed Picard came to look for the chair and look for the screws and that's -- that's what I heard. And him and Pam were on the floor looking for the screws.
But like I said, it had a partition where there was a space underneath where they could have gone anywhere in the manufacturing or into the boiler room area.
Q. And when you say "that's what I heard," who did you hear it from?
A. Ed Picard.
Q. Okay. When did you talk to Ed?
A. He called and asked me where the chair was.
Q. Called you at home?
A. Yeah.
Q. And that was what day?
A. The first day I was out. I'm not sure of the day.
Q. The first day that you were out?
A. The first full day that I was out.
Q. Fair to say within a week of the accident?
A. Oh, yeah.
Q. First full day you were out he called you and asked you where the chair was?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARY ANN KING
and PHILIP KING

VS. C.A. NO. 06-258 S

STAPLES, INC.; IZZY DESIGNS;
JSJ CORPORATION; JOHN DOE
COMPANY

DEPOSITION OF MARY ANN KING, taken on behalf of the Defendant, Staples Inc., Friday, November 17, 2006 at 1:10 p.m. pursuant to the Federal Rules of Civil Procedure at the office of Hanson Curran LLP, 146 Westminster Street, Providence, Rhode Island before Linda F. Oakley, RPR, Inc., Notary Public.

APPEARANCES:

DeLUCA & WEIZENBAUM, LTD.
BY: MICHAEL T. ESKEY, ESQ.
Counsel for the Plaintiffs

HANSON CURRAN LLP
BY: KELLY N. MICHELS, ESQ.
Counsel for Staples Inc.

ZIZIK, POWERS, O'CONNELL, SPAULDING & LaMONTAGNE
BY: DONNA LaMONTAGNE, ESQ.
Counsel for Izzy Designs and JSJ Corporation

CHRISTENSEN & EHRET, LLP
BY: ERIC D. STUBENVOLL, ESQ.
Co-counsel for Izzy Designs and JSJ Corporation

REPORTING ASSOCIATES
Westminster Square Building
10 Dorrance Street, Suite 617
Providence, RI 02903

Page 114

A I don't believe so. I, I think when Jim checked the serial number, it was, I think, so many months old. So it wasn't years. That's Jim Drews.
Q They can tell how many months old the chair is?
A Well, they have the serial numbers.
Q M-hm. What is the serial number?
A You know, like, --
Q Is that from the purchase order?
A You know, you know, like you buy a T.V. It has a model number and a serial number.
Q M-hm. (Affirmative)
A So you can tell when, you know, things were, you know, you can go back and look at that serial number, see when it was made. And I believe he looked at the serial number, if I'm not mistaken, and found out that it was, I think, I want to say six months, but I'm not positive 'cause I wasn't there. I'm just hearing by hearsay.
Q You attended one of these meetings --
A Yes.
Q -- on July 9th, 2003?
A When I -- that's when I went back for a short time.
Q Okay. Did you see the chair that you fell out of at all when you returned in July 2003?
A No. Jim Drews, I believe, had taken it to his area,

Page 115

you know. I guess he had a shop. He was fixing them. And that's another hearsay, I mean. I didn't remember all the skid, all the chairs on skids going to be fixed with four screw holes. That's what I understand. He puts four screws in them.

MS. MICHELS: I'm going to look over my notes. Miss LaMontagne may have some questions for you while I'm doing that, so we don't waste any time.

MS. LaMONTAGNE: I have to do that. And then can I just talk to you for a minute?

MR. ESKEY: Sure.

(Whereupon, Mr. Eskey and Miss LaMontagne leave the conference room)

MR. ESKEY: Mary, can I speak with you a minute, please.

(Whereupon, Miss King leaves the conference room)

MS. MICHELS: I just have one quick question --

MR. ESKEY: Go ahead.

MS. MICHELS: -- before, while I'm thinking of it before we suspend.

