UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MARY ANN KING<br>and PHILLIP KING<br>Plaintiffs<br>v.<br><br>STAPLES INC.; IZZY DESIGN;<br>JSJ CORPORATION;<br>JOHN DOE COMPANY<br>Defendants | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No.: 06-258-S |

**AFFIDAVIT OF MARY ANN KING**

I, Mary Ann King, do hereby depose and state as follows:

1. I am a plaintiff in this action.

2. At the end of my deposition, I testified that I could identify the type of chair that broke on me if shown a picture of it.

3. I recently received and reviewed copies of the following materials produced in this case by Sensata Technologies (successor to my employer, Texas Instruments, Attleboro) in response to a subpoena from my attorneys:

   A. A copy of the Chair Inspection Guidelines article published on June 25, 2003 on the S&C Broadcast Newsline (a Texas Instruments, Attleboro, employees' intranet network);

   B. A copy of the 8D Incident Investigation Report.

4. The Chair Inspection Guidelines document contains pictures and instructions on how to identify and inspect a Superior brand chair.

5. The 8D Incident Investigation Report contains a picture of a chair.

6. Based on my review of these materials and my familiarity with and recollection of the chair that broke on me on June 3, 2003, I am confident that:

   A. The chair that broke on me is the same type of chair as the "Superior" brand chair depicted in the photographs contained in the Chair Inspection Guidelines.

   B. The chair that broke on me is the same type of chair as the chair depicted in the photograph on page 1 of the 8D Incident Investigation Report.



P80

Sworn this 6 day of December, under the pains and penalties of perjury.

Mary Ann King

## Chair Inspection / Adjustment Guidelines

One of our employees recently suffered a significant injury when the back support of a chair failed. As an interim containment action to prevent recurrence the ESH Department has compiled these detailed inspection guidelines for Superior and Miller chairs and general guidelines for other chair brands. It is the responsibility of all chair users to review the following guidelines and report any unsafe equipment as noted below. If a chair is does not pass the inspection criteria please isolate the chair and secure a sign stating "WARNING! UNSAFE CHAIR – DO NOT USE" on the chair. (Power Point File Attached) The standard chair warranty for TI is 10 years. Most damaged or broken chairs will not have to be replaced.

**Notification Guidelines for Manufacturing Line Chairs**

1. Contact your supervisor and alert them to the chair location and condition
2. Supervisor please email Al Brown **and** Tracy Forde with details about chair(s)
3. If you can't locate a replacement chair page Al Brown at 0599.

**Notification Guidelines for Non Manufacturing Line Chairs**

1. Send an email to Al Brown and Tracy Forde with details about the chair.
2. If you can't locate a replacement chair page Al Brown at 0599

## Safety Inspection

Chair manufacturers recommend inspecting all mechanical parts of a chair at 3 to 6 month intervals for evidence of damaged, loose or missing parts.

**Safety Note prior to inspection**: To properly inspect a chair you must turn it over. Chairs are heavy and can be awkward to lift. Prior to lifting a chair please take time to make sure you are in an area that will allow enough room to lay the chair down and pick it up again without compromising your lifting form or creating another hazard. If you are uncomfortable, or have a condition that prevents you from laying the chair down please ask a co-worker to perform these tasks.





### Lowering the chair

1. Position the chair such that the center point on the front edge of the seat pan is between two caster arms on the base of the chair.
2. Roll the chair towards you until the casters have turned away from you
3. Position yourself with feet shoulder-width apart facing the back of the chair with your knee against the outer edge of the seat pan
4. Hold the seat back with both hands until the chair is resting on the two caster legs and your hands
5. Bend your knees while lowering the chair with your arms until it is resting on the edge of the seat pan.

### Lifting the chair

1. Feet shoulder width apart, bent knees, maintain curves of the back and lift with whole body.
2. Reverse the process until chair is resting on all casters.

**How do I know which chair I have?**

1. Most chairs will have a label under the seat pan stating the manufacturer, model number, and date of manufacture.

2. Superior Chairs have larger back support pads. The back support pad is attached to the base of the chair with a single flat piece of steel often called a J Bracket. (Bottom Left)

3. Miller chairs have a smaller back support pad which is supported by two support arms that are welded to the base assembly. (Bottom Right)



Superior



Miller

**Points of Inspection - Superior Brand Chair**





1. **Back Support Screws** - Back support screws fasten the back support to the control mechanism of the chair. The chair will have either 2 or 3 screws depending on date of manufacture. Ensure that all screws are uniform and fastened securely.

   *Note: If your chair has less than 2 screws immediately remove it from service by placing a "Warning- Unsafe Chair - Do Not Use" sign on it and contact Al Brown (x1638 pager 0599 text, or email) If your chair only has two screws please send an email to Al Brown* **and** *Tracy Forde.. The manufacturer will provide A 3rd screw.*

2. **Chair Control Mechanism Screws (4)** these screws fasten the seat control mechanism to the seat pan base. Ensure that they are all installed, uniform and fastened securely.
3. **Seat Pan Base Screws (4)** these screws attached the seat pan to the seat pan base. Ensure that they are all installed, uniform and fastened securely (seat pan should not wobble).
4. **Seat Back Tension Adjustment Knob** - This knob tightens a spring that controls the amount of resistance and support you are afforded when adjusting the angle of the seat back. This support prevents loss of balance Seat should be adjusted so that back supports body weight in controlled decent when back is unlocked
5. **Chair Adjustment Locks** - Include arm rests, seat height, seat pan angle, and back angle. Ensure that these mechanisms **LOCK securely in selected position.**
6. **Casters** – Casters should roll freely and be securely fastened to the base.

## Points of Inspection - Miller Brand Chair




1. **Chair Control Mechanism Lag Bolts (4)** these bolts fasten the seat control mechanism to the seat pan base. Ensure that they are all installed, uniform and fastened securely.

2. **Chair Arm Support Screws (8)** these screws secure the arm brackets to the seat pan. Ensure that they are all installed, uniform and fastened securely.

3. **Seat Back Tension Adjustment Knob** - This knob tightens a spring that controls the amount of resistance and support you are afforded when adjusting the angle of the seat back. This support prevents loss of balance. Seat should be adjusted so that back supports body weight in controlled decent when back is unlocked.

4. **Chair Adjustment Locks** - Include arm rests, seat height, seat pan angle, and back angle. Ensure that these mechanisms **LOCK securely in selected position.**
5. **Casters** – Casters should roll freely and be securely fastened to the base

## Points of Inspection - All Other Chair Brands

1. Ensure that all fasteners are in place, uniform, and tight
2. Ensure that all position adjustments work properly
3. Ensure that all position adjustment locks function and do not release
4. Ensure that all casters roll freely and are securely attached to the chair

### Documentation of Chair Inspections

For this initial inspection each Branch Manager or designee is asked to ensure that all chairs in their respective areas are inspected. When chair inspections are complete please send a message to Al Brown documenting the area and completion date. The targeted completion date for all inspections is 7/11/03.

### Ongoing Inspections

To document future semi-annual inspections, the Safety Department is evaluating color-coded inspection tags available through Staples. Inspections should be conducted at least every 6 months. If you notice issues with your Superior or Miller chair between scheduled inspections contact Jim Drews, the TI Account Representative for Staples at 877-617-1712. Jim will coordinate the repairs. Please also send a quick email to Al Brown in the Safety Department to document the chair issue. If you do not have a Superior or Miller chair contact Al Brown at abrown@ti.com or x1638.

### Common Area Inspections

Conference rooms on the across system will be inspected by Facilities. Other rooms or common areas will be the responsibility of the space owner.

### New Chair Ordering Information

**http://www-esh.mc.ti.com/safety_health/ergonomics/products.html**

**Chair Adjustment Reminders Superior Brand Chairs (Centron 301-A, 302-B, 303-C)**

Chair adjustment mechanisms

- Arm Height - Pull up on trigger under arm rest to raise or lower
- Horizontal Arm Adjustment - Turn handwheel counterclockwise to loosen, slide arm in or out to desired width. Turn handwheel clockwise to tighten.
- Back Height - While seated, lift to one of six positions. To lower, lift back to highest position, then lower.
- Seat Height - Side paddle on RIGHT. To raise, twist paddle up and lift your weight. Release at desired height. To lower, twist paddle up while seated. Release at desired height.
- Seat Back Angle - Side paddle on LEFT. While seated twist paddle up and press chair back. Press down to lock back at desired angle.
- Seat Pan Angle - With back in most upright position and LEFT paddle pulled up, pull RIGHT paddle KNOB out to lock at 0, push in to tip forward.
- Tension Adjustment - While seated, turn knob under seat counterclockwise to tighten rocking motion tension. Turn clockwise to increase rocking motion.

VOLUME I
PAGES 1-130
EXHIBITS: Per Index

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING
and PHILLIP KING,
Plaintiffs

v. C.A. NO.: 06-258-S

STAPLES, INC., IZZY DESIGN,
JSJ CORPORATION, JOHN DOE
COMPANY,
Defendants

* * * * * * *

DEPOSITION of PAMELA J. McGEE, a witness called on behalf of Izzy Design and JSJ Corporation, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the State of Rhode Island, at the offices of Zizik, Powers, O'Connell, Spaulding & Lamontagne, 40 Westminster Street, Providence, Rhode Island, on Thursday, February 1, 2007, commencing at 10:11 a.m.

it goes up and down. I don't know.
Q. Was it the same kind of chair that Pam (sic) had?
A. That Mary Ann had?
Q. I'm sorry. That Mary Ann had, yes.
A. She had a smaller, lower chair more for a desk. Mine was for working at a high counter. But they were the same model.
Q. When you say "they were the same model," what do you mean?
A. I think they were made by Imperial, if I'm not mistaken. I'm not too sure on that.
Q. And the back of the chair, what does it look like?
A. It's kind of oval backing. It's not that big. It's only like that (indicating).
Q. Okay. And is the back connected to the base?
A. With a bar that comes down to go underneath the bottom of the seat.
Q. Okay. And the back of your chair looks the same as the back of Mary Ann's chair?
A. Hers was a lot higher, her back. It would go from the bottom up sort of like this chair, where mine had the bar that went up more and



then the top of the backing was up higher.
Q. Okay. So yours was a smaller oval back?
A. Yes.
Q. And hers was a higher back chair?
A. Right.
Q. Okay. So then fair to say they weren't the same model?
A. No, I guess they're not the same model. But I guess they're Imperial chairs. That's what my boss had told me.
Q. Okay. And when did your boss tell you that?
A. When this was all happening, when she had the accident.
Q. Okay. So you believe the manufacturer of the chair was Imperial?
A. I believe so.
Q. Okay. Were there several different kinds of chairs around the building?
A. Basically they're all the same, just different colors, maybe different shapes. But they got rid of all the older chairs and replaced them with all these new chairs.
Q. Okay. When did they do that?
A. I'm not too sure on that. It might have been



in the late '90s.
Q. Okay. And was there anyplace on the site at Texas Instruments where chairs were kept?
A. That were bad or --
Q. Just any particular place.
A. No.
Q. So to your knowledge, if there was a chair purchased for use at Texas Instruments, it was put into use, there were none that were stored there?
A. Right. Only in Safety where they had samples so you could go and pick out what style you wanted.
Q. Okay. Do you know who was working in Safety back in June of 2003?
A. Dean Chapman, Bob Brown, Bob Hammersley, Bill Reed and Tammy Morrissey.
Q. Morrissey?
A. Yes.
Q. Are any of those people still there?
A. Yes.
Q. Who is still there?
A. Tammy is still there. That's it. The rest are gone.



Q. And are there still samples of chairs when you go to Safety for you to be able to choose from if you have an issue?
A. No. We don't have a Safety area now.
Q. Okay. And when you said all the old chairs were replaced in the late 1990s --
A. Mm-hmm.
Q. -- do you know if there was one particular department that was in charge of that shift?
A. It was Purchasing.
Q. Okay. And is there anyone working in Purchasing now that was there in 2003?
A. Yes.
Q. Who?
A. Natalia Mendes.
Q. Okay. Now, when you went to Building 12 in 2001 and you started using the chair that you had, were there any kind of instructions that came with it?
A. Not on mine. It was taken off.
Q. Okay. Did you have any instructions anywhere in the vicinity, in your desk or anything like that?
A. Mary Ann did in her office.

A. With the rubber bands, stretches she would do for her neck. On her break she would exercise for a few minutes.
Q. Okay. And how often was she doing that?
A. Twice a day.
Q. And when did she do that?
A. On her two breaks.
Q. All the time that you worked there?
A. Not all of the time. Only when she was having problems.
Q. All right. When she came back to work, do you know whether or not she got hurt again in the storeroom?
A. Not that I know of. No.
Q. Okay. You weren't there when she may have been hurt doing something else?
MR. ESKEY: I object.
A. No.
Q. Okay. And to your knowledge, how long did she work part-time?
A. I believe it was right up till she left it was only part-time. And that was up to September 20th was her end date.
Q. Okay. She had gotten the 30-day letter



before?
A. Yes.
Q. Okay. When she had that other problem with her neck, did she miss work?
A. Not a lot of work. You know, just a day or two for appointments. So I'd have to say no, she did not miss work.
Q. To your knowledge, she wasn't out on comp. for any length of time?
A. No. Not to my knowledge.
Q. Okay. You said you thought the chairs were Imperial chairs?
A. Right.
Q. Do you know if they bought chairs from any other manufacturers?
A. The two names that I did hear were Superior and Imperial. Those were the only two that I know of.
Q. And you believe Ed told you that these chairs were Imperial chairs?
A. Yes.
Q. Okay. Was that during one of the safety meetings?
A. No, that was a one-on-one conversation.



