## Chair Inspection / Adjustment Guidelines

One of our employees recently suffered a significant injury when the back support of a chair failed. As an interim containment action to prevent recurrence the ESH Department has compiled these detailed inspection guidelines for Superior and Miller chairs and general guidelines for other chair brands. It is the responsibility of all chair users to review the following guidelines and report any unsafe equipment as noted below. If a chair is does not pass the inspection criteria please isolate the chair and secure a sign stating "WARNING! UNSAFE CHAIR – DO NOT USE" on the chair. (Power Point File Attached) The standard chair warranty for TI is 10 years. Most damaged or broken chairs will not have to be replaced.

**Notification Guidelines for Manufacturing Line Chairs**

1. Contact your supervisor and alert them to the chair location and condition
2. Supervisor please email Al Brown **and** Tracy Forde with details about chair(s)
3. If you can't locate a replacement chair page Al Brown at 0599.

**Notification Guidelines for Non Manufacturing Line Chairs**

1. Send an email to Al Brown and Tracy Forde with details about the chair.
2. If you can't locate a replacement chair page Al Brown at 0599

## Safety Inspection

*Chair manufacturers recommend inspecting all mechanical parts of a chair at 3 to 6 month intervals for* evidence of damaged, loose or missing parts.

**Safety Note prior to inspection**: To properly inspect a chair you must turn it over. Chairs are heavy and can be awkward to lift. Prior to lifting a chair please take time to make sure you are in an area that will allow enough room to lay the chair down and pick it up again without compromising your lifting form or creating another hazard. If you are uncomfortable, or have a condition that prevents you from laying the chair down please ask a co-worker to perform these tasks.







### Lowering the chair

1. Position the chair such that the center point on the front edge of the seat pan is between two caster arms on the base of the chair.
2. Roll the chair towards you until the casters have turned away from you
3. Position yourself with feet shoulder-width apart facing the back of the chair with your knee against the outer edge of the seat pan
4. Hold the seat back with both hands until the chair is resting on the two caster legs and your hands
5. Bend your knees while lowering the chair with your arms until it is resting on the edge of the seat pan.

### Lifting the chair

1. Feet shoulder width apart, bent knees, maintain curves of the back and lift with whole body.
2. Reverse the process until chair is resting on all casters.

## How do I know which chair I have?

1. Most chairs will have a label under the seat pan stating the manufacturer, model number, and date of manufacture.

2. Superior Chairs have larger back support pads. The back support pad is attached to the base of the chair with a single flat piece of steel often called a J Bracket. (Bottom Left)

3. Miller chairs have a smaller back support pad which is supported by two support arms that are welded to the base assembly. (Bottom Right)



Superior



Miller

## Points of Inspection - Superior Brand Chair



1. **Back Support Screws** - Back support screws fasten the back support to the control mechanism of the chair. The chair will have either 2 or 3 screws depending on date of manufacture. Ensure that all screws are uniform and fastened securely.

    *Note: If your chair has less than 2 screws immediately remove it from service by placing a "Warning- Unsafe Chair - Do Not Use" sign on it and contact Al Brown (x1638 pager 0599 text, or email) If your chair only has two screws please send an email to Al Brown* ***and*** *Tracy Forde.. The manufacturer will provide A 3rd screw.*

2. **Chair Control Mechanism Screws** (4) these screws fasten the seat control mechanism to the seat pan base. Ensure that they are all installed, uniform and fastened securely.
3. **Seat Pan Base Screws (4)** these screws attached the seat pan to the seat pan base. Ensure that they are all installed, uniform and fastened securely (seat pan should not wobble).
4. **Seat Back Tension Adjustment Knob** - This knob tightens a spring that controls the amount of resistance and support you are afforded when adjusting the angle of the seat back. This support prevents loss of balance Seat should be adjusted so that back supports body weight in controlled decent when back is unlocked
5. **Chair Adjustment Locks** - Include arm rests, seat height, seat pan angle, and back angle. Ensure that these mechanisms **LOCK securely in selected position.**
6. **Casters** – Casters should roll freely and be securely fastened to the base.

## Points of Inspection - Miller Brand Chair




1. **Chair Control Mechanism Lag Bolts** (4) these bolts fasten the seat control mechanism to the seat pan base. Ensure that they are all installed, uniform and fastened securely.

2. **Chair Arm Support Screws (8)** these screws secure the arm brackets to the seat pan. Ensure that they are all installed, uniform and fastened securely.

