uh-uh or nod your head, but the court reporter can't take that down.
And perhaps the most difficult is we need to remember not to talk over each other. You'll know where I'm going with questions at times and I'll know where you're going with answers. But, again, she'll get really upset and can't take it down if we talk over each other.
Where do you currently live?
A. Sharon, Massachusetts.
Q. What's the street address?
A. 1885 Bay Road.
Q. Any plans to move in the near future?
A. No.
Q. All right. Can you take me through your educational background?
A. I graduated from high school.
Q. Okay. What year was that?
A. 1972.
Q. Okay. Where are you currently employed?
A. I'm employed at -- the location or the company?
Q. The company.



A. The company is Staples Business Advantage.
Q. Okay. And where is Staples located?
A. My office is in Sharon, Massachusetts.
Q. How long have you been with Staples?
A. Since 1994.
Q. I'm going to come back to that in a second, but where were you employed before?
A. For a company called MacIsaac Office Products.
Q. How do you spell that?
A. M-a-c-I-s-a-a-c.
Q. Where is that company located? Or where were they located?
A. They were located in Canton, Massachusetts.
Q. How long were you there?
A. Nineteen years. 1975.
Q. '75, thereabouts?
A. Yes.
Q. And you say it was in the office furniture business?
A. Office supplies.
Q. What kind of products did MacIsaac sell?
A. Pens, pencils, pads of paper, office furniture.
Q. What position did you hold with that company



or what positions did you hold throughout the course of your time there?
A. Initially, purchasing; and then later sales.
Q. Okay. When you moved over to Staples in 1994, what was your job title?
A. Senior account manager.
Q. Has that position changed over time?
A. That's my position today as well.
Q. What does a senior account manager do at Staples?
A. Manages a book of business with corporate clients, outside sales.
Q. What type of products are involved in what you're selling to these clients?
A. Office supplies and office furniture.
Q. Staples, is this the Staples -- is this affiliated with the Staples stores for office supplies you see or is this a different company?
MR. MURPHY: Objection.
A. It's the same -- Staples is the parent company, Staples, Inc. There are divisions of that, and Staples Business Advantage is one of those divisions.



Q. Okay. So we all know, or at least I do, Staples is a chain of stores around the country that sells office supplies. Right?
A. That's correct.
Q. All right. And then the company you work for, that's a separate corporation?
MR. MURPHY: Objection.
A. I don't know that. Technically, I don't know that.
Q. That's fair. Who is your immediate supervisor?
A. The name?
Q. Yes.
A. Jeannette Sparfven.
Q. How do you spell that?
A. She spells her name J-e-a-n-n-e-t-t-e, last name is Sparfven, S-p-a-r-f-v-e-n.
Q. Do you know what her job title is?
A. Her title is district sales manager.
Q. Was one of your accounts at some point, and maybe even up until today, Texas Instruments?
A. Yes.
Q. When did you first have any involvement with Texas Instruments?

Page 10

A. March of 1991.
Q. So that was when you were with MacIsaac?
A. Yes, that's correct.
Q. Okay. What relationship did you have with Texas Instruments at that point in time?
A. As an account manager. I was in sales and they were one of my clients.
Q. Did Staples buy MacIsaac?
A. Yes.
Q. So you continued with that account after you became an employee of Staples?
A. Yes.
Q. We talked earlier, you said various types of office supplies were involved. Pens, papers, office furniture as well. Right?
A. Yes.
Q. I want to focus in on office furniture and chairs in particular. When you were at MacIsaac, were you selling chairs to Texas Instruments?
A. No.
Q. Did you subsequently come to sell chairs to Texas Instruments when you were at Staples?
A. Yes.

Page 11

Q. About what year did that start?
A. I'm not certain, but 1997 to '98.
Q. Is there something that led to you beginning to be involved selling chairs at Texas Instruments?
A. Yes.
Q. Tell me what that was.
A. When -- as MacIsaac and then initially as Staples, we weren't able to sell chairs to Texas Instruments because the chairs -- they had a company standard and their standard involved lines of chairs that are not what we call "open lines" in our industry. They weren't sold through office supply dealers.
And that changed. In or about 1997, they -- they adopted for their corporate standard a chair called Superior. And that is a line that we could sell. And so we began to supply chairs to them at that point.
Q. Okay. So before 1997, as you understood it, Texas Instruments was purchasing its chairs from some other company, I assume?
A. Yes.
Q. Do you know what company that was?

Page 12

A. I don't.
Q. Was your involvement with Texas Instruments limited to the facility in Massachusetts or was it nationwide?
A. Primarily the Massachusetts facility.
Q. What other facilities were you involved with?
A. Texas Instruments has a structure -- they have different divisions, and so we -- we primarily dealt with their division called Sensors and Controls. But they also had a semiconductor division, that's the one in Dallas that most people are familiar with, and we didn't deal with them.
Q. Other than the facility in Massachusetts -- it was in Attleboro. Right?
A. Attleboro.
Q. -- what other Texas Instruments facility were you involved in actually selling product?
A. Versailles, Kentucky and Novi, Michigan.
Q. This is by its very nature going to be an open-ended question to some degree. But in terms of the sale process and how it worked, did Texas Instruments place an order with you? In general. I'm not holding you to a specific instance.
A. Their orders are transmitted electronically through a process called EDI, Electronic Data Interchange. And that's how they -- that's how they deal with us.
Q. Did you provide them with sales literature or options in terms of the types of chairs or office furniture they could purchase?
A. They were only -- they were only allowed to buy two types of chairs from us. One was a Miller Axis Series chair, the other was a Superior Centron chair. Those specific chairs were the only two that we were allowed to provide to them.
MR. ESKEY: Could I have that read back, please? Just the answer.
(Last answer read by reporter)
MR. ESKEY: Thank you.
MR. MURPHY: Just for the record, could you spell the Axis?
THE WITNESS: Sure. A-x-i-s.
Q. When you say Miller Axis, is that Herman Miller?
A. No. Different company.

Page 13

Page 14

Q. Where is that company located?
A. They're not anymore. They were in North Carolina, but they're out of business now.
Q. What kind of chair was that, the Miller Axis?
A. What's typically classified as an office task chair.
Q. The Superior Centron, would you also characterize that as an office task chair?
A. Yes.
Q. I'm assuming that you from time to time visited the Staples -- or strike that -- from time to time visited the Texas Instruments facilities that you dealt with?
A. The Attleboro facility only.
Q. Did you ever see what type of chairs were there that people were using -- strike that. It's a horrible question.
When you were there, did you observe chairs other than the Miller Axis and the Superior Centron?
A. Yes.
Q. And I think you said you don't know what types of chairs those were?
A. I do know the types of chairs. What I had

Page 15

said before, I believe, is that I don't know who they bought them from.
Q. Fair enough. What types of chairs did you observe at the Attleboro facility?
A. Herman Miller and Steelcase.
Q. Would you also characterize those as office task chairs?
A. Yes.
Q. Would it be fair to say that the Miller Axis, the Superior Centron, the Herman Miller and the Steelcase chairs, although they might have distinctions and some differences, were fairly similar in terms of function?
MR. ESKEY: I object.
MR. MURPHY: Objection.
A. I don't know. I can't speak to the -- to the functions of the other two chairs.
Q. You're not familiar with the details?
A. I'm not familiar with them.
Q. Okay. Did all chairs purchased at the Attleboro facility after you became involved in the 1997-1998 time frame, did all chairs at that facility received come through Staples or did some come from other TI facilities?

