assembly to the control mechanism and then take that assembly and flip it upside down and sit it back on the base -- back on the cylinder.
(Attorney Murphy rejoins deposition)
Q. What did you do after that was complete?
A. I deliver it back to the customer.
Q. Do you recall who you delivered this chair to after you had completed that repair?
A. The specific person, no.
Q. Do you remember where you delivered it?
A. Yes. I delivered it back to the area from where I took it.
Q. Do you know Pam McGee?
A. I do.
Q. Does that jog your recollection as to whether you may have delivered it to her?
A. I could have, but I don't remember specifically.
Q. What color was this chair? Do you recall?
A. I think it was blue but --
Q. Can you say that absolutely certain?
A. No, I can't.
Q. What type of chair was it? Do you recall?



A. Like an office task chair? Yes. An office task chair.
Q. Do you recall who the manufacturer was?
A. Centron -- Superior.
Q. When you first saw that chair, were there any parts that were missing?
A. When I first saw it broken?
Q. Yes.
A. I don't recall.
Q. Do you recall whether there were missing screws?
A. I don't remember that either.
Q. How about when you got it back to your garage?
A. I'm sorry, I don't remember that.
Q. Did anyone ever tell you that Texas Instruments had tried to repair that chair at some point before you were involved and saw it?
A. At that time?
Q. Yes.
A. No.
Q. Have you subsequently learned that?
A. Yes.
Q. Was that from a deposition in this case or did



someone at Texas Instruments tell you that?
A. A deposition.
Q. Okay. Did you have any other discussions, other than with Natalia Mendes, with anyone at Texas Instruments about this chair or Ms. King's accident?
A. No.
Q. Did you have any role in investigating how her accident happened?
A. No.
Q. Do you know how her accident happened, other than from reading deposition transcripts in this case?
A. No.
Q. No one at Texas Instruments told you at that time how it happened?
A. The back fell off the chair, but I think I knew that because of seeing the chair with the back off the chair.
Q. I assume you don't know why the back fell off the chair.
MR. ESKEY: I object.
Q. Correct?
A. That, I don't. I -- no.



Q. So correct, you don't know?
A. Correct, I don't know.
Q. Okay. Do you know when that specific chair was sold to Texas Instruments?
A. I don't.
Q. It could have been sold before 1997, it could have been sold after. Right?
MR. ESKEY: I object.
MR. MURPHY: Objection. If you know. If you don't, say so.
A. Well, I mean, that's kind of a general question as I see it. It obviously was sold to them at some point. So yeah, it could have been sold before then or it could have been sold after that. Did I understand the question correct?
Q. I'm going somewhere with it.
A. I know you are. It was sold to them. So in so much as it was sold to them, it was either before that date or after that date.
Q. Perfect. Are there any identifying marks on the chairs that would show that it was purchased from Staples?
A. Yes.

to repairing this broken chair, you ordered the control mechanism and the "J" bar specifically because you knew that you needed two more holes to attach the "J" bar. Correct?
A. Yes.
Q. Are there any other parts that you ordered?
A. They would send me a washer/spacer kit and the new bolts.
Q. Now, after you repaired this broken chair, did you repair any other broken chair where the "J" bar had become detached from the control mechanism?
A. No.
Q. Do you know Al Brown?
A. Yes.
Q. Okay. Is Al Brown still at Sensata or Texas Instruments?
A. I don't know for sure.
Q. Okay. Well, back when this occurred in June of 2003, Al Brown was at Texas Instruments. Correct?
A. That's correct.
Q. Okay. Do you know what his job function was



at that time?
A. I know that he was in the Safety department.
Q. Okay. Did you speak with Al Brown in connection with this broken chair?
A. Yes, I did.
Q. Okay. On how many occasions do you recall speaking with him?
A. About this specific chair?
Q. Yes.
A. I think twice.
Q. And do you recall those as two distinct conversations in which you can recall the gist of each conversation?
A. Fairly well.
Q. Okay. Can you tell us what you recall about the gist of the first conversation?
A. The first conversation was where I met with him and we walked over -- well, actually, drove over to -- from his building Building 10 to Building 12 to look at the -- at the broken chair.
Q. Okay. And was anyone else with you and Mr. Brown at that time?
A. No.



Q. Okay. And is this where you discovered the chair cordoned off in an area and that was the first time you saw the broken chair?
MR. MURPHY: Objection.
A. It's -- it's where I saw the chair. Al took me over to view the chair.
Q. Okay. And what was the second conversation that you recall with Mr. Brown?
A. I believe that it was me -- I believe he had charged me with calling him when the chair was repaired and redelivered.
Q. Okay. Now, on that first occasion when Mr. Brown took you to where you saw the chair, can you describe for us, then, what you saw of the chair at that time?
A. He took me to Mary Ann's office and we went in and the chair was cordoned off in a corner with the yellow tape. And as I had said earlier, the back -- to my recollection, the back was laying on top of the chair.
Q. And where was the control mechanism?
A. That was attached to the chair.
Q. Did you perform any inspection of the chair at that time?



A. Only to look at the chair to determine the control number from it so that I could order new parts.
Q. That was on the bottom of the chair where the control mechanism is?
A. It's on a label that's underneath the seat of the chair.
Q. Okay. Now, that control number, is it a number that's a unique identifier to a particular chair?
A. More or less. It -- I'm speculating a bit on this. It -- it -- it's a number -- it's a "T" number, it's called, and it's a T followed by six digits, I believe. And it -- I believe that it designates a particular order of chairs.
Q. And is that control number one that -- strike that.
Do you know whose control number that is?
A. The manufacturer's control number.
Q. Did you record that control number in any way, make a record of it?
A. I did. At that time, I did.

Q. And how did you record that at that time?
A. I wrote it down on a piece of paper.
Q. Okay. Did you order that -- or enter that control number into any other record either manually or electronically?
A. No.
Q. When you ordered the parts, did you generate a purchase order?
A. No.
Q. How were the parts ordered from the manufacturer?
A. Usually by telephone. Sometimes by e-mail.
Q. Do you know whether in this case you ordered by telephone or e-mail?
A. Not specifically.
Q. Was there a charge for the replacement parts?
A. There is not.
Q. So as far as you know from your end -- well, strike that.
You didn't keep that piece of paper, did you?
A. No.
Q. Okay. And to this day, you don't know where it is?



A. The piece of paper?
Q. Did you throw it away?
A. I would have thrown it away. I typically do that after I fix them. I would throw the paperwork away on it.
Q. Okay. Was there any other paperwork associated with this repair other than writing the control number on that piece of paper on your end?
A. Not that I remember.
Q. Do you remember who you communicated with to order the repair parts?
A. Various people within Superior/Izzy Design. I don't know who it was on that specific day.
Q. And how would that -- I mean, I'm sure there were a number of conversations if you had made, you know, many repairs. But typically, how did that transaction work? You would give them the part number?
A. I would -- I would -- I used to phone them. More recently, there was a point in time where I started to e-mail them. But I would -- and I've got a specific contact there, but that contact has changed over the years.



