**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| MARY ANN KING and PHILLIP KING Plaintiffs, | : | |
| v. | : | C.A. No.: 06-258-S |
| STAPLES INC.; IZZY DESIGN; JSJ CORPORATION; Defendants. | : | |

## PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### PART I PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS.

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Undisputed.

6. Undisputed.

7. Undisputed.

8. Undisputed.

9. Partially disputed. Plaintiffs agree that Ms. King was using a "Superior" Centron office chair at the time of the incident, but dispute that she was simply "seated." The chair broke when Ms. King, while seated, turned to speak with a co-worker and leaned against the back of the chair. *See,* Complaint ¶ 17; Deposition of Mary Ann King 11/17/06 ("King Dep. I") at 32, Supplemental Record Appendix ("SRA") at 4.[1]

[1] At the summary judgment hearing, plaintiff's counsel informed that references in the Record Appendix to the Deposition of Mary Ann King did not accurately cite to the correct volume of her deposition testimony, which was taken on two separate occasions (11/17/06

10. Partially disputed. While Ms. King testified at deposition that she believed she was using a Superior chair because "that was pretty much all we bought," to the extent that, as stated, defendants' assertion implies that Mrs. King claims the chair was a Superior Centron based solely upon her belief that that was what her employer "pretty much" purchased, it is disputed. *See, e.g.,* King Affidavit at 1; RA 79 (identifying photograph of Superior Centron as chair that broke); Deposition of Pamela J. McGee 2/1/07 ("McGee Dep.") at 29; RA at 90-91 (describing chair with features of Superior Centron), 82-86; RA at 100-102 (identifying photograph of Superior Centron as chair that broke); Deposition of Al Brown ("Brown Dep.") at 9, 28, 32; RA at 105-07 (identifying chair that broke as Superior Centron); Deposition of Jim Drews ("Drews Dep."). at 75-76; RA at 166 (identifying chair that broke as Superior Centron); Deposition of Russell Loxley 6/7/07 ("Loxley Dep.") at 73-75; RA at 184-85 (describing chair with features of Superior Centron).

11. Disputed. Defendants take Ms. McGee's statement that her boss told her that the chair was an "Imperial" out of context. Ms. McGee also testified at her deposition that her boss told her the chair that broke on Ms. King was made by either "Imperial" or "Superior." *See,* McGee Dep. 2/1/07 at 18, 71-72, 93; RA at 86-89.

12. Disputed. As the citations to Ms. McGee's deposition testimony in the preceding paragraph show, Ms. McGee had no personal knowledge of whether there were Imperial chairs on site or not.

13. Partially Disputed. The record supports that, in addition to defendants' "Superior" chairs, the chairs of only *two* other manufacturers—Herman Miller and Steelcase—were on site at TI when Ms. King's chair collapsed. The cited testimony does not support defendants' assertion that there were "eight or nine" different styles of chairs on site. Ms. McGee essentially guessed that *in the past* there were *maybe* "eight or nine different *styles*" of chairs on the site. *See,* McGee Dep. at 50; Def. Exh. D. Ms. McGee did not, as the asserted fact implies, testify that there were chairs on site when Ms. King's chair broke that were *produced* by eight or nine different manufacturers. The testimony of Russell Loxley cited by defendants supports only that chairs on site were of many different *colors* –not manufacturers. *See,* Loxley Dep. at 28-29; RA at 191. Jim Drews testified at deposition that he only saw chairs on the TI site manufactured by two companies other than "Superior"—"Herman Miller and Steelcase." Drews Dep. at 14-15; RA at 142.

14. Partially disputed. The record supports that Mr. Loxely arrived shortly after the incident and found the chair in two pieces. The cited record does not support defendants' assertion that Mr. Loxley arrived "within minutes of the accident."

15. Partially disputed. To the extent that Mr. Loxley's account concerning what he observed of and did with the chair is inconsistent with the testimony of Al Brown—who testified that he secured the chair three days after the incident and *believes* that

---

and 1/3/07). For ease of reference, the Supplemental Record Appendix ("SRA") contains relevant pages from both volumes of plaintiffs' deposition testimony and is consecutively numbered in the lower right corner.

the back was off the chair; Brown Dep. at 23-28, 119; RA at 106; Def. Exh. K — there exists a disputed material fact for the jury (as is its prerogative) to resolve by either reconciling the differences or rejecting one version or the other, in part or in whole.

