UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING
and PHILLIP KING
Plaintiffs,

v. C.A. No.: 06-258-S

STAPLES INC.; IZZY DESIGN;
JSJ CORPORATION;
Defendants.

**PLAINTIFFS' SUPPLEMENTAL RECORD APPENDIX IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs,
By their Attorneys,

Amato A. DeLuca (#0531)
Miriam Weizenbaum (#5182)
Michael T. Eskey (#3035)
**DELUCA & WEIZENBAUM, LTD.**
199 North Main Street
Providence, RI 02903
(401) 453-1500
(401) 453-1501 Fax

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARY ANN KING
and PHILIP KING

VS. C.A. NO. 06-258 S

STAPLES, INC.; IZZY DESIGNS;
JSJ CORPORATION; JOHN DOE
COMPANY

DEPOSITION OF MARY ANN KING, taken on behalf of the Defendant, Staples Inc., Friday, November 17, 2006 at 1:10 p.m. pursuant to the Federal Rules of Civil Procedure at the office of Hanson Curran LLP, 146 Westminster Street, Providence, Rhode Island before Linda F. Oakley, RPR, Inc., Notary Public.

APPEARANCES:

DeLUCA & WEIZENBAUM, LTD.
BY: MICHAEL T. ESKEY, ESQ.
Counsel for the Plaintiffs

HANSON CURRAN LLP
BY: KELLY N. MICHELS, ESQ.
Counsel for Staples Inc.

ZIZIK, POWERS, O'CONNELL, SPAULDING & LaMONTAGNE
BY: DONNA LaMONTAGNE, ESQ.
Counsel for Izzy Designs and JSJ Corporation

CHRISTENSEN & EHRET, LLP
BY: ERIC D. STUBENVOLL, ESQ.
Co-counsel for Izzy Designs and JSJ Corporation

REPORTING ASSOCIATES
Westminster Square Building
10 Dorrance Street, Suite 617
Providence, RI 02903

I N D E X


| DEPONENT | PAGE NO. |
|---|---|
| MARY ANN KING | |
| EXAMINATION BY MS. MICHELS | 4 |

| DEFENDANT STAPLES' EXHIBITS | DESCRIPTION | PAGE NO. |
|---|---|---|
| A, I.D. | COPY OF REVISED NOTICE TO TAKE DEPOSITION | 3 |
| B, I.D. | COPY OF PLAINTIFF, MARY ANN KING'S ANSWERS TO DEFENDANT, JSJ CORPORATION AND IZZY DESIGNS' FIRST SET OF INTERROGATORIES | 3 |
| C, I.D. | PHOTOSTATIC COPY OF THREE-PAGE DOCUMENT TITLED 8D INCIDENT INVESTIGATION MEETING MINUTES DATED JUNE 10, 2003 | 3 |
| D, I.D. | PHOTOSTATIC COPY OF FOUR-PAGE DOCUMENT TITLED 8D INCIDENT INVESTIGATION MEETING MINUTES DATED JUNE 17, 2003 | 3 |
| E, I.D. | PHOTOSTATIC COPY OF ONE-PAGE DOCUMENT TITLED 8D INCIDENT INVESTIGATION MEETING MINUTES DATED JULY 9, 2003 | 3 |




(November 17, 2006)

(COPY OF REVISED NOTICE TO TAKE DEPOSITION WAS MARKED DEFENDANT'S EXHIBIT A, IDENTIFICATION ON BEHALF OF STAPLES, INC.)

(COPY OF PLAINTIFF, MARY ANN KING'S ANSWERS TO DEFENDANT, JSJ CORPORATION AND IZZY DESIGNS' FIRST SET OF INTERROGATORIES WAS MARKED DEFENDANT'S EXHIBIT B, IDENTIFICATION ON BEHALF OF STAPLES, INC.)

(PHOTOSTATIC COPY OF THREE-PAGE DOCUMENT TITLED 8D INCIDENT INVESTIGATION MEETING MINUTES DATED JUNE 10, 2003 WAS MARKED DEFENDANT'S EXHIBIT C, IDENTIFICATION ON BEHALF OF STAPLES, INC.)

(PHOTOSTATIC COPY OF FOUR-PAGE DOCUMENT TITLED 8D INCIDENT INVESTIGATION MEETING MINUTES DATED JUNE 17, 2003 WAS MARKED DEFENDANT'S EXHIBIT D, IDENTIFICATION ON BEHALF OF STAPLES, INC.)

(PHOTOSTATIC COPY OF ONE-PAGE DOCUMENT TITLED 8D INCIDENT INVESTIGATION MEETING MINUTES DATED JULY 9, 2003 WAS MARKED DEFENDANT'S EXHIBIT E, IDENTIFICATION ON BEHALF OF STAPLES, INC.)

M A R Y  A N N  K I N G, was duly sworn and testified as follows:

MR. ESKEY: And if you could just keep your voice up.



THE DEPONENT: Okay.
MR. ESKEY: I'm a bit hard of hearing.
THE DEPONENT: Okay.
EXAMINATION BY MS. MICHELS
Q Mrs. King, my name is Kelly Michels. I represent Staples in the action that you brought in the United States District Court for the District of Rhode Island. I'm going to be asking you some questions today about the incident that occurred at Texas Instruments.
A Okay.
Q And about the health care that you've received following that. If at anytime you don't understand a question that I'm asking you, I'd just ask that you let me know, so that I can rephrase it for you.
A Yes.
Q If you do answer a question, I'm going to assume that you've understood what I'm asking you.
A Okay.
Q I also need you to keep everything verbal. The stenographer can't understand "uh-huhs" --
A Yes.
Q -- or take them down.
A Correct.
Q So everything needs to be verbal. And, also, even if



you anticipate what I'm going to ask you, if you could let me finish asking --
A Yes.
Q -- the question first, and then you can verbalize your answer.
A Okay.
Q If at anytime you need to take a break, if you need to stand up, just let me know --
A Okay.
Q -- what your need is; and we'll suspend --
A Yes.
Q -- and let you do what you need to do. Okay?
A Okay.
MR. ESKEY: And, Mary Ann, I'm just going to say one more thing -- okay? -- that would make it go a little bit easier, and I know we went over this before. But while somebody's asking a question, just wait for them to finish --
THE DEPONENT: Yes.
MR. ESKEY: -- asking the question and try and refrain from saying anything until they're through with their question.
THE DEPONENT: Okay.
MR. ESKEY: And then you can begin your answer. Okay?