Q The anxiety that you mentioned, was that, did you have anxiety before this occurred in 2003?
A I have had periodics, you know, periodically, you

Page 116

know, some anxieties, you know, after my husband got sick. But it --
Q Were you treating for it?
A Yeah.
Q Okay.
A But it got worse after they had put me on Zoloft. I, when I was in the hospital, I took, you know, I went off of the Zoloft 'cause I figured I was going to cure myself. You know, I had a new lease. I'm not dying. So I took, you know, I told them I didn't want any medications, but now slowly they're starting to put me back on the medications because of my nerves and, and everything else, so.
Q Did your injuries from 2003 contribute to your anxiety?
A Yeah. Well, it helped, yes.
Q Who are you treating with for the anxiety?
A Dr. Sparadeo was, he was one that said I had depression from my back. And Cindy Longway, she works at Cannon Associates, Cannahan. (Phonetic spelling)
Q Cannahan?
A She should be listed on one of the doctors' lists.
Q She's not listed.
A I, well, because I know Bianca had asked me --

Page 117

MR. ESKEY: Well, excuse me. You know, she's not going to ask you about anything that has gone on in terms of conversations --

THE DEPONENT: Yes.

MR. ESKEY: -- with your attorneys at the office.

THE DEPONENT: Yes.

MR. ESKEY: So I don't want you to say anything about that.

THE DEPONENT: Oh, all right.

Q Do you know where Dr. Longway's located?
A Yes. She's, she moved in Smithfield to Green--- 44 and Putnam Pike. I'm not sure of the exact address. She just moved.
Q Do you know what kind of a doctor she is?
A She's like a nurse. She's a psychiatrist, but like a nurse type. She works with a, she works with a psychiatrist, but she does the same thing. She can write prescriptions, and she does. I'm not sure what they call them.
Q Nurse practitioner is it?
A Probably. But it has to do -- I don't think it is practitioner, but it has to do with psychi--- psychology.
Q Okay. You think it's Cannahan?

VOLUME II
PAGES 1-145
EXHIBITS: None

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING and
PHILLIP KING,
Plaintiffs,

v. C.A. NO.: 06-258-S

STAPLES, INC., IZZY DESIGN,
JSJ CORPORATION, JOHN DOE
COMPANY,
Defendants.

* * * * * * *

CONTINUED DEPOSITION of MARY KING, a witness called on behalf of Izzy Design and JSJ Corporation, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the State of Rhode Island, at the offices of Zizik, Powers, O'Connell, Spaulding & Lamontagne, 40 Westminster Street, Providence, Rhode Island, on Wednesday, January 3, 2007, commencing at 1:15 p.m.

Q. To your knowledge, who took the pictures?
MR. ESKEY: Objection.
A. I don't know.
Q. Have you ever seen any pictures of the chair?
A. No.
Q. Okay. And you believe somebody fixed the chair after?
A. I believe so. Someone said that -- well, this is hearsay. I wasn't there. They called me up and asked me where the chair was, I said it was outside the door. And then they asked the gentleman across the way and they said, Oh, I don't know who the person was took it and he had put screws in it and fixed it. And then they took the chair off the floor and they brought it and Jim Drews took it. That's all I know.
Q. Your personal knowledge of what happened to the chair after was that you placed it where?
A. I placed it in an area -- we had red line, yellow line off a certain -- you know, certain materials and we place it right outside of the door, right outside my storeroom in that, you know, yellow square.



Q. So it was not inside the storeroom, it was outside the storeroom?
A. It was put outside the storeroom.
Q. And when you moved it there, was it still in two pieces?
A. Yes.
Q. At any point after that, did you see the chair in one piece?
A. No.
Q. At any point after that, do you know of anyone who physically touched the chair, the name of any person?
A. I don't know the name of any person who touched it.
Q. And you never saw the chair again. Is that fair to say?
A. Never saw it again after that.
Q. And even when you went back to work part-time and when you went back to work the next day, you didn't see the chair anymore?
A. No.
Q. Okay. And when you went --
A. Well, actually, the chair was outside the door when I went back the next day still.



Q. It had not been moved when you went back to work?
A. It had not been moved at that time.
Q. So for the second day you were there, the chair was there, but you didn't see anything happen to it?
A. No, it was still outside the door.
Q. The following day, which would have been June 4th, was the chair still there?
MR. ESKEY: Object. Asked and answered, go ahead.
A. As long as I was there, while I was there the chair was out in front of that door while I was in work.
Q. And then after June 5th, did you go back to work anymore?
A. I don't believe so. I forgot the date, but I do know when I went out of work that's when they came to look for the chair. So, you know, I'm not sure what date it was to tell you the truth.
Q. And you don't know who came and where they got it from or you don't know what happened to it after that?