Q. And when did that happen, if you remember?
A. That was when I came back from vacation.
Q. So within the first couple weeks?
A. Yes.
MS. LAMONTAGNE: I don't have anything else.
MS. MICHELS: I have a few questions for you.
THE WITNESS: Okay.
EXAMINATION BY MS. MICHELS:
Q. Besides Mary Ann's fall out of her chair, did you ever hear of anybody else having problems with their chairs?
A. Not before this.
Q. What about after?
A. During our meeting is when we found out that there were issues with the chairs. And Al Brown found out that information.
Q. When you say "issues with the chairs," do you know if anybody else was injured as a result of these chairs?
A. Not that I know of.
Q. Just mechanical problems --
A. Right.



Q. -- with the chairs?
A. Mm-hmm.
Q. Had the mechanical problems been reported before Mary Ann fell? Do you know?
A. No, they were not. I heard it was going on in Dallas.
Q. In Dallas?
A. Yes.
Q. What about at the plant in North Attleboro?
A. Not until Mary Ann's accident. And then people started saying that, Yes, my chair wouldn't stay locked in place. But no one got hurt. That I know of.
Q. Do you know if anybody got hurt in Dallas?
A. I don't know.
Q. The 8D investigation, is that done when an incident occurs whether or not somebody is injured or only if somebody is injured?
A. Only when they're injured on the job.
Q. If somebody were to report that they were having a mechanical difficulty with their chair but they weren't necessarily injured, would any type of investigation be made into the problem with the chair?

first meeting and the last meeting?
A. The first one and the one that Mary Ann was there. So those are the two.
Q. Now, on the June 17th meeting minutes, if you can get those in front of you, the first page. Do you see under Topics Discussed, the third paragraph that begins with "Pam informed the group..."?
A. Right.
Q. Do you see that?
A. Yes.
Q. Okay. Do you remember informing the group that Mary Ann had attempted to lock the chair and what it says in the remainder of that sentence? Do you remember actually saying that to the team?
A. Yes, I do remember saying that.
Q. Okay. Now, looking down at the next paragraph where it says that Al explained to the team that he met with Jim Drews, do you see that paragraph?
A. Yes.
Q. Okay. Do you remember Al informing the group of that, that he met with Jim Drews, the



supplier that the chair was purchased from?
A. I'm trying to remember. I don't remember that.
Q. Okay. And in the next sentence, it says after review that Jim was able to determine that the seat panel was broken and the spring for the back, and there's more in that sentence. Do you see that?
A. Yes, I do.
Q. Okay. Do you have a recollection of that being discussed at that team meeting?
A. I remember Al Brown talking about the chair being defective.
Q. Mm-hmm.
A. Jim Drews was not there.
Q. Okay. And do you see the next sentence, Jim did not know the life of the chair? Do you recall from your attendance at the team meetings receiving that information?
A. Yes. I do.
Q. Okay. And the next sentence, do you see that it says, He -- I suppose that refers to Jim, but I'm not 100 percent sure -- He agreed to go to the manufacturer, Superior, and get



paperwork on how to take care of the chair. Do you see that?
A. Yes, I do.
Q. Okay. Do you remember that being discussed at the team meeting, about going back to the manufacturer to get paperwork on how to take care of the chair?
A. I don't recall.
Q. Okay. And do you see that that manufacturer Superior is listed there?
A. Yes, I do.
Q. Okay. And you mentioned before in your testimony another manufacturer, Superior, in addition to Imperial. Correct?
A. Right.
Q. Okay. When did you first hear that Superior was a manufacturer, a possible manufacturer of chairs?
A. That was through Ed Picard. It had to have been throughout all of this when we had the very first meeting with the 8D investigation.
Q. Okay. Now, before you had the 8D investigation, Ed told you he thought it was an Imperial chair. Correct?



A. Right.
Q. Did he also mention at that time Superior? I'm talking about before the 8D meeting.
A. Before the meeting. I'm recalling that day. I'm not too sure on that. I believe so, yes, that he did say it was Imperial and Superior and he was gonna find out which one it was. That's why the two names are familiar to me.
Q. Okay. So in that conversation that you had with Ed, you're recalling now that he mentioned both chairs?
A. Right.
Q. He wasn't sure which one, but he was gonna find out which one?
A. Yes.
Q. Okay. Now, you also testified in response to Ms. Lamontagne's questions about an inspection procedure at Sensata that came into being after the incident with Mary Ann's chair breaking. Do you remember that?
A. Yes.
Q. And everyone was expected to do their own inspection of the chairs?
A. Right.

VOLUME I
PAGES 1-130
EXHIBITS: Per Index

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING
and PHILLIP KING,
Plaintiffs

v. C.A. NO.: 06-258-S

STAPLES, INC., IZZY DESIGN,
JSJ CORPORATION, JOHN DOE
COMPANY,
Defendants

* * * * * * *

DEPOSITION of PAMELA J. McGEE, a witness called on behalf of Izzy Design and JSJ Corporation, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the State of Rhode Island, at the offices of Zizik, Powers, O'Connell, Spaulding & Lamontagne, 40 Westminster Street, Providence, Rhode Island, on Thursday, February 1, 2007, commencing at 10:11 a.m.

time the chair got there to the time that Mary Ann fell, the tag was still hanging on it?
A. I really don't know.
Q. Okay. Did the tag stay on there for any length of time at all?
A. I just remember when it first came over that it had the tag. And then after that, I just didn't pay attention anymore.
Q. Okay. And before this accident happened in June of '03, to your knowledge had Mary Ann had any problems with the chair?
A. The first chair that they had brought over after the orange one was a faulty chair that wouldn't stay locked into place. So they came and got that one and brought her another one.
Q. Okay. So the one she eventually fell off of was actually the third chair --
A. Yes.
Q. -- that you saw her use?
A. Yes.
Q. Okay. What did the first one look like?
A. The first one was the orange one.
Q. Okay.
A. And then the second one was identical to the



third one, the blue -- the blue chairs.
Q. Okay. And when you say it was a faulty chair and it wouldn't lock into place, how do you know that?
A. Because she would lock it into place and sit back and then it would like let go on her. And then she'd have to fix it again. It would happen quite often.
Q. Okay. How long did she have that chair?
A. Not long. I would say no more than two weeks.
Q. Okay. And what did she eventually do about that, if anything?
A. She called Ed again and he brought her another chair.
Q. Okay. And the third chair that came in, how long did she have that before the accident?
A. I don't really know. Probably -- I can assume.
Q. Well, if you can give me your best estimate, but I don't want you to guess.
A. Okay. I'm gonna say about four months.
Q. Okay. And during that time, to your knowledge, did she have any problem with the chair?



A. No. Not that I know of.
Q. That wasn't the chair that kept locking?
A. Unlocking.
Q. Unlocking?
A. No, it wasn't. This one seemed to be okay.
Q. Okay. Did anyone ever come to take a look at that third chair?
A. After the accident they did.
Q. Okay. But not before?
A. Not before.
Q. Okay. Do you know where the third chair came from?
A. Safety.
Q. Okay. And again, Ed brought it over?
A. Yes.
Q. All right. Did that chair have a tag on it?
A. I don't recall.
Q. Okay. Did that chair look newer to you?
A. Yes, it did.
Q. Okay. Do you know if it was a chair that had been used anywhere before?
A. I don't know.
Q. Okay. Is it possible if a chair is in Safety that it had been used in other locations?



MR. ESKEY: I object.
A. Yes.
Q. And you don't remember if the third chair had a tag on it or not?
A. I'm not too sure on that one.
Q. Okay. At any time before this fall, did you ever have occasion to touch Mary Ann's chair and look at it?
A. I've sat in it. So there was no problems with it for me.
Q. Okay. And to your knowledge, this third chair was not the one that had kept locking and unlocking?
A. Right.
Q. And can you describe for me what the third chair looked like?
A. It was the dark blue, the regular type of office chair with the arms. And it also reclined.
Q. Was it a high back or a low back?
A. High back.
Q. Do you know where the levers were to move it up and down?
A. Underneath the bottom of the seat.

Page 30

Q. Okay. On which side?
A. The lever to move it up and down I believe was on your right side, if I'm remembering this correctly. And then there was a lever on the left that would like prop you up more.
Q. Okay. And was there any kind of procedure at TI for the chairs to be, you know, inspected?
A. There was supposed to be a procedure in place.
Q. Okay. And what was that?
A. People were to inspect their own chairs. And they were supposed to actually flip them over, make sure all the screws were intact, and then sign the tag and date it.
Q. When did that procedure go into place?
A. I'm not too sure exactly when that started.
Q. Was it before Mary Ann fell?
A. I'm gonna have to say after.
Q. You think it was after?
A. After.
Q. Okay. Was there anyone on site at TI who was in charge of taking care of faulty equipment or any problems? What would you do?
A. Maintenance guys. We'd ask them.
Q. Okay. And how would the maintenance guys be

Page 31

contacted if there was a problem?
A. We would page them.
Q. Okay. Everybody had the ability to do that --
A. Yes.
Q. -- if they had a problem?
A. Yes.
Q. Who were the maintenance guys working back in 2003?
A. Hmm. Just in that building? Oh, God, there was a million of them.
Q. The ones for Building 12 who would have been responsible for your area.
A. Okay. We would have called like Richard Govoni or Doug Bell, Bob Basiliere, Mike Rose, Kenny Boyer.
Q. And what was the other one right before that?
A. Mike Rose.
Q. Mike Rose, okay. Doug Boyer, you said?
A. Doug Bell.
Q. Doug Bell.
A. Mm-hmm.
Q. So let me just go over them again slowly. Richard Govoni, Doug Bell, Mike Rose.
A. Mm-hmm.

Page 32

Q. Yes?
A. Yes.
Q. And the last?
A. Bob Basiliere and Kenny Boyer.
Q. Was there an electrician on site?
A. That was Richard Govoni and Doug Bell.
Q. Okay. Was there an electrician named Pete?
A. Oh, Pete Sauer. Yes.
Q. Was he in the area?
A. No.
Q. No, okay. So if there was a problem with any chair, these guys could be called to help fix it?
A. Yes.
Q. Okay. And was any one of them involved in trying to help Mary Ann fix the chair that was not locking for her?
A. Another guy was who was not in maintenance. His name was Russell Loxley. I heard he actually repaired the chair a day or two later, but I was out on vacation after that.
Q. Okay. Let me just make sure you understood my first question. You had said that there was a chair that would not lock on Mary Ann.

Page 33

A. Right.
Q. And Russell Loxley had tried to fix that one?
A. Oh, no. He actually tried to fix the one that broke on her.
Q. Okay. Did anyone try to fix the one that was not locking?
A. Not that I know of.
Q. Okay. That one was just --
A. -- taken back over to Safety, to another building.
Q. Another building, okay. You don't know what happened to it afterwards?
A. No, I don't.
Q. Okay. And you do know that the orange one was eventually thrown away.
A. Yes.
Q. Correct?
A. Yes.
Q. You don't know what happened to the middle one?
A. No. They were going through chairs and piling them up on skids and throwing out a lot of them.
Q. When you say "they," who do you mean?

up to a standing position.
Q. Okay. And then the base of the chair rolled backwards?
A. Yes.
Q. Okay. And then what happened next?
A. She called Ed Picard and told him what happened.
Q. Okay. You said before you were laughing about this happening. When did that happen?
A. After I pulled her up and she seemed okay at the moment. And it was just funny the way the whole thing happened. And she was even laughing at that time.
Q. Okay.
A. And I think she was kind of in shock.
Q. Okay. At that point, is it fair to say that neither one of you thought she was hurt?
A. I didn't think she was hurt.
Q. Okay. So then she called Ed and told him what happened.
A. Yes.
Q. And what happened after that?
A. I know that he came over and talked to her and he asked me to leave so that they could talk.



And then he had asked me my side of the story later on, one-on-one, him and I.
Q. Okay. And when was that?
A. The same day. Because then I went out on vacation and when I came back, she was out on medical leave.
Q. So when Ed came down after the incident occurred, was that immediately after?
A. Not immediately. Maybe -- because we went -- we broke for lunch. So it was after lunchtime, I'd say like two o'clock maybe in the afternoon.
Q. Okay. After you pull her up to standing, did you guys touch the chair at all before Ed was called?
A. No.
Q. No, okay. So when Ed came down, where was the chair?
A. Still in her office.
Q. Okay.
A. Near her desk.
Q. What did she do to, you know, get back to work?
A. She didn't. She didn't go back to work. She



ended up coming out to where my computer was and just waiting on customers that came to the window.
Q. Okay. Until lunchtime?
A. Right. Which was only like maybe 20 minutes or so.
Q. And what happened to the chair right after the incident?
A. Well, I know Ed took it. No, wait a minute. He didn't take it. Russ Loxley took it to repair it.
Q. So the back of the chair was off the base?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. Okay. And the base of the chair was still on the wheels?
A. Yes.
Q. So you have two pieces. Correct?
A. Right.
Q. Okay. Did either you or Mary Ann pick up those pieces in any way after this happened?
A. No.
Q. No?