3. **Seat Back Tension Adjustment Knob** - This knob tightens a spring that controls the amount of resistance and support you are afforded when adjusting the angle of the seat back. This support prevents loss of balance. Seat should be adjusted so that back supports body weight in controlled decent when back is unlocked.

4. **Chair Adjustment Locks** - Include arm rests, seat height, seat pan angle, and back angle. Ensure that these mechanisms **LOCK securely in selected position.**
5. **Casters** – Casters should roll freely and be securely fastened to the base

**Points of Inspection - All Other Chair Brands**

1. Ensure that all fasteners are in place, uniform, and tight
2. Ensure that all position adjustments work properly
3. Ensure that all position adjustment locks function and do not release
4. Ensure that all casters roll freely and are securely attached to the chair

**Documentation of Chair Inspections**

For this initial inspection each Branch Manager or designee is asked to ensure that all chairs in their respective areas are inspected. When chair inspections are complete please send a message to Al Brown documenting the area and completion date. The targeted completion date for all inspections is 7/11/03.

**Ongoing Inspections**

To document future semi-annual inspections, the Safety Department is evaluating color-coded inspection tags available through Staples. Inspections should be conducted at least every 6 months. If you notice issues with your Superior or Miller chair between scheduled inspections contact Jim Drews, the TI Account Representative for Staples at 877-617-1712. Jim will coordinate the repairs. Please also send a quick email to Al Brown in the Safety Department to document the chair issue. If you do not have a Superior or Miller chair contact Al Brown at abrown@ti.com or x1638.

**Common Area Inspections**

Conference rooms on the across system will be inspected by Facilities. Other rooms or common areas will be the responsibility of the space owner.

**New Chair Ordering Information**
**http://www-esh.mc.ti.com/safety_health/ergonomics/products.html**

**Chair Adjustment Reminders Superior Brand Chairs (Centron 301-A, 302-B, 303-C)**

Chair adjustment mechanisms

- Arm Height - Pull up on trigger under arm rest to raise or lower
- Horizontal Arm Adjustment - Turn handwheel counterclockwise to loosen, slide arm in or out to desired width. Turn handwheel clockwise to tighten.
- Back Height - While seated, lift to one of six positions. To lower, lift back to highest position, then lower.
- Seat Height - Side paddle on RIGHT. To raise, twist paddle up and lift your weight. Release at desired height. To lower, twist paddle up while seated. Release at desired height.
- Seat Back Angle - Side paddle on LEFT. While seated twist paddle up and press chair back. Press down to lock back at desired angle.
- Seat Pan Angle - With back in most upright position and LEFT paddle pulled up, pull RIGHT paddle KNOB out to lock at 0, push in to tip forward.
- Tension Adjustment - While seated, turn knob under seat counterclockwise to tighten rocking motion tension. Turn clockwise to increase rocking motion.

# OE Safety Meeting 2Q03
# 8D Incident Investigation

- Business name:
- OE / Mfg Systems
- Incident Description:
  - Employee strained neck and back while trying to prevent falling from chair.
  - 06/02/03 / 1:50 PM
  - Bldg # 12 / 2nd Floor / Storeroom
  - Days Lost: 33
  - Days Restricted Duty: 0
  - Cost: ?
  - How: Back support fell off chair when leaning back, causing employee to whip back to prevent herself from falling.
  - Why: Design flaw in chair and lack of inspection program.



# OE Safety Meeting 2Q03
# 8D Incident Investigation

- Interim Containment Action(s):
  - Chair immediately removed from service.
  - Emergency Bulletin published detailing chair inspection procedure.
  - Informed other users in storerooms.



- Root Cause(s):
  - Design Flaw: Back of chair fell off due to design issues that caused fasteners to fall out.
    - Chair has history of failure (Dallas stopped buying this chair 4 years ago but failed to communicate worldwide).