Page 16

A. Could you repeat the time frame you said?
Q. Sure. I don't want to go back before you were involved, and I think you said you first started selling chairs and office furniture for Staples to TI in the 1997-1998 time frame. Right?
A. That's correct.
Q. All right. So after that point in time, did all chairs that the Attleboro facility purchased -- were they purchased through you?
MR. MURPHY: Objection.
A. I don't know that.
Q. Did you ever hear that the chairs were coming from another source other than Staples?
A. With regard to -- with regard to Superior chairs, some of those chairs were procured through their Dallas facility. They were still allowed to buy the other two chairs, the Steelcase and the Herman Miller. And that's -- I don't know if they still bought those.
Q. But you were not an authorized dealer for Steelcase and Herman Miller?
A. That's correct.

Page 17

Q. And when I say "you," you know I mean Staples?
A. Yes.
Q. My understanding about Steelcase and Herman Miller -- I don't know whether you have an understanding or not -- is that they have specific dealers around the country that are authorized to sell their product and that's the only way anyone purchases their product.
MR. MURPHY: Objection to the form.
A. I don't know their -- their specific sales strategy.
Q. All right. You just know that wasn't something that you were selling?
A. I know that Staples can't sell those lines.
Q. And you may have already said this, and forgive me if I'm asking this again. But are you aware that Texas Instruments at the Attleboro facility did purchase Herman Miller and Steelcase product, "product" being chairs, after the 1997-1998 time frame?
A. I don't know that.
Q. You don't remember if you ever saw any new Herman Miller or Steelcase chairs after that time?

Page 82

Q. Can you estimate that in any way?
A. It would be just an estimation.
MR. MURPHY: Don't guess. If it's an estimate, that's fine. But don't speculate.
A. I'd be guessing. I'd be guessing. They bought a lot of them. I'd be guessing as to how many they bought.
Q. At any rate, there would be documentation within Staples to indicate the number of chairs that were sold to Texas Instruments during that time period. Correct?
MR. MURPHY: Objection.
A. I don't know that for sure. I don't have access to those records any longer.
Q. At one time you did?
A. Yeah, there's a -- I can search back in my database, but I can't go back as far as 1998 now. And '97, that was a different computer system. So I wouldn't have access to those any longer.
Q. But at any rate, at the time there was certainly documentation of the number of units that were sold by Staples to Texas Instruments. Correct?

Page 83

MR. MURPHY: Objection.
A. At the time in 1997 and '98? At that time?
Q. Right.
A. Could we have documented it?
Q. Or was it documented?
A. There were -- there were invoices created. Yes.
Q. And was the ordering in 1997, '98 through the Electronic Data Interface?
A. I don't remember.
Q. Okay. When's the first time that you recall that you're sure that that Electronic Data Interface was used for ordering?
A. 1999.
Q. Okay. Now, you said that the corporate standard adopted by Texas Instruments in 1997 was the Superior chair. Do you recall that?
A. At about that time frame, yes.
Q. Okay.
A. Well, Superior and Miller, both brands.
Q. Okay. Now, do you know what the standard was before that time, about '97 or '98, whenever it was that they adopted that standard for the Superior and Miller chair?

Page 84

A. They used Herman Miller and Steelcase.
Q. Okay. Now, how do you know that chairs, Superior chairs in Attleboro may have come from Dallas?
A. Just because I was familiar with how they were getting the chairs prior to procuring them for me. And I would see those labels on the bottom of them that indicated Texas Instruments rather than Staples.
Q. So that meant that they were procuring chairs from Dallas for the Attleboro facility. Were you aware of any such procurement after you began selling chairs to the Attleboro facility?
MR. MURPHY: Objection.
Q. The Superior chairs.
A. You're asking if I can -- can you rephrase?
Q. Let me try that again. When you became authorized to sell Superior chairs to the Texas Instruments/Attleboro facility, from that time forward were you aware of any chairs, Superior chairs being obtained by Texas Instruments/Attleboro from Texas Instruments/Dallas?

Page 85

A. I was not aware of that.
MR. MURPHY: And you mean contemporaneously, that they would be coming from two sources at one time?
MR. ESKEY: Correct.
A. I wasn't aware of that.
Q. Now, other than the control number that you had told us about, the "T" number, was there any other number, a serial number that was affixed to a chair, a Superior chair that you're aware of?
A. Not that I'm aware of.
Q. Now, the broken chair that you repaired, the one that we're concerned with in this case, did the chair appear to be worn?
MR. MURPHY: Objection.
A. I don't remember anything like that.
Q. You can't say whether the chair looked old or new?
A. It had been used. It wasn't a brand new chair.
Q. And did it appear to be in good condition?
MR. MURPHY: Objection.
Q. Other than the fact that the back had fallen

Page 22

what is assembled and what is not?
A. The chairs come in a large box. The seat and control and "J" bar and back mechanism are all assembled at the factory. The parts requiring assembly on our part would be the pneumatic cylinder, the chair base and the casters.
Q. So essentially, the seat and the back are fully assembled and that needs to then be put on the cylinder and the base?
A. The seat and back are fully assembled. The cylinder, base and casters need to be put together.
Q. Who would do that?
A. We would do -- Staples would do the assembly for the customer.
Q. Okay. And was that true from 1997 to the end of 2003?
A. That's correct.
Q. Who for Staples actually performed that work?
A. The assembly was done by the driver who delivered the product.
Q. Where did the driver pick up the chairs?
A. From the Staples distribution hub.
Q. Okay. So the chairs were shipped from the

Page 23

manufacturer to the Staples distribution hub?
A. No. The chairs were shipped to a Staples fulfillment center. There they were received and then forwarded to the distribution hub.
Q. What's a fulfillment center?
A. That's where all the merchandise is stocked. And that's where the actual receiving of product is done.
Q. Okay. But the driver that would pick it up, pick the product up at the distribution center, that's the one who would assemble the product once they arrived at Texas Instruments?
A. Yes.
Q. Do you remember the names of those drivers?
A. One of them.
Q. What was the name?
A. Robert Drews.
Q. I assume he's related to you?
A. Yes.
Q. Brother. Correct?
A. Brother.
Q. Were there other drivers who were involved?
A. Yes.

Page 24

Q. What kind of training did these drivers receive in terms of how to complete the assembly?
A. None specifically.
Q. I assume from time to time there was a -- TI would raise an issue in terms of a chair not working properly or being broken, some type of a warranty claim. Is that fair?
MR. MURPHY: Objection.
A. They would sometimes have an issue with a chair malfunctioning.
Q. Was there a process that was followed in terms of Staples' involvement in the event there was a problem with one of the chairs?
A. Yes.
Q. What was the process?
A. They would notify me, and then I would -- I would get the information from the chair as to the model number and so forth and then order the correct parts to have the chair repaired.
Q. Who would actually repair the chair under those circumstances?
A. Initially, my brother would do the repairs. Up until -- up until about 2000.