So on that specific day, I don't know who my contact was at that time. But there's a contact who works in warranty repairs for Superior/Izzy who I would call and give them that number, and they would send the parts to me.
Q. When the parts arrived, was there a packing slip or any other documentation that was generated by the manufacturer together with the parts?
A. Yes.
Q. And what do you recall was sent to you together with the part itself by way of paperwork?
A. What else besides that packing list was sent to me?
Q. Well, was there anything else besides the packing list that was sent?
A. No, just the parts and the packing list.
Q. Okay. Now, was the broken chair under warranty? The one that you repaired, the one that we're talking about in this case?
A. Yes.
Q. And what was the term of the warranty in terms



of time? Was there a time within which the warranty applied?
A. Yes.
Q. And what was that standard?
A. I believe that it was 12 years. Well, I should say this. Twelve years for most of the chair. A lesser period of time for the pneumatic cylinder. I believe the pneumatic cylinder was a year or two years, but the remaining parts on the chair, control mechanisms, "J" bars, things like that, were 12 years.
Q. Okay. Now, do you have any knowledge of whether a determination was made with respect to the chair that you repaired, the broken chair in this case, whether a determination was made whether it was covered by the warranty?
A. I think you're asking me, was this chair covered by warranty?
Q. Yes.
A. Yes, it was.
Q. Okay. And how do you know that?
A. Because they sent the parts to me, the

Page 58

Q. And how did you record that at that time?
A. I wrote it down on a piece of paper.
Q. Okay. Did you order that -- or enter that control number into any other record either manually or electronically?
A. No.
Q. When you ordered the parts, did you generate a purchase order?
A. No.
Q. How were the parts ordered from the manufacturer?
A. Usually by telephone. Sometimes by e-mail.
Q. Do you know whether in this case you ordered by telephone or e-mail?
A. Not specifically.
Q. Was there a charge for the replacement parts?
A. There is not.
Q. So as far as you know from your end -- well, strike that.
You didn't keep that piece of paper, did you?
A. No.
Q. Okay. And to this day, you don't know where it is?

Page 59

A. The piece of paper?
Q. Did you throw it away?
A. I would have thrown it away. I typically do that after I fix them. I would throw the paperwork away on it.
Q. Okay. Was there any other paperwork associated with this repair other than writing the control number on that piece of paper on your end?
A. Not that I remember.
Q. Do you remember who you communicated with to order the repair parts?
A. Various people within Superior/Izzy Design. I don't know who it was on that specific day.
Q. And how would that -- I mean, I'm sure there were a number of conversations if you had made, you know, many repairs. But typically, how did that transaction work? You would give them the part number?
A. I would -- I would -- I used to phone them. More recently, there was a point in time where I started to e-mail them. But I would -- and I've got a specific contact there, but that contact has changed over the years.

Page 60

So on that specific day, I don't know who my contact was at that time. But there's a contact who works in warranty repairs for Superior/Izzy who I would call and give them that number, and they would send the parts to me.
Q. When the parts arrived, was there a packing slip or any other documentation that was generated by the manufacturer together with the parts?
A. Yes.
Q. And what do you recall was sent to you together with the part itself by way of paperwork?
A. What else besides that packing list was sent to me?
Q. Well, was there anything else besides the packing list that was sent?
A. No, just the parts and the packing list.
Q. Okay. Now, was the broken chair under warranty? The one that you repaired, the one that we're talking about in this case?
A. Yes.
Q. And what was the term of the warranty in terms

Page 61

of time? Was there a time within which the warranty applied?
A. Yes.
Q. And what was that standard?
A. I believe that it was 12 years. Well, I should say this. Twelve years for most of the chair. A lesser period of time for the pneumatic cylinder. I believe the pneumatic cylinder was a year or two years, but the remaining parts on the chair, control mechanisms, "J" bars, things like that, were 12 years.
Q. Okay. Now, do you have any knowledge of whether a determination was made with respect to the chair that you repaired, the broken chair in this case, whether a determination was made whether it was covered by the warranty?
A. I think you're asking me, was this chair covered by warranty?
Q. Yes.
A. Yes, it was.
Q. Okay. And how do you know that?
A. Because they sent the parts to me, the



G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

manufacturer sent the parts to me at no charge.
Q. Okay. And was it your understanding that had the chair not been covered by warranty then there would have been a charge for the parts?
A. Yes.
Q. Had you ever performed a repair to a chair from this manufacturer where there was a charge for the parts?
A. On this specific chair, the Centron Series chair?
Q. On any chair from this manufacturer.
A. I don't know that.
Q. How about on this series chair, Centron?
A. I've never been charged for parts on the Centron Series chair. No, we haven't.
Q. Did Al Brown ever speak to you regarding the life expectancy of the chair to your recollection?
A. Not that I recall.
Q. Based on the control number, was there any indication in that control number -- or strike that.
Was there anything in the control



number which indicated to you the date of manufacture of the chair?
A. Not that I could understand.
Q. And was there anything that you could understand with respect to a Superior chair that indicated a date of manufacture?
A. No.
Q. I believe you testified earlier that when Staples sold the Superior chair to a customer that there was something either affixed to the chair or associated with the chair that would indicate to you that that was a product that was sold by Staples. Is that correct?
A. That's correct. There's a label underneath the chair, underneath the seat that indicates who the buyer was.
Q. Okay. It's a Staples label and it indicates the buyer of the chair?
MR. MURPHY: Objection.
A. The label would say Staples on it if the chair was sold to us.
Q. Okay. So when you say "the buyer" of the chair, chairs purchased by Staples from the manufacturer. Correct?



MR. MURPHY: Objection.
A. If we --
MR. MURPHY: You might want to explain this.
A. If we -- if we purchased the chair from Superior, the label on the bottom would have Staples' name and our address on it and our -- maybe even our purchase order number. If it wasn't -- if it was purchased by Texas Instruments directly from Superior, then that label would say Texas Instruments on the chair.
Q. I see.
A. Some chairs were purchased prior to us selling them to Texas Instruments. Some chairs, Superior Centron chairs were purchased for the Attleboro facility by way of Texas Instruments' Dallas facility. And so those chairs when I flipped them over would say Texas Instruments on them rather than Staples Business Advantage.
Q. Okay. How was that label affixed to the chair?
A. Just a standard label, a white



pressure-sensitive label that's stuck to the bottom of the chair.
Q. So it wasn't bolted or screwed to the chair like a plate, it was actually adhesively affixed to the chair?
A. That's correct.
Q. And with respect to the chair that broke in this case, you don't know one way or the other whether there was a Staples label, a Texas Instruments label or any other label identifying the purchaser of the chair. Is that correct?
A. This chair -- I don't recall whose name was on the label on this chair.
Q. Do you recall seeing a label?
A. Yes. That label has the "T" number that I need on it. So that's how I know there was a label on it because I need that "T" number to order the parts.
Q. Okay. Did you ever have a conversation with the manufacturer, any representative of the manufacturer about supplying additional screws to Texas Instruments for Superior chairs?
A. Yes.

Q. Was there more than one such conversation?
A. Not that I recall.
Q. Okay. Tell us what you recall about that conversation about additional screws for Superior chairs.
A. The chairs that had the two -- the chairs that had "J" bars attached to the control mechanism with two screws also had a provision for a third screw in between those two screws.
And so the manufacturer supplied a box of screws with washers that Texas Instruments used to -- to better attach the back to the -- to the control -- the "J" bar to the control mechanism.
Q. Do you recall who you had this conversation with at Superior about additional screws for Texas Instruments chairs?
A. It would have been that same person that I -- that I used for warranty repairs, whoever that was at the time.
Q. And was that a telephonic conversation or was that a communication that took place by e-mail?
A. I don't remember that.