16. Disputed. Mr. Loxley testified that he put the chair back out in the hallway "within the first week" after the incident and that "whatever happened to it after that is history." Loxley Dep. at 25-26; RA at 190-91. Mr. Loxley was not sure how long the chair remained in the hallway; he guessed "[a] month, maybe two months, *I don't know[,]*" Loxley Dep. at 30-31; RA at 196, "it could have been shorter * * * it could have went away and then come back again, I don't know." *Id.* at 67-68; RA at 194 Mr. Loxley also testified that he thought that the "Safety" department may have taken the chair, but that he wasn't sure. *Id.* at 31-32; RA at 196.

17. Undisputed.

18. Disputed. Mr. Loxely could not positively say one way or another whether the chair he repaired was or was not a "Superior." When shown a photograph of a "Superior" chair, Mr. Loxley could not identify it as the one he repaired after the incident. *See,* Loxley Dep. at 65-66; RA at 193-94. Mr. Loxley did testify, however, that the chair he repaired "could have had [the same] design" as the "Superior" chair depicted in the photograph he was shown at deposition. *See, id.* at 66; RA at 194.

19. Undisputed. Plaintiff agrees that Ms. McGee never saw a label on Ms. King's chair. However, Ms. McGee did positively identify the chair that broke on Ms. King as a "Superior." *See,* McGee Dep. at 82-86; RA at 100-102.

20. Undisputed.

21. Partially disputed. In describing the features of the chair that broke, Ms. King qualified her recollection of the location of levers and knobs by repeatedly maintaining at her deposition that she wasn't sure or could not recall the location and configuration of the adjustment features of her chair. *See,* Deposition of Mary Ann King 1/3/07 ("King Dep. II") at 42-43, 58; SRA at 11, 15.

22. Undisputed.

23. Undisputed. However, in describing the features of the chair that broke, Ms. King qualified her recollection of the location of levers and knobs by repeatedly maintaining at her deposition that she wasn't sure or could not recall the location and configuration of the adjustment features of her chair. *See,* Deposition of Mary Ann King 1/3/07 ("King Dep. II") at 42-43, 58; SRA at 11, 15.

24. Partially disputed. In describing the features of the chair that broke, Ms. King qualified her recollection of the location of levers and knobs by repeatedly maintaining at her deposition that she wasn't sure or could not recall the location and configuration of the adjustment features of her chair. *See,* Deposition of Mary Ann King 1/3/07 ("King Dep. II") at 42-43, 58; SRA at 11, 15.

25. Undisputed.

26. Partially disputed. Plaintiff agrees that her chair slipped into recline at times before the incident, but disputes that it happened frequently, as is implied by defendants' asserted fact. The slip into recline was an infrequent occurrence. *See,* King Dep. I at 41-43; King Dep. II at 51; SRA at 10-11, 13.

27. Partially disputed. Plaintiff agrees that she would "tighten" the recline function when it slipped. Plaintiff disputes, however, that there was any other issue with the chair that required Ms. King to "tighten" it, as is implied with defendants' use of the plural "problem*s*." *See,* King Dep. II at 49; SRA at 12.

28. Partially disputed. Plaintiff agrees that on one occasion, when the chair slipped into recline, a maintenance person looked at the recline function and tightened it up. Plaintiff disputes that implicit statement in defendants' assertion that the maintenance person tightened "everything." The maintenance person checked and tightened *only* the recline function. *See,* King Dep. II at 51-54; SRA at 13-14.

29. Undisputed. However, there was only one time that a maintenance person checked and adjusted the recline mechanism—not, as defendants' assertion implies (particularly read together with defendants' SUF 28)—two or more times when maintenance men checked out and adjusted the chair. Plaintiff also disputes the implicit assertion that the maintenance person tightened "everything." The maintenance person checked and tightened *only* the recline function. *See,* King Dep. II at 51-54; SRA at 13-14.