Page 14

air conditioning, parts that go into, into the car, and it's not supposed to work unless there's a malfunction. It's like a spark plug, you know, spark plug you put in. And unless there's a problem with the air conditioner, this product will work and will, I guess, prevent any fires or anything.
Q Okay. So you helped assemble this product?
A Correct.
Q And you would package it and send it out to various vendors for --
A Correct.
Q -- customers?
A Customer, yes.
Q Okay. And then in 1985 you were promoted to lead operator/assembler, is that correct?
A Correct.
Q How did your duties change when you became a lead operator?
A I would train people how to do the job and, you know, make sure the work was, flow was going through, the numbers that were supposed to, you know, make, make sure that we were making quota for the day. And I think that's about it, if I can remember correctly. That's --
Q Did you receive a pay increase when you became a lead

Page 15

operator?
A Yes, I did.
Q Do you recall how much?
A I don't. I don't recall.
Q And you held that position until 1994?
A Yes.
Q Is that correct?
A I believe so.
Q Okay. And then it was in 1994 that you were promoted to purchasing assistant?
A Correct.
Q And you didn't have any other job between 1985 and 1994?
A No.
Q Okay.
A The purchasing assist, see, when they put me into that job, it was just a May job. And it was like just getting off to, you know. So I really didn't have a -- what do you call it? You know, that, you know, a lead operator or, you know, a purchasing assistant at that time. But I did all that. You know, I did the purchasing. I handled the spare parts.
Q Okay. What were you in charge of purchasing?
A I ran a storeroom that was for spare parts for the

Page 16

machinery. And I used to purchase some parts, plus miscellaneous parts for the production area, if they needed anything from Staples or, or any other vendors that we dealt with. And, you know, I, I was involved in making sure the delivery was on time and making sure I had the parts, so the machines didn't go down.
Q Okay. So if I understand correctly, you purchased parts for the machines that were in use at Texas Instruments?
A Yes. Correct.
Q Who would you purchase those parts from?
A Various companies, Precision Product. They were a fabrication company. Major Electric, Reardon Lynch, Siemens, F.W. Webb. And there's a lot of them. Staples. Trying to think. Park -- Sprague Air Controls, which that was for fittings and things like that. Cambridge Valve & Fitting. There was a lot. We used to send repairs out for calibration at ESCO Calibration. Repairs at different companies. We dealt, dealt with Digital. And we dealt with Command Bearing, which they would send some of our repairs out to, I believe the company was -- I'm not sure of the company, but they used to farm it out. And Rhode Island Refrigeration, you know, we used to deal with them. Granger, W. Granger. I mean, there

Page 17

were hundreds. Autosplice in California. Just some names I'm just not remembering right now, but there are about hundreds of companies that I dealt with on a day-to-day basis.
Q Would you deal with certain companies for specific parts that you needed?
A Yes.
Q What were the different machines that you purchased parts for?
A Well, we had flex links. We had AMI machines, which were assembly machines. We had pressure testers. We had clean rooms, you know, furnaces. I mean, let me see. There are a lot. I mean, the place was so big. You know, like, we dealt with valves, you know, valves for the machines. There were so many different styles. Silk screeners we had. We had quite a few AMI machines, assembly machines. We had quite a few flex links machines. We had testers, all kinds of testers. As far as, you know, there are other machines that I just can't remember.
Q That's fine. So depending on the type of part that you needed for one of your machines --
A Yup.
Q -- at the facility, you would go to that particular --



P3

people. So we ended up closing the business.
Q So it was open for about eighteen months or so?
A Yes.
Q What was your role?
A I was the president of the company.
Q What were your duties as president?
A To do pay--- make sure the payroll was called in, the hiring. And I went and bidded out the, you know, bidded on the jobs and paid the bills.
Q And what was Mr. Vose's role?
A He pretty much went out and made sure. He, you know, he was mainly hands-on, on the company.
Q Would he supervise the jobs as they were being done?
A He would supervise the jobs. He would go and make sure, and sometimes he would, you know, be one of the workers on the job.
Q He would actually perform the work?
A Yes.
Q And you said he got hurt?
A Yes.
Q Did he hurt himself by working at Hypro?
A No.
Q Or through some other way?
A He fell on the ice at a restaurant.
Q What were his injuries from falling on the ice?



A He needed surg--- knee surgery.
Q And because of that he couldn't perform his duties for Hypro anymore?
A Yeah. Because he had several operations on his knee. He's still having problems with it.
Q When you closed the business, did you close it, or did you sell it to somebody?
A No. We closed it. My broth--- brother-in-law, actually, took over the contracts that, you know, we had, which he is JS, Jen -- no. What was his company name? I forgot. He was out of Pawtucket. I forgot the company name, to tell you the truth, right now. My memory hasn't been too good lately.
Q That's okay. Is he still in business?
A Yes.
Q Out of Pawtucket?
A Yes.
Q What's his name?
A Carlos DaSilva.
Q And he took over the contracts that you had through your company?
A Yeah. Well, he had subbed some contracts to me. And I, when I couldn't do it, he ended up taking contracts back.
MS. MICHELS: If we could just take a



short recess.
(Ten-minute recess)
MS. MICHELS: Back on the record.
Q Mrs. King, do you recall the exact date that you were injured at Texas Instruments?
A Yes. June 6th. No. Yeah. June 2nd, '03. I meant to say 6th.
Q Why don't you tell me exactly what happened, how you hurt yourself.
A Okay. I was talking to my co-worker. She asked me a question. And her office was right outside mine. And I turned in the chair to answer a question. And then when I turned back, I was, you know, I leaned back. You know, I just leaned back on the chair, and the chair snapped.
Q Who was the co-worker you were trying to talk to?
A Pam McGee. She asked me a question.
Q And when you leaned back in the chair and it snapped, did you fall to the ground?
A I, when I, what happened was I was going down. And I pulled myself, and I'm jerked. And my arm hit the table. And my buttocks hit the floor probably, you know, I don't know how hard. It was like everything happened. And Pam ran after me, and she grabbed my arm and pulled me up.



Q Excuse me.
A And I pulled up because I knew what bar -- you know, they had bars in the back. And if I -- I didn't want to hit the bar. You know? So I was kind of jerking and pulling myself up.
Q Who had bars in the back? What do you mean by bars?
A The chair, the back of the chair. It had a bar that slid in. And it was on the floor. And, well, I didn't know if it was right behind me, but I didn't want to hit that bar because I probably would have broke my back in half 'cause it came up.
Q Was this bar in the back of the chair?
A It, you got the chair, the, you know, it's a blue part. And it, you know, it slid into the back of the chair. And it was, you know, it was screwed in.
Q Is this the bar that connects the seat to the actual back of the chair?
A Yeah.
Q Okay.
A Well, I think it connects the back of the chair into the seat.
Q Into the seat?
A (Deponent nods head in the affirmative)
Q Okay.
A If I'm, you know, I'm not positive, but I believe

A That was my chair.
Q It was your chair?
A (Deponent nods head in the affirmative)
Q So you had two chairs that broke?
A Yeah.
Q When did the first chair break?
A I, I don't recall. I don't recall the date.
Q Do you know how long it was before you fell that the first chair broke?
A I think it was a good year or two because Kevin had left the company.
Q When did he leave the company?
A Oh, God. I'm not sure.
Q So Kevin's using your chair, and that chair breaks?
A Yes.
Q How exactly did that chair break? Do you know?
A The back of the, the back snapped off, the back of the chair. The same thing happened to the chair I had.
Q The exact same thing?
A Yes.
Q And what exactly was that? What did you notice about the chair that you fell off of?
MR. ESKEY: I object. You can go ahead.
Q Do you understand what I'm saying?