A. No. I know Ed Picard came to look for the chair and look for the screws and that's -- that's what I heard. And him and Pam were on the floor looking for the screws.
But like I said, it had a partition where there was a space underneath where they could have gone anywhere in the manufacturing or into the boiler room area.
Q. And when you say "that's what I heard," who did you hear it from?
A. Ed Picard.
Q. Okay. When did you talk to Ed?
A. He called and asked me where the chair was.
Q. Called you at home?
A. Yeah.
Q. And that was what day?
A. The first day I was out. I'm not sure of the day.
Q. The first day that you were out?
A. The first full day that I was out.
Q. Fair to say within a week of the accident?
A. Oh, yeah.
Q. First full day you were out he called you and asked you where the chair was?

VOLUME II
PAGES 1-145
EXHIBITS: None

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING and
PHILLIP KING,
Plaintiffs,

v. C.A. NO.: 06-258-S

STAPLES, INC., IZZY DESIGN,
JSJ CORPORATION, JOHN DOE
COMPANY,
Defendants.

* * * * * * *

CONTINUED DEPOSITION of MARY KING, a witness called on behalf of Izzy Design and JSJ Corporation, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the State of Rhode Island, at the offices of Zizik, Powers, O'Connell, Spaulding & Lamontagne, 40 Westminster Street, Providence, Rhode Island, on Wednesday, January 3, 2007, commencing at 1:15 p.m.

Q That was a feature of the chair?
A Yeah.
Q Once you tightened the knob, would it stay tightened?
A At times it would, yes. Sometimes it would slip.
Q How often would it slip?
A I don't recall. Not often. You know, every now and then it did. I had tend--- I had a tendency of reclining in the chair. You know, when I would talk to somebody, you know, I would just lean back.
Q So you would keep it in the reclined position, so that you could lean back to talk?
A Sometimes. Not all the time. It depends. You know, if I had a visitor, I would sit in the recline position. Or when I worked, I worked at an upright position, or --
Q So would you physically have to put it into the recline position when you wanted it to recline?
A Yes.
Q And then if you were working at your computer, you would sit in the upright position?
A Correct.
Q Would you have to tighten it to sit --
A Yes.
Q -- in the upright position?
A Yes.



Q The day that you fell, do you recall putting it into the recline position?
A Yes.
Q Okay. So you had loosened the knob --
MR. ESKEY: I object. But you can go ahead.
Q -- in order to recline?
MR. ESKEY: Object. You can go ahead.
A I, I don't understand. Repeat that.
Q If I understand correctly, you have to tighten the knob to make the chair back upright, so that it doesn't recline?
A Yes.
Q Is that correct?
A Yeah, there was a lever that you would, you know, you know, if you wanted to go, you know, hit the lever and it would go back. And then when you would sit up, you would tighten it.
Q Okay. So you would have to hit the lever to be able to go back?
A Correct.
Q And that day that you fell, you had hit the lever, so that you could go back at some point during the day?
A I don't recall, but at that, at that instant, you know, I was working at my computer. I would never



sit in a recline position because it's hard, you know, to work on the computer like this. So I did lock it into position and, you know.
Q Do you recall locking it --
A Oh, yeah.
Q -- in the lock position that day in order to work on your computer?
A Yup.
Q When you leaned back to talk to Pam, did you expect to be able to recline, or did you think --
A I just turned in my chair. It had five wheels. I turned. Pam, Pam was right there. I just rolled back because I was working on my computer. I answered her question. And as I was going back, I sat back. You know, I sit, you know, with my feet leaned out. So I leaned, you know, back on the chair to go back to the computer, and that's when it snapped.
Q Okay. So you were repositioning yourself back in your chair to work at the computer?
A Correct.
Q And as you placed your back against the back of the chair, that's when you went back?
A That's when it snapped, yes.
Q And that's when you fell?