A. No.
Q. You never touched them?
A. I didn't, no.
Q. Okay. Did Mary Ann touch them?
A. Not that I remember.
Q. Okay. Who was the first person to touch the chair after it broke, if you know?
A. I believe it was Russ Loxley.
Q. How was he notified? If you know.
A. Mary Ann. She talked to him. He worked right on the other side of us. So she told him what happened, he came in and took the chair.
Q. Okay. Do you know if Russell is still there?
A. He is not.
Q. Okay. Do you know where he lives?
A. North Smithfield.
Q. Okay. Do you know if he has another job now?
A. He does now, but I don't know where.
Q. Okay. And to your knowledge, Russell came and took the chair. And at that point, you just go off and do your own regular day's work?
A. Yes.
Q. The only thing that was out of the ordinary after that is that you had to talk to Ed about

Q. Did you do that?
A. Yes. We had to.
Q. Okay. And what was involved in -- strike that.
How did you know what to do and how to inspect the chair?
A. Ed had explained to us what we were supposed to do, check the locking mechanizations on the side. He showed us how to do it. And to look for the right amount of screws that should have been in the bottom of the chair to keep it intact.
So it was basically the levers, make sure that they were working properly. And make sure your wheels were okay, the backing didn't recline back too far.
Q. And the chair that you had at that time and inspected, was it the same type or was it a different type of chair than the one that broke on Mary Ann King?
A. The same type.
Q. Okay. And what did you do to inspect that chair? Do you recall?
A. Well, mine being so high, I didn't have to



flip it over and count the screws. I could just look underneath it and see that I had four in the back of mine. So everything stays really tight on that chair.
Q. Did anyone occupy that office space that Mary Ann worked in in June of 2003 after she left?
A. I did.
Q. Okay. And when you moved to her office space, did you move to a lower chair?
A. Yes.
Q. Okay. And when you moved to a lower chair, was that the same type of chair that Mary Ann was using that broke on her in June of 2003?
A. Yes.
Q. And did you perform inspections on that chair as well?
A. Yes.
Q. Did Ed show you how to do that?
A. Yes.
Q. Okay. And were there any written materials that were ever provided to you that showed you how to perform inspections?
A. No.
Q. Okay. Were there any web resources that you



could turn to --
A. Yes.
Q. -- with respect to that?
A. Yes.
Q. Did you ever consult an Internet web site or a Sonesta (sic) web site, intranet site for inspecting the chairs?
A. No, I did not.
Q. Okay. And how were you aware that that was a resource that was available to you with respect to inspections?
A. From other people talking.
Q. Okay. And do you know whether that was an Internet web site or an intranet web site?
A. An Internet.
Q. Okay. Now, did you speak with Russell Loxley about the broken chair?
A. No.
Q. Okay. How do you know that he tried to fix it?
A. I was told that.
Q. Okay. And who told you that? I may be repeating a question that somebody already asked you, but who told you that?



A. Ed Picard.
Q. Okay. Now, when Jim Drews brought the repaired chair back into the work area, were you present at that time?
A. Yes, I was. But I was very busy so I really didn't pay attention to what was going on. I know that he brought it in and he took it back to the back of the room where it was when he first picked it up. And he left it there. And I was straight out that day so I never even got to even go back there and look at it.
Q. And at that time, were you working in Mary Ann's old area or were you still in your original area?
A. I was doing both.
Q. Okay. Then you said that Ed Picard came and he took the chair?
A. He also took it at one point, yes.
Q. I was specifically referring to when Jim brought the chair back. I believe you testified that Ed came and --
A. After that, Ed came and he took it, too, and then I don't know what happened to it after that.

up to a standing position.
Q. Okay. And then the base of the chair rolled backwards?
A. Yes.
Q. Okay. And then what happened next?
A. She called Ed Picard and told him what happened.
Q. Okay. You said before you were laughing about this happening. When did that happen?
A. After I pulled her up and she seemed okay at the moment. And it was just funny the way the whole thing happened. And she was even laughing at that time.
Q. Okay.
A. And I think she was kind of in shock.
Q. Okay. At that point, is it fair to say that neither one of you thought she was hurt?
A. I didn't think she was hurt.
Q. Okay. So then she called Ed and told him what happened.
A. Yes.
Q. And what happened after that?
A. I know that he came over and talked to her and he asked me to leave so that they could talk.



And then he had asked me my side of the story later on, one-on-one, him and I.
Q. Okay. And when was that?
A. The same day. Because then I went out on vacation and when I came back, she was out on medical leave.
Q. So when Ed came down after the incident occurred, was that immediately after?
A. Not immediately. Maybe -- because we went -- we broke for lunch. So it was after lunchtime, I'd say like two o'clock maybe in the afternoon.
Q. Okay. After you pull her up to standing, did you guys touch the chair at all before Ed was called?
A. No.
Q. No, okay. So when Ed came down, where was the chair?
A. Still in her office.
Q. Okay.
A. Near her desk.
Q. What did she do to, you know, get back to work?
A. She didn't. She didn't go back to work. She



ended up coming out to where my computer was and just waiting on customers that came to the window.
Q. Okay. Until lunchtime?
A. Right. Which was only like maybe 20 minutes or so.
Q. And what happened to the chair right after the incident?
A. Well, I know Ed took it. No, wait a minute. He didn't take it. Russ Loxley took it to repair it.
Q. So the back of the chair was off the base?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. Okay. And the base of the chair was still on the wheels?
A. Yes.
Q. So you have two pieces. Correct?
A. Right.
Q. Okay. Did either you or Mary Ann pick up those pieces in any way after this happened?
A. No.
Q. No?



A. No.
Q. You never touched them?
A. I didn't, no.
Q. Okay. Did Mary Ann touch them?
A. Not that I remember.
Q. Okay. Who was the first person to touch the chair after it broke, if you know?
A. I believe it was Russ Loxley.
Q. How was he notified? If you know.
A. Mary Ann. She talked to him. He worked right on the other side of us. So she told him what happened, he came in and took the chair.
Q. Okay. Do you know if Russell is still there?
A. He is not.
Q. Okay. Do you know where he lives?
A. North Smithfield.
Q. Okay. Do you know if he has another job now?
A. He does now, but I don't know where.
Q. Okay. And to your knowledge, Russell came and took the chair. And at that point, you just go off and do your own regular day's work?
A. Yes.
Q. The only thing that was out of the ordinary after that is that you had to talk to Ed about

what happened?
A. Right.
Q. Okay. To your knowledge, did Mary Ann go see the doctor at TI that day?
A. No, she did not. It was the next day when I was out.
Q. Okay. So there is a medical facility on staff at TI. Correct?
A. Yes, there was.
Q. All right. And you didn't know that she went there the next day until you came back?
A. Right.
Q. Okay. So you were scheduled to go on vacation starting the following day?
A. Yes.
Q. Okay. And after Russell came and took the chair -- did you see him do that, by the way?
A. No, I didn't.
Q. Okay. So when you got back from lunch, was the chair gone?
A. Yes, it was.
Q. Okay. And you found out later that Russell took it?
A. Yes.



Q. Okay. Do you know what happened to the chair after Russell took it?
A. They brought it back into our area. We ended up -- my boss ended up saying, "We can't use that chair, we have to tag it" until Jim Drews from Staples came in. He came in and took it.
Q. So the chair was brought back into your area?
A. Yes.
Q. Okay. Do you know if there were any parts of the chair that were not kept with it?
A. Not that I know of.
Q. Okay. And where in your area was the chair kept?
A. In the back of the room, in front of a window.
Q. All right. And was the base attached to --
A. It was all back together then.
Q. It was all back together.
A. Yes.
Q. Okay. Were there any tags on it at that point?
A. No.
Q. No. And how long did it stay in your area back together back by the window?
A. Oh, God, I'm not too sure exactly how long it



was. It might have been a month, I think, before Jim actually came in and got the chair.
Q. Okay. Did you ever look at it after it was put back together?
A. Just from a distance. I didn't inspect it or anything.
Q. Okay. When the chair broke, did you hear any screws fall on the ground or anything?
A. No. I'm deaf in my right ear and it was on my right side so I didn't hear anything.
Q. Did you hear the chair snap?
A. No.
Q. Did you see any screws on the ground?
A. No. And I was asked to look for them, but I could not find them. There's partitions so they could have rolled out. And people that sweep the floors, they might have just swept them up. I don't really know. But I never found them.
Q. So to your recollection, you never found any screws?
A. No.
Q. Was it ever determined where the chair originally came from?



A. As far as I knew, it was from Safety.
Q. Okay. And no one knows how long it had been at Safety?
A. Right, no one knows.
Q. Okay. And so you were out for about a week?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. And when you got back to work, was Mary Ann there?
A. No, she was not.
Q. Okay. Did you ever work with Mary Ann again after that?
A. Yes, she did come back. Not for very long, though. And it was part-time. She came back part-time. I don't remember the dates.
Q. All right. Did she ever come back full-time?
A. No.
Q. When the chair was put into the back by the window, do you know if anyone else went to look and see it over there?
A. I don't know.
Q. You never went back and looked at it again?
A. No. It just stayed back there and --

heard he had repaired it and then brought it back, but he had to take it through Safety first.
Q. Okay. So to your knowledge, it was repaired in some way?
A. Yes.
Q. And then brought back for use at TI?
A. Yes.
Q. Okay. But you don't know where or what happened to it after that?
A. No. I do not.
Q. In terms of the maintenance of the chairs before this accident in June of 2003, were chairs brought to Safety, fixed, and then brought back into the use?
A. I don't know.
Q. Okay. The maintenance guys were responsible for taking care of any problems with the chairs?
A. Yes.
Q. If there was a problem with a chair, would it go to a maintenance guy before it went to Jim Drews?
A. I don't know how they were supposed to



actually have that work. I believe so.
Q. Okay. When this chair broke that Mary Ann was on, did you see any broken metal?
A. No, I did not.
Q. Okay. When Jim brought it back, did you ever see it again?
A. Yes, he did bring it back into our room, but then Ed came and got it and then I don't know. So it was brief, very brief.
Q. Okay. So Jim brought it back from Staples. You're sure about that?
A. Yes.
Q. And then Ed came and took it.
A. Right.
Q. And you never saw it again after that?
A. No, I did not.
Q. Okay. Now, you took part in the safety meetings, the 8D meetings you talked about after?
A. I went to two of the meetings.
Q. Do you know how many they had?
A. No, I don't.
Q. Were these 8D meetings a routine that TI did for years?



A. Yes. Whenever there was an accident.
Q. Okay. And do you remember when the first one was after this accident?
A. God, I did have paperwork on it but --
Q. All right. You guys are given copies of the 8D reports if you go to the meeting?
A. Yes.
Q. Is that correct?
A. Mm-hmm.
Q. And did you save the ones involved --
A. I did, but I don't think I have it any longer.
Q. Okay.
MS. LAMONTAGNE: I'm gonna have these marked.
(Defendants' Exhibit 2 marked for identification)
Q. I'm gonna show you what I've had marked collectively as Exhibit 2. And there are eight pages here. Just take your time and look through it and see if those documents look familiar to you.
A. Okay.
(Witness reviews documents)
A. This is all very familiar to me except for the



part where I found the screw. I didn't find a screw.
Q. Okay. So you're referring to page 2 that I've shown you?
A. Yes.
Q. Okay. And just for the record, we're referring to the 8D report dated June 10th, 2003. Is that correct?
A. Yes.
Q. Okay. And when it talks about the chronology of events, how Ed received a call from Mary Ann on Monday, June 2nd --
A. Mm-hmm.
Q. -- at approximately 2:10 p.m., does that make you think that the accident was later or you still believe it was around lunchtime?
A. I thought it was around lunchtime.
Q. Okay. And again, I'm not showing you this to try to confuse you in any way. It's just that sometimes things can refresh your memory.
A. Right.
Q. Okay. The rest of that you've taken the time to read and that looks accurate to you?
A. Yes.

Page 94

Q. Did you do that?
A. Yes. We had to.
Q. Okay. And what was involved in -- strike that.
How did you know what to do and how to inspect the chair?
A. Ed had explained to us what we were supposed to do, check the locking mechanizations on the side. He showed us how to do it. And to look for the right amount of screws that should have been in the bottom of the chair to keep it intact.
So it was basically the levers, make sure that they were working properly. And make sure your wheels were okay, the backing didn't recline back too far.
Q. And the chair that you had at that time and inspected, was it the same type or was it a different type of chair than the one that broke on Mary Ann King?
A. The same type.
Q. Okay. And what did you do to inspect that chair? Do you recall?
A. Well, mine being so high, I didn't have to

Page 95

flip it over and count the screws. I could just look underneath it and see that I had four in the back of mine. So everything stays really tight on that chair.
Q. Did anyone occupy that office space that Mary Ann worked in in June of 2003 after she left?
A. I did.
Q. Okay. And when you moved to her office space, did you move to a lower chair?
A. Yes.
Q. Okay. And when you moved to a lower chair, was that the same type of chair that Mary Ann was using that broke on her in June of 2003?
A. Yes.
Q. And did you perform inspections on that chair as well?
A. Yes.
Q. Did Ed show you how to do that?
A. Yes.
Q. Okay. And were there any written materials that were ever provided to you that showed you how to perform inspections?
A. No.
Q. Okay. Were there any web resources that you

Page 96

could turn to --
A. Yes.
Q. -- with respect to that?
A. Yes.
Q. Did you ever consult an Internet web site or a Sonesta (sic) web site, intranet site for inspecting the chairs?
A. No, I did not.
Q. Okay. And how were you aware that that was a resource that was available to you with respect to inspections?
A. From other people talking.
Q. Okay. And do you know whether that was an Internet web site or an intranet web site?
A. An Internet.
Q. Okay. Now, did you speak with Russell Loxley about the broken chair?
A. No.
Q. Okay. How do you know that he tried to fix it?
A. I was told that.
Q. Okay. And who told you that? I may be repeating a question that somebody already asked you, but who told you that?