# OE Safety Meeting 2Q03
# 8D Incident Investigation

- Corrective Actions:

| What | Who | When |
|---|---|---|
| Contacted Staples supplier, manufacturer, and WW ESH | Al Brown | 6/05/03 |
| Wrote comprehensive inspection procedure & published | Al Brown | 6/12/03 |
| Inspected storeroom chairs | Ed Picard /Al Brown | 6/13/03 |
| Incident chair replaced by supplier and several chairs repaired by supplier | Jim Drew | 7/8/03 |

# OE Safety Meeting 2Q03
# 8D Incident Investigation

- Long Term Corrective Actions (Prevent Recurrence):

| What | Who | When |
|---|---|---|
| • Inspection required every 6 months, documented in ergonomic training, ESH Web page, and site wide reminder will be issued by ESH. | Brown | Complete |
| • Close the loop with WW Facilities / ESH on sharing information relative to product failures or recalls. | Brown | Complete |

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MARY ANN KING<br>and PHILLIP KING<br>Plaintiffs<br>v. | : | C.A. No.: 06-258-S |
| STAPLES INC.; IZZY DESIGN;<br>JSJ CORPORATION;<br>JOHN DOE COMPANY<br>Defendants | : | |

**AFFIDAVIT OF MARY ANN KING**

I, Mary Ann King, do hereby depose and state as follows:

1. I am a plaintiff in this action.

2. At the end of my deposition, I testified that I could identify the type of chair that broke on me if shown a picture of it.

3. I recently received and reviewed copies of the following materials produced in this case by Sensata Technologies (successor to my employer, Texas Instruments, Attleboro) in response to a subpoena from my attorneys:

   A. A copy of the Chair Inspection Guidelines article published on June 25, 2003 on the S&C Broadcast Newsline (a Texas Instruments, Attleboro, employees' intranet network);

   B. A copy of the 8D Incident Investigation Report.

4. The Chair Inspection Guidelines document contains pictures and instructions on how to identify and inspect a Superior brand chair.

5. The 8D Incident Investigation Report contains a picture of a chair.

6. Based on my review of these materials and my familiarity with and recollection of the chair that broke on me on June 3, 2003, I am confident that:

   A. The chair that broke on me is the same type of chair as the "Superior" brand chair depicted in the photographs contained in the Chair Inspection Guidelines.

   B. The chair that broke on me is the same type of chair as the chair depicted in the photograph on page 1 of the 8D Incident Investigation Report.

Sworn this 6 day of December, under the pains and penalties of perjury.

Mary Ann King

There were a variety of different chairs that were.
Q. All kinds of different chairs?
A. Yes.
Q. They were sort of worn out to the point you couldn't fix them?
A. They didn't meet the inspection criteria.
Q. Now, going back -- I think we're pretty much done with this document -- to Exhibit C, the investigation meeting minutes. The next meeting of the 8D team was June 17th; is that right?
A. Yes.
Q. And you were present at that meeting also, correct?
A. Yes, I was.
Q. Under the Topics Discussed, a couple of lines up from the bottom, it says, "Al checked with the Medical Department and according to their evaluation, there were no contact injuries." Do you see that? Right here.
A. Oh.
Q. No, right here.
A. Okay. Yes.
Q. Do you remember who you spoke with at the Medical Department?



A. I believe it was Barbara Lewis.
Q. What was her -- was she a nurse?
A. She was a nurse.
Q. What did she tell you?
MR. ESKEY: I object.
A. I don't specifically recall.
Q. All right. Why did you check with the Medical Department?
A. Part of the process was just gathering as much information as we could, and we wanted to know the types of injuries, was the injury purely from the failure of the chair and a whipping motion, or was she close to the desk and hit her head on the desk? I believe she could recall at, Mary Ann could recall at the time, but we were just trying to get as much information as we can.
Q. Were you trying to get the ergonomics of the situation?
A. More or less just trying to get the -- within the 8D procedure when you're trained on 8D, it tells you to just go into as much detail as you can in the description of the incident, so you're really as thorough as you can be in describing the incident, the actual steps of the incident and the timeline so you don't miss anything that they



could go back to and question.
Q. And it says in the report, "There were no contact injuries." What I'd like you to tell us, Mr. Brown, is what did you mean by contact? What is a contact injury within the meaning of this?
A. Well, again, according to their evaluation, there was nothing that Mary Ann had struck against.
Q. With her head?
A. As I recall.
Q. With her head or any part of her body?
A. I believe it was with her head.
Q. Later on there are some discussions about what Ed explained or Pam informed the group about. Then it says here, "Al informed the group that according to the supplier, the most complaints received are regarding the locking mechanism." Do you see that?
A. Yes.
Q. When you refer to supplier, who would that be?
A. Jim Drews.
Q. So he explained to you this is where most of the complaints come from?
A. Correct.
Q. And this was a locking mechanism problem as far as you were concerned with this chair of Mary Ann