Page 25

Q. Okay. And how did that change in 2000?
A. He passed away so he wasn't able to do that anymore. So then it fell on me.
Q. Okay. Did Texas Instruments perform its own repairs on chairs from time to time?
MR. MURPHY: Objection.
A. I don't know that.
Q. Did anyone ever tell you that?
A. No.
Q. Was there ever a circumstance, again in that same 1997, '98 through 2003 time frame, where a chair had to be returned to the manufacturer because something was wrong with it?
A. Not that I recall.
Q. The Miller Axis chairs, did those come with any type of instructions, warnings, guides?
A. As far as how to adjust them? Yes.
Q. I assume you don't have copies of those in your records anywhere?
A. For the Miller Axis chair?
Q. Yes.
A. No, I don't.
(Cell phone interruption)
(Attorney Murphy leaves deposition)

what is assembled and what is not?
A. The chairs come in a large box. The seat and control and "J" bar and back mechanism are all assembled at the factory. The parts requiring assembly on our part would be the pneumatic cylinder, the chair base and the casters.
Q. So essentially, the seat and the back are fully assembled and that needs to then be put on the cylinder and the base?
A. The seat and back are fully assembled. The cylinder, base and casters need to be put together.
Q. Who would do that?
A. We would do -- Staples would do the assembly for the customer.
Q. Okay. And was that true from 1997 to the end of 2003?
A. That's correct.
Q. Who for Staples actually performed that work?
A. The assembly was done by the driver who delivered the product.
Q. Where did the driver pick up the chairs?
A. From the Staples distribution hub.
Q. Okay. So the chairs were shipped from the



manufacturer to the Staples distribution hub?
A. No. The chairs were shipped to a Staples fulfillment center. There they were received and then forwarded to the distribution hub.
Q. What's a fulfillment center?
A. That's where all the merchandise is stocked. And that's where the actual receiving of product is done.
Q. Okay. But the driver that would pick it up, pick the product up at the distribution center, that's the one who would assemble the product once they arrived at Texas Instruments?
A. Yes.
Q. Do you remember the names of those drivers?
A. One of them.
Q. What was the name?
A. Robert Drews.
Q. I assume he's related to you?
A. Yes.
Q. Brother. Correct?
A. Brother.
Q. Were there other drivers who were involved?
A. Yes.



Q. What kind of training did these drivers receive in terms of how to complete the assembly?
A. None specifically.
Q. I assume from time to time there was a -- TI would raise an issue in terms of a chair not working properly or being broken, some type of a warranty claim. Is that fair?
MR. MURPHY: Objection.
A. They would sometimes have an issue with a chair malfunctioning.
Q. Was there a process that was followed in terms of Staples' involvement in the event there was a problem with one of the chairs?
A. Yes.
Q. What was the process?
A. They would notify me, and then I would -- I would get the information from the chair as to the model number and so forth and then order the correct parts to have the chair repaired.
Q. Who would actually repair the chair under those circumstances?
A. Initially, my brother would do the repairs. Up until -- up until about 2000.



Q. Okay. And how did that change in 2000?
A. He passed away so he wasn't able to do that anymore. So then it fell on me.
Q. Okay. Did Texas Instruments perform its own repairs on chairs from time to time?
MR. MURPHY: Objection.
A. I don't know that.
Q. Did anyone ever tell you that?
A. No.
Q. Was there ever a circumstance, again in that same 1997, '98 through 2003 time frame, where a chair had to be returned to the manufacturer because something was wrong with it?
A. Not that I recall.
Q. The Miller Axis chairs, did those come with any type of instructions, warnings, guides?
A. As far as how to adjust them? Yes.
Q. I assume you don't have copies of those in your records anywhere?
A. For the Miller Axis chair?
Q. Yes.
A. No, I don't.
(Cell phone interruption)
(Attorney Murphy leaves deposition)

what is assembled and what is not?
A. The chairs come in a large box. The seat and control and "J" bar and back mechanism are all assembled at the factory. The parts requiring assembly on our part would be the pneumatic cylinder, the chair base and the casters.
Q. So essentially, the seat and the back are fully assembled and that needs to then be put on the cylinder and the base?
A. The seat and back are fully assembled. The cylinder, base and casters need to be put together.
Q. Who would do that?
A. We would do -- Staples would do the assembly for the customer.
Q. Okay. And was that true from 1997 to the end of 2003?
A. That's correct.
Q. Who for Staples actually performed that work?
A. The assembly was done by the driver who delivered the product.
Q. Where did the driver pick up the chairs?
A. From the Staples distribution hub.
Q. Okay. So the chairs were shipped from the



manufacturer to the Staples distribution hub?
A. No. The chairs were shipped to a Staples fulfillment center. There they were received and then forwarded to the distribution hub.
Q. What's a fulfillment center?
A. That's where all the merchandise is stocked. And that's where the actual receiving of product is done.
Q. Okay. But the driver that would pick it up, pick the product up at the distribution center, that's the one who would assemble the product once they arrived at Texas Instruments?
A. Yes.
Q. Do you remember the names of those drivers?
A. One of them.
Q. What was the name?
A. Robert Drews.
Q. I assume he's related to you?
A. Yes.
Q. Brother. Correct?
A. Brother.
Q. Were there other drivers who were involved?
A. Yes.



Q. What kind of training did these drivers receive in terms of how to complete the assembly?
A. None specifically.
Q. I assume from time to time there was a -- TI would raise an issue in terms of a chair not working properly or being broken, some type of a warranty claim. Is that fair?
MR. MURPHY: Objection.
A. They would sometimes have an issue with a chair malfunctioning.
Q. Was there a process that was followed in terms of Staples' involvement in the event there was a problem with one of the chairs?
A. Yes.
Q. What was the process?
A. They would notify me, and then I would -- I would get the information from the chair as to the model number and so forth and then order the correct parts to have the chair repaired.
Q. Who would actually repair the chair under those circumstances?
A. Initially, my brother would do the repairs. Up until -- up until about 2000.



Q. Okay. And how did that change in 2000?
A. He passed away so he wasn't able to do that anymore. So then it fell on me.
Q. Okay. Did Texas Instruments perform its own repairs on chairs from time to time?
MR. MURPHY: Objection.
A. I don't know that.
Q. Did anyone ever tell you that?
A. No.
Q. Was there ever a circumstance, again in that same 1997, '98 through 2003 time frame, where a chair had to be returned to the manufacturer because something was wrong with it?
A. Not that I recall.
Q. The Miller Axis chairs, did those come with any type of instructions, warnings, guides?
A. As far as how to adjust them? Yes.
Q. I assume you don't have copies of those in your records anywhere?
A. For the Miller Axis chair?
Q. Yes.
A. No, I don't.
(Cell phone interruption)
(Attorney Murphy leaves deposition)

Q. Now, at some point, I think in maybe 2004, Texas Instruments sold that facility to an entity known as Sensata?
A. They did.
Q. All right. Do you have --
A. Well, I shouldn't say that. I -- I don't know exactly who the owner of that is. Texas Instruments' name changed but not in 2004. That was changed to Sensata in 2006.
Q. Okay. Does Staples still have a relationship with that facility under whatever name it's under?
A. With Sensata, yes.
Q. Do you continue to sell chairs to Sensata?
A. Yes.
Q. And what manufacturers are involved?
A. Today, the only chair -- presently, the only chair I sell to them is the Superior Centron chair.
Q. Do you know a woman named Mary Ann King?
A. Yes.
Q. When did you first meet her?
A. I believe it was about the time we started with TI. So early 1990s.