Q. Now, how is it that you had this conversation with the person at -- it was at Superior or it was at Izzy? We're using Superior. That's a model of chair, isn't it?
A. A Superior chair is a chair manufacturer who, as I understand it, was -- was purchased by Izzy Design.
Q. Okay. So now, how is it that you came to have this conversation with someone at Superior about the third screw for Texas Instruments chairs?
A. Well, because when -- when we looked at the chairs, there was a -- there was a provision for a third screw and I think it was -- it was deemed that that would be a more secure way to attach the back to the control mechanism. It seemed -- three screws seems better than two.
Q. You said when "we" looked at the chairs. Do you mean you and Al Brown? Or was there someone else?
A. I don't remember. I believe it was Al Brown and I that looked at the chairs and determined that.
Q. Okay. So at some point with Al or someone



else you were looking at these chairs. And who was it that noticed that there was a provision for a third screw?
A. I don't remember that.
Q. And how did you learn that the manufacturer supplied a box of screws with washers for that third screw on these chairs?
A. I was the one that asked them to supply those.
Q. Okay. And the reason that you asked them to supply it was to more securely attach the "J" bar to the control mechanism?
A. Yes.
Q. Okay. And that was after observing the broken chair that came from Mary Ann King's office?
A. Yes, it was after that.
Q. Okay. So was that part of an attempt to prevent this sort of break from happening again?
MR. STUBENVOLL: Object to form, foundation.
MR. MURPHY: Objection.
A. I don't know that. That would be an assumption on my part, I think.
Q. Well, who asked you to do this?



A. To get the screws?
Q. Yes.
A. It was Al Brown, I believe.
Q. Okay. And was it Al's idea or was it your idea or did you both concur on that?
A. Yeah, that's -- I think -- I think maybe you asked me that before, and I think I don't remember that. I don't know if it was me that noticed that there was a third screw provision or Al. But it was figured out and we went ahead and ordered the screws.
Q. And when you spoke to the people at Superior and told them you wanted the third screw, what did you tell them that you wanted it for?
A. To -- to affix the backs of the chairs to the control mechanism in a better fashion.
Q. And what, if anything, did the person from Superior say to you about ordering that part for that purpose?
A. They agreed to send them out to me.
Q. Did they say anything to your recollection about whether they thought that was a good idea or --
A. I don't recall that.

control mechanism that told about how to adjust the chair and -- and I believe, but this is my -- I'm relying on my memory here -- I believe that card also speaks to how to make -- how you should regularly inspect for the screws, for the tightness of the screws and to be sure that they're all there and --
Q. Now, the tightness of what screws?
A. Just in general. To check how tight -- to make sure that the screws are tight that attach the control mechanism to the seat and the "J" bar to the control mechanism.
Q. And do you recall how one was directed to inspect for tightness of screws?
A. I don't. I believe that Al asked me to provide him with those cards, and I think what happened is that we got him that -- what that card said in general in a PDF format from the manufacturer and that I sent that to him. And I believe that that was sent out to -- to -- as a -- as an all desk bulletin to the various associates at Texas Instruments.
Q. And did you see that PDF document before -- or at any time?



A. It was sent to me originally from Superior.
Q. Okay. And that was after the broken chair that you repaired that we're concerned with in this case. Correct?
A. That was after.
Q. Okay. I'm going to show you --
MR. ESKEY: And we can mark this.
Q. I want to show you -- it's a very grainy photograph or photocopy that has two chairs on it.
MR. MURPHY: Do you want to get it marked first?
MR. ESKEY: What's that?
MR. MURPHY: Do you want to get it marked first?
MR. ESKEY: We can mark it after. It doesn't matter.
Q. Do either of the chairs -- there are two chairs depicted on that photocopy. Do either of the chairs depicted in that photocopy -- are either of those a Superior chair?
A. This one here (indicating) looks like a Superior chair.
Q. You're pointing to the one on the left?



A. This one (indicating), yes.
Q. Okay. Would you just do me a favor and write Superior beneath the one that you've identified and sign and date that? Today's the 7th.
A. Sign my name to it?
Q. Yes, please.
(Witness complies)
(Exhibit P-1 marked for identification)
MR. ESKEY: Can we go off the record for a second?
MR. MURPHY: Sure.
(Discussion off the record)
Q. Okay. Mr. Drews, you've been presented with a copy of what we're going to mark as Plaintiffs' Exhibit 2 for identification to this deposition. Have you seen that document before today?
MR. STUBENVOLL: Just for the record, before he answers, to preserve our objection to the use of this document which has not been produced which it appears that plaintiffs have had in their possession, received from



someone, presumably Texas Instruments, was not produced with the Rule 26 disclosures. It was not produced, to my knowledge, in response to our discovery requests, which I think is inappropriate.
MR. MURPHY: I'll echo Mr. Stubenvoll's objection.
MR. STUBENVOLL: And we'll preserve all rights as a result.
(Exhibit P-2 marked for identification)
Q. Have you seen this document before today, Mr. Drews?
A. No.
MR. MURPHY: Take a chance to look through it. It's several pages.
(Witness reviews document)
MR. MURPHY: I'm pointing out parts that I want to be sure he reads in this document for completeness before you ask questions.
(Witness continues reviewing document)
Q. Mr. Drews, I just want to know whether you

VOLUME I
PAGES 1-75
EXHIBITS: Per Index

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING and
PHILLIP KING,
Plaintiffs

v. C.A. No.: 06-258S

STAPLES, INC., IZZY
DESIGN, JSJ CORPORATION,
JOHN DOE COMPANY,
Defendants

* * * * * * *

DEPOSITION of RUSSELL LOXLEY, a witness called on behalf of Izzy Design and JSJ Corporation, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the State of Rhode Island, at the offices of Zizik, Powers, O'Connell, Spaulding & Lamontagne, 40 Westminster Street, Providence, Rhode Island, on Thursday, June 7, 2007, commencing at 10:02 a.m.

Now, have you ever had a chance to give a deposition before?
A. No, I have never given a deposition.
Q. Basically you are here because I and my office served a subpoena on you because your name happened to be mentioned in a couple of the depositions that have already been taken in this case.
You had worked at Texas Instruments. Correct?
A. Yes.
Q. Okay. How long had you worked there?
A. Eighteen and a half years.
Q. Okay. And in what capacity?
A. Actually, I was a toolmaker in the beginning; and after I got my degree, I became an engineering technician.
Q. Okay. How many years were you a toolmaker?
A. I started at Brown & Sharpe in 1966. Oh, my God. Forty-one years ago. And I've been in the trade ever since.
Q. And when did you get your degree to become an engineering tech?
A. 1989.