30. Disputed. The record does not support defendants' assertion that "something"—implying "it-could-have-been-anything"—on the chair was stripped. Ms. King testified that when maintenance checked and adjusted the *recline* part of the chair "they just figured it was a little stripped or something on the side." *See,* King Dep. II 53-54; SRA at 13-14.

31. Partially disputed. Plaintiff agrees that Mr. Brown located the chair he believed collapsed on Ms. King in the hall area outside her workspace. Plaintiff disputes, however, that the chair was "waiting to be discarded." When Mr. Brown located the chair, it was not waiting to be discarded. *See,* Loxley Dep. at 12-13, 52-53; RA at 176-79 (describing placement of chairs for his inspection before being discarded and noting that Mrs. King's chair was never placed by the dumpster with those to be discarded).

32. Partially disputed. Plaintiff agrees that chairs waiting to be worked on were kept in an assembly area near Ms. King's work area, but disputes that they were "piled up" and disputes that in that area they were waiting to be thrown away. The chairs were kept in that area on pallets, shrink-wrapped, for inspection by Mr. Loxley. They were not kept there "waiting to be * * * thrown away." *See,* Loxley Dep. at 12-13, 52-53; RA at 176-79.

33. Partially disputed. Plaintiff agrees that it was a "Centron," but the issue whether the back was attached to the chair is subject to conflicting accounts and qualifications of certainty by Mr. Brown. *See*, Brown Dep. at 27; RA at 110; *compare* Loxley Dep. at 42-43; Def. Exh. E.

34. Undisputed.

35. Undisputed.

36. Undisputed. However, Mr. Drews' recollection of whether the back was attached to the chair when he first saw it is subject to conflicting testimony by Mr. Loxley. Loxley Dep. at 42-43; Def. Exh. E. Given that the facts must be viewed favorably to plaintiff and all reasonable inferences drawn in her favor, this testimonial conflict cannot presently be used to support an inference that Drews and Loxley repaired two different "Superior Centron" chairs with failed J-bar attachments. Examples of equally reasonable inferences, favorable to plaintiff, are that either Drew or Loxley did not clearly recollect the condition of the chair when first seen or that they had indeed repaired different chairs—both of which were "Superior Centron" chairs and one of which was Ms. King's chair.

37. Undisputed that the present location of the chair repaired by Mr. Drews is not known.

38. Undisputed.

39. Undisputed.

40. Partially disputed. Plaintiff agrees that in 1998, Superior introduced a third-screw design to attach the back to the chair and that this made the back more stable. Plaintiff disputes, however, the self-serving characterization of the defendants' assertion that the introduction of the third-screw design was an "offer" to customers as a way of making the back more stable. Defendants' conduct in sending a product bulletin to customers notifying of the problems with the two-screw design cannot reasonably be characterized as an offer to make the back more stable. *See*, Product Bulletin; RA at 42.

41. Disputed. Defendant Staples has produced records. Defendant Izzy (JSJ) has also produced records.

42. Disputed. The record contains evidence that the chair came from defendants, as it was a "Superior Centron" manufactured by defendant. *See, e.g.*, King Affidavit at 1; RA 79 (identifying photograph of Superior Centron as chair that broke); McGee Dep. at 29; RA at 90-91 (describing chair with features of Superior Centron), 82-86; RA at 100-102 (identifying photograph of Superior Centron as chair that broke); Brown Dep. at 9, 28, 32; RA at 105-07 (identifying chair that broke as Superior Centron); Drew Dep. at 75-76; RA at 166 (identifying chair that broke as Superior Centron); Loxley Dep. at 73-75; RA at 184-85 (describing chair with features of Superior Centron).

## PART II PLAINTIFFS' STATEMENT OF ADDITIONAL DISPUTED AND/OR UNDISPUTED FACTS.

1. JSJ and Izzy design, manufacture, and sell office chairs. Metzger Affidavit at ¶¶ 4-5; Vukcevich Dep. at 26-32; Record Appendix ("RA") at 1-5.