A No.
Q You said that the first chair broke the exact same way as the second chair broke. If you could tell me how they both broke.
MR. ESKEY: Objection.
A Well, I wasn't there that night. I'm just going by hearsay, saying what Kevin said, the back of the chair snapped off.
Q And that's what you noticed about the chair that you fell off of?
A Yes.
Q But you never saw the first chair?
A No.
Q So you don't know for sure if it was the exact same break?
A No, I don't know for sure.
Q After Kevin broke the first chair, he then requested a new chair from Ed?
A Yes.
Q For your use?
MR. ESKEY: I object to the last questions.
THE DEPONENT: Okay. Sorry.
MR. ESKEY: Go ahead.
A (No response)



Q Am I right? He requested the chair for your use, or did you request it from Ed?
A I believe he called Ed and told Ed the chair was broken. And then when I came in the next day, I told Ed that I needed a chair. And then by the time I came in the following day, Kevin -- and Ed had, had, you know, given Kevin another chair to bring to the office.
Q So one day you don't have a chair, and the next day you come in and you have a chair?
A Correct.
Q Do you know where that chair came from?
A No.
Q Do you know if it was ordered for you?
A I'm not sure.
Q Do you know if it had come from some other place within the company?
A I don't know.
Q Did it look new to you?
A Yes. Yeah.
Q Did it have any type of wear or tear that you noticed?
A Not that I noticed at all.
Q Did it have any type of instructions or labels that indicated that it was new?



A The only thing I got was like instruction, you know, thing, how to adjust it. That's the only thing I had gotten from, from them. I'm not sure if, I don't recall if there were any tags on it, but they did give me the instructions to adjust the chair.
Q Who gave you the instructions?
A It was there. So I'm, I'm assuming Kevin brought it with the chair. It was there when the chair got there, so they could show me how to use it.
Q And you had this chair a good year or two before --
A Oh, yeah.
Q -- you fell out of it?
A Yup.
Q Had you ever had any problems with the chair prior to you falling?
A Every now and then the back, you know, it would like slip out of the, you know, it would go into the recline position. And I would tighten it back up.
Q You would tighten?
A Because there were knobs on the side, you could tighten it to bring it up and down, or you could, you know, tighten it, you know, so it wouldn't go in the recline position. So you could put it in the recline position, too, because that's, they were made to recline.

Page 42

Q That was a feature of the chair?
A Yeah.
Q Once you tightened the knob, would it stay tightened?
A At times it would, yes. Sometimes it would slip.
Q How often would it slip?
A I don't recall. Not often. You know, every now and then it did. I had tend--- I had a tendency of reclining in the chair. You know, when I would talk to somebody, you know, I would just lean back.
Q So you would keep it in the reclined position, so that you could lean back to talk?
A Sometimes. Not all the time. It depends. You know, if I had a visitor, I would sit in the recline position. Or when I worked, I worked at an upright position, or --
Q So would you physically have to put it into the recline position when you wanted it to recline?
A Yes.
Q And then if you were working at your computer, you would sit in the upright position?
A Correct.
Q Would you have to tighten it to sit --
A Yes.
Q -- in the upright position?
A Yes.

Page 43

Q The day that you fell, do you recall putting it into the recline position?
A Yes.
Q Okay. So you had loosened the knob --
MR. ESKEY: I object. But you can go ahead.
Q -- in order to recline?
MR. ESKEY: Object. You can go ahead.
A I, I don't understand. Repeat that.
Q If I understand correctly, you have to tighten the knob to make the chair back upright, so that it doesn't recline?
A Yes.
Q Is that correct?
A Yeah, there was a lever that you would, you know, you know, if you wanted to go, you know, hit the lever and it would go back. And then when you would sit up, you would tighten it.
Q Okay. So you would have to hit the lever to be able to go back?
A Correct.
Q And that day that you fell, you had hit the lever, so that you could go back at some point during the day?
A I don't recall, but at that, at that instant, you know, I was working at my computer. I would never

Page 44

sit in a recline position because it's hard, you know, to work on the computer like this. So I did lock it into position and, you know.
Q Do you recall locking it --
A Oh, yeah.
Q -- in the lock position that day in order to work on your computer?
A Yup.
Q When you leaned back to talk to Pam, did you expect to be able to recline, or did you think --
A I just turned in my chair. It had five wheels. I turned. Pam, Pam was right there. I just rolled back because I was working on my computer. I answered her question. And as I was going back, I sat back. You know, I sit, you know, with my feet leaned out. So I leaned, you know, back on the chair to go back to the computer, and that's when it snapped.
Q Okay. So you were repositioning yourself back in your chair to work at the computer?
A Correct.
Q And as you placed your back against the back of the chair, that's when you went back?
A That's when it snapped, yes.
Q And that's when you fell?

Page 45

A (Deponent nods head in the affirmative)
MR. ESKEY: You have to -- I'm sorry. You have to answer her question. So that's when you fell? And you were nodding your head. I just want to make sure you verbalize your answer.
A Okay. Yes.
MR. ESKEY: Okay.
THE DEPONENT: I'm nervous.
MR. ESKEY: That's all right.
Q So you weren't attempting to lean back when you fell; is that what you're saying?
A Not in the recline position. I was, you know, I, you know, was relaxed like I, with my feet leaning, you know. And I, you know, I would lean back down, sit down like this, you know, you know, a little bit crunched down and work on my computer. So as I was going, you know, I was getting in position to lean, you know, not lean back, but lean, you know, to be comfortable in the chair.
Q To work at the computer?
A Yeah.
Q When the chair snapped and you fell back, could Pam see you from where she was?
A She was looking right at me because her door, her seat is right at my doorway, which she could see my



P6

computer.
Q What was the purpose of you turning and rolling over to answer her question if you could see one another?
A Well, because I would have had to lean back like this because my computer faces this way with my back towards her. And I was trying to, you know, she asked me a work question. So I just turned the chair to talk to her. And then when we were done, when I was done answering her question, I turned the chair back. I was turning the chair back. As I was doing that, when I leaned back, that's when the chair snapped.
Q Would you --
A It actually rolled a little because I was, you know, trying to catch my feet, and it had wheels. You know, just not, not a lot, but it rolled back a little after that happened. And after it snapped, you know, it kind of like moved back a little.
Q After the chair snapped, did you inspect it at all?
A No. I called my boss. We were laughing a little. Because Pam's like, she's a little bit of a girl. And she was running towards me. Everything was like in slow motion. So we were nervously laughing. You know? And I forgot the rest of the question. My brain's not --