A (Deponent nods head in the affirmative)
MR. ESKEY: You have to -- I'm sorry. You have to answer her question. So that's when you fell? And you were nodding your head. I just want to make sure you verbalize your answer.
A Okay. Yes.
MR. ESKEY: Okay.
THE DEPONENT: I'm nervous.
MR. ESKEY: That's all right.
Q So you weren't attempting to lean back when you fell; is that what you're saying?
A Not in the recline position. I was, you know, I, you know, was relaxed like I, with my feet leaning, you know. And I, you know, I would lean back down, sit down like this, you know, you know, a little bit crunched down and work on my computer. So as I was going, you know, I was getting in position to lean, you know, not lean back, but lean, you know, to be comfortable in the chair.
Q To work at the computer?
A Yeah.
Q When the chair snapped and you fell back, could Pam see you from where she was?
A She was looking right at me because her door, her seat is right at my doorway, which she could see my

Page 38

A That was my chair.
Q It was your chair?
A (Deponent nods head in the affirmative)
Q So you had two chairs that broke?
A Yeah.
Q When did the first chair break?
A I, I don't recall. I don't recall the date.
Q Do you know how long it was before you fell that the first chair broke?
A I think it was a good year or two because Kevin had left the company.
Q When did he leave the company?
A Oh, God. I'm not sure.
Q So Kevin's using your chair, and that chair breaks?
A Yes.
Q How exactly did that chair break? Do you know?
A The back of the, the back snapped off, the back of the chair. The same thing happened to the chair I had.
Q The exact same thing?
A Yes.
Q And what exactly was that? What did you notice about the chair that you fell off of?
MR. ESKEY: I object. You can go ahead.
Q Do you understand what I'm saying?

Page 39

A No.
Q You said that the first chair broke the exact same way as the second chair broke. If you could tell me how they both broke.
MR. ESKEY: Objection.
A Well, I wasn't there that night. I'm just going by hearsay, saying what Kevin said, the back of the chair snapped off.
Q And that's what you noticed about the chair that you fell off of?
A Yes.
Q But you never saw the first chair?
A No.
Q So you don't know for sure if it was the exact same break?
A No, I don't know for sure.
Q After Kevin broke the first chair, he then requested a new chair from Ed?
A Yes.
Q For your use?
MR. ESKEY: I object to the last questions.
THE DEPONENT: Okay. Sorry.
MR. ESKEY: Go ahead.
A (No response)

Page 40

Q Am I right? He requested the chair for your use, or did you request it from Ed?
A I believe he called Ed and told Ed the chair was broken. And then when I came in the next day, I told Ed that I needed a chair. And then by the time I came in the following day, Kevin -- and Ed had, had, you know, given Kevin another chair to bring to the office.
Q So one day you don't have a chair, and the next day you come in and you have a chair?
A Correct.
Q Do you know where that chair came from?
A No.
Q Do you know if it was ordered for you?
A I'm not sure.
Q Do you know if it had come from some other place within the company?
A I don't know.
Q Did it look new to you?
A Yes. Yeah.
Q Did it have any type of wear or tear that you noticed?
A Not that I noticed at all.
Q Did it have any type of instructions or labels that indicated that it was new?

Page 41

A The only thing I got was like instruction, you know, thing, how to adjust it. That's the only thing I had gotten from, from them. I'm not sure if, I don't recall if there were any tags on it, but they did give me the instructions to adjust the chair.
Q Who gave you the instructions?
A It was there. So I'm, I'm assuming Kevin brought it with the chair. It was there when the chair got there, so they could show me how to use it.
Q And you had this chair a good year or two before --
A Oh, yeah.
Q -- you fell out of it?
A Yup.
Q Had you ever had any problems with the chair prior to you falling?
A Every now and then the back, you know, it would like slip out of the, you know, it would go into the recline position. And I would tighten it back up.
Q You would tighten?
A Because there were knobs on the side, you could tighten it to bring it up and down, or you could, you know, tighten it, you know, so it wouldn't go in the recline position. So you could put it in the recline position, too, because that's, they were made to recline.

Q That was a feature of the chair?
A Yeah.
Q Once you tightened the knob, would it stay tightened?
A At times it would, yes. Sometimes it would slip.
Q How often would it slip?
A I don't recall. Not often. You know, every now and then it did. I had tend--- I had a tendency of reclining in the chair. You know, when I would talk to somebody, you know, I would just lean back.
Q So you would keep it in the reclined position, so that you could lean back to talk?
A Sometimes. Not all the time. It depends. You know, if I had a visitor, I would sit in the recline position. Or when I worked, I worked at an upright position, or --
Q So would you physically have to put it into the recline position when you wanted it to recline?
A Yes.
Q And then if you were working at your computer, you would sit in the upright position?
A Correct.
Q Would you have to tighten it to sit --
A Yes.
Q -- in the upright position?
A Yes.