Page 97

A. Ed Picard.
Q. Okay. Now, when Jim Drews brought the repaired chair back into the work area, were you present at that time?
A. Yes, I was. But I was very busy so I really didn't pay attention to what was going on. I know that he brought it in and he took it back to the back of the room where it was when he first picked it up. And he left it there. And I was straight out that day so I never even got to even go back there and look at it.
Q. And at that time, were you working in Mary Ann's old area or were you still in your original area?
A. I was doing both.
Q. Okay. Then you said that Ed Picard came and he took the chair?
A. He also took it at one point, yes.
Q. I was specifically referring to when Jim brought the chair back. I believe you testified that Ed came and --
A. After that, Ed came and he took it, too, and then I don't know what happened to it after that.

A. No.
Q. Okay. Now, the chair that broke at the time, were you familiar with that chair to the extent that you could identify it by sight, that type of chair, if you saw it again?
A. That type of chair, yes, I could.
Q. Okay. And you described the chair somewhat. Can you describe the base of the chair? Did it have wheels?
A. Yes, it did. I believe it had five legs that came out with wheels.
Q. Yes. And I'm gonna show you --
MR. ESKEY: Can we mark this as Plaintiffs' A?
(Plaintiffs' Exhibit A marked for identification)
MS. LAMONTAGNE: Just for the record, I'm gonna have an objection to any introduction of this. It's completely nondescript, but I see where you're going with it.
MR. ESKEY: That's fine.
Q. Just showing you, Ms. McGee, what's been marked as Plaintiffs' Exhibit A for



identification.
A. Mm-hmm.
Q. Now, for the record, there are two photographs, not the greatest quality, of two chairs here. Now, are either of these chairs either identical or similar to the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. I'd say similar.
Q. I'm sorry?
A. Similar.
Q. Okay. And which chair is similar?
MS. LAMONTAGNE: Objection.
A. I'm trying to recall. I believe it was this one (indicating).
Q. Okay. You're pointing to the chair on the right?
A. Right.
Q. Okay. Now, do you see in that photograph that there's a metal ring around the bottom? Do you see that?
A. Yes.
Q. Is that the type of chair that Mary Ann King had?



A. No, she did not.
Q. Okay. Now, looking at the other photograph, there's no metal ring on that. Correct?
A. Right.
Q. Now, focusing on that element of these photographs, does that change your opinion in any way as to whether either of these chairs were similar to the --
MS. LAMONTAGNE: Objection.
A. Yes, I would say this is more -- this is definitely the bottom that she had on her chair. This is what my chair looked like, except mine was higher, and hers looked more like that. But I couldn't -- I was trying to remember the backing of her chair, and I don't remember the size of it.
Q. Now, when you say the chair that was more similar to yours, you're pointing to the photograph on the right, the one with the metal ring around the bottom. Correct?
A. This one (indicating), yes.
Q. And is it your testimony then that the chair on the left resembles the chair that broke --
A. Yes.



Q. -- on Mary Ann King?
MS. LAMONTAGNE: Objection. If you can just let him finish his question.
THE WITNESS: Oh, okay.
Q. Now, focusing on the back of that chair, does the back of that chair -- I'm talking about the photograph on the left -- does that resemble the back of the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. Yes.
Q. And the arms on that chair, the photograph on the left, do those arms resemble those that were on the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. Yes.
Q. Okay. And you told me about the base already. That base resembles the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. Yes.
Q. Okay. So as far as you can tell from this photograph, poor quality as it is, the photograph on the left, that resembles the

Page 82

A. No.
Q. Okay. Now, the chair that broke at the time, were you familiar with that chair to the extent that you could identify it by sight, that type of chair, if you saw it again?
A. That type of chair, yes, I could.
Q. Okay. And you described the chair somewhat. Can you describe the base of the chair? Did it have wheels?
A. Yes, it did. I believe it had five legs that came out with wheels.
Q. Yes. And I'm gonna show you --
MR. ESKEY: Can we mark this as Plaintiffs' A?
(Plaintiffs' Exhibit A marked for identification)
MS. LAMONTAGNE: Just for the record, I'm gonna have an objection to any introduction of this. It's completely nondescript, but I see where you're going with it.
MR. ESKEY: That's fine.
Q. Just showing you, Ms. McGee, what's been marked as Plaintiffs' Exhibit A for

Page 83

identification.
A. Mm-hmm.
Q. Now, for the record, there are two photographs, not the greatest quality, of two chairs here. Now, are either of these chairs either identical or similar to the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. I'd say similar.
Q. I'm sorry?
A. Similar.
Q. Okay. And which chair is similar?
MS. LAMONTAGNE: Objection.
A. I'm trying to recall. I believe it was this one (indicating).
Q. Okay. You're pointing to the chair on the right?
A. Right.
Q. Okay. Now, do you see in that photograph that there's a metal ring around the bottom? Do you see that?
A. Yes.
Q. Is that the type of chair that Mary Ann King had?

Page 84

A. No, she did not.
Q. Okay. Now, looking at the other photograph, there's no metal ring on that. Correct?
A. Right.
Q. Now, focusing on that element of these photographs, does that change your opinion in any way as to whether either of these chairs were similar to the --
MS. LAMONTAGNE: Objection.
A. Yes, I would say this is more -- this is definitely the bottom that she had on her chair. This is what my chair looked like, except mine was higher, and hers looked more like that. But I couldn't -- I was trying to remember the backing of her chair, and I don't remember the size of it.
Q. Now, when you say the chair that was more similar to yours, you're pointing to the photograph on the right, the one with the metal ring around the bottom. Correct?
A. This one (indicating), yes.
Q. And is it your testimony then that the chair on the left resembles the chair that broke --
A. Yes.

Page 85

Q. -- on Mary Ann King?
MS. LAMONTAGNE: Objection. If you can just let him finish his question.
THE WITNESS: Oh, okay.
Q. Now, focusing on the back of that chair, does the back of that chair -- I'm talking about the photograph on the left -- does that resemble the back of the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. Yes.
Q. And the arms on that chair, the photograph on the left, do those arms resemble those that were on the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. Yes.
Q. Okay. And you told me about the base already. That base resembles the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. Yes.
Q. Okay. So as far as you can tell from this photograph, poor quality as it is, the photograph on the left, that resembles the

A. No.
Q. Okay. Now, the chair that broke at the time, were you familiar with that chair to the extent that you could identify it by sight, that type of chair, if you saw it again?
A. That type of chair, yes, I could.
Q. Okay. And you described the chair somewhat. Can you describe the base of the chair? Did it have wheels?
A. Yes, it did. I believe it had five legs that came out with wheels.
Q. Yes. And I'm gonna show you --
MR. ESKEY: Can we mark this as Plaintiffs' A?
(Plaintiffs' Exhibit A marked for identification)
MS. LAMONTAGNE: Just for the record, I'm gonna have an objection to any introduction of this. It's completely nondescript, but I see where you're going with it.
MR. ESKEY: That's fine.
Q. Just showing you, Ms. McGee, what's been marked as Plaintiffs' Exhibit A for



identification.
A. Mm-hmm.
Q. Now, for the record, there are two photographs, not the greatest quality, of two chairs here. Now, are either of these chairs either identical or similar to the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. I'd say similar.
Q. I'm sorry?
A. Similar.
Q. Okay. And which chair is similar?
MS. LAMONTAGNE: Objection.
A. I'm trying to recall. I believe it was this one (indicating).
Q. Okay. You're pointing to the chair on the right?
A. Right.
Q. Okay. Now, do you see in that photograph that there's a metal ring around the bottom? Do you see that?
A. Yes.
Q. Is that the type of chair that Mary Ann King had?



A. No, she did not.
Q. Okay. Now, looking at the other photograph, there's no metal ring on that. Correct?
A. Right.
Q. Now, focusing on that element of these photographs, does that change your opinion in any way as to whether either of these chairs were similar to the --
MS. LAMONTAGNE: Objection.
A. Yes, I would say this is more -- this is definitely the bottom that she had on her chair. This is what my chair looked like, except mine was higher, and hers looked more like that. But I couldn't -- I was trying to remember the backing of her chair, and I don't remember the size of it.
Q. Now, when you say the chair that was more similar to yours, you're pointing to the photograph on the right, the one with the metal ring around the bottom. Correct?
A. This one (indicating), yes.
Q. And is it your testimony then that the chair on the left resembles the chair that broke --
A. Yes.



Q. -- on Mary Ann King?
MS. LAMONTAGNE: Objection. If you can just let him finish his question.
THE WITNESS: Oh, okay.
Q. Now, focusing on the back of that chair, does the back of that chair -- I'm talking about the photograph on the left -- does that resemble the back of the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. Yes.
Q. And the arms on that chair, the photograph on the left, do those arms resemble those that were on the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. Yes.
Q. Okay. And you told me about the base already. That base resembles the chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. Yes.
Q. Okay. So as far as you can tell from this photograph, poor quality as it is, the photograph on the left, that resembles the

chair that broke on Mary Ann King?
MS. LAMONTAGNE: Objection.
A. Yes.
Q. Okay. Now, earlier in the deposition, Ms. Lamontagne asked you about downsizing at Texas Instruments or maybe it was --
A. Sensata.
Q. Sensata.
MR. ESKEY: I always want to say Sonesta for some reason. Sensata.
Q. Was there any downsizing in your purchasing department?
A. Yes, there was.
Q. Okay. And was there any downsizing with respect to the assistant purchasing position?
A. Yes, there was.
Q. Okay. And was that position ever filled again?
A. No.
Q. Now, was it Ed Picard that told you that Mary Ann's chair was manufactured by Imperial? Is that what you recall?
A. Yes.
Q. Okay. And he told you that on your return to



work?
A. Yes.
Q. Was that before the 8D meetings?
A. Yes, it was.
Q. Okay. And you attended the 8D meetings?
A. I went to two of them.
Q. Now, looking back at the record of those meetings that's been marked as Defendants' 2 --
A. This one?
Q. Yes. The first meeting is dated June 10th. Do you see that?
A. Yes.
Q. Okay. And do you see where it says Members Present and it says that you were present?
A. Yes.
Q. Okay. Do you remember attending this meeting?
A. Yes, I do.
Q. Okay. Now, you had gone on vacation the day after the incident. Correct?
A. Right. Well, actually, I had only taken a few days off so I believe it was Thursday, Friday, Monday.
Q. Okay. And then was it the first day back that



you had the conversation with Ed that he told you it was an Imperial chair?
A. No, it was the day after that.
Q. Okay. And then sometime later was this meeting on June 10th. Correct?
A. Right.
Q. Now, the second meeting, according to these records, took place on June 17th. Correct? It's the second --
A. Yes.
Q. And it also indicates that you were present at this meeting.
A. Right. Those are the two that I went to.
Q. Okay. And so then on the last page of the exhibit, the one dated July 9th, do you see that?
A. Yes, I see that.
Q. Okay. And do you see that it also indicates that you were present at that meeting?
A. Right.
Q. And you recall that Ms. Lamontagne asked you about this meeting as well. This is the one where Mary Ann King was there and she informed the team that she had received a new chair,



etc. Do you recall being --
A. I know I was at the meeting with Mary Ann and one other and that was it. And I do remember Mary Ann being at this meeting.
Q. Okay. So you remember being at that meeting on July 9th when Mary Ann was there?
A. Yes.
Q. But you only recall being at one other meeting, either the June 10th or the June 17th?
A. Right. And I believe it was the June 10th meeting that I went to.
Q. That would have been the first meeting?
A. The very first one, yes.
Q. Okay. Is it possible that you attended the June 17th meeting but simply because of the passage of time don't recall?
A. Maybe, yes.
Q. Do you have any reason to dispute that you were present at that meeting as indicated in the minutes from June 17th?
A. I just don't -- I only recall going to the two meetings so...
Q. And you're not sure, but you think it was the

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

C.A. NO. 06-258 S

MARY ANN KING
and PHILLIP KING,

Vs.

STAPLES, INC., IZZY DESIGNS;
JSJ CORPORATION;
JOHN DOE COMPANY,

---

DEPOSITION of ALAN E. BROWN, JR., taken on behalf of the Defendant, Staples, Inc., pursuant to the Federal Rules of Civil Procedure, before Kristen M. Bengtson, RPR, Notary Public in and for the State of Rhode Island, at the offices of: Hanson Curran LLP, 146 Westminster Street, Providence, Rhode Island, on Monday, May 21, 2007, at 4:30 p.m.