King's?
MR. ESKEY: I object.
A. No.
Q. What was the problem with her chair as you determined it to be?
A. I believe the problem, as I determined it from everything I gathered in this investigation, that the, there was a problem with Superior chairs with the two screws backing out over time, and that they added a third screw, a retention screw with a fender washer on it and some thread lock around it to secure that.
Q. Do you know when they added that third screw?
A. I don't recall.
Q. You weren't able to determine when that happened?
A. I believe they did provide us with a date or someone did provide us with a date, but I don't recall the date.
Q. Okay. Then the next paragraph, the last full paragraph on this page, it says that "Al explained to the team that on Monday, June 16th, he met with Jim Drews, the supplier that we purchased the chair from." Do you know that the chair, this particular chair was purchased through Drews or through -- or could it have been purchased from

A. I don't recall.
Q. But, at any rate, that was the solution that you determined after investigating the Mary Ann King chair incident?
A. That was the solution that I learned about from the presentation in Dallas. They told me, Paul Schwab told me that they received that information from Superior and that also Jim Drews had informed us of some.
Q. Okay. Now, after that point, were there any more incidents of chair backs on Superior chairs having problems?
A. I recall an incident in Building 1, and I can't remember if it was the back of the chair. I just, I remember something in Building 1 had happened, but I'm not sure if the chair had broken apart or if the screw came out of it. I'm just not clear enough on it, but I believe there was an incident in Building 1 where a screw came out of a chair, the same chair.
Q. A Superior chair?
A. Yes.
Q. Was there any documentation about the inspections?
A. We left it up to the individual to do the inspection. Certain areas, production floors --



and not just specific to Superior. We did every chair on the site. Certain production areas, rather than having each operator do their own chair inspection, would have individuals out of maintenance or support technicians go through an area and do every chair and mark them, label them.
Q. Okay. Now, if someone identified as a result of the inspection a loose screw in a Superior chair, what would they do?
A. They were told to mark the chair where they did not use it and notify us.
Q. Then who would come and inspect the chair?
A. I would call Jim Drews.
Q. Did Mr. Drews then, to the extent that it was possible, make repairs on chairs?
A. Yes.
Q. Do you recall how many chairs fell into that category?
A. I don't recall. I do recall that we had more failures with the locking mechanism or issues with the locking mechanisms not holding in place than we did with the chairs, the back falling off a chair.
Q. Now, when the chair broke on Mary Ann King and you first saw the chair, did you inspect the chair at



that time?
A. Yes.
Q. Now, you said that the back was not fixed to the chair, correct?
A. I believe it was still off. As I recall it, it was still off when we got there.
Q. Now, did you try and match up the back, the J bar, to the bottom of the chair?
A. I don't think we did until Jim was there, so no, I don't recall doing that.
Q. Now, when you looked at the chair, when you first inspected it, for that model chair there were two screws that affixed the J bar to the bottom of the chair, correct?
A. Correct.
Q. Did you see either of those two screws?
A. No.
Q. So both screws were missing; you just didn't find them anywhere, correct?
A. Right.
Q. So you weren't able to determine whether at the time of the incident there was one screw or two screws holding the J bar to the seat of the chair?
A. No, we couldn't say that. We could not say that there were one or two.



Q. Did you conclude as a result of your examination of the chair that the screws had come out of the place where they were to affix the J bar to the bottom of the chair?
A. I believe we concluded that the chair was supporting Mary Ann daily for some period of time, and then on that day the back fell off of it, and we couldn't find any screws so we looked at it and said there most likely would have been something retaining this in at some point.
Q. There had to have been screws at some point, because otherwise the J bar wouldn't stay on the chair, correct?
A. Correct.
Q. When you came and inspected the chair, you saw that the J bar was off and you couldn't find the screws, correct?
A. Correct.
Q. On the basis of that information, did you conclude that the screws had come out of the chair?
A. Yes.
Q. Now, Mr. Murphy asked you about the minutes, and I just wanted to ask you a couple of more questions about that, of the 8D incident investigation. And on the minutes for June 17th, 2003, on page two,