Q. And she was involved in the purchasing department. Right?
A. I'm not certain of that. As I said earlier, they have various admins who order product. I think -- I think there were probably a couple a hundred maybe of those admins. And my understanding was, Mary Ann bought from us but as one of those admins.
Q. So she was purchasing product from Staples?
A. She did.
Q. And how long did she continue in that role?
A. I don't know that.
Q. How often did you deal with her?
A. With her specifically?
Q. I'm not holding you to a number of times, but generally if you can estimate.
A. I might -- I might see her once every couple of months.
Q. Do you have any personal -- well, strike that.
We're obviously here as a result of a lawsuit Ms. King has filed relating to an accident she says occurred in June of '03, I believe. Do you have any personal knowledge as to that accident?



A. No.
Q. Okay. I assume you've heard that she alleges she had an accident.
A. I do know that. If that's what you mean by personal knowledge, I do know that.
Q. No, no. I'm definitely drawing a distinction there. I want to make sure we're clear. When did you first hear that she had had an accident?
A. You mean the date?
Q. When did you first hear?
A. After the accident.
Q. Do you know how long afterward?
A. I don't remember.
Q. What were you told?
A. That the chair had broken. The extent of my -- of my involvement was to get the chair repaired.
Q. Who told you that the chair had broken?
A. Again, I believe it was Natalia. I believe Natalia advised me that the chair had broken.
Q. Is that based upon a recollection that she contacted you? Or is that just because generally she would be the one who would call you?
MS. MICHELS: Objection.



A. No. It's -- it's -- usually, in fact, she wasn't the one who would call me, but in this case I think she did. Usually the end user would call.
MS. MICHELS: Excuse me. Could you read that back?
(End of last question read by reporter)
Q. Assuming it was Natalia, what did she tell you, if you can recall?
A. Exact words I obviously don't remember, but something to the effect of could I -- could I go over to that building and assess what needed to be done to get the chair repaired.
Q. And what did you do?
A. I did just that. I went over there. I -- I got the -- typically, I'll get a control number off the bottom of the chair that the manufacturer requires in order to supply parts. And then I would order the parts and then repair the chair.
Q. Okay. And what did you do in this case?

Q. Now, at some point, I think in maybe 2004, Texas Instruments sold that facility to an entity known as Sensata?
A. They did.
Q. All right. Do you have --
A. Well, I shouldn't say that. I -- I don't know exactly who the owner of that is. Texas Instruments' name changed but not in 2004. That was changed to Sensata in 2006.
Q. Okay. Does Staples still have a relationship with that facility under whatever name it's under?
A. With Sensata, yes.
Q. Do you continue to sell chairs to Sensata?
A. Yes.
Q. And what manufacturers are involved?
A. Today, the only chair -- presently, the only chair I sell to them is the Superior Centron chair.
Q. Do you know a woman named Mary Ann King?
A. Yes.
Q. When did you first meet her?
A. I believe it was about the time we started with TI. So early 1990s.



Q. And she was involved in the purchasing department. Right?
A. I'm not certain of that. As I said earlier, they have various admins who order product. I think -- I think there were probably a couple a hundred maybe of those admins. And my understanding was, Mary Ann bought from us but as one of those admins.
Q. So she was purchasing product from Staples?
A. She did.
Q. And how long did she continue in that role?
A. I don't know that.
Q. How often did you deal with her?
A. With her specifically?
Q. I'm not holding you to a number of times, but generally if you can estimate.
A. I might -- I might see her once every couple of months.
Q. Do you have any personal -- well, strike that.
We're obviously here as a result of a lawsuit Ms. King has filed relating to an accident she says occurred in June of '03, I believe. Do you have any personal knowledge as to that accident?



A. No.
Q. Okay. I assume you've heard that she alleges she had an accident.
A. I do know that. If that's what you mean by personal knowledge, I do know that.
Q. No, no. I'm definitely drawing a distinction there. I want to make sure we're clear. When did you first hear that she had had an accident?
A. You mean the date?
Q. When did you first hear?
A. After the accident.
Q. Do you know how long afterward?
A. I don't remember.
Q. What were you told?
A. That the chair had broken. The extent of my -- of my involvement was to get the chair repaired.
Q. Who told you that the chair had broken?
A. Again, I believe it was Natalia. I believe Natalia advised me that the chair had broken.
Q. Is that based upon a recollection that she contacted you? Or is that just because generally she would be the one who would call



you?
MS. MICHELS: Objection.
A. No. It's -- it's -- usually, in fact, she wasn't the one who would call me, but in this case I think she did. Usually the end user would call.
MS. MICHELS: Excuse me. Could you read that back?
(End of last question read by reporter)
Q. Assuming it was Natalia, what did she tell you, if you can recall?
A. Exact words I obviously don't remember, but something to the effect of could I -- could I go over to that building and assess what needed to be done to get the chair repaired.
Q. And what did you do?
A. I did just that. I went over there. I -- I got the -- typically, I'll get a control number off the bottom of the chair that the manufacturer requires in order to supply parts. And then I would order the parts and then repair the chair.
Q. Okay. And what did you do in this case?

Page 30

A. That's what I did.
Q. Okay. Did you take the chair with you away from Texas Instruments?
A. Not at that time.
Q. Okay. Let's focus on when you first went out there. What specifically did you do with respect to this chair the first time you saw it?
A. I took the number from the -- the control number from the bottom of the chair and -- and made a note as to the parts that it needed and then left.
Q. How did you come to believe that the chair you were dealing with was the one that had been involved in Ms. King's accident?
A. Because I had been told that.
Q. Did someone point you to a specific chair and say, "Hey, that's it" or --
A. The chair was in the corner of her general office area, wrapped or circled off with a yellow tape, as I recall, so that nobody else would use it.
Q. Do you recall who pointed you in the direction or told you that was the chair?

Page 31

A. I don't know that now.
Q. What condition was the chair in --
MR. ESKEY: I object.
Q. -- at that time?
A. There was a seat and base assembly that was still assembled, and then the back was laying on top of the chair.
Q. What parts did you determine you needed to order to repair it?
A. I ordered a control mechanism. With that comes a "J" bar which attaches to the back and then later attaches that to the control mechanism.
Q. Did you take any pictures of the chair?
A. I did not.
Q. All right. So you ordered the parts. I assume that takes some time to be delivered?
A. Usually -- yes, it does. Usually about a week.
Q. And was that the case with respect to this chair and these parts?
A. As I recall.
Q. All right. What did you do next with respect to this chair?