Q. When did you leave Texas Instruments?
A. June of '05. I actually went on a bridge to retirement. So I'm actually still like involved but not involved.
Q. Okay.
A. I'm still on the retirement list.
Q. You're still on their retirement list?
A. Well, I actually retired. Instead of being let go, you get -- you know, you get retired.
Q. So you still get some benefits from Texas Instruments?
A. Well, sort of. Yeah, you know, like -- well, I got profit sharing, stuff like that. You know, still -- you know, I'm on the books as a retiree. Let's put it that way. Benefits are far and few in between but --
Q. Do you currently work other than being fully retired?
A. Yes.
Q. Where is that?
A. AmeriSource Bergen in Mansfield, Massachusetts.
Q. Could you spell that for us?
A. No. Just like it sounds. AmeriSource Bergen,



B-e-r-g-e-n.
Q. And what do you do for AmeriSource Bergen?
A. I'm a maintenance technician.
Q. Is that a full-time job?
A. Yes, it is.
Q. And where do you currently live?
A. Smithfield, Rhode Island.
Q. And what's the address?
A. 19 Chamberlain Street.
Q. Any plans to move?
A. No, not after 59 years. I like it there.
Q. Now, do you know someone named Mary Ann King?
A. Yes, I do.
Q. How did you know Mrs. King?
A. I worked with her at Texas Instruments.
Q. Okay. And through this case, we've been able to learn that she worked in the tool crib.
A. Yes.
Q. Are you familiar with that area?
A. Yes. It was right across from my area.
Q. And what was your area called?
A. It was a tool room.
Q. Tool room.
A. Right.



Q. And she's in the tool crib.
A. Yes. But her tool crib had nothing to do with my tool room because I had my own tool crib. Hers was more of a parts crib, I would have to say.
Q. Okay. And what hours did you work there?
A. 7 to 3:30.
Q. Monday through Friday?
A. Yes.
Q. And back in June of 2003, were you an engineering tech at that time?
A. Yes, I was.
Q. For TI?
A. Yes.
Q. Okay. Would you see Mary Ann King on a regular basis?
A. Well, when I needed parts to repair equipment, I would go into the crib and get them.
Q. Okay. As you sit here today, you're aware that Mrs. King was hurt on the job?
A. Yes, I am.
Q. Okay. How did you first become aware of her injury?
A. I was there that day that she was injured.

Now, have you ever had a chance to give a deposition before?
A. No, I have never given a deposition.
Q. Basically you are here because I and my office served a subpoena on you because your name happened to be mentioned in a couple of the depositions that have already been taken in this case.
You had worked at Texas Instruments. Correct?
A. Yes.
Q. Okay. How long had you worked there?
A. Eighteen and a half years.
Q. Okay. And in what capacity?
A. Actually, I was a toolmaker in the beginning; and after I got my degree, I became an engineering technician.
Q. Okay. How many years were you a toolmaker?
A. I started at Brown & Sharpe in 1966. Oh, my God. Forty-one years ago. And I've been in the trade ever since.
Q. And when did you get your degree to become an engineering tech?
A. 1989.



Q. When did you leave Texas Instruments?
A. June of '05. I actually went on a bridge to retirement. So I'm actually still like involved but not involved.
Q. Okay.
A. I'm still on the retirement list.
Q. You're still on their retirement list?
A. Well, I actually retired. Instead of being let go, you get -- you know, you get retired.
Q. So you still get some benefits from Texas Instruments?
A. Well, sort of. Yeah, you know, like -- well, I got profit sharing, stuff like that. You know, still -- you know, I'm on the books as a retiree. Let's put it that way. Benefits are far and few in between but --
Q. Do you currently work other than being fully retired?
A. Yes.
Q. Where is that?
A. AmeriSource Bergen in Mansfield, Massachusetts.
Q. Could you spell that for us?
A. No. Just like it sounds. AmeriSource Bergen,



B-e-r-g-e-n.
Q. And what do you do for AmeriSource Bergen?
A. I'm a maintenance technician.
Q. Is that a full-time job?
A. Yes, it is.
Q. And where do you currently live?
A. Smithfield, Rhode Island.
Q. And what's the address?
A. 19 Chamberlain Street.
Q. Any plans to move?
A. No, not after 59 years. I like it there.
Q. Now, do you know someone named Mary Ann King?
A. Yes, I do.
Q. How did you know Mrs. King?
A. I worked with her at Texas Instruments.
Q. Okay. And through this case, we've been able to learn that she worked in the tool crib.
A. Yes.
Q. Are you familiar with that area?
A. Yes. It was right across from my area.
Q. And what was your area called?
A. It was a tool room.
Q. Tool room.
A. Right.



Q. And she's in the tool crib.
A. Yes. But her tool crib had nothing to do with my tool room because I had my own tool crib. Hers was more of a parts crib, I would have to say.
Q. Okay. And what hours did you work there?
A. 7 to 3:30.
Q. Monday through Friday?
A. Yes.
Q. And back in June of 2003, were you an engineering tech at that time?
A. Yes, I was.
Q. For TI?
A. Yes.
Q. Okay. Would you see Mary Ann King on a regular basis?
A. Well, when I needed parts to repair equipment, I would go into the crib and get them.
Q. Okay. As you sit here today, you're aware that Mrs. King was hurt on the job?
A. Yes, I am.
Q. Okay. How did you first become aware of her injury?
A. I was there that day that she was injured.

Page 10

Q. Okay. And how did you learn about it?
A. They actually came to -- well, I was in the -- I went in the crib, and I believe it was Pamela McGee told me that Mary Ann had fallen out of the chair, the chair had let go.
And I said, "Oh, well, let me take the chair." So I took the chair, brought it out of her area and put it in my area. And then when I had a chance, I'd look at it. Because part of my function was to repair chairs, believe it or not. Tons of them.
Q. Okay.
A. I used to work with a gentleman from Staples. I believe he was one of the salesmen.
Q. Jim Drews?
A. Yes, as a matter of fact. He used to come in. We used to argue all the time about chairs.
Q. Okay. So part of your job was to repair chairs?
A. Well, yeah, in a way. It was like a sideline, you know, because they didn't want to, you know, scrap the chairs. They just wanted to try to salvage them. So they asked me if I'd look at them and take parts from this chair.

Page 11

And I was very much against that whole scenario because you don't do that with chairs, especially those kind. You know, they were the high chairs for the line workers, for assembly workers, you know.
So we had a little go-around about repairing chairs. So that's when we had Jim come in to look at them to see if they were still under warranty and stuff like that. Some of them were Staples chairs or the other company and some were Steelcase chairs. Different companies, but I believe most of them were from Staples. I'm not absolutely sure. Because he took a few back. I mean, he even repaired a couple himself.
Q. How long had it been your function to repair chairs for TI?
A. Well, every time there was a problem with a chair, they'd call me. So it could have been -- it's hard to say. It could have been ten years.
I mean, it was just -- it wasn't a -- it wasn't a job description of mine. It was just a function that if a chair needed to be

Page 12

repaired, then I'd look at it because maintenance was not -- had too many other things to do to be bothered with chairs.
Q. Okay.
A. I mean, at the time, we had 40 chairs piled up that needed to be looked at, you know. Most of the time I put them in the dumpster because I didn't want to work on them.
Q. When you say at the time you had 40 chairs piled up, would those have been in your tool crib?
A. Oh, no, no. They'd be in a different area, just a storage area.
Q. Okay. Were they kept in the area called Safety?
A. No.
Q. No?
A. No.
Q. Okay. Where was this storage area in relation to your --
A. Well, my area was here, Mary Ann's area was here, and then there was an empty assembly area alongside her crib. And that's where we used to keep the chairs until I disposed of