2. One such chair—the "Superior" brand "Centron" product line—is an office chair that JSJ first marketed in 1996. Vukcevich Dep. at 28-31; RA at 6-7.

3. The back of a Superior Centron chair is attached to a control mechanism under the seat by a curved piece of steel called a "J-bar." Vukcevich Dep. at 31-32; RA at 8.

4. From 1996 through 1998, JSJ designed the J-bar to be secured to the under-seat control mechanism by two screws. Vukcevich Dep at 57; RA at 9.

5. The screws were intended to permanently attach the J-bar (and thus the back of the chair) to the seat. Vukcevich Dep. at 134-135; RA at 10.

6. The screws were not designed to loosen or back out. Vukcevich Dep. at 136; RA at 11.

7. From 1996 to 2003, JSJ sold over 13,000 Superior Centron chairs—about 10,000 of which were sold to Texas Instruments ("TI"). Vukcevich Dep. at 159-60; RA at 12.

8. In April 1997, an independent facility—SGS U.S. Testing Co., Inc.—performed various tests for JSJ on a sample chair of the same type as the Superior Centron to assess its compliance with national standards for general purpose office chairs. IZ 00144; RA at 13.

9. One of the tests performed—the back durability test—was intended to simulate the action over time of a person leaning against the back of the chair. Vukcevich Dep. at 117; RA at 14.

10. If, subjected to the forces of the test, a chair does not break, deform, or otherwise fail, it passes. *Id.*

11. As reported by SGS, the Superior Centron chair failed when, one-quarter of the way through the test, "the two screws attaching the control mechanism to the seat base sheared off." IZ 00148, Vukcevich Dep. 115-117; RA at 15-16.

12. In addition to the failure of the screws during the back durability test, in the first few years after the Superior Centron chair was introduced to the market, JSJ received "feedback" from customers that they were encountering problems with "loose Centron backs." Vukcevich Dep. at 32-33; RA at 17.

13. During that time, JSJ's biggest customer for Centron chairs—TI—reported problems with loose backs and loose screws attaching the J-bar to Centron chairs. Vukcevich Dep. at 57-58, 69; DeYoung e-mail 9/21/00; RA at 18-21.

14. Whether in response to the failure of the screws during the April 1997 back durability test, to customer feedback concerning problems with loose backs, or both, JSJ initiated an engineering change process, which resulted in a decision in September 1998 to modify the design of the attachment of the J-bar to the chair "so that a third screw can be used for more integral strength between control and j-bar." IZ 00912; Vukcevich Dep. at 66-67, 118; RA at 22-24.

15. As an interim measure until J-bars with a new hole pattern could be produced, JSJ developed a so-called "TI Field Fix," which consisted of installing a third screw with a heavy fender washer and a drop of "Loc-tite" in a hole located between the two existing J-bar mounting screws. IZ 00152; IZ 00915; Vukcevich Dep. at 67-72; RA at 25-28.

16. In December 1998, SGS U.S. Testing performed back durability testing on a sample Centron chair "w/3rd Screw for TI Field Fix" and reported that it passed "without any apparent structural breakage or loss of serviceability." IZ 00152-00153; RA 29-30.

17. On December 29, 1998, JSJ incorporated the TI Field Fix into an Engineering Change Notice, the purpose of which was to add a third screw attaching the J-bar to all Centron chairs manufactured after December 29, 1998. IZ 00915; RA 31; Vukcevich Dep. 67-69, 83; RA at 32-33.

18. As with the "TI Field Fix," the December 1998 modification was intended to be "a temporary change until the J-bars with the new hole pattern come in." IZ 00915; RA 34.

19. While the new J-bars were not used in production until May 2000, beginning December 29, 1998, all Centron chairs were manufactured with three screws attaching the J-bar to the under-seat control mechanism. IZ 00914; Vukcevich Dep. 71-73; RA at 35-36.

20. While the third-screw design change provided an answer to the loose back problem for Centron chairs manufactured after December 29, 1998, customers continued to report problems with loose backs on Centron chairs made from 1996-1998. Vukcevich Dep. at 142; DeYoung e-mail 9/21/00; RA at 37-38.