MR. ESKEY: She just asked whether you inspected the chair after you fell.
A (Continued) No, I didn't. My boss asked me to put it in a certain area so they can, you know, look at it.
Q But you yourself never looked at the chair to see what broke?
A No. I just knew the bar was on the floor, and I didn't check it out.
Q So the bar had actually come off from the chair?
A Yup.
Q And was lying on the floor?
A Yup. With the, with the bar sticking up.
Q Was the back of the chair still attached to the bar?
A Yes.
Q Okay. So the chair's now in two pieces, the seat and the wheels, the base of the chair?
A Yeah, and the arms.
Q And the arms, and then the bar with the back was a separate part --
A It was on --
Q -- lying on the floor?
A Yes.
Q What was the purpose of you calling the boss?
A To let him know that the chair broke, and that



I would need another chair to use.
Q So it wasn't to tell him that you were injured?
A Not at that point because I didn't feel any pain at that point.
Q Did he ask you if you were hurt?
A He said, "Are you all right?" I said, "Yeah." You know, "I'm all right."
Q Did he ask you to fill out any type of report?
A Not at that point, no.
Q Did you make any type of report on your own about what happened?
A Not, not at that point. It was towards the end of the day.
Q What time was it? Do you recall?
A I want to say, I think it was around 11:00, somewhere around lunchtime, or something like that.
Q What were the hours that you normally worked?
A Sometimes I worked 5:00 to 2:30 or 5:00 to 3:30.
Q 5:00 in the morning to 2:30 in the afternoon?
A And, you know, that was at times I did that, yeah.
Q So this occurred around lunch; if lunch was at noon, --
A Yeah.
Q -- that would be towards the end of your day?
A It was around -- yeah, it was around that time, yeah.



Q Besides calling Ed, your boss, did you call anyone else or tell anybody else about your fall?
A No. Just Pam and me, you know, myself and Pam talked about it. And we said, "Oh, thank God that you didn't hit the bar." And, you know, we laughed a little. We were all, we were both nervous. We were laughing. It was, like, jesus, you know, we're like.
Q Besides your bottom hitting floor, did any other part of your body hit the floor?
A No. Because I was crunched. So, like, my buttocks. She didn't -- you know, it happened so fast, like, I went. I kind of hit, and she pulled me up. It was like faster than -- she didn't actually see me hit the bottom, but she pulled me up.
(Mr. Eskey conferring privately with deponent)
THE DEPONENT: Okay.
Q When she helped you up, did she help you -- where did she touch you to help you up?
A She grabbed my right arm. And she, she grabbed with both hands, and she helped pull me up.
Q When you went home that night, did you experience any pain?
A On the ride home it started.
Q What started exactly?



P6A

Page 94

Q Did both of those fusions take, do you know, from the third surgery?
A It's looking good. They did an x-ray. It looks good. But I'm still having, you know, while I was laid up when I should have been doing therapy, so.
Q But you were in the hospital for the infection?
A M-hm. (Deponent nods head in the affirmative)
MR. ESKEY: Yes?
A Yes.
MR. ESKEY: Okay.
THE DEPONENT: Thank you.
Q Have you made any type of claim or anything because of your infection?
A No.
Q Now, you made your Workers' Compensation claim after you were injured in 2003?
A Correct.
Q And you've been, after you stopped working in July 2003, you haven't been back, is that right?
A I went -- I went back in 2004.
Q In 2004, right?
A I went back part-time.
Q Right.
A I had a lot of vacation, so I took a lot of days out because the doctors wanted me to try it. And then

Page 95

Dr. Breiding took me out for the month of August. Well, he took me off, out at the end of August. And my end date at TI was September 24th. So I had to go back one day just to sign my papers.
Q September 24th?
A Yeah.
Q And you haven't worked since?
A No.
Q Has Dr. Nordt said anything to you about going back to work?
A No. I'm collecting SSD right now. Been collecting that for a couple of years.
Q When you went back to work the day following your fall, was your chair still within your work area?
A I had had a different style chair -- it wasn't a Superior chair -- I had used until they pretty much put a chair in there. I guess Jim Drews brought a chair from Staples. He brought a chair in for me to use.
THE REPORTER: What was the last name, again? Jim?
THE DEPONENT: Drews, D r e w s, I believe.
Q Okay. My question, specifically, though, is when you came back to work the next day on June 3rd, was the

Page 96

chair that broke still within your work area?
A It was put outside the door.
Q Okay. How long did it remain outside the door?
A Well, someone had picked it up and tried, tried to fix it.
Q Do you know who that was?
A I don't know their name, but my boss tracked it down. My boss, Ed Picard, tracked it down.
Q Okay. And were they able to fix it, whoever this person was?
A Not to my knowledge. I don't think it was totally fixed, no.
Q Do you know how long it remained outside your door?
A Well, they put it into my, into my storeroom with the tape around it stating not to use it.
Q Do you know who put it in your storeroom?
A I believe -- I wasn't there, but I believe maybe my boss, Ed Picard. I'm not sure.
Q And they put tape around the chair?
A Yes. Sorry.
Q How long did it remain in your storeroom? Do you know?
A I don't know.
Q Do you know what day it arrived into your storeroom?

Page 97

A I, I don't know. I was out of work by the time they found it and brought it back.
Q What do you mean, found it and brought it back?
A The chair. That you're talking about the chair?
Q I'm talking about the chair. But what do you mean, they found it? Found it where?
A Well, remember I said it was outside the door?
Q Right.
A And someone took it and tried to fix it.
Q Okay.
A So they, you know, one of the guys working across from me says another guy had taken it, and they brought it back.
Q So they didn't try to fix it as it was outside your door?
A No.
Q They moved it to another location?
A They moved it to another location.
Q Tried to fix it?
A Yup.
Q And then eventually it was found at that other location?
A Yes.
Q And that's when they moved it into your storeroom?
A Correct.



P7

VOLUME II
PAGES 1-145
EXHIBITS: None

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MARY ANN KING and
PHILLIP KING,
Plaintiffs,

v. C.A. NO.: 06-258-S

STAPLES, INC., IZZY DESIGN,
JSJ CORPORATION, JOHN DOE
COMPANY,
Defendants.

* * * * * * *

CONTINUED DEPOSITION of MARY KING, a witness called on behalf of Izzy Design and JSJ Corporation, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Mary E. Rinne, Registered Professional Reporter and Notary Public for the State of Rhode Island, at the offices of Zizik, Powers, O'Connell, Spaulding & Lamontagne, 40 Westminster Street, Providence, Rhode Island, on Wednesday, January 3, 2007, commencing at 1:15 p.m.