Q The day that you fell, do you recall putting it into the recline position?
A Yes.
Q Okay. So you had loosened the knob --
MR. ESKEY: I object. But you can go ahead.
Q -- in order to recline?
MR. ESKEY: Object. You can go ahead.
A I, I don't understand. Repeat that.
Q If I understand correctly, you have to tighten the knob to make the chair back upright, so that it doesn't recline?
A Yes.
Q Is that correct?
A Yeah, there was a lever that you would, you know, you know, if you wanted to go, you know, hit the lever and it would go back. And then when you would sit up, you would tighten it.
Q Okay. So you would have to hit the lever to be able to go back?
A Correct.
Q And that day that you fell, you had hit the lever, so that you could go back at some point during the day?
A I don't recall, but at that, at that instant, you know, I was working at my computer. I would never



sit in a recline position because it's hard, you know, to work on the computer like this. So I did lock it into position and, you know.
Q Do you recall locking it --
A Oh, yeah.
Q -- in the lock position that day in order to work on your computer?
A Yup.
Q When you leaned back to talk to Pam, did you expect to be able to recline, or did you think --
A I just turned in my chair. It had five wheels. I turned. Pam, Pam was right there. I just rolled back because I was working on my computer. I answered her question. And as I was going back, I sat back. You know, I sit, you know, with my feet leaned out. So I leaned, you know, back on the chair to go back to the computer, and that's when it snapped.
Q Okay. So you were repositioning yourself back in your chair to work at the computer?
A Correct.
Q And as you placed your back against the back of the chair, that's when you went back?
A That's when it snapped, yes.
Q And that's when you fell?



A (Deponent nods head in the affirmative)
MR. ESKEY: You have to -- I'm sorry. You have to answer her question. So that's when you fell? And you were nodding your head. I just want to make sure you verbalize your answer.
A Okay. Yes.
MR. ESKEY: Okay.
THE DEPONENT: I'm nervous.
MR. ESKEY: That's all right.
Q So you weren't attempting to lean back when you fell; is that what you're saying?
A Not in the recline position. I was, you know, I, you know, was relaxed like I, with my feet leaning, you know. And I, you know, I would lean back down, sit down like this, you know, you know, a little bit crunched down and work on my computer. So as I was going, you know, I was getting in position to lean, you know, not lean back, but lean, you know, to be comfortable in the chair.
Q To work at the computer?
A Yeah.
Q When the chair snapped and you fell back, could Pam see you from where she was?
A She was looking right at me because her door, her seat is right at my doorway, which she could see my

VOLUME II
PAGES 1-145
EXHIBITS: None

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING and
PHILLIP KING,
Plaintiffs,

v. C.A. NO.: 06-258-S

STAPLES, INC., IZZY DESIGN,
JSJ CORPORATION, JOHN DOE
COMPANY,
Defendants.

* * * * * * *

CONTINUED DEPOSITION of MARY KING, a witness called on behalf of Izzy Design and JSJ Corporation, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the State of Rhode Island, at the offices of Zizik, Powers, O'Connell, Spaulding & Lamontagne, 40 Westminster Street, Providence, Rhode Island, on Wednesday, January 3, 2007, commencing at 1:15 p.m.

locked position?
MR. ESKEY: I object. Go ahead.
A. Yeah, I mentioned it -- mentioned it to my boss.
Q. And who was that? Ed?
A. Ed Picard.
Q. Okay. When did you mention that to Ed?
A. Probably a few weeks before -- after it started happening.
Q. Do you remember when it first started happening?
A. It could have been about a month and a half, two months before it broke.
Q. I'm not trying to confuse you.
A. No, I'm just trying to remember.
Q. I think you told me that every couple of months it would happen that it wouldn't --
A. Yeah, but I'm just trying to remember how long -- how long it went for. But I know it was like a matter of months, you know, and then I had told Ed that it was coming out of -- out of position.
But I didn't -- he didn't -- nobody thought much of it because the chair was meant



to recline. So it was like -- it wasn't like it was snapping back or anything. It was -- you know, you would feel it go and -- you know, but that would be it.
Q. When you say "nobody thought much of it," what do you mean?
A. Well, when I told him it was coming out of -- you know, it would slip out of the reclined position, he said he would try to get me a new chair. And because it was made to recline, nobody thought anything about it because the back wasn't loose.
Q. How do you know the back wasn't loose?
MR. ESKEY: I object.
Q. You can answer.
A. Oh. Because it was steady. I mean, it wasn't like the back was loose, you know, shaking around or anything. It was just -- it was just like -- it was steady, the chair. The back of the chair was steady. It would just like, you know, come out of the reclined position.
Q. Would it come out of the reclined position or would it come out of the locked position?