APPEARANCES:
DeLuca & Weizenbaum, Ltd.
BY: MICHAEL T. ESKEY, ESQUIRE
Counsel for the Plaintiffs

Hanson Curran LLP
BY: JAMES T. MURPHY, ESQUIRE
Counsel for Staples, Inc.

Zizik, Powers, O'Connell, Spaulding & Lamontagne, P.C.
BY: DONNA M. LAMONTAGNE, ESQUIRE
Counsel for Izzy Designs and JSJ Corporation

REPORTING ASSOCIATES
Shorthand Reporters
10 Dorrance Street
Providence, RI 02903
(401) 351-1660

I-N-D-E-X


| WITNESS | PAGE |
|---|---|
| ALAN E. BROWN, JR. | |
| Examination By Mr. Murphy | 3, 117 |
| Examination By Ms. Lamontagne | 74, 118 |
| Examination By Mr. Eskey | 80, 120 |


E-X-H-I-B-I-T-S


| | | |
|---|---|---|
| A | 8D Incident investigation Procedure | 15 |
| B | 8D Incident Investigation Meeting Minutes dated June 10, 2003 | 17 |
| C | 8D Investigation Meeting Minutes Dated June 10, 2003 | 20 |
| D | Chair inspection guide | 36 |




ALAN E. BROWN, JR.,
A witness called on behalf of the Defendant,
Staples, Inc.,
having been first duly sworn,
deposes and says as follows:

DIRECT EXAMINATION:
Q. (By Mr. Murphy) Could you give us your full name, please.
A. Alan E. Brown, Junior.
Q. Mr. Brown, where do you live?
A. No. 5 French Street in Rehoboth, Massachusetts.
Q. Presently, where are you employed?
A. Dominion New England, Brayton Point Power Station.
Q. What's your position there?
A. Senior safety specialist.
Q. Now, at one time, Mr. Brown, were you employed at Texas Instruments --
A. Yes.
Q. -- in Attleboro, Massachusetts?
A. Yes, I was.
Q. What was your position there?
A. I was a senior safety specialist.
Q. Could you tell us what the duties were that you had as a senior safety specialist at TI?



A. I was responsible for OSHA compliance and compliance with Texas Instruments' policies and procedures.
Q. Concerning?
A. Development of those procedures, any incident or accident investigations.
Q. How long did you work at Texas Instruments?
A. I worked there for 15 and-a-half years.
Q. Until when?
A. I left in 2004.
Q. How long were you a senior safety specialist there?
A. Since 1992, January of '92.
Q. I take it then in the 2003 time frame you were employed as a senior safety specialist at Texas Instruments?
A. Yes.
Q. At the Attleboro facility?
A. Yes.
Q. Were there a number of buildings there at the time?
A. Yes, there were.
Q. This is a case that involves a claim by Mary Ann King that she was injured while working as an employee at Texas Instruments and while sitting in



a chair. You are aware of that?
A. Yes.
Q. My understanding is that you had some role with respect to the investigation of that work incident?
A. Yes, I did.
Q. In your best laymen's terms, could you give us a concise explanation of what your role was with respect to Mary Ann King's injury.
A. We had different business units on the property, and I was a liaison from the safety department to the particular unit she worked for. And as such, when we had an accident, I would lead the 8D, what's called an 8D investigation.
Q. Back then, how many people were in the safety department?
A. I believe five.
Q. Who was in charge of the safety department?
A. At that time, it would be Ruth Martin.
Q. Was she your supervisor?
A. Yes, she was.
Q. Was there anybody in the chain between you and her?
A. No.
Q. Okay. Then were there several people at your

level?
A. Yes.
Q. Who were the other folks at your level?
A. Dean Chapman was another senior safety specialist, and William Reed was our industrial hygienist.
Q. Do you know a man named Ed Picard?
A. Yes, I do.
Q. Was he in the safety department?
A. No.
Q. What department was he in?
A. Ed was a tool room supervisor, and I believe at that time he had moved over to take care of stores, which is our internal store.
Q. All right. How about John Elliott, did he work in safety?
A. No.
Q. Where did he work?
A. John was a facilities manager.
Q. What does that mean?
A. He was responsible for the building, the property maintenance, for electrical and plumbing.
Q. Okay.
A. Heating, ventilation, air conditioning.
Q. All right. You know Natalia Mendes?
A. Yes.



Q. Do you recall what her position was back in June of 2003?
A. She was in purchasing.
Q. How about Yolanda Robinson, do you know who she was?
A. Yes.
Q. What was her position?
A. Yolanda was a supervisor under Natalia in purchasing.
Q. How about Mary Ann King, did you know her before her injury?
A. Yes.
Q. How did you know her?
A. I just knew her from being in the plant.
Q. Now, in the safety department, I take it you would make rounds of the plant periodically?
A. Yes.
Q. Why would you do that?
A. We would do it for a variety of different reasons. Most of it was to make sure that we were compliant, we had ongoing projects that we were responsible for in all different buildings of the facility.
Q. Would that include furniture as well?
A. How do you mean?



Q. Such as office furniture, the safety of office furniture such as chairs.
A. We were responsible for ergonomics, yes.
Q. Ergonomics?
A. Yes.
Q. For the record, in case someone ever asks what we're talking about, could you define ergonomics as you used it in that job.
A. We used it as human factors, engineering and then the study of the relationship of the individual to their work station or environment.
Q. All right. Mr. Brown, were there various types of chairs that were used at Texas Instruments --
A. Yes.
Q. -- in the 2003 time frame?
A. Yes.
Q. Do you know about how many different types of chairs would be on site?
A. By type, do you mean by manufacturer or by style of chair?
Q. Why don't we start with style of chair.
A. Because we had conference room chairs, side chairs, office chairs. Production chairs came in a variety of different models based on the work station they were set up with.



Q. Now, you're familiar with the chair that Mrs., or the type of chair at least that Mrs. King was in when she --
A. Yes.
Q. -- allegedly got hurt?
A. Yes.
Q. Do you know what?
A. A Superior Centron.
Q. Now, before the date of her injury in June 2003, were you familiar with that particular type of chair?
A. Yes.
Q. How was it that you were familiar with it?
A. I would in some cases recommend that chair. We had what we called a fit station in the safety department where if someone was going to move offices or we had a new employee, we'd bring them over and adjust and measure them for their furniture so they were at maximum working height or maximize their productivity by giving them optimal working conditions.
Q. So that, in other words, the lumbar portion --
A. The lumbar selection --
Q. -- would hit in the right place?
A. Hands on the keyboard, measure the top of their

A. Yes.
Q. -- an accident scene or a police scene?
A. Yes, it is.
Q. And it says a sign was posted indicating that the chair was broken and not to be used?
A. Correct.
Q. Do you know who made the sign?
A. I believe I did.
Q. It was just on a piece of cardboard, for example, is that what it was?
A. I think I did it in Power Point.
Q. So it was a piece of paper?
A. Yes.
Q. Then it goes on to say, "In looking at the chair, it was found that the seat of the chair would move freely and would not stay in the locked position." Do you see that language?
A. Correct, yes.
Q. Did you look at the chair?
A. Yes, I did.
Q. Is that what you found?
A. Yes.
Q. Can you explain what you mean by it would move freely and not stay in a locked position?
A. The seat pan would adjust with the back of that



chair would go into a free motion where you could lean back in it, and the seat pan would tilt and the back of the chair would tilt and then you could lock it into a position. And it was intended to stay there, the design was for it to stay there, but it would slip forward.
Q. Now, seat pan, is that the part that I sit on?
A. Yes.
Q. My butt is sitting on?
A. Yes.
Q. That's the seat pan, okay. So you found that it would not stay in the locked position?
A. Yes.
Q. But it would move forward.
A. It was at rest in a forward, I believe.
Q. At that time when you first saw the chair, was the back still on the chair?
A. I don't believe so.
Q. All right. Where was the back?
A. It was with the chair.
Q. With it but not --
A. I don't recall it being on it.
Q. I'm not going to ask you to guess.
A. No, I don't recall it being on it.
Q. It also goes on to say in the next sentence, "We



also noticed that several screws were missing." Did you notice that screws were missing?
A. We couldn't locate the screws.
Q. Could you locate places where screws, you felt, should have been but weren't?
A. Yes.
Q. Can you tell me where those locations were.
A. We had looked at another chair, we had looked at a similar chair, the same model, and saw the two screws were in. I believe we found one screw on the floor.
Q. Do you know if it was to that chair or not?
A. It was the same type of screw that was in the chair.
Q. Sometimes we belabor things and we miss the obvious, but the chair that you were looking at that you had this yellow caution tape put around, what kind of chair was that?
A. Superior Centron.
Q. And the chair that you looked at for comparison was another Superior Centron?
A. Yes, it was.
Q. Do you recall what color this chair was that you were concerned with?
A. No, I don't.



Q. It goes on to say that "Pam indicated that on today, June 10th, she had located one of the screws on the floor near the computer stand." This is Pam McGee, I take it?
A. Yes.
Q. Did you look at, did you see this, any screw or screws that she --
A. That one screw, yes.
Q. Were you able to determine what it went to?
A. That's the one I was just speaking about that we, looked like the screw that was in the Superior Centron.
Q. Did you attempt to put it back in the chair?
A. No, I didn't.
Q. But it looked similar to it?
A. Yes.
Q. Where on the -- and this is near the computer stand?
A. Yes.
Q. Would this be the computer stand where Mary Ann King worked?
A. Yeah. That was the only computer stand in that area, that I recall.
Q. There's another sentence here, it says, "Ed informed the team that he would retrieve the screw

from the store room and provide it to Al for him to try and determine if it was the original manufacturer's screw." Do you see that?
A. Yes.
Q. Did you try to do that?
A. Yes, that's right.
Q. Were you able to determine if it was, in fact?
A. Couldn't tell if it was the original manufacturer's. It looked similar to the screw that was in the other Superior chair.
Q. Now, these hex, not hex -- are these Phillips head screws or slot screws or something else?
A. I believe it's a hex head screw. I'm not sure.
Q. The next sentence, Mr. Brown, I'm going to ask you about specifically says, "Al informed the group that based on the information that he was able to retrieve from the chair, it was manufactured in 1996." Do you see that?
A. Yes.
Q. Did you, in fact, retrieve information from the chair that assisted you in dating its manufacture?
A. With Jim Drews, yes.
Q. You had his assistance?
A. Yes.
Q. Where was this information that you retrieved from



the chair? Where was it located on the chair?
A. It was under the chair, under the seat pan, I believe.
Q. How were you able to determine that it was 1996?
A. Jim gave me that information as I recall, Jim Drews.
Q. Was there a code, was there sort of a code that was on this? Was it a label -- strike that.
A. I believe Jim, Jim knew the system of marking what was familiar with it and said that he was able to.
Q. To date it?
A. Yes.
Q. Did you see the label yourself?
A. I believe I did, but I don't recall specifically now where I'd say yes, I did.
Q. Can you describe the label for us.
A. I can't specifically describe that label.
Q. Were you familiar with that type of label on chairs?
A. Yes, I've looked at many chairs from adjusting chairs and measuring people for chairs and testing chairs.
Q. Are you familiar with what's known as a T code?
A. Not by that name, no.
Q. Are you familiar with any type of coding for



determining from where chairs come and when they're made and data concerning chairs?
A. Jim explained the coding to me briefly as he was going through it, but it's not something that I held onto.
Q. Can you recall what he told you about the coding?
A. He told me that he could take, get the date of manufacture out of it.
Q. And he related back to you that this was a 1996 manufactured chair?
A. Yes.
Q. Were you able to determine when the chair was shipped to the Attleboro Sensors division of Textron?
A. No. Texas Instruments.
Q. Texas Instruments. I'm sorry.
A. No.
Q. Were you yourself personally able to determine from where this chair was shipped?
A. No.
Q. So you don't know where it came from?
A. No, I do not.
Q. You just know it was a Superior Centron chair?
A. Yes.
Q. Based on what you learned from Mr. Drews, you



understand it was manufactured in 1996?
A. Correct.
Q. There's some language in the next paragraph about John. Do you see, "John asked the team had Mary Ann ever..."?
A. Yes.
Q. Were you present during any of these discussions where other --
A. Discussing John?
Q. Yeah. Where it says, "John asked" and "Ed indicated."
A. Yes, that was during the meeting.
Q. So you were present to hear these things?
A. Yes.
Q. Is there anything about the -- Well, strike that. I'm maybe getting ahead of ourselves here.
Was it your understanding, Mr. Brown, that when Mary Ann first began using the chair, it had already been used somewhere else at Texas Instruments?
A. As part of this process, yes, that's what I understood.
Q. Okay. So she had gotten it, but it came from -- it wasn't a brand new chair?
A. No.