Page 90

you told us about the why's, the five why's and the what question, and explained to us that those were possibilities of what may have happened in determining the root cause; is that correct?
A. This was probably best stated as these are the notes of the recorder for that meeting, so it certainly isn't all of the discussion that went on but what that person thought were the high points of it made it into the meeting minutes.
Q. All right. Is it fair to say that this was a brainstorming session and people were throwing out possibilities, and these were the ones that were recorded?
A. Yes.
Q. Now, if you turn to page three, do you see there's more bullet points on page three?
A. Yes.
Q. Okay. Now, can you tell us how, if at all, these relate to what we saw and discussed on page two.
A. These, I believe, are the assessing questions for the -- these are, I believe, the assessing questions so we can go onto the next step in the process, in the 8D process.
Q. These were the assessing questions before you can go onto the next step in the 8D process, so what

Page 91

step were these assessing questions drawn from?
A. This would be assessing questions for D4.
Q. And that's verifying the root cause?
A. Correct.
Q. Now, as you look on page three of the minutes from June 17th, 2003, can you tell us then in answering these assessing questions what information is listed here.
A. I'm sorry. I don't follow you on that.
Q. Well, for example, when you look at the third bullet point, it says, "Why did root cause happen?" Do you see that?
A. Yes.
Q. There are three things listed, A, B and C?
A. Yes.
Q. A, screws failed; B, screws were removed; and C, screws backed out. Do you see that?
A. Yes.
Q. Now, are those three possibilities?
A. Yes.
Q. Now, what's the assessing question that goes with that?
A. It would be the "Why did the root cause happen?", the same thing.
Q. So if we go back to the guidelines, verify the

Page 92

root cause.
A. D4, assessing question number two.
Q. Okay. Now, so at least according to these minutes, the root cause happened because of the screws, either one of the three possibilities, the failure of the screws, the removal of the screws or the screws backing out?
A. Yes.
Q. Now, when it says, "How was the root cause verified?" there's only one thing listed there, and that's inspection after incident, correct?
A. Correct.
Q. Is that in this case how the root cause was verified?
A. Yes, it is.
Q. Was there any other method of verification for the root cause?
A. No, there was nothing else that we could look at. The process, again, the 8D process is used for a variety of different incident investigations from fires to accidents, quality defects in a product. So there's some things that with this case you had, how could you verify that the root cause happened? Some root causes and processes are very hard to put your finger on. In this case, the

Page 93

back of the chair was physically removed from the bottom of the chair.
Q. Okay. Now, going back to the second bullet point on page three, it says, "Root Cause," and there's only one thing listed there. Do you see that?
A. Yes.
Q. It's the failure of the securing system for the back chair panel, correct?
A. Yes.
Q. And could you explain what you understood that to mean.
A. It means that the root cause, the root cause of the incident, being that Mary Ann falling, the root cause of that is that the back of her chair separated from the bottom of the chair.
Q. Okay.
A. It failed in some way.
Q. Okay. And the securing system, what did you understand the securing system to be?
A. The screws.
Q. Those two screws?
A. Yes.
Q. Now, at the time of this meeting on June 17th of 2003, had you already spoken to Mr. Schwab?
A. I don't believe so at that point.

Q. So you didn't know at that time they were having this problem with screws --
A. No, I didn't know.
Q. -- in Dallas?
A. No.
Q. So at this time then, it was independently determined by the team that the root cause was the failure of the securing system for the back chair panel?
A. Yes.
Q. Now, I believe that Mr. Murphy asked you whether you were able to determine with reasonable certainty what happened on the day of the incident. Do you recall that?
A. The sequence of events.
Q. I think he just asked you -- I mean, the record will obviously speak for itself, but I think he just asked you about whether you were able to determine with reasonable certainty what happened on the day of the incident, and my question is this: Were you able to, based on your investigation and based on your examination of the chair, and based on your conversations with other people able to satisfy yourself in your own mind as to what the root cause of that incident was?



A. I'd say we identified the most likely cause of this case, but I don't think that we could absolutely say it was the root cause.
Q. Okay. What was the most likely cause?
MR. MURPHY: Objection.
A. The team identified it as that the securing system of that chair failed allowing the seat back and J bracket to break away from the base of the chair.
Q. The securing system meaning those two screws, correct?
A. If there were two screws. It gets into that we don't know what was there. If there was one screw, two screws, we don't know that.
Q. Now, in, I think it was the minutes for the first meeting on the second page, it says in that first full paragraph, "In looking at the chair, it was found that the seat of the chair would move freely and would not stay in a locked position." I'm looking for another portion in which it said that the seat pan was loose. Do you remember that?
MR. MURPHY: Objection.
Q. Let me just try and find it for you. Oh, I'm sorry. Okay. It's for the June 17th meeting minutes, the paragraph at the bottom of the page, and there's a sentence that begins in that last