Page 32

A. When the parts come in, they'll be shipped to my office. When those arrive, then I go take the chair from the facility and repair it and then return it to the facility.
Q. And did you do that with respect to the chair we've just been talking about?
A. Yes, I did.
Q. Do you recall how long after your initial visit it was before you went and -- well, strike that.
You took the chair from the TI facility at some point?
A. At the point that the parts came in to me.
Q. And where did you take the chair?
A. I take it to my garage and I did the repair there.
Q. Do you remember how long it was after you ordered the parts that this took place?
A. Are you asking me from -- from the time I ordered the parts until the time the parts came in?
Q. Until you went and took the chair.
A. I don't know exactly.
Q. When you took the chair back to your garage,

Page 33

what specifically did you do?
A. I take it to my garage because it's kind of -- a bit of a noisy process that isn't really appropriate for an office.
There's a press fit between the cylinder and the base and the cylinder and the control mechanism, and that needs to be pounded out. You need to spray it with WD-40 and then it needs to be pounded out. Typically a two-pound sledgehammer works best for that.
But that's a noisy process. They don't usually like you to do that in the office, so that's the reason that I take it out of there.
So I unscrew -- I unscrew the base -- the control mechanism from the seat base and then tip it over and bang the control mechanism off the cylinder. I put the new control mechanism onto the base of the chair, the seat base of the chair, screw that on, and then put the -- remove the "J" bar from the -- from the back assembly and put the new "J" bar on and then screw the "J" bar with the back

A. That's what I did.
Q. Okay. Did you take the chair with you away from Texas Instruments?
A. Not at that time.
Q. Okay. Let's focus on when you first went out there. What specifically did you do with respect to this chair the first time you saw it?
A. I took the number from the -- the control number from the bottom of the chair and -- and made a note as to the parts that it needed and then left.
Q. How did you come to believe that the chair you were dealing with was the one that had been involved in Ms. King's accident?
A. Because I had been told that.
Q. Did someone point you to a specific chair and say, "Hey, that's it" or --
A. The chair was in the corner of her general office area, wrapped or circled off with a yellow tape, as I recall, so that nobody else would use it.
Q. Do you recall who pointed you in the direction or told you that was the chair?



A. I don't know that now.
Q. What condition was the chair in --
MR. ESKEY: I object.
Q. -- at that time?
A. There was a seat and base assembly that was still assembled, and then the back was laying on top of the chair.
Q. What parts did you determine you needed to order to repair it?
A. I ordered a control mechanism. With that comes a "J" bar which attaches to the back and then later attaches that to the control mechanism.
Q. Did you take any pictures of the chair?
A. I did not.
Q. All right. So you ordered the parts. I assume that takes some time to be delivered?
A. Usually -- yes, it does. Usually about a week.
Q. And was that the case with respect to this chair and these parts?
A. As I recall.
Q. All right. What did you do next with respect to this chair?



A. When the parts come in, they'll be shipped to my office. When those arrive, then I go take the chair from the facility and repair it and then return it to the facility.
Q. And did you do that with respect to the chair we've just been talking about?
A. Yes, I did.
Q. Do you recall how long after your initial visit it was before you went and -- well, strike that.
You took the chair from the TI facility at some point?
A. At the point that the parts came in to me.
Q. And where did you take the chair?
A. I take it to my garage and I did the repair there.
Q. Do you remember how long it was after you ordered the parts that this took place?
A. Are you asking me from -- from the time I ordered the parts until the time the parts came in?
Q. Until you went and took the chair.
A. I don't know exactly.
Q. When you took the chair back to your garage,



what specifically did you do?
A. I take it to my garage because it's kind of -- a bit of a noisy process that isn't really appropriate for an office.
There's a press fit between the cylinder and the base and the cylinder and the control mechanism, and that needs to be pounded out. You need to spray it with WD-40 and then it needs to be pounded out. Typically a two-pound sledgehammer works best for that.
But that's a noisy process. They don't usually like you to do that in the office, so that's the reason that I take it out of there.
So I unscrew -- I unscrew the base -- the control mechanism from the seat base and then tip it over and bang the control mechanism off the cylinder. I put the new control mechanism onto the base of the chair, the seat base of the chair, screw that on, and then put the -- remove the "J" bar from the -- from the back assembly and put the new "J" bar on and then screw the "J" bar with the back

assembly to the control mechanism and then take that assembly and flip it upside down and sit it back on the base -- back on the cylinder.
(Attorney Murphy rejoins deposition)
Q. What did you do after that was complete?
A. I deliver it back to the customer.
Q. Do you recall who you delivered this chair to after you had completed that repair?
A. The specific person, no.
Q. Do you remember where you delivered it?
A. Yes. I delivered it back to the area from where I took it.
Q. Do you know Pam McGee?
A. I do.
Q. Does that jog your recollection as to whether you may have delivered it to her?
A. I could have, but I don't remember specifically.
Q. What color was this chair? Do you recall?
A. I think it was blue but --
Q. Can you say that absolutely certain?
A. No, I can't.
Q. What type of chair was it? Do you recall?



A. Like an office task chair? Yes. An office task chair.
Q. Do you recall who the manufacturer was?
A. Centron -- Superior.
Q. When you first saw that chair, were there any parts that were missing?
A. When I first saw it broken?
Q. Yes.
A. I don't recall.
Q. Do you recall whether there were missing screws?
A. I don't remember that either.
Q. How about when you got it back to your garage?
A. I'm sorry, I don't remember that.
Q. Did anyone ever tell you that Texas Instruments had tried to repair that chair at some point before you were involved and saw it?
A. At that time?
Q. Yes.
A. No.
Q. Have you subsequently learned that?
A. Yes.
Q. Was that from a deposition in this case or did



someone at Texas Instruments tell you that?
A. A deposition.
Q. Okay. Did you have any other discussions, other than with Natalia Mendes, with anyone at Texas Instruments about this chair or Ms. King's accident?
A. No.
Q. Did you have any role in investigating how her accident happened?
A. No.
Q. Do you know how her accident happened, other than from reading deposition transcripts in this case?
A. No.
Q. No one at Texas Instruments told you at that time how it happened?
A. The back fell off the chair, but I think I knew that because of seeing the chair with the back off the chair.
Q. I assume you don't know why the back fell off the chair.
MR. ESKEY: I object.
Q. Correct?
A. That, I don't. I -- no.



Q. So correct, you don't know?
A. Correct, I don't know.
Q. Okay. Do you know when that specific chair was sold to Texas Instruments?
A. I don't.
Q. It could have been sold before 1997, it could have been sold after. Right?
MR. ESKEY: I object.
MR. MURPHY: Objection. If you know. If you don't, say so.
A. Well, I mean, that's kind of a general question as I see it. It obviously was sold to them at some point. So yeah, it could have been sold before then or it could have been sold after that. Did I understand the question correct?
Q. I'm going somewhere with it.
A. I know you are. It was sold to them. So in so much as it was sold to them, it was either before that date or after that date.
Q. Perfect. Are there any identifying marks on the chairs that would show that it was purchased from Staples?
A. Yes.

A. That's what I did.
Q. Okay. Did you take the chair with you away from Texas Instruments?
A. Not at that time.
Q. Okay. Let's focus on when you first went out there. What specifically did you do with respect to this chair the first time you saw it?
A. I took the number from the -- the control number from the bottom of the chair and -- and made a note as to the parts that it needed and then left.
Q. How did you come to believe that the chair you were dealing with was the one that had been involved in Ms. King's accident?
A. Because I had been told that.
Q. Did someone point you to a specific chair and say, "Hey, that's it" or --
A. The chair was in the corner of her general office area, wrapped or circled off with a yellow tape, as I recall, so that nobody else would use it.
Q. Do you recall who pointed you in the direction or told you that was the chair?



A. I don't know that now.
Q. What condition was the chair in --
MR. ESKEY: I object.
Q. -- at that time?
A. There was a seat and base assembly that was still assembled, and then the back was laying on top of the chair.
Q. What parts did you determine you needed to order to repair it?
A. I ordered a control mechanism. With that comes a "J" bar which attaches to the back and then later attaches that to the control mechanism.
Q. Did you take any pictures of the chair?
A. I did not.
Q. All right. So you ordered the parts. I assume that takes some time to be delivered?
A. Usually -- yes, it does. Usually about a week.
Q. And was that the case with respect to this chair and these parts?
A. As I recall.
Q. All right. What did you do next with respect to this chair?