Page 13

them.
Q. All right. And that's in Building 12?
A. Yes.
Q. Was that area open for employees to go into and out of?
A. Well, you could walk -- you could walk by there.
Q. Okay. It wasn't kept secured or anything?
A. Oh, no. No. The chairs were wrapped with that clear wrap so you couldn't take the chairs off the pallets, you know, and use them again. So we had them secured with that clear shrink wrap, they call it, pallet wrap, whatever you want to call it, so the chairs couldn't be removed. If they were, they'd all end up on the floor. It was secure in a way.
Q. And those chairs were there as of 2003 just waiting to be worked on by you?
A. Well, during -- yeah, in that period, you know. Probably from, I don't know, 2000 till 2003. I mean, there were chairs in and out. Those chairs weren't there for that many years. They were just there until we had Jim come in and --

THE WITNESS: (To Ms. Michels) Was it Jim?
A. But anyway, he -- he come in and then we went through the chairs and ended up throwing most of them away.
Q. You said there were all different kinds of chairs in that storage room?
A. Well, there was different manufacturers.
Q. Okay. And you mentioned that Texas Instruments had wanted you to try to take parts from one to fix another. When did you start doing that?
MR. ESKEY: I object.
Q. Was that like ten years ago?
A. Yeah, that was during that period. I didn't do it, but that's when they wanted me to do it.
Q. Okay. Who told you that they wanted you to try to salvage the chairs in that way?
A. Well, let me see. Ron Czipal was one of the supervisors. Bill Condon (phonetic) was another one. Those are two of the men I worked for.
Q. Can you spell Ron's last name for me?



A. Czipal?
Q. Yes.
A. I think it's C-z-i-p-a-l.
Q. Okay. And Bill Condon?
A. Condon, yes. C-o-n-g-e-n, something like that.
Q. And what was Mr. Czipal's title?
A. He was -- he was like a manufacturing manager, I would have to say.
Q. Okay. And Bill Condon?
A. He was a -- like an operations manager more or less.
Q. Was Mr. Condon or Mr. Czipal your immediate supervisor?
A. No, they were the head of the departments.
Q. Okay. Who was your immediate supervisor?
A. Charlie Knight. Charles Knight, Chuck Knight. And Robert Nabb was one of them. I had a number of supervisors while I worked there.
Q. Okay. So somewhere roughly in the late '90s you were asked to if a chair was broken --
A. Right.
Q. -- try to fix it?
A. Yes.



Q. Okay. And from 1997 to 2003, did you periodically work on chairs?
A. Mm-hmm.
Q. Yes?
A. I would look at them. I would see what they needed. And then I would try to get the parts, but the parts were never available because chair repair was not -- I don't think chair repair was an option.
Q. Okay. What do you mean?
A. I don't know. I don't think they wanted to repair the chairs. I mean, they wanted me to repair the chairs because I could make parts in my tool room if I needed parts, but I didn't do that. I wouldn't make parts because I didn't want the responsibility of that.
Q. So if you saw a part that needed to be added to a chair, would you then go to the parts crib and try to get parts?
A. No, you can't get parts out of the crib for chairs. We didn't stock chair parts.
Q. Okay. Did you ever order parts yourself from Staples?
A. No. Staples, they came in and looked at the



chairs. I don't -- I'm not -- I don't remember if he ever repaired any of them. He did take a couple of them apart and he did -- to my knowledge, I think he did repair a couple of chairs.

And then after that, we just gave up on it because it was just -- it was -- it was easier to buy another chair than to try to repair, you know. It was actually more economical to buy a chair than to repair a chair. So we ended up throwing most of them away.
Q. To your knowledge, when the chair broke for Mary Ann King --
A. Mm-hmm.
Q. -- were you the first person to touch it after that?
A. Yes, I was.
Q. Okay. And when you first saw it, where was it?
A. It was in their area.
Q. In the area where Mary Ann sat?
A. Right.
Q. Okay.

Page 18

A. As I remember it, when I came in, Mary Ann was still there and Pam was with her and the chair was sitting there in two pieces.
Q. Okay.
A. Because the back was off and the seat was still there.
Q. Did Mary Ann or Pam tell you what had happened?
A. She said, "The chair broke and I fell."
Q. Okay. Do you know how long after she fell you were into the crib?
A. It was -- I think it was pretty close to right away I walked in. I was always in and out.
Q. Did you --
A. I don't know if I heard a commotion or I heard a noise, but I remember going in the crib and the chair was broke and they were talking about it.
Q. So you don't remember as you sit here today hearing something that made you go in?
A. Well, you see, I'm not sure. I know -- I know something made me go in there. Whether I needed a part or I heard a noise, it's tough to say. But I know they said she fell out of

Page 19

the chair. Or the chair broke and she fell.
Q. When you saw Mary Ann, was she standing up or sitting down?
A. She was leaning on her desk, on the corner of her desk.
Q. Okay. Standing up?
A. Well, yeah, but sitting on the corner. You know, half and half. You know, you'd be resting your cheeks on the --
Q. On the counter of the --
A. Yes.
Q. -- work station?
A. Well, her desk.
Q. Of her desk.
A. She had a desk. She had an office. That's where the chair was.
Q. Okay. And at that point, did you think Mary Ann was hurt?
MR. ESKEY: I object.
A. Well, it looked like she had an expression on her face that she wasn't happy. And Pamela was standing with her like -- you know, not supporting her but just, you know, assuring her, I guess.

Page 20

Q. Did she tell you she hurt herself?
A. Well, she said she fell out of the chair and she got hurt, you know. I won't say it exactly how she said it, but she said it.
Q. She told you that she fell out of the chair and got hurt?
A. She said she -- yeah, the chair broke and she got hurt.
Q. And did she tell you where she got hurt?
A. Not really. She just said -- you know, when she went back, it pulled -- you know, she pulled her side, I guess it was, or her back. I was more interested in the chair.
Q. Okay. Up to that point, had any chair that you're aware of at TI broken?
A. Well, the backs -- the backs were the biggest problem with the chairs. Because they have a lever that controls the -- not the same as her chair, but the chairs on the line had a -- they would actually break away.
The clutches they have, they call them clutches, that set the pressure on the chair on the back on the shaft, the axle, whatever they call it. And they would weaken,

Page 21

I guess, and then the chairs would, you know -- they wouldn't break, but they would -- you wouldn't be able to adjust them anymore, you wouldn't be able to put the backs up.
Then they had a piston that controlled the height of the chair, which was another weak point in the chair.
Q. But you said those chairs were not the same as Mary Ann's chair?
A. Well, no. Hers was more of an office chair, I believe, more of a -- same type of mechanism but not the same type of chair.
Q. Do you know what kind of chair it was that she was sitting in?
A. No, I can't remember.
Q. Okay.
A. It was an office chair, I know. An adjustable chair.
Q. When you first saw the chair, it was in two pieces?
A. Right, the back was off.
Q. Okay. What exactly did you do when you --
A. I picked up the back, put it on the chair and wheeled it out. I didn't put it back in the



G&M COURT REPORTERS, LTD.
1.800.655.3663 - www.gmcourtreporters.com

Q. Okay. And how did you learn about it?
A. They actually came to -- well, I was in the -- I went in the crib, and I believe it was Pamela McGee told me that Mary Ann had fallen out of the chair, the chair had let go.
And I said, "Oh, well, let me take the chair." So I took the chair, brought it out of her area and put it in my area. And then when I had a chance, I'd look at it. Because part of my function was to repair chairs, believe it or not. Tons of them.
Q. Okay.
A. I used to work with a gentleman from Staples. I believe he was one of the salesmen.
Q. Jim Drews?
A. Yes, as a matter of fact. He used to come in. We used to argue all the time about chairs.
Q. Okay. So part of your job was to repair chairs?
A. Well, yeah, in a way. It was like a sideline, you know, because they didn't want to, you know, scrap the chairs. They just wanted to try to salvage them. So they asked me if I'd look at them and take parts from this chair.