21. For instance, in addition to loose back problems at its North Texas facilities, TI reported two injuries related to backrests that became loose and fell off Centron chairs at its Tucson site. Sensata (TI) response to subpoena; Vukcevich Dep. at 145; RA at 201-211; 39.

22. For its bigger customers, like TI, JSJ responded in 2000 by "performing inspections and service to the screws attaching the J-bar" for all Centron chairs at TI's Texas facilities. DeYoung e-mail 9/21/00; RA at 40.

23. For the rest of its customers, on September 29, 2000, JSJ sent them a letter with a so-called Product Bulletin by certified mail, notifying them that Centron chairs manufactured before December 29, 1998, could have problems with "screws attaching the back J-bar to the control [working] loose." Ltr. 9/29/00, IZ 01843, 01852; RA. 41, 43.

24. The letter advised customers to inspect the chairs in accordance with the directions on the Product Bulletin, and to notify JSJ's SuperiorFurniture "if any screws are loose." *Id.*; Product Bulletin IZ 01927; RA at 42.

25. JSJ's SuperiorFurniture offered to remedy problems "at its own cost" and encouraged its customers provide information concerning the loose-screw problem to the ultimate purchasers of Centron chairs. IZ 01843; RA at 44.

26. Those customers that responded were sent a third screw, regardless of whether they reported a loose screw/back problem. *See, e.g.,* IZ 01843, 1846, 1926-27; RA at 44-47.

27. JSJ expected "a 20% or lower response rate" to its letter and Product Bulletin, and set a "budget for field servicing costs associated with this issue accordingly." DeYoung e-mail 9/21/00 (response rate); RA at 48.

28. In spite of this and the fact that numerous letters were returned "undeliverable" and that many customers (retailers and distributors) responded that they had no records identifying ultimate users, JSJ's SuperiorFurniture and Izzy, its successor, made no additional attempts to notify ultimate users of the loose-screw and -back problems

with Superior Centron chairs. Vukcevich Dep. 73-74, 100-106, 164 (re: notification letter and product bulletin); IZ 01852, 01861, 01863, 01945 (examples of customers reporting that ultimate users cannot be located); IZ 01859 (example of letter and bulletin returned "undeliverable"; RA at 49-59.

29. In spite of the fact that it knew that its September 2000 letter and Product Bulletin did not reach hundreds if not thousands of ultimate users of Superior Centron chairs, JSJ and Izzy did not initiate a voluntary recall, issue a press release, publish a notice in a newspaper or other public media, or notify any government agency or consumer protection organization of the loose-screw problems with the Centron chairs manufactured between 1996 and 1998. Vukcevich Dep. at 102-106; RA at 60-61.

30. On June 2, 2003, Mary Ann King worked at a TI facility in Attleboro, Massachusetts as a purchasing assistant. King Dep. I at 15; SRA at 3.

31. As she leaned back in her chair to speak with a co-worker, Pam McGee, the back of her chair broke off from its seat, causing her to fall and injure her back. King Dep. I at 32-33; SRA at 4.

32. Ms. King observed that the metal bar with the back attached to it had come off the chair. King Dep. I at 47; SRA at 6A.

33. The next day, Ms. King was given "a different style chair—it wasn't a Superior chair," and the chair that broke was placed outside the door of her work area. King Dep. I at 95-96, King Dep. II at 119-120; SRA at 7, 16.

34. When asked at deposition about the levers and knobs used to adjust the broken chair, Ms. King gave the best description she could, but indicated that she wasn't

positive in her recollection because "[i]t's been so long." King Dep. II 42-43, 47-49; SRA at 12.

35. When questioned whether she had any problems with the chair before it broke apart, Ms. King testified that while it would occasionally slip into the reclining position, it did not have a loose back. King Dep. I at 41-43, King Dep. II at 51; SRA at 5-6, 13.

36. Ms. King additionally testified at deposition that, if shown a picture, she could identify the same type of chair that broke apart on her. King Dep. II at 142; SRA 18.