APPEARANCES:
DeLUCA & WEIZENBAUM, LTD.
BY: Michael T. Eskey, Esq.
199 North Main Street
Providence, Rhode Island 02903
p:401.453.1500 f:401.453.1501
tim@delucaandweizenbaum.com
On behalf of Mary and Phillip King.

ZIZIK, POWERS, O'CONNELL, SPAULDING & LAMONTAGNE
BY: Donna Lamontagne, Esq.
40 Westminster Street
Providence, Rhode Island 02903
p:401.421.7110
dlamontagne@zizikpowers.com
On behalf of Izzy Design and JSJ Corporation.



APPEARANCES (cont'd):
HANSON CURRAN LLP
BY: Kelly N. Michels, Esq.
The Francis Building
146 Westminster Street
Providence, Rhode Island 02903
p:401.421.2154 f:401.521.7040
knm@hansoncurran.com
On behalf of Staples, Inc.



INDEX


| DEPONENT: | PAGE |
|---|---|
| MARY KING | |
| Examination by Ms. Lamontagne | 5 |
| Examination by Ms. Michels | 133 |
| Examination by Mr. Eskey | 142 |


EXHIBITS

| NO. DESCRIPTION | PAGE |
|---|---|
| No Exhibits | |



PROCEEDINGS

MARY KING,
having been duly sworn,
testifies as follows to

EXAMINATION BY MS. LAMONTAGNE:

Q. Would you please state your full name for the record, ma'am.
A. Mary Ann King.
Q. And, Ms. King, as you may or may not remember, my name is Attorney Donna Lamontagne.
A. Right. I remember.
Q. And I'm representing JSJ Corporation and Izzy Design --
A. Okay.
Q. -- in connection with a lawsuit that you've filed against them and Staples in the Federal Court.
A. Okay.
Q. And you had already given three hours of deposition testimony in this case on November 17th. Do you recall that?
A. Right.
Q. Okay. At that time, we had all decided to suspend the deposition --

Page 38

A. It was attached to the steel on the back on the bottom.
Q. And if you looked at the back of the chair, would you see any steel or would it be all fabric?
A. No, it was all fabric.
Q. Okay. And the knob would be where?
A. It was -- the chair went down and there was -- well, you could actually probably if you were standing back see the steel. But there was a knob on the very bottom of it where you could adjust.
And they also had levers on the side where you could adjust. You could lean back on it, you know, relax back on it. You could, you know, lower it. They had a lever where you can put it up and down.
Q. Where was the lever to recline?
A. It was -- if I recall, it was like to the side, like right about here (indicating) on the side like where the -- I'm trying to remember. I think it might have been attached to something underneath, if I recall. I'm not really positive. But I do know the levers

Page 39

were there.
Q. Just for the record, you're indicating to the left side of the chair? Is that what you're doing?
A. I'm pretty sure it was to the left, yes.
Q. Okay. So you believe that the lever to recline the seat back was to the left side of the chair toward the rear?
MR. ESKEY: I object.
Q. I'm just trying to categorize what you're telling me.
A. Yeah, I'm trying to remember. I'm not sure, but I do know the lever was there. But I'm not positive what side it was on.
Q. Okay. So you don't know --
A. I think it was left. I'm not positive.
Q. You don't know if it was the left?
A. It always seems that I always went on this side. I don't know if it was to adjust -- you know, like sometimes I sat in a reclined position. I don't know if it was, you know, because you could, you know, recline in the chairs.
When I'd talk to people, I would

Page 40

just, you know -- you know, recline it. And then they had the lever where you can adjust the height up and down for your desk level.
Q. So was the lever to adjust the height up and down also on the left side?
MR. ESKEY: I object.
A. I believe so.
Q. Again, for the record, you've been gesturing towards your left side.
A. I believe so. I believe -- if I remember correctly, I believe so.
Q. So both levers you've described, one to adjust the height and one to recline the back, were both on the left side based on your recollection?
MR. ESKEY: I object.
A. I think so.
Q. Okay. And what would you have to do to the levers to get them to work?
A. Well, the lever to go up and down, that's all you had to do, it was either -- there was a big square lever. You know, push it up or down, you know, to raise it or to lower it.
Q. So if you wanted to raise the seat of the

Page 41

chair, you would press the lever how?
A. Like, push it down and up, I believe. Like, if I wanted to go down, I would push the lever and it would bring the chair down. And then, you know, you'd have to raise yourself a little to raise, you know, the chair up.
There were some chairs that you had to use by hand and turn them. The first one was like that. We had to turn it to raise it up.
Q. When you say "the first one was like that," you mean the first chair that you've described for me that was exactly the same as the one you fell out of?
A. Yeah.
Q. So it wasn't exactly the same.
A. Well, different design, you know.
Q. Well, that's what I need to make sure. So the first chair that you had, what was different about how you raised it?
A. It was just you had to spin the seat.
Q. Okay. And then the second chair you had had a lever?
A. Had the lever.

Page 42

Q. And the lever itself you said was square?
A. It was kinda square.
Q. And flat?
A. Yes.
Q. Okay. Was that also the case for the lever to recline the back?
A. No. That was like an oval thing where you would -- if I recall, you could, you know -- it was like just a lever. You would just like push it and then, you know, you could recline or you could put it any adjustment you wanted to sit, either way you want.
Q. Which way would you push it?
A. I don't remember. I don't recall.
Q. Okay. You don't remember what you had to do to get the chair to recline?
A. I -- I think the lever went back and forth, you know, like up and down, but I'm not positive.
Q. You don't know if it went back and forth or up and down?
A. I know it didn't go up and down, but I think it went back and forth. I think you just had to lever it up, you know, but I'm not totally

Page 43

positive on it. It's been so long.
Q. Okay. So there's one knob in the back of the chair --
A. That's --
Q. -- to adjust the seat height. Correct?
MR. ESKEY: Object. Go ahead.
A. Correct.
Q. Or to adjust the back height?
A. Back height.
Q. Once you got the chair, do you remember having to adjust the back height?
MS. MICHELS: The second chair?
MS. LAMONTAGNE: Yes.
A. I believe so. I believe so.
Q. After that first time adjusting it, did you have to adjust it any other times?
A. Occasionally.
Q. Okay. How often?
A. Not often at all. When Kevin would sit in it, he was a little taller than me so he would adjust it different. He didn't sit in my chair every day, but he would adjust it different.
Q. Did you ever have any problems adjusting the

Page 44

height of the back of the chair?
A. No.
Q. And when Kevin would sit in your chair and then you would sit in it after, would you have to change the height of the seat?
A. Yes.
Q. That was a more common thing. Is that fair to say?
A. Yes, that was the more common thing. The back didn't really need to be adjusted, just the height of the chair at the desk, you know, the seat itself.
Q. Okay. And you would do that by pressing on the lever?
A. Lever, yeah.
Q. Did you ever have any problems with that?
A. No. No.
Q. Okay. And you said you would use the chair to recline back --
A. Mm-hmm.
Q. -- to, you know, talk to Pam or other people you were working with.
A. Yeah.
Q. Was that the normal position you had your