A. I mean, out of the upright position.
Q. Okay.
A. When I was upright, it would recline.
Q. Okay. So when it was fully in the reclined position, there was no problem.
A. No.
Q. It was only when you went to take it out of recline and put it back upright that it wouldn't stay upright?
A. I believe when I sat -- if I put my legs up, it would, you know, come out of the, you know, reclined position. So, you know, I thought maybe I wasn't adjusting it properly.
Q. Can you say that to me again?
A. I used to have to put my feet up on a bench that I had.
Q. Under your desk?
A. Under my desk. So I would, you know, move it and I would sit, you know, with my legs up and lean back on it. And then it would just, you know, every now and then just come out of recline. I mean, out of upright, not recline.
Q. So if I understand correctly, even though the chair when you used it was in the upright



position, you would put your feet up under the desk and lean back on it. Is that correct?
A. You know, just like you're doing now.
Q. Okay. But you would not at those times move the chair into the reclined position?
A. No.
Q. Okay. You would just sort of shift your weight to lean back on it more?
A. Yeah. Just like you did just right now.
Q. And it was then that you noticed when you would be leaning back on it when it was in the upright position that it would not -- it would slip out of that upright position. Is that accurate?
A. Yes.
MR. ESKEY: I object.
A. Once in a while.
Q. And you believe that happened to you how many times before the chair broke?
A. Probably about three -- three, four times.
Q. Okay. And when is it after -- after which time did you talk to Ed about it?
A. I don't recall. I know it was in between then at that time. I'm not sure exactly when.

EXAMINATION BY MR. ESKEY:

Q. Ms. Lamontagne has asked you a number of questions about the description of the chairs and the levers. Do you recall that?

A. Yes.

Q. Could you identify the same type of chair that broke and that we're talking about today if you were shown a picture of it?

A. Oh, yeah.

MR. ESKEY: That's all I have. We're gonna read and sign. Thank you.

(Whereupon the deposition was concluded at 3:50 p.m.)



CERTIFICATE

STATE OF RHODE ISLAND
COUNTY OF NEWPORT

I, Mary E. Rinne, Registered Professional Reporter and Notary Public in and for the State of Rhode Island, do hereby certify that the foregoing transcript of the deposition of Mary King, having been duly sworn on Wednesday January 3, 2007, is true and accurate to the best of my knowledge, skill and ability.

IN WITNESS HEREOF, I have hereunto set my hand and notarial seal this 16th day of January 2007.

Mary E. Rinne
RPR and Notary Public

My Commission Expires: February 27, 2011



DEPONENT'S ERRATA SHEET
AND SIGNATURE INSTRUCTIONS

The Original of the Errata Sheet has been delivered to Michael T. Eskey, Esq.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL delivered to Donna Lamontagne, Esq., to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself.

REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.



ATTACH TO THE DEPOSITION OF MARY KING
CASE: KING v. STAPLES, et al.

ERRATA SHEET

INSTRUCTIONS: After reading the transcript of your deposition, note any change or correction to your testimony and the reason therefor on this sheet. DO NOT make any marks or notations on the transcript volume itself. Sign and date this errata sheet (before a Notary Public, if required). Refer to Page 144 of the transcript for errata sheet distribution instructions.

PAGE LINE
___ ___ CHANGE: ________
REASON: ________
___ ___ CHANGE: ________
REASON: ________
___ ___ CHANGE: ________
REASON: ________
___ ___ CHANGE: ________
REASON: ________
___ ___ CHANGE: ________
REASON: ________
___ ___ CHANGE: ________
REASON: ________
___ ___ CHANGE: ________
REASON: ________
___ ___ CHANGE: ________
REASON: ________
___ ___ CHANGE: ________
REASON: ________
___ ___ CHANGE: ________
REASON: ________

I have read the foregoing transcript of my deposition and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

____________
Mary King Date