time, on the index of the Incident Investigation Procedure, it actually identifies these different steps as Step D1, and Step D2; is that correct?
A. Correct.
Q. And it provides references to pages that describe precisely what to do?
A. Correct.
Q. Okay. And there's a New York Times rule that's listed on page one of Exhibit A. Was that your idea or is that Ford Motor Company's?
A. Not specifically my idea.
Q. It is?
A. No, not specifically.
Q. But you would agree when you write something, it could become a public document so you want to be sure that it's clear what you're talking about?
A. That it's factual, yes.
Q. So it was your goal in conducting or in helping this investigation to make sure that it was factual, fact driven and clearly explained?
A. Correct.
Q. Okay. Rather than having opinions and guesses filter into it; is that right?
A. Correct.
Q. Because your goal was to find the root cause of



what happened with this chair and this lady, correct?
A. Correct.
Q. So it wouldn't happen again?
A. Correct.
Q. On page two of Exhibit C, still -- I think we're still on the first meeting of the 10th of June?
A. Yes.
Q. It mentions in the first full paragraph that the meeting continued with Al and Ed explaining to the rest of the team that Al, Ed and myself went to the location of the incident on Thursday, June 5, 2003, to do an initial assessment of the situation?
A. Correct.
Q. Now, the myself, would that have been Yolanda Robinson, the recorder, or some other person, if you know?
A. My best recollection is it was Natalia Mendes.
Q. And Ed would be Ed Picard?
A. Yes.
Q. And the location of the incident was where, if you recall?
A. It was in the Building 12 tool crib, second floor.
Q. All right. In there, it says on the next



sentence, "We found --" and, by the way, if I read anything incorrectly, let me know, okay? The next sentence says that "We found that someone from the manufacturing area had removed the chair from the area and attempted to repair it." Do you see that? This second sentence, that first full paragraph of page two. It would be right there.
A. Correct.
Q. My question to you, Mr. Brown, is do you know who that someone was who had removed the chair?
MR. ESKEY: I object.
A. I do not recall.
Q. You don't know who it is?
A. (The deponent shook head.)
Q. All right. Do you know what attempts, if any, had been made to repair it?
A. I don't recall it being repaired.
Q. Okay. Do you recall the source of the information that's set forth in this report that we found that someone from the manufacturing area had removed the chair?
A. I believe it was discussed. I don't know that we found the chair repaired.
Q. But did you find the chair?
A. Yes. It was on the outside of the crib with some



equipment that was staged to be removed from the building.
Q. So it was outside of the crib, which is a room essentially?
A. It was a caged-in area, yes, yeah.
Q. Was it in a hallway?
A. Yes.
Q. How did you find it, how was it found?
A. We were looking for it. We knew it was out of there, and the people had removed it from the area.
Q. And it was going to be discarded otherwise?
A. Yes.
Q. And it goes on to say in the minutes that the chair was immediately placed in a secure location inside the store room with yellow caution tape around it?
A. Correct.
Q. So was it put back in the crib?
A. Yes, it was.
Q. Do you recall where in the crib it was put?
A. It was a very small area. I don't recall exactly where it was.
Q. And the yellow caution tape, is this the kind of thing you see at --

time, on the index of the Incident Investigation Procedure, it actually identifies these different steps as Step D1, and Step D2; is that correct?
A. Correct.
Q. And it provides references to pages that describe precisely what to do?
A. Correct.
Q. Okay. And there's a New York Times rule that's listed on page one of Exhibit A. Was that your idea or is that Ford Motor Company's?
A. Not specifically my idea.
Q. It is?
A. No, not specifically.
Q. But you would agree when you write something, it could become a public document so you want to be sure that it's clear what you're talking about?
A. That it's factual, yes.
Q. So it was your goal in conducting or in helping this investigation to make sure that it was factual, fact driven and clearly explained?
A. Correct.
Q. Okay. Rather than having opinions and guesses filter into it; is that right?
A. Correct.
Q. Because your goal was to find the root cause of



what happened with this chair and this lady, correct?
A. Correct.
Q. So it wouldn't happen again?
A. Correct.
Q. On page two of Exhibit C, still -- I think we're still on the first meeting of the 10th of June?
A. Yes.
Q. It mentions in the first full paragraph that the meeting continued with Al and Ed explaining to the rest of the team that Al, Ed and myself went to the location of the incident on Thursday, June 5, 2003, to do an initial assessment of the situation?
A. Correct.
Q. Now, the myself, would that have been Yolanda Robinson, the recorder, or some other person, if you know?
A. My best recollection is it was Natalia Mendes.
Q. And Ed would be Ed Picard?
A. Yes.
Q. And the location of the incident was where, if you recall?
A. It was in the Building 12 tool crib, second floor.
Q. All right. In there, it says on the next



sentence, "We found --" and, by the way, if I read anything incorrectly, let me know, okay? The next sentence says that "We found that someone from the manufacturing area had removed the chair from the area and attempted to repair it." Do you see that? This second sentence, that first full paragraph of page two. It would be right there.
A. Correct.
Q. My question to you, Mr. Brown, is do you know who that someone was who had removed the chair?
MR. ESKEY: I object.
A. I do not recall.
Q. You don't know who it is?
A. (The deponent shook head.)
Q. All right. Do you know what attempts, if any, had been made to repair it?
A. I don't recall it being repaired.
Q. Okay. Do you recall the source of the information that's set forth in this report that we found that someone from the manufacturing area had removed the chair?
A. I believe it was discussed. I don't know that we found the chair repaired.
Q. But did you find the chair?
A. Yes. It was on the outside of the crib with some



equipment that was staged to be removed from the building.
Q. So it was outside of the crib, which is a room essentially?
A. It was a caged-in area, yes, yeah.
Q. Was it in a hallway?
A. Yes.
Q. How did you find it, how was it found?
A. We were looking for it. We knew it was out of there, and the people had removed it from the area.
Q. And it was going to be discarded otherwise?
A. Yes.
Q. And it goes on to say in the minutes that the chair was immediately placed in a secure location inside the store room with yellow caution tape around it?
A. Correct.
Q. So was it put back in the crib?
A. Yes, it was.
Q. Do you recall where in the crib it was put?
A. It was a very small area. I don't recall exactly where it was.
Q. And the yellow caution tape, is this the kind of thing you see at --

A. Yes.
Q. -- an accident scene or a police scene?
A. Yes, it is.
Q. And it says a sign was posted indicating that the chair was broken and not to be used?
A. Correct.
Q. Do you know who made the sign?
A. I believe I did.
Q. It was just on a piece of cardboard, for example, is that what it was?
A. I think I did it in Power Point.
Q. So it was a piece of paper?
A. Yes.
Q. Then it goes on to say, "In looking at the chair, it was found that the seat of the chair would move freely and would not stay in the locked position." Do you see that language?
A. Correct, yes.
Q. Did you look at the chair?
A. Yes, I did.
Q. Is that what you found?
A. Yes.
Q. Can you explain what you mean by it would move freely and not stay in a locked position?
A. The seat pan would adjust with the back of that



chair would go into a free motion where you could lean back in it, and the seat pan would tilt and the back of the chair would tilt and then you could lock it into a position. And it was intended to stay there, the design was for it to stay there, but it would slip forward.
Q. Now, seat pan, is that the part that I sit on?
A. Yes.
Q. My butt is sitting on?
A. Yes.
Q. That's the seat pan, okay. So you found that it would not stay in the locked position?
A. Yes.
Q. But it would move forward.
A. It was at rest in a forward, I believe.
Q. At that time when you first saw the chair, was the back still on the chair?
A. I don't believe so.
Q. All right. Where was the back?
A. It was with the chair.
Q. With it but not --
A. I don't recall it being on it.
Q. I'm not going to ask you to guess.
A. No, I don't recall it being on it.
Q. It also goes on to say in the next sentence, "We



also noticed that several screws were missing." Did you notice that screws were missing?
A. We couldn't locate the screws.
Q. Could you locate places where screws, you felt, should have been but weren't?
A. Yes.
Q. Can you tell me where those locations were.
A. We had looked at another chair, we had looked at a similar chair, the same model, and saw the two screws were in. I believe we found one screw on the floor.
Q. Do you know if it was to that chair or not?
A. It was the same type of screw that was in the chair.
Q. Sometimes we belabor things and we miss the obvious, but the chair that you were looking at that you had this yellow caution tape put around, what kind of chair was that?
A. Superior Centron.
Q. And the chair that you looked at for comparison was another Superior Centron?
A. Yes, it was.
Q. Do you recall what color this chair was that you were concerned with?
A. No, I don't.



Q. It goes on to say that "Pam indicated that on today, June 10th, she had located one of the screws on the floor near the computer stand." This is Pam McGee, I take it?
A. Yes.
Q. Did you look at, did you see this, any screw or screws that she --
A. That one screw, yes.
Q. Were you able to determine what it went to?
A. That's the one I was just speaking about that we, looked like the screw that was in the Superior Centron.
Q. Did you attempt to put it back in the chair?
A. No, I didn't.
Q. But it looked similar to it?
A. Yes.
Q. Where on the -- and this is near the computer stand?
A. Yes.
Q. Would this be the computer stand where Mary Ann King worked?
A. Yeah. That was the only computer stand in that area, that I recall.
Q. There's another sentence here, it says, "Ed informed the team that he would retrieve the screw

Page 30

from the store room and provide it to Al for him to try and determine if it was the original manufacturer's screw." Do you see that?
A. Yes.
Q. Did you try to do that?
A. Yes, that's right.
Q. Were you able to determine if it was, in fact?
A. Couldn't tell if it was the original manufacturer's. It looked similar to the screw that was in the other Superior chair.
Q. Now, these hex, not hex -- are these Phillips head screws or slot screws or something else?
A. I believe it's a hex head screw. I'm not sure.
Q. The next sentence, Mr. Brown, I'm going to ask you about specifically says, "Al informed the group that based on the information that he was able to retrieve from the chair, it was manufactured in 1996." Do you see that?
A. Yes.
Q. Did you, in fact, retrieve information from the chair that assisted you in dating its manufacture?
A. With Jim Drews, yes.
Q. You had his assistance?
A. Yes.
Q. Where was this information that you retrieved from

Page 31

the chair? Where was it located on the chair?
A. It was under the chair, under the seat pan, I believe.
Q. How were you able to determine that it was 1996?
A. Jim gave me that information as I recall, Jim Drews.
Q. Was there a code, was there sort of a code that was on this? Was it a label -- strike that.
A. I believe Jim, Jim knew the system of marking what was familiar with it and said that he was able to.
Q. To date it?
A. Yes.
Q. Did you see the label yourself?
A. I believe I did, but I don't recall specifically now where I'd say yes, I did.
Q. Can you describe the label for us.
A. I can't specifically describe that label.
Q. Were you familiar with that type of label on chairs?
A. Yes, I've looked at many chairs from adjusting chairs and measuring people for chairs and testing chairs.
Q. Are you familiar with what's known as a T code?
A. Not by that name, no.
Q. Are you familiar with any type of coding for

Page 32

determining from where chairs come and when they're made and data concerning chairs?
A. Jim explained the coding to me briefly as he was going through it, but it's not something that I held onto.
Q. Can you recall what he told you about the coding?
A. He told me that he could take, get the date of manufacture out of it.
Q. And he related back to you that this was a 1996 manufactured chair?
A. Yes.
Q. Were you able to determine when the chair was shipped to the Attleboro Sensors division of Textron?
A. No. Texas Instruments.
Q. Texas Instruments. I'm sorry.
A. No.
Q. Were you yourself personally able to determine from where this chair was shipped?
A. No.
Q. So you don't know where it came from?
A. No, I do not.
Q. You just know it was a Superior Centron chair?
A. Yes.
Q. Based on what you learned from Mr. Drews, you

Page 33

understand it was manufactured in 1996?
A. Correct.
Q. There's some language in the next paragraph about John. Do you see, "John asked the team had Mary Ann ever..."?
A. Yes.
Q. Were you present during any of these discussions where other --
A. Discussing John?
Q. Yeah. Where it says, "John asked" and "Ed indicated."
A. Yes, that was during the meeting.
Q. So you were present to hear these things?
A. Yes.
Q. Is there anything about the -- Well, strike that. I'm maybe getting ahead of ourselves here.
Was it your understanding, Mr. Brown, that when Mary Ann first began using the chair, it had already been used somewhere else at Texas Instruments?
A. As part of this process, yes, that's what I understood.
Q. Okay. So she had gotten it, but it came from -- it wasn't a brand new chair?
A. No.

A. Yes.
Q. Okay. And the opening sentence under that section says, "One of our employees recently suffered a significant injury when the back support of a chair failed."
A. Correct.
Q. Did you write this?
A. Yes, I did.
Q. So this is your product right here?
A. Yes, it is.
Q. And the employee you're referring to here, was that Mrs. King?
A. Yes, it is.
Q. Four lines down, or three lines down at the very end, it says, "It is the responsibility of all chair users to review the following guidelines and report any unsafe equipment as noted below."
A. Yes.
Q. Was this a new requirement or is that something that had been in place before?
A. This is, this was a new requirement.
Q. So that it was the -- from this point onwards, it was the responsibility of the chair users to inspect their chairs basically?
A. Correct.