paragraph, "After review, Jim was able to determine that the seat panel was broken and that the spring for the back panel was totally out of adjustment and as loose as possible." Were you with Jim at that time where he was looking at the chair?
A. Yes.
Q. And was there a discussion between you and Jim about the back panel being out of adjustment and loose?
A. I believe we did talk about that, yes.
Q. Well, do you remember how it was determined that the back panel was out of adjustment and the spring for that was loose?
A. I don't believe it was the back panel. I believe -- I'm not sure that that was accurate in the minutes. I think it was the seat pan.
Q. Okay. Because the back panel --
A. There was a tensioner knob, right, there was a tensioner knob on the bottom of that seat pan, so I believe it was that, that it was loose.
Q. So as far as the back panel was concerned, was there anything that you observed about the back panel that was out of adjustment?
A. No. It didn't have many adjustments to it, the



back panel.
Q. Okay. But did you observe anything about the back panel that was out of adjustment or misaligned?
A. No. It was separated from the chair.
Q. Okay. Now, the spring being as loose as possible, do you know how that was determined?
MR. MURPHY: Objection.
A. It was Jim, as I remember, Jim looked at it. I don't believe we could back it out any more as far as the tensioner knob, so I think it was as loose as possible in the setting of the knob.
Q. Do you have any knowledge as to whether that was the setting before the chair broke?
A. No, I don't.
Q. Now, before you became aware that there was a problem with screws on the Superior chair, had you received any warnings from the manufacturer?
A. No.
Q. Were you aware of any recalls?
A. No.
Q. Was there any notice whatsoever from the manufacturer concerning --
A. Not that I was aware of.
Q. -- screws in the chair?
MS. LAMONTAGNE: Objection.

# OE Safety Meeting 2Q03
# 8D Incident Investigation

- Business name:
- OE / Mfg Systems
- Incident Description:
  - Employee strained neck and back while trying to prevent falling from chair.
  - 06/02/03 / 1:50 PM
  - Bldg # 12 / 2nd Floor / Storeroom
  - Days Lost: 33
  - Days Restricted Duty: 0
  - Cost: ?
  - How: Back support fell off chair when leaning back, causing employee to whip back to prevent herself from falling.
  - Why: Design flaw in chair and lack of inspection program.



# OE Safety Meeting 2Q03
# 8D Incident Investigation

- Interim Containment Action(s):
  - Chair immediately removed from service.
  - Emergency Bulletin published detailing chair inspection procedure.
  - Informed other users in storerooms.



- Root Cause(s):
  - Design Flaw: Back of chair fell off due to design issues that caused fasteners to fall out.
    - Chair has history of failure (Dallas stopped buying this chair 4 years ago but failed to communicate worldwide).



P136

# OE Safety Meeting 2Q03
# 8D Incident Investigation

- Corrective Actions:

| What | Who | When |
|---|---|---|
| Contacted Staples supplier, manufacturer, and WW ESH | Al Brown | 6/05/03 |
| Wrote comprehensive inspection procedure & published | Al Brown | 6/12/03 |
| Inspected storeroom chairs | Ed Picard /Al Brown | 6/13/03 |
| Incident chair replaced by supplier and several chairs repaired by supplier | Jim Drew | 7/8/03 |

# OE Safety Meeting 2Q03
# 8D Incident Investigation

- Long Term Corrective Actions (Prevent Recurrence):

| What | Who | When |
|---|---|---|
| Inspection required every 6 months, documented in ergonomic training, ESH Web page, and site wide reminder will be issued by ESH. | Brown | Complete |
| Close the loop with WW Facilities / ESH on sharing information relative to product failures or recalls. | Brown | Complete |

VOLUME I
PAGES 1-94
EXHIBITS: Per Index

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING
and PHILIP KING,
Plaintiffs,

v. C.A. No.: 06-258-S

STAPLES, INC., IZZY DESIGN,
JSJ CORPORATION, JOHN DOE
COMPANY,
Defendants.

* * * * * * *

DEPOSITION OF JIM DREWS, a witness called on behalf of Izzy Design and JSJ Corporation, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the Commonwealth of Massachusetts, at the offices of Zizik, Powers, O'Connell, Spaulding & Lamontagne, 40 Westminster Street, Providence, Rhode Island, on Wednesday, March 7, 2007, commencing at 10:01 a.m.