A. When the parts come in, they'll be shipped to my office. When those arrive, then I go take the chair from the facility and repair it and then return it to the facility.
Q. And did you do that with respect to the chair we've just been talking about?
A. Yes, I did.
Q. Do you recall how long after your initial visit it was before you went and -- well, strike that.
You took the chair from the TI facility at some point?
A. At the point that the parts came in to me.
Q. And where did you take the chair?
A. I take it to my garage and I did the repair there.
Q. Do you remember how long it was after you ordered the parts that this took place?
A. Are you asking me from -- from the time I ordered the parts until the time the parts came in?
Q. Until you went and took the chair.
A. I don't know exactly.
Q. When you took the chair back to your garage,



what specifically did you do?
A. I take it to my garage because it's kind of -- a bit of a noisy process that isn't really appropriate for an office.
There's a press fit between the cylinder and the base and the cylinder and the control mechanism, and that needs to be pounded out. You need to spray it with WD-40 and then it needs to be pounded out. Typically a two-pound sledgehammer works best for that.
But that's a noisy process. They don't usually like you to do that in the office, so that's the reason that I take it out of there.
So I unscrew -- I unscrew the base -- the control mechanism from the seat base and then tip it over and bang the control mechanism off the cylinder. I put the new control mechanism onto the base of the chair, the seat base of the chair, screw that on, and then put the -- remove the "J" bar from the -- from the back assembly and put the new "J" bar on and then screw the "J" bar with the back

A. That's what I did.
Q. Okay. Did you take the chair with you away from Texas Instruments?
A. Not at that time.
Q. Okay. Let's focus on when you first went out there. What specifically did you do with respect to this chair the first time you saw it?
A. I took the number from the -- the control number from the bottom of the chair and -- and made a note as to the parts that it needed and then left.
Q. How did you come to believe that the chair you were dealing with was the one that had been involved in Ms. King's accident?
A. Because I had been told that.
Q. Did someone point you to a specific chair and say, "Hey, that's it" or --
A. The chair was in the corner of her general office area, wrapped or circled off with a yellow tape, as I recall, so that nobody else would use it.
Q. Do you recall who pointed you in the direction or told you that was the chair?



A. I don't know that now.
Q. What condition was the chair in --
MR. ESKEY: I object.
Q. -- at that time?
A. There was a seat and base assembly that was still assembled, and then the back was laying on top of the chair.
Q. What parts did you determine you needed to order to repair it?
A. I ordered a control mechanism. With that comes a "J" bar which attaches to the back and then later attaches that to the control mechanism.
Q. Did you take any pictures of the chair?
A. I did not.
Q. All right. So you ordered the parts. I assume that takes some time to be delivered?
A. Usually -- yes, it does. Usually about a week.
Q. And was that the case with respect to this chair and these parts?
A. As I recall.
Q. All right. What did you do next with respect to this chair?



A. When the parts come in, they'll be shipped to my office. When those arrive, then I go take the chair from the facility and repair it and then return it to the facility.
Q. And did you do that with respect to the chair we've just been talking about?
A. Yes, I did.
Q. Do you recall how long after your initial visit it was before you went and -- well, strike that.
You took the chair from the TI facility at some point?
A. At the point that the parts came in to me.
Q. And where did you take the chair?
A. I take it to my garage and I did the repair there.
Q. Do you remember how long it was after you ordered the parts that this took place?
A. Are you asking me from -- from the time I ordered the parts until the time the parts came in?
Q. Until you went and took the chair.
A. I don't know exactly.
Q. When you took the chair back to your garage,



what specifically did you do?
A. I take it to my garage because it's kind of -- a bit of a noisy process that isn't really appropriate for an office.
There's a press fit between the cylinder and the base and the cylinder and the control mechanism, and that needs to be pounded out. You need to spray it with WD-40 and then it needs to be pounded out. Typically a two-pound sledgehammer works best for that.
But that's a noisy process. They don't usually like you to do that in the office, so that's the reason that I take it out of there.
So I unscrew -- I unscrew the base -- the control mechanism from the seat base and then tip it over and bang the control mechanism off the cylinder. I put the new control mechanism onto the base of the chair, the seat base of the chair, screw that on, and then put the -- remove the "J" bar from the -- from the back assembly and put the new "J" bar on and then screw the "J" bar with the back

A. That's what I did.
Q. Okay. Did you take the chair with you away from Texas Instruments?
A. Not at that time.
Q. Okay. Let's focus on when you first went out there. What specifically did you do with respect to this chair the first time you saw it?
A. I took the number from the -- the control number from the bottom of the chair and -- and made a note as to the parts that it needed and then left.
Q. How did you come to believe that the chair you were dealing with was the one that had been involved in Ms. King's accident?
A. Because I had been told that.
Q. Did someone point you to a specific chair and say, "Hey, that's it" or --
A. The chair was in the corner of her general office area, wrapped or circled off with a yellow tape, as I recall, so that nobody else would use it.
Q. Do you recall who pointed you in the direction or told you that was the chair?



A. I don't know that now.
Q. What condition was the chair in --
MR. ESKEY: I object.
Q. -- at that time?
A. There was a seat and base assembly that was still assembled, and then the back was laying on top of the chair.
Q. What parts did you determine you needed to order to repair it?
A. I ordered a control mechanism. With that comes a "J" bar which attaches to the back and then later attaches that to the control mechanism.
Q. Did you take any pictures of the chair?
A. I did not.
Q. All right. So you ordered the parts. I assume that takes some time to be delivered?
A. Usually -- yes, it does. Usually about a week.
Q. And was that the case with respect to this chair and these parts?
A. As I recall.
Q. All right. What did you do next with respect to this chair?



A. When the parts come in, they'll be shipped to my office. When those arrive, then I go take the chair from the facility and repair it and then return it to the facility.
Q. And did you do that with respect to the chair we've just been talking about?
A. Yes, I did.
Q. Do you recall how long after your initial visit it was before you went and -- well, strike that.
You took the chair from the TI facility at some point?
A. At the point that the parts came in to me.
Q. And where did you take the chair?
A. I take it to my garage and I did the repair there.
Q. Do you remember how long it was after you ordered the parts that this took place?
A. Are you asking me from -- from the time I ordered the parts until the time the parts came in?
Q. Until you went and took the chair.
A. I don't know exactly.
Q. When you took the chair back to your garage,



what specifically did you do?
A. I take it to my garage because it's kind of -- a bit of a noisy process that isn't really appropriate for an office.
There's a press fit between the cylinder and the base and the cylinder and the control mechanism, and that needs to be pounded out. You need to spray it with WD-40 and then it needs to be pounded out. Typically a two-pound sledgehammer works best for that.
But that's a noisy process. They don't usually like you to do that in the office, so that's the reason that I take it out of there.
So I unscrew -- I unscrew the base -- the control mechanism from the seat base and then tip it over and bang the control mechanism off the cylinder. I put the new control mechanism onto the base of the chair, the seat base of the chair, screw that on, and then put the -- remove the "J" bar from the -- from the back assembly and put the new "J" bar on and then screw the "J" bar with the back

A. That's what I did.
Q. Okay. Did you take the chair with you away from Texas Instruments?
A. Not at that time.
Q. Okay. Let's focus on when you first went out there. What specifically did you do with respect to this chair the first time you saw it?
A. I took the number from the -- the control number from the bottom of the chair and -- and made a note as to the parts that it needed and then left.
Q. How did you come to believe that the chair you were dealing with was the one that had been involved in Ms. King's accident?
A. Because I had been told that.
Q. Did someone point you to a specific chair and say, "Hey, that's it" or --
A. The chair was in the corner of her general office area, wrapped or circled off with a yellow tape, as I recall, so that nobody else would use it.
Q. Do you recall who pointed you in the direction or told you that was the chair?