And I was very much against that whole scenario because you don't do that with chairs, especially those kind. You know, they were the high chairs for the line workers, for assembly workers, you know.
So we had a little go-around about repairing chairs. So that's when we had Jim come in to look at them to see if they were still under warranty and stuff like that. Some of them were Staples chairs or the other company and some were Steelcase chairs. Different companies, but I believe most of them were from Staples. I'm not absolutely sure. Because he took a few back. I mean, he even repaired a couple himself.
Q. How long had it been your function to repair chairs for TI?
A. Well, every time there was a problem with a chair, they'd call me. So it could have been -- it's hard to say. It could have been ten years.
I mean, it was just -- it wasn't a -- it wasn't a job description of mine. It was just a function that if a chair needed to be



repaired, then I'd look at it because maintenance was not -- had too many other things to do to be bothered with chairs.
Q. Okay.
A. I mean, at the time, we had 40 chairs piled up that needed to be looked at, you know. Most of the time I put them in the dumpster because I didn't want to work on them.
Q. When you say at the time you had 40 chairs piled up, would those have been in your tool crib?
A. Oh, no, no. They'd be in a different area, just a storage area.
Q. Okay. Were they kept in the area called Safety?
A. No.
Q. No?
A. No.
Q. Okay. Where was this storage area in relation to your --
A. Well, my area was here, Mary Ann's area was here, and then there was an empty assembly area alongside her crib. And that's where we used to keep the chairs until I disposed of



them.
Q. All right. And that's in Building 12?
A. Yes.
Q. Was that area open for employees to go into and out of?
A. Well, you could walk -- you could walk by there.
Q. Okay. It wasn't kept secured or anything?
A. Oh, no. No. The chairs were wrapped with that clear wrap so you couldn't take the chairs off the pallets, you know, and use them again. So we had them secured with that clear shrink wrap, they call it, pallet wrap, whatever you want to call it, so the chairs couldn't be removed. If they were, they'd all end up on the floor. It was secure in a way.
Q. And those chairs were there as of 2003 just waiting to be worked on by you?
A. Well, during -- yeah, in that period, you know. Probably from, I don't know, 2000 till 2003. I mean, there were chairs in and out. Those chairs weren't there for that many years. They were just there until we had Jim come in and --

Page 10

Q. Okay. And how did you learn about it?
A. They actually came to -- well, I was in the -- I went in the crib, and I believe it was Pamela McGee told me that Mary Ann had fallen out of the chair, the chair had let go.
And I said, "Oh, well, let me take the chair." So I took the chair, brought it out of her area and put it in my area. And then when I had a chance, I'd look at it. Because part of my function was to repair chairs, believe it or not. Tons of them.
Q. Okay.
A. I used to work with a gentleman from Staples. I believe he was one of the salesmen.
Q. Jim Drews?
A. Yes, as a matter of fact. He used to come in. We used to argue all the time about chairs.
Q. Okay. So part of your job was to repair chairs?
A. Well, yeah, in a way. It was like a sideline, you know, because they didn't want to, you know, scrap the chairs. They just wanted to try to salvage them. So they asked me if I'd look at them and take parts from this chair.

Page 11

And I was very much against that whole scenario because you don't do that with chairs, especially those kind. You know, they were the high chairs for the line workers, for assembly workers, you know.
So we had a little go-around about repairing chairs. So that's when we had Jim come in to look at them to see if they were still under warranty and stuff like that. Some of them were Staples chairs or the other company and some were Steelcase chairs. Different companies, but I believe most of them were from Staples. I'm not absolutely sure. Because he took a few back. I mean, he even repaired a couple himself.
Q. How long had it been your function to repair chairs for TI?
A. Well, every time there was a problem with a chair, they'd call me. So it could have been -- it's hard to say. It could have been ten years.
I mean, it was just -- it wasn't a -- it wasn't a job description of mine. It was just a function that if a chair needed to be

Page 12

repaired, then I'd look at it because maintenance was not -- had too many other things to do to be bothered with chairs.
Q. Okay.
A. I mean, at the time, we had 40 chairs piled up that needed to be looked at, you know. Most of the time I put them in the dumpster because I didn't want to work on them.
Q. When you say at the time you had 40 chairs piled up, would those have been in your tool crib?
A. Oh, no, no. They'd be in a different area, just a storage area.
Q. Okay. Were they kept in the area called Safety?
A. No.
Q. No?
A. No.
Q. Okay. Where was this storage area in relation to your --
A. Well, my area was here, Mary Ann's area was here, and then there was an empty assembly area alongside her crib. And that's where we used to keep the chairs until I disposed of

Page 13

them.
Q. All right. And that's in Building 12?
A. Yes.
Q. Was that area open for employees to go into and out of?
A. Well, you could walk -- you could walk by there.
Q. Okay. It wasn't kept secured or anything?
A. Oh, no. No. The chairs were wrapped with that clear wrap so you couldn't take the chairs off the pallets, you know, and use them again. So we had them secured with that clear shrink wrap, they call it, pallet wrap, whatever you want to call it, so the chairs couldn't be removed. If they were, they'd all end up on the floor. It was secure in a way.
Q. And those chairs were there as of 2003 just waiting to be worked on by you?
A. Well, during -- yeah, in that period, you know. Probably from, I don't know, 2000 till 2003. I mean, there were chairs in and out. Those chairs weren't there for that many years. They were just there until we had Jim come in and --

Page 14

THE WITNESS: (To Ms. Michels) Was it Jim?
A. But anyway, he -- he come in and then we went through the chairs and ended up throwing most of them away.
Q. You said there were all different kinds of chairs in that storage room?
A. Well, there was different manufacturers.
Q. Okay. And you mentioned that Texas Instruments had wanted you to try to take parts from one to fix another. When did you start doing that?
MR. ESKEY: I object.
Q. Was that like ten years ago?
A. Yeah, that was during that period. I didn't do it, but that's when they wanted me to do it.
Q. Okay. Who told you that they wanted you to try to salvage the chairs in that way?
A. Well, let me see. Ron Czipal was one of the supervisors. Bill Condon (phonetic) was another one. Those are two of the men I worked for.
Q. Can you spell Ron's last name for me?