37. Recently, Ms. King was presented with pictures of a Superior Centron chair taken at the time of the incident and published with an electronic newsletter sent to TI Attleboro employees, instructing them how to identify and inspect a Superior Centron chair. King Affidavit at 1; RA at 80-85.

38. From these images, Ms. King positively identified the chair that broke apart on her as a Superior Centron. *Id.*

39. Ms. King's co-worker, Pam McGee, testified based on what a co-worker told her that she believed the chair that broke on Ms. King was made either by "Imperial" or "Superior," but that she was "not too sure on that." McGee Dep. at 18, 71-72, 93; RA at 86-89.

40. Ms. McGee described the chair as a "dark blue, regular type of office chair with arms. And, it also reclined" and had a "[h]igh back." McGee Dep. at 29; RA at 90-91.

41. Ms. McGee also testified that Russell Loxley from maintenance took the chair after the incident and attempted to repair it. McGee Dep. at 32-33, 44-45, 96-97; RA at 92-94.

42. According to Ms. McGee, the chair was then returned to McGee and King's work area, where Ms. McGee's boss, Ed Picard, tagged it and set it aside until Jim Drews, a salesman, inspected and collected it. McGee Dep. at 44-48; RA at 95-96.

43. Ms. McGee testified that she saw the chair again, briefly, when Mr. Drews, who repaired it, brought it back into her area, where Mr. Picard picked it up. After Mr. Picard took it, she did not see it again. McGee Dep. at 54-55, 97; RA at 97-98.

44. Ms. McGee testified that she was familiar with Ms. King's chair and could identify the same type of chair if she saw it again. McGee Dep. at 82; RA at 99.

45. From photographs of two office chairs—one a Superior Centron, the other a "Miller"—Ms. McGee identified the Superior Centron as the type of chair that broke on Ms. King. McGee Dep. at 82-86; RA at 100-102.

46. Al Brown, a senior safety specialist for TI Attleboro, headed an investigation of the chair incident. Brown Dep. at 3-5; RA at 103-104.

47. Mr. Brown identified the chair that broke apart on Ms. King as a Superior Centron. Brown Dep. at 9, 28, 32; RA at 105-107.

48. Mr. Brown testified that on June 5, 2003—three days after the incident—he, and others, went to inspect the chair, but found that someone from the "manufacturing area" had removed and attempted to repair it. Brown Dep. at 23-24; RA at 108.

49. According to Mr. Brown, they located the chair in the hallway outside Ms. King's work area, put it back in Ms. King's work area, put yellow "caution" tape around it, and posted a sign indicting that it was broken and was not to be used. Brown Dep. at 24-26; RA at 109-110.

50. Mr. Brown testified that he did not "believe" that the back was on the chair when he first saw it. Brown Dep. at 27; RA at 110.

51. With the assistance of Mr. Drews, a salesman from Staples who had been supplying Centron chairs to TI Attleboro since 1997-98, Mr. Brown determined from a label underneath the seat of the Centron chair that it had been manufactured in 1996. Brown Dep. at 30-31; RA at 111.

52. Mr. Brown contacted the manufacturer of the Superior Centron chair—JSJ's SuperiorFurniture—and learned of the third screw field fix. Through Mr. Drews, TI ordered a box of 500 screws from Superior, because none of Centron chairs at TI Attleboro had a third screw. Brown Dep. at 45, 76, 83-85, 111-112; RA 112-115.

53. After speaking with the manufacturer, Mr. Brown contacted his safety counterpart at TI in Dallas and learned for the first time that the Texas facilities had encountered similar problems with loose Centron backs and had their chairs inspected and retrofitted with a third screw several years earlier. Brown Dep. at 80-82; RA at 116-117.

54. Mr. Brown took photographs of a Superior Centron chair of the same type that broke on Ms. King and incorporated them into an electronic newsletter sent to TI employees, notifying them of the problem with loose Centron screws and backs, and instructing them on how to identify and inspect their chairs. Brown Dep. at 36-44; Inspection Guidelines; RA at 118-124.