Page 45

chair in?
A. The reclined position?
Q. Yes.
A. No.
Q. No, okay. So in order to talk with Pam, would you have to just move your chair backwards or would you also have to hit the lever?
A. No, I would just turn pretty much. If I had salesmen come in, that's when, you know, I would recline, put my feet up on the thing and talk to them. You know, I had a little stool. But they were made to recline so I never thought anything about it, you know. So I just would recline and relax and we'd talk, you know, because I had a lot of salespeople that used to come in and talk to me.
Q. Okay. And normally when you were trying to do your job, it required you to sit at the computer?
A. Correct.
Q. Okay. And in that position, your chair was upright?
A. Yes.
Q. Okay. And when you reclined the seat, was



G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

there more than one possible reclined position?
A. I believe no. I believe it either went all the way back or up -- I'm not sure if you could adjust it to, you know, have it back just a little bit. I don't remember. But I -- the only two positions I sat in was either reclined or up straight. So I don't remember if it went halfway or --
Q. If it did go halfway, you didn't use it that way?
A. I didn't, yeah.
Q. So when you wanted to recline your chair, what would you do?
A. I would press the lever and then just lean back on it.
Q. Okay. And then was there a certain point where the chair stopped or you would let go of the lever?
A. Oh, no, it stopped. You know, you'd let go of the lever, but it would just stop at a certain point.
Q. Did it click when it got to a certain point or did you just know that the lever was coming



up? How did that work?
A. I don't really recall, but I'm pretty sure it just like stopped at a certain point. It didn't click or anything. It just -- that was as far as it was going.
Q. Okay. Did you ever have any difficulty putting the chair in the reclined position?
A. Not in the reclined position, no.
Q. Okay. So at any point before you fell, did you have any difficulties at all with the chair?
MR. ESKEY: Objection. You can go ahead.
A. Every now and then it would, you know, come out of the locked position a little if I didn't lock it in right.
Q. What's the locked position?
A. Well, you would turn the lever to sit up, you know, straight and it would slip out every now and then of the locked position.
Q. When you say "you would turn the lever to sit up straight," what do you mean?
A. Flip the lever, you know. If I recall, I'm pretty sure it was on the left-hand side. I



would flip, you know, and you would tighten it in and, you know, it would sit up.
Q. Can you describe for me exactly what you would do to the lever to tighten it up?
A. That's all you had to do was push it into a position and that was it.
Q. So you would push it --
A. Yeah.
Q. -- and then the back would come up?
A. Yeah. And then you would lock it back in.
Q. How do you lock it back in?
A. I'm trying to -- the lever -- it's very -- it's very foggy, but if I'm not -- if I recall right, the lever, it came up and down. And you could release and it would bring the chair back.
And when you wanted to come back up, you would put it back into -- you know, you would tighten it back down into the locked position.
Q. How would you know it was in the locked position?
A. Because the back of the chair, you know, wouldn't -- wasn't reclined. I mean, I could



lean on it and I'd be straight up.
Q. Were there any markings on the lever at all?
A. I don't recall.
Q. Okay. And you said it occasionally would not stay in the locked position?
A. Yeah, it would slip out.
Q. Okay. How often did that happen to you?
A. I don't know. Every couple a months or so, you know.
Q. Okay. And would you do anything when that happened?
A. I would tighten it in. Because I wasn't sure if I was tightening it tight enough, I would tighten it in.
Q. How would you tighten it?
A. I would just push harder on the lever.
Q. Okay. Push harder on the lever downward?
A. I believe so. I'm not positive. I believe when you lift the lever, it went back; and when you wanted to tighten it, you'd push down, if I'm not mistaken. I'm not really positive.
Q. Did you ever tell anyone at TI that there was a problem with the chair not staying in the



G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

locked position?
MR. ESKEY: I object. Go ahead.
A. Yeah, I mentioned it -- mentioned it to my boss.
Q. And who was that? Ed?
A. Ed Picard.
Q. Okay. When did you mention that to Ed?
A. Probably a few weeks before -- after it started happening.
Q. Do you remember when it first started happening?
A. It could have been about a month and a half, two months before it broke.
Q. I'm not trying to confuse you.
A. No, I'm just trying to remember.
Q. I think you told me that every couple of months it would happen that it wouldn't --
A. Yeah, but I'm just trying to remember how long -- how long it went for. But I know it was like a matter of months, you know, and then I had told Ed that it was coming out of -- out of position.
But I didn't -- he didn't -- nobody thought much of it because the chair was meant



to recline. So it was like -- it wasn't like it was snapping back or anything. It was -- you know, you would feel it go and -- you know, but that would be it.
Q. When you say "nobody thought much of it," what do you mean?
A. Well, when I told him it was coming out of -- you know, it would slip out of the reclined position, he said he would try to get me a new chair. And because it was made to recline, nobody thought anything about it because the back wasn't loose.
Q. How do you know the back wasn't loose?
MR. ESKEY: I object.
Q. You can answer.
A. Oh. Because it was steady. I mean, it wasn't like the back was loose, you know, shaking around or anything. It was just -- it was just like -- it was steady, the chair. The back of the chair was steady. It would just like, you know, come out of the reclined position.
Q. Would it come out of the reclined position or would it come out of the locked position?



A. I mean, out of the upright position.
Q. Okay.
A. When I was upright, it would recline.
Q. Okay. So when it was fully in the reclined position, there was no problem.
A. No.
Q. It was only when you went to take it out of recline and put it back upright that it wouldn't stay upright?
A. I believe when I sat -- if I put my legs up, it would, you know, come out of the, you know, reclined position. So, you know, I thought maybe I wasn't adjusting it properly.
Q. Can you say that to me again?
A. I used to have to put my feet up on a bench that I had.
Q. Under your desk?
A. Under my desk. So I would, you know, move it and I would sit, you know, with my legs up and lean back on it. And then it would just, you know, every now and then just come out of recline. I mean, out of upright, not recline.
Q. So if I understand correctly, even though the chair when you used it was in the upright



position, you would put your feet up under the desk and lean back on it. Is that correct?
A. You know, just like you're doing now.
Q. Okay. But you would not at those times move the chair into the reclined position?
A. No.
Q. Okay. You would just sort of shift your weight to lean back on it more?
A. Yeah. Just like you did just right now.
Q. And it was then that you noticed when you would be leaning back on it when it was in the upright position that it would not -- it would slip out of that upright position. Is that accurate?
A. Yes.
MR. ESKEY: I object.
A. Once in a while.
Q. And you believe that happened to you how many times before the chair broke?
A. Probably about three -- three, four times.
Q. Okay. And when is it after -- after which time did you talk to Ed about it?
A. I don't recall. I know it was in between then at that time. I'm not sure exactly when.