Q. And then if they noticed a problem, there was a reporting requirement?
A. Yes.
Q. And as it goes down here, it says "Notification guidelines." They were to notify you and Tracy Forde?
A. Correct.
Q. Who's Tracy Forde?
A. Tracy Forde was a contract person that worked for me.
Q. For?
A. For me in the safety department.
Q. Okay. She was an employee of Texas Instruments?
A. No, she was a contract employee through a contract agency.
Q. So she was an independent contractor?
A. She worked for a staffing agency.
Q. What were her duties?
A. She did training in ergonomic support for me.
Q. So she was your assistant principally?
A. I wouldn't say that. She was specifically a technical contract person I used.
Q. And then under "Safety Inspection" subheading, it says, "Chair manufacturers recommend inspecting all mechanical parts of a chair at 3 to 6 month intervals for evidence of damaged, loose or missing parts."
A. Yes.
Q. You learned this in the course of your investigation?
A. In the course of the investigation reading other chair, I would check on Miller or Superior and look through their information and see to generalize different manufacturer's requirements.
Q. Was this on the instruction booklets that were with the chairs with the tags?
A. I believe I took it from there and web page information as well.
Q. That would be whether it was Superior or Miller chairs?
A. Correct.
Q. So that was pretty much the standard?
A. We also had steel cage chairs as well, so there was a variety of different chairs. I looked at a lot of information.
Q. But they generally all said three to six months, check your chair?
A. Yes.
Q. And you gave instructions on how to check your chair?





A. Correct.
Q. On the next page at the top, Mr. Brown, there's an item one, back support screws. Do you see that?
A. Yes.
Q. And it says that, in part, that the chair will have either two or three screws depending on date of manufacture?
A. Yes.
Q. And you learned that from Mr. Drews?
A. Yes, I did.
Q. And you instructed folks if your chair has only two, send an e-mail to you or to Tracy Forde?
A. Yes.
Q. And then you'd get a third one from the manufacturer?
A. I'm sorry?
Q. Then you'd get a third screw from the manufacturer for it?
A. Yes, we were given, we were provided a box of screws, the third screw.
Q. Were the chairs retrofitted?
A. Yes.
Q. Were some chairs just thrown out after this incident?
A. Some were, yes, but not just Superior chairs.

giving you our e-mail addresses, I don't have any other questions. I'll send you over to counsel.

CROSS-EXAMINATION:

Q. (By Ms. Lamontagne) Hi, Mr. Brown.
A. Hello.
Q. My name is Donna Lamontagne. We met briefly before the deposition started. I just have very few questions for you.
A. Okay.
Q. The screws for Mary Ann King's chair were never found; is that correct?
A. Correct.
Q. And the one screw that's discussed in the 8D investigations was determined that it was not a correct screw for the chair; is that correct?
A. I don't recall that. I believe it was similar to the manufacturer's screw, but --
Q. Direct your attention to Exhibit C again and the June 17th, 2003, do you see on page one in paragraph two --
A. Yes.
Q. -- the second sentence, "It was determined that the screw was not the correct screw for the chair." Does that refresh your recollection?



A. I know -- my recollection was that it was similar to the screw that was in the chair, but --
Q. Do you know where the information was obtained that said it was not the correct screw for the chair?
A. I believe it was Ed Picard.
Q. Do you know whether or not Ed Picard played any role in getting this chair for Mrs. King?
A. No, I don't.
Q. Ed never told you that he got the chair for her?
A. No. I believe she received the chair from somewhere else or found the chair. I believe he did not purchase the chair for her.
Q. No one knows where the chair came from?
A. No.
Q. Do you know where the chair is now?
A. No, I have no idea.
Q. Do you know what happened to it after you had looked at it?
A. No, I don't. I don't recall what happened to the chair.
Q. There was a reference to another chair in that area. When Mr. Murphy asked you about Superior chair in the same location, noticed that a screw was missing. That was on, I think, page two of



the same --
A. Yes.
Q. -- note. You mentioned that a screw was missing. Would that have been one screw missing or were there supposed -- were there two and then there wasn't a third?
A. My recollection is that we did not have any of the chairs with three screws on the site.
Q. Okay.
A. The newest chair that we had still had two screws, so I believe it was just the one screw missing out of that chair.
Q. Did any of the other chairs that had two screws have any problems?
MR. ESKEY: I object.
A. Not that I recall. Can I ask a question on that? Do you mean the problems with the --
Q. With the --
A. -- back of the chair coming off? No.
Q. Did TI ever inspect these chairs before Mary Ann King's accident in any kind of systematic fashion?
A. No, not that I recall.
Q. It wasn't part of your job duties before this incident?
A. No, it wasn't.



Q. Was there a policy in place to have someone go over with the employees the instruction cards when they got the chairs?
A. No, we did not.
Q. When someone came to your safety department to get a chair, would they take it with them --
A. No.
Q. -- or would you then deliver it to the area?
A. They would only choose which chair they wanted to order, that was it. We had a selection of chairs there, we'd fit them to the desk, measure them and they'd choose which model they wanted to order. That would be ordered through a purchasing system within their own business group, not through the safety department.
Q. Would there be any way of tracking how long Mary Ann King had the chair that eventually broke?
A. I would have no idea on that. There were no systems to track chairs assigned to people.
Q. You mentioned that there was a problem with the screws backing out over time. The chair that Mary Ann was on was seven years old, correct, at least based on what you were able to --
A. Based on what I was told, yes.
Q. And we don't know if there were screws missing in

to the chair.
Q. Was that the retrofit, the solution to the problem, to add a third screw?
A. Third screw with a fender washer and some thread locker.
Q. Now, let me show you, I think what you have in front of you is Exhibit D, the one with the pictures on it?
A. Yes.
Q. Now, there's a -- the diagram in the, or the picture in the lower right-hand corner, the one with the tags on it --
A. Yes.
Q. -- number one says seat back support screws, two or three, and there are two arrows. Do you see that?
A. Yes.
Q. Does this picture show where that third screw would be added?
A. No, it does not.
Q. Okay. Can you describe where the third screw is to be added?
A. In that center long slot, between the two arrows.
Q. Between the two arrows, there's a --
A. Horizontal slot, yes.



Q. -- a slot that looks like the shape of a pill sort of, correct?
A. Correct.
Q. So the screw would be inserted in that area?
A. As I recall, yes.
Q. Now, was there actually in the -- a threaded slot to receive a third screw?
A. Yes, as I recall.
Q. So there was a lock washer and a screw that was inserted at that point, correct?
A. I believe they called it a fender washer. It was just a bent washer, if I recall correctly.
Q. Okay. Was it your understanding the purpose of the fender washers was to lock the screw into position?
A. I believe the fender washer was there to span the gap of the oblong hole.
Q. And you mentioned something about some locking nut or mechanism?
A. A thread locker.
Q. What's that?
A. It's a chemical.
Q. That was applied to the screw?
A. The screw itself, yes.
Q. Now, did you ask Al -- I'm sorry, did you ask Jim



Drews to obtain those screws from the manufacturer?
A. Yes.
Q. Did he, in fact, do that?
A. Yes, he did.
Q. Did he deliver those screws to you?
A. Yes.
Q. Together with those other parts, the washer and the lock --
A. Right. Yes, it was in a package.
Q. Were there any instructions that came with that?
A. I don't recall any instructions with it.
Q. What did you do with that material that you received from Mr. Drews?
A. I had those screws in my office, and we, Jim Drews would come in and repair chairs, and I would give him some, if he was repairing them on site. Others, I believe, I'm not sure if we actually within TI, if any of our employees put any of those screws in. I don't believe so, but I can't say with any certainty that we didn't have the carpenter shop do some of the additions.
Q. All right. Now, were the repairs to the chairs done on site at TI?
A. Some Jim would do on site and some he would take



home with him.
Q. When he took them home, how did that work?
A. He would put them in his vehicle and take them home with him, trunk of his car and take them.
Q. Now, the addition of the third screw, how many chairs was a third screw added to, Superior chairs?
A. I don't recall. I've been trying to think about that when I was coming here, but I can't recall.
Q. Do you recall how many screws were sent to you by the manufacturer through Mr. Drews?
A. I believe I had asked for 500 screws. I'm not sure. I think I asked for 500 screws.
Q. Why did you ask for that number of screws?
A. We had quite a few chairs on site. I wasn't sure how many we had. As I said, we had about 4,000 employees there at one time, so I was trying to look at all the different -- and not each person had only -- it wasn't one chair per person. The manufacturing lines had multiple chairs, and so I wasn't sure how many I would need.
Q. Do you recall how many of those 500 screws were used?
A. I don't.
Q. In terms of percentages?

something we need to do site wide, what are the resources we need to do that across the site, so we start to plan those and then implement the corrective actions, the kick-off point when we're going to do inspections. Starting on next Tuesday, for example, we'll start doing inspections throughout each one of the buildings.
Q. Okay. Now, when you're at the point of verifying that the corrective action will take care of the problem, how do you do that, how do you verify that?
A. We're testing against the root cause and the step that we, we look and say, if this corrective action, we implement this, is it possible that the chair back or the screws will come out of the chair or the screws will be missing from a chair through normal use? We can never account for if someone removes the screws, but through normal use, we look at this and say that if we install the third screw, it has the thread locker retaining on it and we do an inspection program, we don't feel that we'll have this type of failure again.
Q. Okay. Did you actually perform any testing in connection with that verification process?



A. No, we used the -- the recommendation was from the manufacturer.
Q. So you didn't put in three screws and verify that they couldn't be backed out; is that correct?
MS. LAMONTAGNE: Objection.
A. We installed the screws and then we'd catch it on the inspections.
Q. As you performed the inspections, the follow-up inspections, after installing the third screw, do you recall performing inspections like that?
A. I didn't specifically.
Q. Do you know who did?
A. Would have been a variety of people throughout the, throughout the areas.
Q. Was there an instruction if somebody observed a loose screw after the third screw was installed to notify the persons in safety?
A. At that point, we were letting the areas maintain their own.
Q. As long as you were there, did you receive any information after the third screws were installed that there was a problem with screws backing out?
A. No, I did not.
Q. Did you ever speak to anyone at the manufacturer of the chair itself?



A. I believe I did.
Q. Do you recall the name of the person?
A. No, I don't. No, I don't.
Q. This was after the incident?
A. Yes.
Q. Do you recall what the gist of the conversation was?
A. I was trying to find out if they had experienced this type of failure before.
Q. What, if anything, did you learn about that?
A. The best I recall, I didn't get a lot of information out as far as if they had experienced it before, but I believe that, I believe that's when I learned about the third screw.
Q. Was that before you had spoken to Mr. Schwab or after?
A. That was before.
Q. So when you spoke to Mr. Schwab, you already had some understanding of a third screw solution?
A. Yes. I believe the conversation was I told Mr. Schwab about the third screw, so the sharing the information across the company was the idea of, not just having someone injured in Attleboro without trying to make sure we'd mitigate that across the company. And when I informed him of



it, as I recall, he said yes, we're aware of that.
Q. And he had indicated that he had been aware of that since March?
A. Yes.
Q. Now, did he indicate whether they had, as you did, obtain screws from the manufacturer and put a third screw in?
A. I don't recall what they did on that.
Q. Did he indicate that they were inspecting chairs at the Dallas facility?
MS. LAMONTAGNE: Objection.
A. As I remember, yes.
Q. But you don't remember what his solution was, whether to tighten two screws or to make sure two screws were tightened or to do a third screw or any other possibility?
A. I believe they had the third screw installed. I don't believe they received them in. I'm not sure if they received them in, in Dallas themselves or if they just had the manufacturer come in and do all the chairs.
Q. Did you discuss with Jim Drews how to perform the inspections on the chairs?
A. I believe I asked Jim first and then we looked at the card, that card that came along with the

that chair or not?
A. We do not know that.
Q. After this incident, did you ever see Mary Ann King back on the facility?
A. Yes.
Q. Was she back to work at any point?
A. I believe so, yes.
Q. When you left in 2004, was she still working there?
A. I don't recall. Many layoffs and downsizing through the employees.
Q. Other than speaking to Barbara Lewis in the Medical Department, did you speak to anyone else in the TI Medical Department about Mary Ann King?
A. Well, yes. We would have had, our process was that we had case review meetings for all open workers' comp. cases on a regular basis, and that could be with anyone within the Medical Department. So it would have been, I believe, two other nurses there that we would have sat down and discussed -- the safety department would have met with them and discussed open cases.
Q. So you had a periodic procedure to meet on all open comp. cases?
A. Yes.



Q. Do you know how many times you met on Mary Ann King's case?
A. We would have met, I believe, weekly at that time frame, so the time it was an active case.
Q. And were there any meeting minutes kept of those meetings?
A. Some, yes.
Q. Would they be in Mary Ann King's medical file, if you know?
A. I don't know that.
Q. Would there be any documentation kept in the safety department of your attention at those meetings?
A. There would have been minutes issued by the safety department and they would have been on a server in the safety department.
Q. Do you remember the names of the two nurses you would have met with?
A. No, I don't.
Q. Would that be recorded in the safety --
A. Yes.
Q. -- department notes?
A. Yes.
Q. From time to time, if someone working at TI had a problem with any of their equipment, would they



have to bring it to you or call you for repairs?
A. Office equipment?
Q. Yes.
A. There were, after this, Jim was doing some repairs for us, Jim Drews was doing some repairs for it and taking care of these issues, adding third screws, those types of things. For equipment that we did not have a support person for, such as Jim, we had a carpenter shop on site and they would do some minor repairs with replacement parts from the manufacturer.
Q. Before the incident with this chair for Mary Ann King, were you aware of any other problems she had with any other chairs?
A. No, I was not.