A. I don't know that now.
Q. What condition was the chair in --
MR. ESKEY: I object.
Q. -- at that time?
A. There was a seat and base assembly that was still assembled, and then the back was laying on top of the chair.
Q. What parts did you determine you needed to order to repair it?
A. I ordered a control mechanism. With that comes a "J" bar which attaches to the back and then later attaches that to the control mechanism.
Q. Did you take any pictures of the chair?
A. I did not.
Q. All right. So you ordered the parts. I assume that takes some time to be delivered?
A. Usually -- yes, it does. Usually about a week.
Q. And was that the case with respect to this chair and these parts?
A. As I recall.
Q. All right. What did you do next with respect to this chair?



A. When the parts come in, they'll be shipped to my office. When those arrive, then I go take the chair from the facility and repair it and then return it to the facility.
Q. And did you do that with respect to the chair we've just been talking about?
A. Yes, I did.
Q. Do you recall how long after your initial visit it was before you went and -- well, strike that.
You took the chair from the TI facility at some point?
A. At the point that the parts came in to me.
Q. And where did you take the chair?
A. I take it to my garage and I did the repair there.
Q. Do you remember how long it was after you ordered the parts that this took place?
A. Are you asking me from -- from the time I ordered the parts until the time the parts came in?
Q. Until you went and took the chair.
A. I don't know exactly.
Q. When you took the chair back to your garage,



what specifically did you do?
A. I take it to my garage because it's kind of -- a bit of a noisy process that isn't really appropriate for an office.
There's a press fit between the cylinder and the base and the cylinder and the control mechanism, and that needs to be pounded out. You need to spray it with WD-40 and then it needs to be pounded out. Typically a two-pound sledgehammer works best for that.
But that's a noisy process. They don't usually like you to do that in the office, so that's the reason that I take it out of there.
So I unscrew -- I unscrew the base -- the control mechanism from the seat base and then tip it over and bang the control mechanism off the cylinder. I put the new control mechanism onto the base of the chair, the seat base of the chair, screw that on, and then put the -- remove the "J" bar from the -- from the back assembly and put the new "J" bar on and then screw the "J" bar with the back

assembly to the control mechanism and then take that assembly and flip it upside down and sit it back on the base -- back on the cylinder.
(Attorney Murphy rejoins deposition)
Q. What did you do after that was complete?
A. I deliver it back to the customer.
Q. Do you recall who you delivered this chair to after you had completed that repair?
A. The specific person, no.
Q. Do you remember where you delivered it?
A. Yes. I delivered it back to the area from where I took it.
Q. Do you know Pam McGee?
A. I do.
Q. Does that jog your recollection as to whether you may have delivered it to her?
A. I could have, but I don't remember specifically.
Q. What color was this chair? Do you recall?
A. I think it was blue but --
Q. Can you say that absolutely certain?
A. No, I can't.
Q. What type of chair was it? Do you recall?



A. Like an office task chair? Yes. An office task chair.
Q. Do you recall who the manufacturer was?
A. Centron -- Superior.
Q. When you first saw that chair, were there any parts that were missing?
A. When I first saw it broken?
Q. Yes.
A. I don't recall.
Q. Do you recall whether there were missing screws?
A. I don't remember that either.
Q. How about when you got it back to your garage?
A. I'm sorry, I don't remember that.
Q. Did anyone ever tell you that Texas Instruments had tried to repair that chair at some point before you were involved and saw it?
A. At that time?
Q. Yes.
A. No.
Q. Have you subsequently learned that?
A. Yes.
Q. Was that from a deposition in this case or did



someone at Texas Instruments tell you that?
A. A deposition.
Q. Okay. Did you have any other discussions, other than with Natalia Mendes, with anyone at Texas Instruments about this chair or Ms. King's accident?
A. No.
Q. Did you have any role in investigating how her accident happened?
A. No.
Q. Do you know how her accident happened, other than from reading deposition transcripts in this case?
A. No.
Q. No one at Texas Instruments told you at that time how it happened?
A. The back fell off the chair, but I think I knew that because of seeing the chair with the back off the chair.
Q. I assume you don't know why the back fell off the chair.
MR. ESKEY: I object.
Q. Correct?
A. That, I don't. I -- no.



Q. So correct, you don't know?
A. Correct, I don't know.
Q. Okay. Do you know when that specific chair was sold to Texas Instruments?
A. I don't.
Q. It could have been sold before 1997, it could have been sold after. Right?
MR. ESKEY: I object.
MR. MURPHY: Objection. If you know. If you don't, say so.
A. Well, I mean, that's kind of a general question as I see it. It obviously was sold to them at some point. So yeah, it could have been sold before then or it could have been sold after that. Did I understand the question correct?
Q. I'm going somewhere with it.
A. I know you are. It was sold to them. So in so much as it was sold to them, it was either before that date or after that date.
Q. Perfect. Are there any identifying marks on the chairs that would show that it was purchased from Staples?
A. Yes.

Page 82

Q. Can you estimate that in any way?
A. It would be just an estimation.
MR. MURPHY: Don't guess. If it's an estimate, that's fine. But don't speculate.
A. I'd be guessing. I'd be guessing. They bought a lot of them. I'd be guessing as to how many they bought.
Q. At any rate, there would be documentation within Staples to indicate the number of chairs that were sold to Texas Instruments during that time period. Correct?
MR. MURPHY: Objection.
A. I don't know that for sure. I don't have access to those records any longer.
Q. At one time you did?
A. Yeah, there's a -- I can search back in my database, but I can't go back as far as 1998 now. And '97, that was a different computer system. So I wouldn't have access to those any longer.
Q. But at any rate, at the time there was certainly documentation of the number of units that were sold by Staples to Texas Instruments. Correct?

Page 83

MR. MURPHY: Objection.
A. At the time in 1997 and '98? At that time?
Q. Right.
A. Could we have documented it?
Q. Or was it documented?
A. There were -- there were invoices created. Yes.
Q. And was the ordering in 1997, '98 through the Electronic Data Interface?
A. I don't remember.
Q. Okay. When's the first time that you recall that you're sure that that Electronic Data Interface was used for ordering?
A. 1999.
Q. Okay. Now, you said that the corporate standard adopted by Texas Instruments in 1997 was the Superior chair. Do you recall that?
A. At about that time frame, yes.
Q. Okay.
A. Well, Superior and Miller, both brands.
Q. Okay. Now, do you know what the standard was before that time, about '97 or '98, whenever it was that they adopted that standard for the Superior and Miller chair?