Page 15

A. Czipal?
Q. Yes.
A. I think it's C-z-i-p-a-l.
Q. Okay. And Bill Condon?
A. Condon, yes. C-o-n-g-e-n, something like that.
Q. And what was Mr. Czipal's title?
A. He was -- he was like a manufacturing manager, I would have to say.
Q. Okay. And Bill Condon?
A. He was a -- like an operations manager more or less.
Q. Was Mr. Condon or Mr. Czipal your immediate supervisor?
A. No, they were the head of the departments.
Q. Okay. Who was your immediate supervisor?
A. Charlie Knight. Charles Knight, Chuck Knight. And Robert Nabb was one of them. I had a number of supervisors while I worked there.
Q. Okay. So somewhere roughly in the late '90s you were asked to if a chair was broken --
A. Right.
Q. -- try to fix it?
A. Yes.

Page 16

Q. Okay. And from 1997 to 2003, did you periodically work on chairs?
A. Mm-hmm.
Q. Yes?
A. I would look at them. I would see what they needed. And then I would try to get the parts, but the parts were never available because chair repair was not -- I don't think chair repair was an option.
Q. Okay. What do you mean?
A. I don't know. I don't think they wanted to repair the chairs. I mean, they wanted me to repair the chairs because I could make parts in my tool room if I needed parts, but I didn't do that. I wouldn't make parts because I didn't want the responsibility of that.
Q. So if you saw a part that needed to be added to a chair, would you then go to the parts crib and try to get parts?
A. No, you can't get parts out of the crib for chairs. We didn't stock chair parts.
Q. Okay. Did you ever order parts yourself from Staples?
A. No. Staples, they came in and looked at the

Page 17

chairs. I don't -- I'm not -- I don't remember if he ever repaired any of them. He did take a couple of them apart and he did -- to my knowledge, I think he did repair a couple of chairs.
And then after that, we just gave up on it because it was just -- it was -- it was easier to buy another chair than to try to repair, you know. It was actually more economical to buy a chair than to repair a chair. So we ended up throwing most of them away.
Q. To your knowledge, when the chair broke for Mary Ann King --
A. Mm-hmm.
Q. -- were you the first person to touch it after that?
A. Yes, I was.
Q. Okay. And when you first saw it, where was it?
A. It was in their area.
Q. In the area where Mary Ann sat?
A. Right.
Q. Okay.

Q. Okay. And how did you learn about it?
A. They actually came to -- well, I was in the -- I went in the crib, and I believe it was Pamela McGee told me that Mary Ann had fallen out of the chair, the chair had let go.
And I said, "Oh, well, let me take the chair." So I took the chair, brought it out of her area and put it in my area. And then when I had a chance, I'd look at it. Because part of my function was to repair chairs, believe it or not. Tons of them.
Q. Okay.
A. I used to work with a gentleman from Staples. I believe he was one of the salesmen.
Q. Jim Drews?
A. Yes, as a matter of fact. He used to come in. We used to argue all the time about chairs.
Q. Okay. So part of your job was to repair chairs?
A. Well, yeah, in a way. It was like a sideline, you know, because they didn't want to, you know, scrap the chairs. They just wanted to try to salvage them. So they asked me if I'd look at them and take parts from this chair.



And I was very much against that whole scenario because you don't do that with chairs, especially those kind. You know, they were the high chairs for the line workers, for assembly workers, you know.
So we had a little go-around about repairing chairs. So that's when we had Jim come in to look at them to see if they were still under warranty and stuff like that. Some of them were Staples chairs or the other company and some were Steelcase chairs. Different companies, but I believe most of them were from Staples. I'm not absolutely sure. Because he took a few back. I mean, he even repaired a couple himself.
Q. How long had it been your function to repair chairs for TI?
A. Well, every time there was a problem with a chair, they'd call me. So it could have been -- it's hard to say. It could have been ten years.
I mean, it was just -- it wasn't a -- it wasn't a job description of mine. It was just a function that if a chair needed to be



repaired, then I'd look at it because maintenance was not -- had too many other things to do to be bothered with chairs.
Q. Okay.
A. I mean, at the time, we had 40 chairs piled up that needed to be looked at, you know. Most of the time I put them in the dumpster because I didn't want to work on them.
Q. When you say at the time you had 40 chairs piled up, would those have been in your tool crib?
A. Oh, no, no. They'd be in a different area, just a storage area.
Q. Okay. Were they kept in the area called Safety?
A. No.
Q. No?
A. No.
Q. Okay. Where was this storage area in relation to your --
A. Well, my area was here, Mary Ann's area was here, and then there was an empty assembly area alongside her crib. And that's where we used to keep the chairs until I disposed of



them.
Q. All right. And that's in Building 12?
A. Yes.
Q. Was that area open for employees to go into and out of?
A. Well, you could walk -- you could walk by there.
Q. Okay. It wasn't kept secured or anything?
A. Oh, no. No. The chairs were wrapped with that clear wrap so you couldn't take the chairs off the pallets, you know, and use them again. So we had them secured with that clear shrink wrap, they call it, pallet wrap, whatever you want to call it, so the chairs couldn't be removed. If they were, they'd all end up on the floor. It was secure in a way.
Q. And those chairs were there as of 2003 just waiting to be worked on by you?
A. Well, during -- yeah, in that period, you know. Probably from, I don't know, 2000 till 2003. I mean, there were chairs in and out. Those chairs weren't there for that many years. They were just there until we had Jim come in and --



G&M COURT REPORTERS, LTD.
1.800.655.3663 - www.gmcourtreporters.com

Q. Okay. And how did you learn about it?
A. They actually came to -- well, I was in the -- I went in the crib, and I believe it was Pamela McGee told me that Mary Ann had fallen out of the chair, the chair had let go.
And I said, "Oh, well, let me take the chair." So I took the chair, brought it out of her area and put it in my area. And then when I had a chance, I'd look at it. Because part of my function was to repair chairs, believe it or not. Tons of them.
Q. Okay.
A. I used to work with a gentleman from Staples. I believe he was one of the salesmen.
Q. Jim Drews?
A. Yes, as a matter of fact. He used to come in. We used to argue all the time about chairs.
Q. Okay. So part of your job was to repair chairs?
A. Well, yeah, in a way. It was like a sideline, you know, because they didn't want to, you know, scrap the chairs. They just wanted to try to salvage them. So they asked me if I'd look at them and take parts from this chair.



And I was very much against that whole scenario because you don't do that with chairs, especially those kind. You know, they were the high chairs for the line workers, for assembly workers, you know.
So we had a little go-around about repairing chairs. So that's when we had Jim come in to look at them to see if they were still under warranty and stuff like that. Some of them were Staples chairs or the other company and some were Steelcase chairs. Different companies, but I believe most of them were from Staples. I'm not absolutely sure. Because he took a few back. I mean, he even repaired a couple himself.
Q. How long had it been your function to repair chairs for TI?
A. Well, every time there was a problem with a chair, they'd call me. So it could have been -- it's hard to say. It could have been ten years.
I mean, it was just -- it wasn't a -- it wasn't a job description of mine. It was just a function that if a chair needed to be



repaired, then I'd look at it because maintenance was not -- had too many other things to do to be bothered with chairs.
Q. Okay.
A. I mean, at the time, we had 40 chairs piled up that needed to be looked at, you know. Most of the time I put them in the dumpster because I didn't want to work on them.
Q. When you say at the time you had 40 chairs piled up, would those have been in your tool crib?
A. Oh, no, no. They'd be in a different area, just a storage area.
Q. Okay. Were they kept in the area called Safety?
A. No.
Q. No?
A. No.
Q. Okay. Where was this storage area in relation to your --
A. Well, my area was here, Mary Ann's area was here, and then there was an empty assembly area alongside her crib. And that's where we used to keep the chairs until I disposed of



them.
Q. All right. And that's in Building 12?
A. Yes.
Q. Was that area open for employees to go into and out of?
A. Well, you could walk -- you could walk by there.
Q. Okay. It wasn't kept secured or anything?
A. Oh, no. No. The chairs were wrapped with that clear wrap so you couldn't take the chairs off the pallets, you know, and use them again. So we had them secured with that clear shrink wrap, they call it, pallet wrap, whatever you want to call it, so the chairs couldn't be removed. If they were, they'd all end up on the floor. It was secure in a way.
Q. And those chairs were there as of 2003 just waiting to be worked on by you?
A. Well, during -- yeah, in that period, you know. Probably from, I don't know, 2000 till 2003. I mean, there were chairs in and out. Those chairs weren't there for that many years. They were just there until we had Jim come in and --