55. Mr. Brown's photographs were also incorporated into a final investigation report. Final Rpt.; RA at 125-128.

56. These are the photographs that Ms. King viewed and used to identify the type of chair that broke apart and injured her as a Superior Centron chair. *See,* King Affidavit; RA at 129-130.

57. Mr. Brown and the investigation team ultimately concluded that Ms. King's chair broke because of a design flaw that permitted the screws attaching the J-bar to the chair to loosen and back out. Brown Dep. at 49, 88-95; 8D meeting minutes and findings; RA at 131-138.

58. Jim Drews worked for Staples Business Advantage as an account manager since 1994. Drew Dep. at 6-7; RA at 139-140.

59. Beginning in 1997-98, Mr. Drews began supplying Superior Centron chairs to TI Attleboro. Drews Dep. at 10-13; RA at 141.

60. Mr. Drews testified that before he obtained the account, TI Attleboro procured some of its Superior chairs from TI's Dallas facility. Drews Dep. at 16, 84-85; RA at 142-143.

61. According to Mr. Drews, the Superior chairs came partially assembled; the seat, control mechanism, and J-bar were factory assembled as a unit, and were required to be pieced together with the pneumatic cylinder, chair base and casters. The J-bar/seat back assembly was not assembled by the customer. Drew Dep. at 22; RA at 144.

62. When, after 1997-98, TI Attleboro had a problem with a Superior Centron chair, Mr. Drews would inspect it, take the model number from the chair, and order parts if the chair could be repaired. Drew Dep. at 24; RA at 145.

63. Mr. Drews' brother performed the repairs until he passed away in 2000; thereafter, Mr. Drews made repairs. Drew Dep. at 24-25; RA at 146.

64. Shortly after Ms. King's chair broke, Mr. Drews learned what had happened and was called to inspect and repair it. Drew Dep. at 28; RA at 147.

65. Following his usual practice, Mr. Drews obtained the manufacturer's control number from the bottom of the chair, ordered replacement parts, and repaired the chair. Drew Dep. at 29-30; RA at 148-149.

66. When Mr. Drews first saw the chair, which he identified as a Superior Centron, it was in the corner of Ms. King's office area, "circled off with yellow tape" so that nobody would use it. Drew Dep. at 30, 35; RA at 150-151.

67. The seat and base were still assembled, but the back was sitting on top of the chair. Drew Dep. at 31; RA at 152.

68. Mr. Drews ordered a control mechanism, which came with a J-bar attached. Drew Dep. at 31; RA at 153.

69. When the replacement parts arrived, Mr. Drews returned to TI, retrieved the chair, and took it to his garage to repair it. Drew Dep. at 32-33; RA at_154.

70. On completing the repair, Mr. Drews returned the chair to TI at 33; RA at 155.

71. Mr. Drews recalled that the fabric of the chair that broke on Ms. King was blue. Drew Dep. at 34; RA at 156.

72. Mr. Drews recalled that the chair was "used." Drew Dep. at 85; RA at 157.

73. From his inspection of the chair, Mr. Drews knew that the back of the chair had fallen off. Drew Dep. at 36; RA at 158.

74. While he observed that the J-bar was not attached to the chair, Mr. Drews could not recall whether the screws that attach the J-bar to the chair were present when he inspected and repaired it. Drew Dep. at 48; RA at 159.

75. While he recorded the manufacturer's control number on a piece of paper when he saw the chair with Al Brown, Mr. Drews discarded the paper after completing the

repair, and could not recall at his deposition whether the chair was sold to TI before or after 1997. Drew Dep. at 37, 57-59; RA at 160-162

76. Because the chair was still under warranty, the manufacturer supplied the replacement parts without charge. Drew Dep. at 61-62; RA at 163-164.

77. Mr. Drew testified that the manufacturer also supplied a box of 500 screws "to better attach to the – to the control – the 'J' bar to the control mechanism" on TI Attleboro's other Superior Centron chairs. Drew Dep. at 66-67; RA at 165.