Q. Okay. Do you know if anybody looked at the chair after you complained to Ed about it?
A. I worked with maintenance men and, you know -- you know, they came. You know, they tried to fix -- you know, adjust everything, you know, make sure everything was all right.
And they looked at it and they didn't see anything wrong with it really. They just figured it was a little stripped or something on the side.
Q. And who were the maintenance men who came to look at it?
A. Pete Sauer.
Q. S-o-w-a?
A. S-a-u-e-r.
Q. Do you know if Pete's still at TI?
A. No, he's not.
Q. And what was his position?
A. He was an electrician.
Q. And he was an electrician for TI?
A. Yes.
Q. Okay. Did he look at it at the request of Ed Picard or just did you say to him one day, Hey, Pete, take a look at my chair, it's



slipping out?
A. Yeah, I asked him to look at it.
Q. Okay. But you don't know when that happened?
A. I think right around when it first started happening.
Q. Okay. Which would have been months --
A. Yeah.
Q. -- before the accident. Correct?
A. Yeah.
Q. Okay. Did you ever fill out any kind of complaint form to Ed about it?
A. No, because I -- you know, I didn't think anything too much of it because I -- you know, it only happened a couple of times and I just thought I wasn't locking it in properly.
Q. Well, when you said they figured it was stripped on the side --
A. Well, Peter.
Q. Peter did. Did he like physically look at the chair?
A. Yeah.
Q. Okay. Were you there when he did it?
A. No.
Q. No? When did he do it? Like second shift or



something?
A. He might have done it when I was at lunch, you know, because they would do things on the side for me.
Q. Okay. So you weren't there to see him do it?
A. No.
Q. Okay. And he just told you after what?
A. He just thought it was -- the knob was just loose, you know, like it's just -- you know, it just loosens up. He said he doesn't know why, you know, it's just loosening up.
Q. When you say knob, you mean --
A. Well, the lever.
Q. The lever. There wasn't anything to turn, if I understand you correctly.
A. No, I don't believe so. I don't believe there was a turn on that one.
Q. Okay. Did you personally ever look at the chair underneath or on the side to see what was happening?
A. I -- well, I pretty much tried. Everything looked fine. You know, I looked, you know, because, you know, you don't know unless you take something apart. I mean, everything



looked new, everything looked fine.
Q. Okay.
A. I mean --
Q. You could have had this chair, though, for at least six years but it still looked new?
MR. ESKEY: I object.
A. I don't know. It's -- I mean, I wasn't heavy on it. I mean, I was pretty much in it at times when I ordered. I was pretty much up running around answering the window. We had near 12 buildings we took care of so I was pretty much out of the chair more than I was in the chair.
Q. Did you ever look at the instructions that came with the chair to see if it covered, you know, what to do if this happens?
MR. ESKEY: I object.
Q. You can answer.
A. No, I don't remember.
Q. Okay. And did Ed personally ever look at the chair before you fell?
A. I don't believe so.
Q. Okay. And to your knowledge, he didn't send anybody to look at it?

A. No.
Q. And it was just you on your own, you asked Pete Sauer to look at it?
A. Correct.
Q. To your knowledge, did anybody else look at it before it broke?
A. No.
Q. Okay. And you don't know how those levers were attached to the chair, do you?
A. I'm not positive. I do know the up and down one was attached to the bottom underneath. The other levers, I'm not fully positive. You know what I mean? I know they were there, but I'm not exactly sure how they were -- I don't remember.
I lost a lot of my memory when I had that infection and it's like things are hard to remember. Things are just starting to come back to me, you know. So it's real hard for me to remember things that happened even yesterday. Sometimes I forget, you know.
Q. I understand. And if there's something you don't remember, it's perfectly okay to tell me you don't remember. I'd rather have you --



A. Yeah, I really don't remember how the lever worked on the side, you know, like where it was. But I do know you had to push it in, you know, turn it to lock it in and lock it out, you know. I know it was a lever. A flat piece.
Q. And when you sat at your desk, you were there for roughly eight hours a day?
A. At the desk, no. Two or three, maybe sometimes eight.
Q. You could be sitting there all day?
A. I could be there all day. Sometimes -- sometimes I never even got to sit in the chair, you know what I mean? That's how, you know, busy things were at TI.
Q. And when you were sitting, it was your practice to put your feet up on the bench?
A. Yeah, I had a little --
MR. ESKEY: I object.
Q. Go ahead.
A. A little bench. I had a little bench. I would, you know, just --
Q. How high was the bench?
A. Probably about this high (indicating).



Q. Maybe about a foot?
A. Yeah, probably about a foot.
Q. Okay. And why did you do that? Was it more comfortable?
A. Yeah.
Q. Okay. Was it for your back or your legs?
A. No, it was just more comfortable.
Q. Okay. And as a result of that, the chair was sort of in a slightly angled back position?
MR. ESKEY: I object.
A. It was straight up.
Q. The chair was still straight up?
A. Yeah, I would just sit, you know, with my feet up like this (indicating) like I'm sitting now, just with my feet up.
Q. And you were leaning back on the chair?
MR. ESKEY: I object. You can go ahead.
A. I believe like I'm -- like I'm sitting now.
Q. Okay. Would your head be touching the back of the chair?
A. No.
Q. All right. Would your shoulders be touching the back of the chair?



A. No. I believe it would be just like I'm sitting right this minute, you know. Because I was typing so it's kind of hard to --
Q. So you'd be typing and pushed back slightly but not with your shoulders touching and not with your head?
A. Just like this (indicating), you know.
Q. But with your feet up.
A. Yeah.
Q. Okay. And when the incident that we're here about happened, you were sitting at your desk typing?
A. Yes.
Q. Okay. And what position was the chair in?
A. Upright.
Q. Okay. When was the last time before the chair broke that you had experienced the problem with it staying in the upright position?
A. Probably a month before.
Q. Okay. And by then, had Pete already looked at it?
A. I had him look at it the first time it happened. And, you know, they tightened it in. They, you know -- they, you know, checked

Q. To your knowledge, who took the pictures?
MR. ESKEY: Objection.
A. I don't know.
Q. Have you ever seen any pictures of the chair?
A. No.
Q. Okay. And you believe somebody fixed the chair after?
A. I believe so. Someone said that -- well, this is hearsay. I wasn't there. They called me up and asked me where the chair was, I said it was outside the door. And then they asked the gentleman across the way and they said, Oh, I don't know who the person was took it and he had put screws in it and fixed it. And then they took the chair off the floor and they brought it and Jim Drews took it. That's all I know.
Q. Your personal knowledge of what happened to the chair after was that you placed it where?
A. I placed it in an area -- we had red line, yellow line off a certain -- you know, certain materials and we place it right outside of the door, right outside my storeroom in that, you know, yellow square.