CROSS-EXAMINATION:

Q. (By Mr. Eskey) Mr. Brown, my name is Tim Eskey. I introduced myself earlier, so --
A. Yes.
Q. -- I'll introduce myself again. Thank you for coming. I just have a few questions first about your communications with Dallas with respect to the problems that they were having with chairs. And do you recall that you testified you spoke



with a Mr. Schwab?
A. Yes.
Q. Okay. And what problems was the Dallas facility having with chairs?
A. As I recall from my conversation, they had a chair back fall off as well and had some problems with loose screws. Screws backing out was the term we used.
Q. That was the same chair, Superior chair?
A. Yes.
Q. Do you know if they had conducted an 8D investigation in Dallas?
A. No, they didn't use that tool for investigations.
Q. Do you know why?
A. Well, they would have done it different. It wouldn't be an 8D investigation. They would have done a root cause analysis on it.
Q. Did you speak with Mr. Schwab about their root cause analysis?
A. I did, and Mr. Schwab just informed me that they were in contact with the manufacturer. The manufacturer, according to him, had a retrofit for the chairs, so I gather from -- I gathered, I guess I assumed from that that if there was a problem with it, that they would add a third screw

to the chair.
Q. Was that the retrofit, the solution to the problem, to add a third screw?
A. Third screw with a fender washer and some thread locker.
Q. Now, let me show you, I think what you have in front of you is Exhibit D, the one with the pictures on it?
A. Yes.
Q. Now, there's a -- the diagram in the, or the picture in the lower right-hand corner, the one with the tags on it --
A. Yes.
Q. -- number one says seat back support screws, two or three, and there are two arrows. Do you see that?
A. Yes.
Q. Does this picture show where that third screw would be added?
A. No, it does not.
Q. Okay. Can you describe where the third screw is to be added?
A. In that center long slot, between the two arrows.
Q. Between the two arrows, there's a --
A. Horizontal slot, yes.



Q. -- a slot that looks like the shape of a pill sort of, correct?
A. Correct.
Q. So the screw would be inserted in that area?
A. As I recall, yes.
Q. Now, was there actually in the -- a threaded slot to receive a third screw?
A. Yes, as I recall.
Q. So there was a lock washer and a screw that was inserted at that point, correct?
A. I believe they called it a fender washer. It was just a bent washer, if I recall correctly.
Q. Okay. Was it your understanding the purpose of the fender washers was to lock the screw into position?
A. I believe the fender washer was there to span the gap of the oblong hole.
Q. And you mentioned something about some locking nut or mechanism?
A. A thread locker.
Q. What's that?
A. It's a chemical.
Q. That was applied to the screw?
A. The screw itself, yes.
Q. Now, did you ask Al -- I'm sorry, did you ask Jim



Drews to obtain those screws from the manufacturer?
A. Yes.
Q. Did he, in fact, do that?
A. Yes, he did.
Q. Did he deliver those screws to you?
A. Yes.
Q. Together with those other parts, the washer and the lock --
A. Right. Yes, it was in a package.
Q. Were there any instructions that came with that?
A. I don't recall any instructions with it.
Q. What did you do with that material that you received from Mr. Drews?
A. I had those screws in my office, and we, Jim Drews would come in and repair chairs, and I would give him some, if he was repairing them on site. Others, I believe, I'm not sure if we actually within TI, if any of our employees put any of those screws in. I don't believe so, but I can't say with any certainty that we didn't have the carpenter shop do some of the additions.
Q. All right. Now, were the repairs to the chairs done on site at TI?
A. Some Jim would do on site and some he would take



home with him.
Q. When he took them home, how did that work?
A. He would put them in his vehicle and take them home with him, trunk of his car and take them.
Q. Now, the addition of the third screw, how many chairs was a third screw added to, Superior chairs?
A. I don't recall. I've been trying to think about that when I was coming here, but I can't recall.
Q. Do you recall how many screws were sent to you by the manufacturer through Mr. Drews?
A. I believe I had asked for 500 screws. I'm not sure. I think I asked for 500 screws.
Q. Why did you ask for that number of screws?
A. We had quite a few chairs on site. I wasn't sure how many we had. As I said, we had about 4,000 employees there at one time, so I was trying to look at all the different -- and not each person had only -- it wasn't one chair per person. The manufacturing lines had multiple chairs, and so I wasn't sure how many I would need.
Q. Do you recall how many of those 500 screws were used?
A. I don't.
Q. In terms of percentages?

Q. The action items are listed. Is that part of an 8D investigation, that there will be certain action items?
A. Yes.
Q. It says, "Al will take pictures of the area/chair"?
A. Yes.
Q. Did you do that?
A. Yes, I did.
Q. Then it goes on to say, "Al will have a newsletter article put out explaining the chair procedures/usage"?
A. Correct.
Q. Did you do that?
A. Yes, I did.
Q. Was that put out through the internet system at Texas Instruments?
A. It was sent out as an e-mail, and it was posted in areas for those people that didn't have e-mail.
Q. And then it goes on to say that "Al will speak with Jim Drews, the supplier regarding the life expectancy of the chair."
A. Yes.
Q. Did you do that?
A. Yes, I did.



Q. Did you get information concerning the life expectancy of the chair?
A. I remember Jim talking about certain chairs were, depending on the make and the model of the chair, there were certain warrantied parts.
Q. Do you know today what the life expectancy of that model chair was?
A. No, I don't.
Q. Then it goes on to say that Ed will do some things and Natalia will do some things?
A. Yes.
Q. When did you take the pictures of the -- did you take pictures of the area itself?
A. Yes, I did.
Q. And of the chair itself?
A. Yes.
Q. Do you know where those pictures are?
A. I would have left them at Texas Instruments on the server.
Q. So they would have been digitalized?
A. Yes.
Q. How about the newsletter, would that have been digitalized also and put on the server?
A. That was a, that was a document that I created on my C drive, my hard drive at Texas Instruments, so



it would have been there on my hard drive for my PC.
Q. At work?
A. Yes.
Q. Then it was e-mailed out to people?
A. Yes, it was.
Q. Now, from what you've seen of the first meeting, the June 10th meeting, does this report fairly and accurately summarize what was discussed and determined at that meeting?
A. As I remember it, yes.
Q. Is there anything in here that you say, wait a minute, that's not right, I disagree with that?
A. No.
Q. Now, at some point, you said you did do a newsletter?
A. Yes.
MR. MURPHY: Now, this was marked as Exhibit C. I think it was Mendes' deposition. We'll mark it as Exhibit D here.
(Defendant's Exhibit D, Chair inspection guide, marked for identification.)
Q. Mr. Brown, I'll hand you Exhibit D. I'm going to ask you first to take a look at it. I think it's three pages. Do you recognize the document?



A. Yes, I do.
Q. What is it?
A. It's a guide on how to inspect a chair safely.
Q. Was this the newsletter item or was it part of the newsletter item?
A. We didn't have a specific newsletter. This was a, this was a one-time thing that was sent out to make everyone aware of a condition that we had and how we were going to address it and how we were going to stop that from happening again.
Q. This was the thing that you e-mailed out to people that you mentioned in your report?
A. Yes.
Q. Is this complete or is there anything, to your knowledge?
A. There was another section to this that talked about the inspection procedures for chairs outside of the Miller and Superior chairs.
Q. Okay. There are some photographs on Exhibit C on the first page. There's four. Do you know who took those photographs?
A. I took those photographs.
Q. All four of them?
A. Yes, I did.
Q. And the first two are of two different chairs?

A. Yes.
Q. Do they fairly and accurately depict a Superior chair and a Miller chair as depicted here? Are they fair and accurate representations?
A. To the best of my knowledge, yes.
Q. With respect to the chair that's at the bottom left of the first page of Exhibit C, is that a Superior chair?
A. Yes.
Q. Is that Mrs. King's chair or is it another?
A. No, this is a new chair.
Q. A new Superior?
A. Yes.
Q. Is it a Centron?
A. Yes, I believe so.
Q. Now, the picture in the lower right has a number of boxes numbered one through four with information in them; is that correct?
A. Correct.
Q. Number one says, "Seat Back Support Screws (2 or 3)." Do you see that?
A. Yes.
Q. And there's little arrows that point to some holes and screws, it looks like?
A. Yes.



Q. What are those, are those -- what do those screws do as far as you know?
A. As far as I know, they fasten the J bar bracket which holds the back of the chair to the base of the chair.
Q. Do you know why it says two or three?
A. Yes. I was told that the newer chairs were coming in with three screws. Yeah. I wanted to try and make people aware there could be two or there could be three, and the picture here shows only two.
Q. Who told you that?
A. Jim Drews, I believe.
Q. On the right side of that photograph, item number two, seat control mechanism screws, do you see that?
A. Yes.
Q. And just to the left of that and below it to the left of it, there seems to be a white area with printing or something on it. Do you see that?
A. Yes.
Q. Do you know what that is?
A. I believe it's the manufacturer's tag.
Q. The label?
A. Yes.



Q. Is this where the data that Mr. Drews interpreted for you would be located?
A. I believe so.
Q. Were there any tags or cards, booklets that came with the chair, that were with the chairs, the Superior chairs?
A. There was information, and I don't recall if it was specifically with Superior. I remember with chairs, new chairs, there was information and an inspection that would be affixed to the bottom with a wire tie or some sort of tie.
Q. Would that contain instructions on the use of the chair?
A. Yes.
Q. And maintenance of the chair?
A. And inspection, correct.
Q. The next page of Exhibit D has three photographs of a gentleman wrestling with a chair. Is that you?
A. Yes, it is.
Q. Do you know who took the picture?
A. Yes, I do. I believe it was Kelly Morse.
Q. Is that Mrs. King's chair or is that a different?
A. This is a different chair.
Q. Then on the back page, there's a -- it says,



"Points of Inspection - Miller Brand Chair." Do you see that?
A. Yes.
Q. Did you take that photo?
A. Yes, I did.
Q. Now, going back to the front page of Exhibit D, item number one says, "Most chairs will have a label under the seat pan stating the manufacturer, model number and date of manufacture." Is that correct?
A. Yes.
Q. Where did you get that information that would be the case?
A. As I recall, I got this from the website on inspecting a chair, I believe. I believe I got it from the Superior chair.
Q. Did that appear to be the case when you looked at chairs?
A. Yes. Well, there was coding there. I was told from Jim that it would contain that information.
Q. But it was coded, is that correct, as far as you know?
A. As I recall, yes.
Q. On the next page there's a segment on Chair Inspection/Adjustment Guidelines?

A. Yes.
Q. Okay. And the opening sentence under that section says, "One of our employees recently suffered a significant injury when the back support of a chair failed."
A. Correct.
Q. Did you write this?
A. Yes, I did.
Q. So this is your product right here?
A. Yes, it is.
Q. And the employee you're referring to here, was that Mrs. King?
A. Yes, it is.
Q. Four lines down, or three lines down at the very end, it says, "It is the responsibility of all chair users to review the following guidelines and report any unsafe equipment as noted below."
A. Yes.
Q. Was this a new requirement or is that something that had been in place before?
A. This is, this was a new requirement.
Q. So that it was the -- from this point onwards, it was the responsibility of the chair users to inspect their chairs basically?
A. Correct.



Q. And then if they noticed a problem, there was a reporting requirement?
A. Yes.
Q. And as it goes down here, it says "Notification guidelines." They were to notify you and Tracy Forde?
A. Correct.
Q. Who's Tracy Forde?
A. Tracy Forde was a contract person that worked for me.
Q. For?
A. For me in the safety department.
Q. Okay. She was an employee of Texas Instruments?
A. No, she was a contract employee through a contract agency.
Q. So she was an independent contractor?
A. She worked for a staffing agency.
Q. What were her duties?
A. She did training in ergonomic support for me.
Q. So she was your assistant principally?
A. I wouldn't say that. She was specifically a technical contract person I used.
Q. And then under "Safety Inspection" subheading, it says, "Chair manufacturers recommend inspecting all mechanical parts of a chair at 3 to 6 month



intervals for evidence of damaged, loose or missing parts."
A. Yes.
Q. You learned this in the course of your investigation?
A. In the course of the investigation reading other chair, I would check on Miller or Superior and look through their information and see to generalize different manufacturer's requirements.
Q. Was this on the instruction booklets that were with the chairs with the tags?
A. I believe I took it from there and web page information as well.
Q. That would be whether it was Superior or Miller chairs?
A. Correct.
Q. So that was pretty much the standard?
A. We also had steel cage chairs as well, so there was a variety of different chairs. I looked at a lot of information.
Q. But they generally all said three to six months, check your chair?
A. Yes.
Q. And you gave instructions on how to check your chair?



A. Correct.
Q. On the next page at the top, Mr. Brown, there's an item one, back support screws. Do you see that?
A. Yes.
Q. And it says that, in part, that the chair will have either two or three screws depending on date of manufacture?
A. Yes.
Q. And you learned that from Mr. Drews?
A. Yes, I did.
Q. And you instructed folks if your chair has only two, send an e-mail to you or to Tracy Forde?
A. Yes.
Q. And then you'd get a third one from the manufacturer?
A. I'm sorry?
Q. Then you'd get a third screw from the manufacturer for it?
A. Yes, we were given, we were provided a box of screws, the third screw.
Q. Were the chairs retrofitted?
A. Yes.
Q. Were some chairs just thrown out after this incident?
A. Some were, yes, but not just Superior chairs.