Page 84

A. They used Herman Miller and Steelcase.
Q. Okay. Now, how do you know that chairs, Superior chairs in Attleboro may have come from Dallas?
A. Just because I was familiar with how they were getting the chairs prior to procuring them for me. And I would see those labels on the bottom of them that indicated Texas Instruments rather than Staples.
Q. So that meant that they were procuring chairs from Dallas for the Attleboro facility. Were you aware of any such procurement after you began selling chairs to the Attleboro facility?
MR. MURPHY: Objection.
Q. The Superior chairs.
A. You're asking if I can -- can you rephrase?
Q. Let me try that again. When you became authorized to sell Superior chairs to the Texas Instruments/Attleboro facility, from that time forward were you aware of any chairs, Superior chairs being obtained by Texas Instruments/Attleboro from Texas Instruments/Dallas?

Page 85

A. I was not aware of that.
MR. MURPHY: And you mean contemporaneously, that they would be coming from two sources at one time?
MR. ESKEY: Correct.
A. I wasn't aware of that.
Q. Now, other than the control number that you had told us about, the "T" number, was there any other number, a serial number that was affixed to a chair, a Superior chair that you're aware of?
A. Not that I'm aware of.
Q. Now, the broken chair that you repaired, the one that we're concerned with in this case, did the chair appear to be worn?
MR. MURPHY: Objection.
A. I don't remember anything like that.
Q. You can't say whether the chair looked old or new?
A. It had been used. It wasn't a brand new chair.
Q. And did it appear to be in good condition?
MR. MURPHY: Objection.
Q. Other than the fact that the back had fallen

Page 34

assembly to the control mechanism and then take that assembly and flip it upside down and sit it back on the base -- back on the cylinder.
(Attorney Murphy rejoins deposition)
Q. What did you do after that was complete?
A. I deliver it back to the customer.
Q. Do you recall who you delivered this chair to after you had completed that repair?
A. The specific person, no.
Q. Do you remember where you delivered it?
A. Yes. I delivered it back to the area from where I took it.
Q. Do you know Pam McGee?
A. I do.
Q. Does that jog your recollection as to whether you may have delivered it to her?
A. I could have, but I don't remember specifically.
Q. What color was this chair? Do you recall?
A. I think it was blue but --
Q. Can you say that absolutely certain?
A. No, I can't.
Q. What type of chair was it? Do you recall?

Page 35

A. Like an office task chair? Yes. An office task chair.
Q. Do you recall who the manufacturer was?
A. Centron -- Superior.
Q. When you first saw that chair, were there any parts that were missing?
A. When I first saw it broken?
Q. Yes.
A. I don't recall.
Q. Do you recall whether there were missing screws?
A. I don't remember that either.
Q. How about when you got it back to your garage?
A. I'm sorry, I don't remember that.
Q. Did anyone ever tell you that Texas Instruments had tried to repair that chair at some point before you were involved and saw it?
A. At that time?
Q. Yes.
A. No.
Q. Have you subsequently learned that?
A. Yes.
Q. Was that from a deposition in this case or did

Page 36

someone at Texas Instruments tell you that?
A. A deposition.
Q. Okay. Did you have any other discussions, other than with Natalia Mendes, with anyone at Texas Instruments about this chair or Ms. King's accident?
A. No.
Q. Did you have any role in investigating how her accident happened?
A. No.
Q. Do you know how her accident happened, other than from reading deposition transcripts in this case?
A. No.
Q. No one at Texas Instruments told you at that time how it happened?
A. The back fell off the chair, but I think I knew that because of seeing the chair with the back off the chair.
Q. I assume you don't know why the back fell off the chair.
MR. ESKEY: I object.
Q. Correct?
A. That, I don't. I -- no.

Page 37

Q. So correct, you don't know?
A. Correct, I don't know.
Q. Okay. Do you know when that specific chair was sold to Texas Instruments?
A. I don't.
Q. It could have been sold before 1997, it could have been sold after. Right?
MR. ESKEY: I object.
MR. MURPHY: Objection. If you know. If you don't, say so.
A. Well, I mean, that's kind of a general question as I see it. It obviously was sold to them at some point. So yeah, it could have been sold before then or it could have been sold after that. Did I understand the question correct?
Q. I'm going somewhere with it.
A. I know you are. It was sold to them. So in so much as it was sold to them, it was either before that date or after that date.
Q. Perfect. Are there any identifying marks on the chairs that would show that it was purchased from Staples?
A. Yes.

Page 46

A. With regard to the control mechanism? That was primarily where it changed was the control mechanism of the chair.
Q. Okay. So when you referred in your earlier testimony to an original design, you were referring to a change in design in the control mechanism?
A. Yes.
Q. And I think Mr. Stubenvoll covered at least some of that in his last few questions. One of the areas that you said there was a change was with respect to the "J" bar. Can you tell me what changes in the original design and the new design that you put onto the chair after you repaired it, what those changes were exactly on the "J" bar?
A. Yes. The way it affixed to the back was the exact same, six screws. But the way it attached to the base, the original design attached -- excuse me. The way it attached to the control mechanism, the original design it attached with two screws; in the new design it attached with four screws.
Q. Okay. Now, in the original design attaching

Page 47

with two screws, those are the screws that attach the "J" bar to the control mechanism?
A. That's correct.
Q. Okay. Now, once the "J" bar is attached to the control mechanism, is the "J" bar adjustable?
A. No. The back adjusts on the "J" bar.
Q. Okay. But the "J" bar itself, the design is intended to fix the "J" bar to the control mechanism on the seat?
A. That's correct.
MR. STUBENVOLL: Object to form.
A. When it attaches to the control mechanism, it's solid bolted, it's not -- it's not adjustable.
Q. Okay. So the screws are designed -- or the intent of that design is for the screws to fix the "J" bar to the control mechanism which is under the seat. Correct?
MR. MURPHY: Objection.
MR. STUBENVOLL: Same.
A. The "J" bar attaches to the control mechanism with two screws and it's not adjustable. Those screws solidly attach it to the -- to

Page 48

the -- to the -- the "J" bar to the control mechanism.
Q. Okay. And when you saw the chair that broke, was the "J" bar attached to the control mechanism?
A. It was not.
Q. Okay. Where was the control mechanism?
A. The control mechanism was attached to the seat of the chair.
Q. Okay. So the screws that were to attach the "J" bar to the control mechanism in the broken chair, where were those screws?
A. Could you repeat that for me, please?
Q. When you first saw the broken chair or when you repaired the broken chair, were the screws, the two screws that attached the "J" bar to the control mechanism, were they with the chair?
A. I don't remember that now.
Q. Why did you order a new control mechanism?
A. Because that's how we fix the chairs. The control mechanism -- the control mechanism, as I recall in this chair, some of them -- some of them had a faulty tilt lock mechanism. So

Page 49

that although that could be locked in place, it could suddenly release.
And so we just made a habit of anytime there was a problem with a chair like that, we replaced the control mechanism and the "J" bar.
Q. Were there problems with that type of chair, Superior chair, other than the one that broke and you repaired?
MR. STUBENVOLL: Object to form, foundation.
MR. MURPHY: Objection.
Q. Well, let me withdraw that and ask you another question. Was this the only chair that you ever repaired, Superior chair, for Texas Instruments?
A. No, it is not.
Q. Okay. How many chairs did you repair?
A. I'd be speculating.
MR. MURPHY: Is there a time frame, Tim? Up to the present?
Q. Well, from 1997 forward.
A. From '97 forward?
Q. Yes.