It was a -- you know, it was a tedious operation to change these clutches and change the pistons. It wasn't worth the effort, you know, economically. But the other chair with two broken bolts was no big deal. So that's what I did.
Q. And did you ever talk to Jim Drews about Mary Ann's chair?
A. Not to my knowledge, no. Because it wasn't a -- it wasn't a failure -- to me --
Q. It wasn't a mechanism failure?
A. Right. To me, it wasn't a -- you know, I didn't know this whole -- this thing was gonna, you know, get like this. You know, it was just two broken bolts and, you know, I just put the chair back together.
And, you know, it was really no big deal at the time. I mean, it is now. But not at the time it wasn't a big deal.
Q. Okay. And then --
A. Because there was nothing he could have done, I mean, about that particular problem. I mean, he could have -- you know, he might have saved the bolts or done something like that,



but I don't -- at the time it didn't seem, you know, necessary to call him in on it, you know.
Q. Okay. And then the chairs that you felt it was necessary to call him in on, he would come check out the chair?
A. Right. He'd take a serial number and check it and see if they were his chairs or --
Q. Do you know how he did that?
A. He would write down the numbers if they were still available on the chair and then he'd go back.
Q. Where was the number located?
A. I'm not even sure. Some of them were on the pistons, some were underneath on the label. A lot of the labels were missing. He knew what chairs were his. But as far as the warranties, I don't know. I don't know -- I don't even know how long the warranties were for.
Q. Do you know if you could tell how old the chair was based on that number?
A. Well, he could. I couldn't. He took the numbers and would go back and see if the chair



was still under warranty by the manufacturer, I assume, not by Staples. But I would assume the manufacturer's warranty was either active or not.
Q. Did you ever see the number on the bottom of Mrs. King's chair?
A. No. See, it was a whole different scenario. We weren't interested -- you know, that chair was not part of the fix situation.
See, they had all these chairs that were -- that were broken that they wanted to salvage so they wouldn't have to buy all new chairs. If they had ten broken chairs, they wanted six good ones out of the ten broken ones.
Where her chair was just a whatever. You know, it was a -- it happened. So it wasn't part of that situation, you know.
Q. And when you say "they," you're talking about Texas Instruments?
A. Texas Instruments, right.
Q. Who wanted to try to salvage --
A. Exactly.
Q. -- these chairs.



A. Right. Because I guess those chairs were quite expensive or -- I don't know.
Q. And after the chairs would be fixed, were they just available for anybody to use?
A. They weren't fixed.
MR. ESKEY: I object.
Q. The ones that had the problems with the pistons and the --
A. They weren't fixed.
Q. They weren't fixed.
A. No.
Q. What happened to those chairs?
A. They got thrown in the dumpster. Some people took them, actually. They put them out and they took them and I don't know what they did with them. They took them home or whatever.
Q. They took them out of the dumpster?
A. Well, we put them outside so the dumpster people could pick them up. We left them on the pallet. And as time went by, I guess they took the chairs. You know, people would actually ask if they could have a chair, and they said, "Yeah, go ahead and take them."
Q. But Mrs. King's chair was never put out by the

Page 50

It was a -- you know, it was a tedious operation to change these clutches and change the pistons. It wasn't worth the effort, you know, economically. But the other chair with two broken bolts was no big deal. So that's what I did.
Q. And did you ever talk to Jim Drews about Mary Ann's chair?
A. Not to my knowledge, no. Because it wasn't a -- it wasn't a failure -- to me --
Q. It wasn't a mechanism failure?
A. Right. To me, it wasn't a -- you know, I didn't know this whole -- this thing was gonna, you know, get like this. You know, it was just two broken bolts and, you know, I just put the chair back together.
And, you know, it was really no big deal at the time. I mean, it is now. But not at the time it wasn't a big deal.
Q. Okay. And then --
A. Because there was nothing he could have done, I mean, about that particular problem. I mean, he could have -- you know, he might have saved the bolts or done something like that,

Page 51

but I don't -- at the time it didn't seem, you know, necessary to call him in on it, you know.
Q. Okay. And then the chairs that you felt it was necessary to call him in on, he would come check out the chair?
A. Right. He'd take a serial number and check it and see if they were his chairs or --
Q. Do you know how he did that?
A. He would write down the numbers if they were still available on the chair and then he'd go back.
Q. Where was the number located?
A. I'm not even sure. Some of them were on the pistons, some were underneath on the label. A lot of the labels were missing. He knew what chairs were his. But as far as the warranties, I don't know. I don't know -- I don't even know how long the warranties were for.
Q. Do you know if you could tell how old the chair was based on that number?
A. Well, he could. I couldn't. He took the numbers and would go back and see if the chair

Page 52

was still under warranty by the manufacturer, I assume, not by Staples. But I would assume the manufacturer's warranty was either active or not.
Q. Did you ever see the number on the bottom of Mrs. King's chair?
A. No. See, it was a whole different scenario. We weren't interested -- you know, that chair was not part of the fix situation.
See, they had all these chairs that were -- that were broken that they wanted to salvage so they wouldn't have to buy all new chairs. If they had ten broken chairs, they wanted six good ones out of the ten broken ones.
Where her chair was just a whatever. You know, it was a -- it happened. So it wasn't part of that situation, you know.
Q. And when you say "they," you're talking about Texas Instruments?
A. Texas Instruments, right.
Q. Who wanted to try to salvage --
A. Exactly.
Q. -- these chairs.

Page 53

A. Right. Because I guess those chairs were quite expensive or -- I don't know.
Q. And after the chairs would be fixed, were they just available for anybody to use?
A. They weren't fixed.
MR. ESKEY: I object.
Q. The ones that had the problems with the pistons and the --
A. They weren't fixed.
Q. They weren't fixed.
A. No.
Q. What happened to those chairs?
A. They got thrown in the dumpster. Some people took them, actually. They put them out and they took them and I don't know what they did with them. They took them home or whatever.
Q. They took them out of the dumpster?
A. Well, we put them outside so the dumpster people could pick them up. We left them on the pallet. And as time went by, I guess they took the chairs. You know, people would actually ask if they could have a chair, and they said, "Yeah, go ahead and take them."
Q. But Mrs. King's chair was never put out by the