78. When presented with the photographs taken by Al Brown that were incorporated into the newsletter notifying TI employees of the problem with loose Centron screws and backs, Mr. Drews identified as a "Superior" the same chair depicted in the photograph that Ms. King and Ms. McGee testified was the type of chair that broke apart on Ms. King. Drew Dep. at 75-76; RA at 166.

79. In June 2000, Russell Loxley worked at TI Attleboro as an engineering technician. Loxley Dep. at 6; RA at 167-168.

80. His tool room was across from Ms. King's work area. Loxley Dep. at 8; RA at 169.

81. Mr. Loxley testified that he took the chair that broke apart on Ms. King from her work area on the day of the incident to repair it. Loxley Dep. at 10, 17-18; RA at 170-172.

82. While it was not part of his job description, he was often asked to look and chairs and determine whether they could be repaired or should be discarded. Loxley Dep. at 10-13; RA at 173.

83. Most of the time, Mr. Loxley discarded them. Loxley Dep. at 12, 15-17; RA at 174-175.

84. While waiting for Mr. Loxley to look at them, broken chairs were piled up on pallets in an empty assembly area outside Ms. King's work area. Loxley Dep. at 12-13; RA at 176.

85. There, the chairs were secured with clear plastic "pallet wrap" so they "couldn't be removed" from the pallets. Loxley Dep. at 13; RA at 177.

86. When the chairs were discarded, they were taken on the pallets outside, to the dumpster. Loxley Dep. at 52-53; RA at 178.

87. Ms. King's chair was never placed by the dumpster. Loxley Dep. at 53; RA at 179.

88. Mr. Loxley could not remember the kind of chair that broke on Ms. King and could not identify it from photographs, but he recalled that it as an adjustable office chair, with arms and casters—"a typical office chair." Loxley Dep. at 21, 55, 64-66, 69; RA at 180-183.

89. Mr. Loxley testified that he also remembered the "J-bar going underneath," "the screws holding it in," that "there was a knob * * * for the adjustment of the pressure on the back of the chair," and that it had an adjustment lever to tilt the chair." Loxley Dep. at 73-74; RA at 184-185.

90. Mr. Loxley observed that the back had come off the chair and that the heads of the screws that secured the J-bar to the chair "were gone as if they had sheared." Loxley Dep. at 22-23, 58-60; RA at 186-187.

91. From his examination of the chair, Mr. Loxley concluded that "[t]hose two screws are what failed." Loxley Dep. at 23; RA at 188.

92. He did not believe that it had been previously repaired. Loxley Dep. at 40; RA at 189.

93. Mr. Loxley removed the failed screws, re-attached the back with new screws, and returned the chair to the hallway, to a little area in the corner between his work area and Ms. King's area, where he kept other materials and "junk that he used to pile up." Loxley Dep. at 25-26, 58-64, 67; RA at 190-194.

94. Mr. Loxley believes he told Ms. King that it was there if she needed it, and that he never did anything with it again. Loxley Dep. at 26; RA at 195.

95. Mr. Loxley testified that the chair sat there for "a while," but he could not say how long; it could have been a month "or shorter" and could have been taken away by "Safety" and put back again. Loxley Dep. at 30-32, 68; RA at 196-197.

96. The only other chairs in that area were "a couple" that Mr. Loxley had placed there after looking at them to determine whether they could be fixed. Loxley Dep. at 68-69; RA at 198.

97. Mr Loxley testified that the only chairs other than Ms. King's that were in the same area were not office chairs like Ms. King's, but were "assembly chairs" or "high chairs." Loxley Dep. at 68-69; RA at 198.

98. Mr. Loxley did not remember seeing a chair taped off with yellow tape or in Ms. King's work area, but testified that it could have been cordoned off in the back corner of Ms. King's work area (where he "usually didn't go"). Loxley Dep. at 32, 66; RA at 199-200.

Plaintiffs,
By their Attorneys,

/s/ Michael T. Eskey

______________________________

Amato A. DeLuca (#0531)
Miriam Weizenbaum (#5182)
Michael T. Eskey (#3035)
**DELUCA & WEIZENBAUM, LTD.**
199 North Main Street
Providence, RI 02903
(401) 453-1500
(401) 453-1501 Fax