Q. So it was not inside the storeroom, it was outside the storeroom?
A. It was put outside the storeroom.
Q. And when you moved it there, was it still in two pieces?
A. Yes.
Q. At any point after that, did you see the chair in one piece?
A. No.
Q. At any point after that, do you know of anyone who physically touched the chair, the name of any person?
A. I don't know the name of any person who touched it.
Q. And you never saw the chair again. Is that fair to say?
A. Never saw it again after that.
Q. And even when you went back to work part-time and when you went back to work the next day, you didn't see the chair anymore?
A. No.
Q. Okay. And when you went --
A. Well, actually, the chair was outside the door when I went back the next day still.



Q. It had not been moved when you went back to work?
A. It had not been moved at that time.
Q. So for the second day you were there, the chair was there, but you didn't see anything happen to it?
A. No, it was still outside the door.
Q. The following day, which would have been June 4th, was the chair still there?
MR. ESKEY: Object. Asked and answered, go ahead.
A. As long as I was there, while I was there the chair was out in front of that door while I was in work.
Q. And then after June 5th, did you go back to work anymore?
A. I don't believe so. I forgot the date, but I do know when I went out of work that's when they came to look for the chair. So, you know, I'm not sure what date it was to tell you the truth.
Q. And you don't know who came and where they got it from or you don't know what happened to it after that?



A. No. I know Ed Picard came to look for the chair and look for the screws and that's -- that's what I heard. And him and Pam were on the floor looking for the screws.
But like I said, it had a partition where there was a space underneath where they could have gone anywhere in the manufacturing or into the boiler room area.
Q. And when you say "that's what I heard," who did you hear it from?
A. Ed Picard.
Q. Okay. When did you talk to Ed?
A. He called and asked me where the chair was.
Q. Called you at home?
A. Yeah.
Q. And that was what day?
A. The first day I was out. I'm not sure of the day.
Q. The first day that you were out?
A. The first full day that I was out.
Q. Fair to say within a week of the accident?
A. Oh, yeah.
Q. First full day you were out he called you and asked you where the chair was?

A. Correct.
Q. And you said, It's outside in the hallway?
A. Correct.
Q. Okay. And what else did you say?
A. I don't recall. I think that's all he wanted to know and he asked me how I was doing and I told him. And pretty much that was about it.
And then I heard -- they asked Russell Loxley where the chair was. He said, So-and-so -- I don't know the guy's name -- took it. And that's when they went and found the guy and took the chair back and gave it to Jim Drews.
Q. Russell Loxley?
A. Loxley.
Q. How do you spell that?
A. L-o-x-l-e-y.
Q. And who did he work for?
A. He worked in the tool room across from me.
Q. The tool room across from your storeroom?
A. Yes.
Q. And you heard from whom that Russell was involved with the chair?
A. He wasn't involved, but he seen the person who



took it. Pam told me.
Q. So when did you talk to Pam?
A. I don't recall. It was in probably in that first week or the following week. They were calling to see how I was doing.
Q. Okay. And Pam told you that Russell Loxley had seen who took the chair?
A. Between Pam and Ed, one of the two told me, yeah, that they had seen -- Russell had seen somebody take the chair to fix it.
Q. Okay. And then we don't know what happened to it after that?
A. I believe Jim Drews took it.
Q. Okay. Do you know if it ever got back to TI after Jim Drews took it?
A. I don't know.
Q. Do you know if it ever went off the TI premises?
A. Oh, yes. A lot of chairs. A lot of chairs on skids went off the TI premises.
Q. Did you see the chair that you fell off of going off the TI premises?
A. No. I didn't see it personally, no.
Q. You heard from someone that the chair that you



fell off of was taken off the premises?
A. Ed Picard told me that Jim Drews took the chair because they were checking the serial number on it to see if it was under warranty or some issue like that.
Q. So Ed Picard told you that Jim Drews took the chair?
A. Correct.
Q. Okay.
A. And, actually, it's in the safety reports.
Q. That Jim Drews took the chair?
A. Yes.
Q. What safety reports were you referring to? The TI reports?
A. TI safety reports, I believe.
Q. There's a reference in the safety reports to a man named Al.
A. Al Brown.
Q. Al Brown, okay. Did you hear whether or not Al had anything to do with the chair?
A. I don't know. I would assume, he was the head of safety.
Q. Okay. How many safety reports did you see?
A. I seen three.



Q. You've seen three, okay. And do you know which one has the reference that Jim Drews took the chair?
A. I'm not sure which one.
Q. Okay.
A. And when I had come back to work part-time, they had had a safety meeting with -- you know, I was in -- they called it a 4D meeting and they had said Jim Drews had taken the chair.
Q. So you were in the meeting when --
A. I was in a meeting when they had said that, yeah.
Q. They said that Jim Drews took the chair?
A. Yeah. Skids of chairs.
Q. You said they called it a what D kind of investigation?
A. I think 4D or 3D or whatever you call it.
Q. Could it be 8D?
A. 8D, there you go.
Q. There's a reference on June 10th, 2003. It says team members. You were one of the team members. Correct?
A. What date was that?

EXAMINATION BY MR. ESKEY:
Q. Ms. Lamontagne has asked you a number of questions about the description of the chairs and the levers. Do you recall that?
A. Yes.
Q. Could you identify the same type of chair that broke and that we're talking about today if you were shown a picture of it?
A. Oh, yeah.
MR. ESKEY: That's all I have. We're gonna read and sign. Thank you.
(Whereupon the deposition was concluded at 3:50 p.m.)



CERTIFICATE

STATE OF RHODE ISLAND
COUNTY OF NEWPORT

I, Mary E. Rinne, Registered Professional Reporter and Notary Public in and for the State of Rhode Island, do hereby certify that the foregoing transcript of the deposition of Mary King, having been duly sworn on Wednesday January 3, 2007, is true and accurate to the best of my knowledge, skill and ability.

IN WITNESS HEREOF, I have hereunto set my hand and notarial seal this 16th day of January 2007.

Mary E. Rinne
RPR and Notary Public

My Commission Expires: February 27, 2011



DEPONENT'S ERRATA SHEET
AND SIGNATURE INSTRUCTIONS

The Original of the Errata Sheet has been delivered to Michael T. Eskey, Esq.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL delivered to Donna Lamontagne, Esq., to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself.

REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.



ATTACH TO THE DEPOSITION OF MARY KING
CASE: KING v. STAPLES, et al.

ERRATA SHEET

INSTRUCTIONS: After reading the transcript of your deposition, note any change or correction to your testimony and the reason therefor on this sheet. DO NOT make any marks or notations on the transcript volume itself. Sign and date this errata sheet (before a Notary Public, if required). Refer to Page 144 of the transcript for errata sheet distribution instructions.

PAGE LINE
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________
____ ____ CHANGE: ____________________
REASON: ____________________

I have read the foregoing transcript of my deposition and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

____________________
Mary King Date