UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MARY ANN KING, and PHILLIP KING, Plaintiffs, | : | |
| v. | : | CA 06-258 S |
| STAPLES INC.; IZZY DESIGN; JSJ SEATING COMPANY TEXAS, LP; JSJ SEATING CORPORATION; JOHN DOE COMPANY, Defendants. | : | |

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the Court is Izzy Design and JSJ Corporation's Motion for Summary Judgment (Doc. #99) ("Motion for Summary Judgment" or "Motion").[1] The Motion has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). After reviewing the filings, listening to oral argument, and performing independent research, I recommend that the Motion be denied.

**Facts**

On June 2, 2003, Plaintiff Mary Ann King ("Plaintiff" or "King") was working as a purchasing assistant at a Texas Instruments ("TI") facility in Attleboro, Massachusetts. See Plaintiffs' Supplemental Response to Defendants' Statement of

[1] JSJ Corporation is no longer a defendant in this action by virtue of the Amended Complaint (Doc. #107) which was filed after the instant Motion for Summary Judgment. In the interest of economy and efficiency, the Court treats the Motion for Summary Judgment as being filed by Izzy Design ("Izzy") and the two defendants added by the Amended Complaint, JSJ Seating Company Texas, LP, and its predecessor, JSJ Seating Corporation (collectively "JSJ Seating").

Uncontroverted Facts in Support of Their Motion for Summary Judgment (Doc. #117) ("Plaintiffs' Supp. Resp."), Part II (Plaintiffs' Statement of Additional Disputed and/or Undisputed Facts) ¶ 30. As Plaintiff leaned back in her chair to speak with a co-worker, Pamela McGee ("McGee"), the back of Plaintiff's chair broke off from its seat, causing Plaintiff to fall and injure her back. See id. ¶ 31. Plaintiff observed that the metal bar with the back attached to it had come off the chair. See id. ¶ 32.

Russell Loxley ("Loxley"), a TI engineering technician, viewed the chair very shortly after the incident.[2] He observed that the chair was in two pieces. See Deposition of Russell Loxley ("Loxley Dep.") at 18. As he described it, "the back was off and the seat was still there." Id. Loxley also observed that two screws on the chair had broken. Id. at 22. The threaded portion of each screw was still in the chair but "[t]he heads of the screws were gone as if they were sheared." Id. Loxley found the two screw tops,[3] see id. at 23-24, and took the

---

[2] When Loxley was asked if he knew how long after Plaintiff had fallen he entered her work area, he answered: "It was -- I think it was pretty close to right away I walked in." Deposition of Russell Loxley ("Loxley Dep.") at 18. Loxley recalled that Plaintiff was leaning on the corner of her desk and "it looked like she had an expression on her face that she wasn't happy." Id. at 19. He also observed that Plaintiff's co-worker, Pamela McGee ("McGee") was "standing with her like -- you know, not supporting her but just, you know, assuring her, I guess." Id. Loxely testified that he was the first person to touch the chair after it broke. See id. at 17. McGee likewise believed that Loxley was the first to touch it. See Deposition of Pamela J. McGee ("McGee Dep.") at 45.

[3] Loxley's testimony on this point was inconsistent. Compare Loxley Dep. at 23-24 ("Yes, we found the two screws. I had -- I had all four pieces after. I had the two screw tops and the two threaded portions, which I didn't save of course ....") with id. at 58 (Q. "And did you say that you retrieved the heads?" A. "I believe we got one. We found one. I don't know where the other one went.").

chair to his work area,[4] see id. at 58. Within a few days,[5] he repaired the chair by putting in two new screws. See id. at 24-25. Loxley then wheeled the chair out of his area and put it in the corner of an L-shaped hallway where he kept other materials. See id. at 25-26, 67 ("the chair was up in that corner with other junk that I used to pile up"). According to Loxley, the chair stayed in this area for a period of time, which could have been less than one month but no more than two months, and then it was gone, see id. at 68. Loxley remembered that the chair was an adjustable office chair, but he could not recall the manufacturer. See id. at 21.

On June 5, 2003, three days after the incident, Alan E. Brown, Jr. ("Brown"), a TI senior safety specialist, Ed Picard ("Picard"), who was Plaintiff's and McGee's boss, and another member of the safety team visited Plaintiff's work area to do an initial assessment. See Deposition of Alan E. Brown, Jr. ("Brown Dep."), at 23. They found that someone from the manufacturing area had removed the chair from Plaintiff's work area which was known as the "tool crib." Id. They looked for the chair and found it in a hallway "on the outside of the crib with some equipment that was staged to be removed from the building." Id. at 24-25. They moved it back into the tool crib and put yellow caution tape around the chair. See id. at 25. Brown made a sign stating that the chair was broken and not to be used, and the

---

[4] According to McGee, Plaintiff told Loxley "what happened, [and] he came in and took the chair." McGee Dep. at 45. McGee did not see Loxley take the chair away. Id. at 46. When she came back from lunch it was gone. Id.

[5] Loxley testified that he repaired the chair within the first week following the accident. See Loxley Dep. at 25.

sign was posted.[6] See id. at 26. The chair was a Superior Centron chair.[7] See id. at 28.

A report of the safety team's June 5th visit stated that someone had "attempted to repair [the chair]," id. at 24, but when Brown testified at his deposition (almost four years later) he did not "recall it being repaired," id. Brown looked at the chair and found that the seat would move freely and would not stay in a locked position. See id. at 26. The back of the chair was with the seat, but Brown did not recall the back being on the chair.[8] The report of the visit also stated that the team

---

[6] McGee testified that the chair was brought back into her area "all back together," McGee Dep. at 47, and that it stayed there for a period of time, see id. at 48 ("it might have been a month"). She recalled that her boss, Ed Picard ("Picard"), "ended up saying, 'We can't use that chair, we have to tag it' until Jim Drews from Staples [comes] in." Id. at 47. McGee testified that Drews took the chair and then brought it back from Staples. See id. at 55. According to McGee, it remained in her area only very briefly before Picard took the chair away, and she never saw it again. Id.

[7] The name "Superior" appears to refer to the manufacturer or seller of the chair while "Centron" appears to refer to the type of chair or model. Documents and witnesses speak of the chair in question both as a "Superior Centron chair" and a "Centron chair."

[8] As Defendants attach significance to this point, Brown's testimony is reproduced below:

Q. At that time when you first saw the chair, was the back still on the chair?

A. I don't believe so.

Q. All right. Where was the back?

A. It was with the chair.

Q. With it but not --

A. I don't recall it being on it.

Q. I'm not going to ask you to guess.

A. No, I don't recall it being on it.

noticed that several screws were missing from the chair. See Brown Dep. at 27-28. Brown was able to locate places on the chair where there should have been screws, but the screws were missing. See id. at 28. The safety team looked at another chair of the same model and "saw the two screws were in." Id. Brown testified that he believed that the team found one screw on the floor and that it "looked like the screw that was in the Superior Centron,"[9] id. at 29.

On June 16, 2008, fourteen days after Plaintiff's accident, Brown returned to the area with Jim Drews ("Drews"), a senior account manager for Staples Business Advantage ("Staples"), to look at the chair around which Brown had placed the yellow caution tape. See Izzy Design and JSJ Corporation's Statement of Uncontroverted Facts in Support of Their Motion for Summary Judgment ("SUF"), Exhibit ("Ex.") M ("8D Incident Investigation Meeting Minutes of 6/17/03") at 1; Deposition of Jim Drews ("Drews Dep.") at 28-30. Drews observed that the "seat and base assembly ... was still assembled, and ... the back was laying on top of the chair." Drews Dep. at 31. He took the control number from the bottom of the chair, made a note as to the parts that it needed, and left. See id. at 30. The chair was a Superior Centron chair, see id. at 35, which Brown with Drews' assistance was able to determine was manufactured in 1996, see Brown Dep. at 30-31.

Drews ordered the parts needed to repair the chair. See Drews Dep. at 31. At some later point, he received the parts and took the chair to his garage where he repaired it. See id. at 32. He then returned the chair to the area in TI from which he

---

Deposition of Alan E. Brown, Jr. ("Brown Dep."), at 27.

[9] Presumably, the "Superior Centron" to which Brown was referring here was the Centron chair which the safety team was using for purposes of comparison. See Brown Dep. at 28-29.

had taken it. See id. at 34. What became of the chair thereafter is unknown.

From 1996 to 2003, JSJ Seating sold over 13,000 Superior Centron chairs—about 10,000 of which were sold to TI. See Plaintiffs' Supp. Resp., Part II ¶ 7. The back of a Superior Centron chair is attached to a control mechanism under the seat by a curved piece of steel called a "J-bar." Id. ¶ 3. From 1996 through 1998, JSJ Seating designed the J-bar to be secured to the under-seat control mechanism by two screws. See id. ¶ 4. The screws were intended to attach the J-bar (and thus the back of the chair) permanently to the seat. See id. ¶ 5.

In April of 1997, an independent facility, SGS U.S. Testing Co. ("SGS U.S. Testing"), performed various tests for JSJ Seating on a sample chair of the same type as the Superior Centron to assess its compliance with national standards for general purpose office chairs.[10] Id. ¶ 8. One of the tests performed, the back durability test, was intended to simulate the action over time of a person leaning against the back of the chair. See id. ¶ 9. If, subjected to the forces of the test, a chair does not break, deform, or otherwise fail, it passes. See id. ¶ 10. The Superior Centron chair failed when, one-quarter of the way through the test, the two screws attaching the control mechanism to the seat base sheared off. See id. ¶ 11.

In addition to the failure of the screws during the back durability test, in the first few years after the Superior Centron chair was introduced to the market, JSJ Seating received "feedback" from customers that they were encountering problems with "loose Centron backs." Id. ¶ 12 (quoting Deposition of Daniel Vukcevich ("Vukcevich Dep.") at 32-33). During that time,

[10] Defendants dispute that Plaintiff was sitting in the model or version of the chair that was used in the referenced tests. See Letter from Stubenvoll to Martin, M.J., of 3/5/08.

JSJ Seating's biggest customer of Superior Centron chairs, TI, reported problems with loose backs and loose screws attaching the J-bar to Centron chairs. See id. ¶ 13.

Whether in response to the failure of the screws during the April 1997 back durability test or to customer feedback concerning problems with loose backs or both, JSJ Seating initiated an engineering change process, which resulted in a decision in September 1998 to modify the design of the attachment of the J-bar to the chair "so that a third screw can be used for more integral strength between control and j-bar." Id. ¶ 14 (quoting Vukcevich Dep. at 66-67). As an interim measure until J-bars with a new hole pattern could be produced, JSJ Seating developed a so-called "TI Field Fix," which consisted of installing a third screw with a heavy fender washer and a drop of "Loc-tite" in a hole located between the two existing J-bar mounting screws." Id. ¶ 15 (citing Vukcevich Dep. at 67-72).

In December 1998, SGS U.S. Testing performed back durability testing on a sample Centron chair "w/3rd Screw for TI Field Fix" and reported that it passed "without any apparent structural breakage or loss of serviceability." Id. ¶ 16. On December 29, 1998, JSJ Seating incorporated the TI Field Fix into an Engineering Change Notice, the purpose of which was to add a third screw attaching the J-bar to all Centron chairs manufactured after December 29, 1998. Id. ¶ 17. As with the "TI Field Fix," the December 1998 modification was intended to be "a temporary change until the J-bars with the new hole pattern c[a]me in." Id. ¶ 18. While the new J-bars were not used in production until May 2000, beginning on December 29, 1998, all Centron chairs were manufactured with three screws attaching the J-bar to the under-seat control mechanism. Id. ¶ 19.

Although the third-screw design change provided an answer to the loose back problem for Centron chairs manufactured after

December 29, 1998, customers continued to report problems with loose backs on Centron chairs made from 1996-1998. Id. ¶ 20. TI reported loose back problems at its North Texas facilities and two injuries at its Tucson site related to backrests that became loose and fell off. Id. ¶ 21. For its biggest customers, like TI, JSJ Seating responded in 2000 by "performing inspections and service to the screws attaching the J-bar" for all Centron chairs at TI's Texas facilities.[11] Id. ¶ 22.

For the rest of its customers, on September 29, 2000, JSJ Seating sent them a letter by certified mail with a Product Bulletin, notifying them that Centron chairs manufactured before December 29, 1998, could have problems with "screws attaching the back J-bar to the control [working] loose." Id. ¶ 23 (alteration in original). The letter advised customers to inspect the chairs in accordance with the directions on the Product Bulletin and to notify JSJ Seating "if any screws are loose." Id. ¶ 24. JSJ Seating offered to remedy problems "at its own cost" and encouraged its customers to provide information concerning the loose-screw problem to the ultimate purchasers of Centron chairs. Id. ¶ 25. Those customers that responded were sent a third screw, regardless of whether they reported a loose screw/back problem. Id. ¶ 26. Numerous letters were returned as "undeliverable," and many customers (retailers and distributors) responded that they had no records identifying ultimate users. Id. ¶ 28. JSJ Seating made no additional attempts to notify ultimate users of the loose-screw-and-back problems with Superior

---

[11] It appears that no similar action was taken with regard to Centron chairs at TI's Attleboro site. Although the company "had quite a few [Centron] chairs on site," Brown Dep. at 85, Brown's recollection was "that we did not have any of the chairs with three screws on the site," id. at 76. Brown believed that after Plaintiff's accident he asked for 500 screws, id. at 85, to make the recommended repair to the chairs.

Centron chairs.[12] Id. ¶¶ 28-29.

Somewhere between 2002 and 2004, Izzy Design ("Izzy"), a division of JSJ Corporation, assumed responsibility for manufacturing Superior Centron chairs. See Vukcevich Dep. at 21. In addition, Izzy "support[s]," id. at 22, Superior Centron chairs that have already been sold, id.

**Travel**[13]

Plaintiffs filed this action on May 25, 2006, naming Staples, Inc., Izzy Design, JSJ Corporation, and John Doe Company as Defendants. See Complaint (Doc. #1). Defendants Izzy and JSJ Corporation ("JSJ") filed the instant Motion for Summary Judgment on November 7, 2007. Plaintiffs' objection to the Motion was filed on December 10, 2007. See Plaintiffs' Objection to Defendants' Motion for Summary Judgment (Doc. #105). Defendants Izzy and JSJ filed a reply memorandum on December 19, 2007. See Izzy Design and JSJ Corporation's Reply Memorandum in Support of Their Motion for Summary Judgment (Doc. #108) ("Defendants' Reply Mem.").

In the meantime, on December 7, 2007, Plaintiffs filed a motion for leave to amend their complaint. Plaintiffs sought to delete JSJ as a defendant and to add JSJ Seating. See Plaintiffs' Memorandum in Support of Motion for Leave to Amend Complaint ("Plaintiffs' Mem. for Leave") at 1-2; see also Proposed Amended Complaint (Doc. #104). In support of their request, Plaintiffs noted that JSJ had filed an affidavit indicating that it was not a proper defendant to the action and that JSJ Seating was the actual entity which manufactured and

[12] Defendants Izzy and JSJ Seating (collectively "Defendants") contend that "[t]he evidence establishes that there were follow-up mailings." Letter from Stubenvoll to Martin, M.J., of 3/5/08 at 2.

[13] The Court recounts only the travel that is relevant to the instant Motion.

sold the type of chair at issue in the litigation. See Plaintiffs' Mem. for Leave at 1.

Plaintiffs' Motion for Leave to Amend Complaint (Doc. #103) was granted on December 11, 2007. See Docket (Text Order of 12/11/07). The Amended Complaint (Doc. #107) was filed the next day.

The Court conducted a hearing on the Motion for Summary Judgment on January 28, 2008. Because Plaintiffs had not filed a separate statement of undisputed facts, the Court directed them to do so.[14] See Order Directing Plaintiffs to File Supplemental Response (Doc. #114) ("Order of 1/28/08"). Plaintiffs complied on February 18, 2008. See Plaintiffs' Supp. Resp. (Doc. #117).

In addition to containing Plaintiffs' Response to Defendants' Statement of Uncontroverted Facts, Plaintiffs' Supp. Resp. also contained Plaintiffs' Statement of Additional Disputed and/or Undisputed Facts, see Plaintiffs' Supp. Resp., Part II at 6-18. Defendants responded to Plaintiffs' Supp. Resp. in a March 5, 2008, letter to this Magistrate Judge, stating that "movants will not dispute the facts [in Plaintiffs' Supp. Resp.], except as set forth in the reply memorandum and [in the letter]." Letter from Stubenvoll to Martin, M.J., of 3/5/08 at 1. Thereafter, the Motion was taken under advisement.

**Summary Judgment Standard**

"Summary judgment is appropriate if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

---

[14] Local Rule Cv 56 now requires that "[a]n objecting party that is contesting the movant's Statement of Undisputed Facts shall file a Statement of Disputed Facts, which shall be numbered correspondingly to the Statement of Undisputed Facts, and which shall identify the evidence establishing the dispute ...." LR Cv 56(a)(3) (incorporating Emergency Amendment effective 4/10/08).

is entitled to a judgment as a matter of law.'" Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006)(quoting Fed. R. Civ. P. 56(c)); accord Kearney v. Town of Wareham, 316 F.3d 18, 21 (1st Cir. 2002). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)(quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)(citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." Coyne v. Taber Partners I, 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." Gannon v. Narragansett Elec. Co., 777 F. Supp. 167, 169 (D.R.I. 1991)(citation and internal quotation marks omitted).

The non-moving party, however, may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which it would bear the ultimate

burden of proof at trial. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d at 53 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505 (1986)). "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002)(quoting LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993))(alteration in original)(internal quotation marks omitted).

## Discussion

### I. Product Identification

Izzy and JSJ Seating ("Defendants") initially contend that they are entitled to summary judgment because Plaintiffs allegedly cannot establish that Izzy or JSJ Seating manufactured the chair. Defendants rely heavily on the fact that the chair has been lost and that there are no documents regarding its sale or maintenance. They argue the eyewitness testimony refutes Plaintiff's claim that the chair was a Centron. In particular, Defendants argue that Plaintiff's own testimony eliminates the Centron as being the defective chair. They point to her testimony that to adjust the back on the chair, there was a round knob which could be turned. See Deposition of Mary Ann King ("King Dep."), Vol. II at 37. Defendants assert that "[t]he Centron has never had such a knob." Izzy Design and JSJ Corporation's Memorandum of Law in Support of Their Motion for Summary Judgment ("Defendants' Mem.") at 8. In support of this assertion, Defendants cite the testimony of Daniel Vukcevich, Izzy's vice-president of brand strategy, who answered no when asked if there was "any type of knob that's used to adjust the height on the Centron chair[.]" Vukcevich Dep. at 171; see also id. at 8.

Defendants' argument regarding Plaintiff's testimony overlooks two important considerations. First, Vukcevich did not testify that the Centron chair does not have a round knob. Rather, he testified only that a round knob did not control the *height* of the chair. Id. at 171. Indeed, photographs of the Centron chair show that it has a round "Tension Adjustment Knob." Plaintiffs' Record Appendix[15] ("RA") at 122. This knob, located on the bottom of the chair, "controls the amount of resistance and support you are afforded when adjusting the angle of the seat back." Id. at 123. Second, Plaintiff was not asked how the *height* of the chair was adjusted. She was asked "[h]ow did you adjust the back?" King Dep., Vol. II at 37. Her description that the chair "had a knob on the back where you could, you know, like adjust the -- you know, the height on it somewhat, if I recall that," id., was not necessarily incompatible with the chair being a Centron. The Centron has a knob, and turning that knob does adjust the back. RA at 123.

As for the location of the knob, Plaintiff initially described the knob as being on "[t]he very back of the chair where you could turn it," King Dep., Vol. II at 37, but she went on to state that "[i]t was attached to the steel on the back on the bottom," id. at 38, and that the back of the chair was "all fabric," id. The photograph of the Centron chair in the record appears to show the knob attached to the steel portion of the chair underneath the seat. RA at 122. While the knob is not on the back of the chair, Plaintiff indicated that the knob was "on the back on the bottom," King Dep., Vol. II at 38, "on the very bottom ...," id., and that the knob was attached to steel (not

---

[15] Plaintiffs' Record Appendix ("RA") is needlessly voluminous, containing multiple copies of identical documents. See, e.g., RA at 170, 173-74, 176-77, 186, 188, 190. This circumstance hindered the Court's work.

fabric), id. at 37-38. All in all, Plaintiff's description of the location of the knob is not that far off the mark.

As for Plaintiff's reference that the knob permitted her to adjust "the height on it somewhat," id. at 37, she immediately qualified this statement with the words, "if I recall that," id.[16] Plaintiff was not asked specifically about how the height of the back of the chair was controlled. She later indicated that she thought that the chair had two levers, one to adjust the height of the chair and one to recline the back. See id. at 40. The Centron chair has "paddle[s]," Vukcevich Dep. at 171, and by pulling up on the right paddle and releasing one's weight the chair raises, id. A lay person might well use the term "lever" when referring to a control denominated a "paddle" by the manufacturer. The two terms are close enough to be almost interchangeable. Thus, Plaintiff's statement that the height of the chair could be adjusted by operating a lever comports with a Centron chair.

Defendants, however, cite Plaintiff's testimony that the chair had levers as further evidence that the chair could not have been a Centron chair. See Defendants' Mem. at 8. Plaintiffs testified that the chair had "levers on the side where you could adjust," King Dep., Vol. II at 38, that "the up and down one was attached to the bottom underneath," id. at 58, and that she "really d[id]n't remember how the lever worked on the side .... But I do know you had to push it in, you know, turn it to lock it in and lock out, you know. I know it was a lever. A flat piece," id. at 59. Defendants point out that Vukcevich was

---

[16] The tension adjustment knob is used "when adjusting the angle of the seat back." RA at 123. Adjusting the angle of the seat back would seemingly have at least a slight effect on the height of the seat back in relation to the floor. Thus, Plaintiff's statement that turning the knob would adjust "the height on it somewhat, if I recall that," Deposition of Mary Ann King ("King Dep."), Vol. II at 37, may not necessarily be incorrect.

asked if there had "ever been any levers on a Centron that you push in and turn to lock in or lock out," Vukcevich Dep. at 172, and that he responded: "Push in and turn, no," id.

The Court would be far more impressed with the strength of this purported discrepancy if Vukcevich had testified that the Centron did not have levers. As already noted, Vukcevich testified that the Centron had "paddle[s]." Id. at 171, 173. Plaintiff's attempt to recall some three and a half years after the accident how the levers worked and to verbally describe their operation was not an easy task as evidenced by her repeated comments indicating a lack of certainty in this regard. See King Dep., Vol. II at 58 ("I'm not positive."); id. ("I'm not fully positive."); id. ("I'm not exactly sure how they were -- I don't remember."); id. ("things are hard to remember"); id. at 59 ("I really don't remember how the lever worked on the side, you know, like where it was.").

It is true that after her final expression of uncertainty on the topic, Plaintiff appears to state with some conviction that "I do know you had to push it in, you know, turn it to lock it in and lock it out, you know. I know it was a lever." Id. at 59. However, after considering the totality of Plaintiff's testimony and the other evidence, the Court concludes that, to the extent that there is a conflict between Plaintiff's description of how the lever operated and the operation of the lever on a Centron chair, this is simply too fine a point on which to base a finding that the chair could not have been a Centron chair. Accordingly, Defendants' argument in this regard is rejected.

In further support of their contention that Plaintiff cannot prove the chair was a Centron chair, Defendants argue that there were eight or nine different styles of chairs at the TI facility in Attleboro, that Loxley did not think the chair involved in the accident was a Superior chair, and that McGee was told the chair

was an "Imperial" chair. Defendants' Mem. at 8. While there may have been eight or nine "styles" of chairs at the Attleboro plant, the admissible evidence indicates that there were only three manufacturers (in addition to Superior) whose chairs were on site when Plaintiff's chair collapsed: Herman Miller, Steelcase, and Miller Axis. See Drews Dep. at 13-15.[17] Loxley stated that he could not remember the brand of the chair. See Loxley Dep. at 21. He was shown photographs of both Centron and non-Centron chairs, see id. at 65-66, and, while he stated that he did not believe that Plaintiff's chair was as adjustable as the Centron chair shown in the photograph, see id. at 65, he also allowed that Plaintiff's chair "could have had ...," id. at 66, the design of a Centron chair. As for McGee, she "guess[ed]," McGee Dep. at 19, that her chair and Plaintiff's chair were "Imperial chairs," id., because "[t]hat's what my boss had told me," id. She had no personal knowledge that there were any Imperial chairs on the site. Thus, the evidence cited by Defendants regarding the brands of chairs that were at the site, Loxley's inability to remember the chair's manufacturer, and McGee's guess (based on hearsay) that it was an Imperial chair is not fatal to Plaintiffs' claims.

Of course, Plaintiffs have the burden of proving by a preponderance of the evidence that Defendants manufactured the chair that broke.

> It is axiomatic that a plaintiff must prove that the proximate cause of his or her injuries was the defendant's product. Stated another way, a plaintiff in a products liability case bears the burden of proving by

---

[17] Drews testified that TI was allowed to buy two types of chairs from Staples: "One was a Miller Axis Series chair, the other was a Superior Centron chair. Those specific chairs were the only two that we were allowed to provide to them." Drews Dep. at 13. Drews also stated that he also observed Herman Miller and Steelcase chairs at the TI Attleboro facility. Drews Dep. at 15.

> a preponderance of the evidence that the defendant caused the harm that is the subject of the litigation. The identification element of causation-in-fact requires the plaintiff to establish a sufficient connection between the product and its alleged manufacturer or supplier.

Clift v. Vose Hardware, Inc., 848 A.2d 1130, 1132 (R.I. 2004) (quoting 1 Louis R. Frumer & Melvin I. Friedman, Products Liability § 3.04[1] at 3-46 to 3-48 (2002)). In some instances, circumstantial evidence may be used to establish the identity of the manufacturer or the seller of a defective product, id. (citing Frumer at § 3-50), but "such evidence 'must establish that it is reasonably probable, not merely possible, that the defendant was the source of the offending product. Mere speculation, guess, or conjecture is insufficient to establish identification,'" id. (quoting Frumer at § 3-50 to 3-50.1). The task of deciding when circumstantial evidence is sufficient to make a fact reasonably probable and not merely possible is not always a simple matter. Cf. Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir. 1985)("The line between circumstantial evidence sufficient to support a finding under a substantial evidence standard and evidence which merely permits conjecture or speculation is difficult to draw."). Here the Court concludes that the following evidence makes it reasonably probable that Defendants manufactured the chair which caused Plaintiff's injuries.

First, there is direct evidence in the form of Plaintiff's affidavit. Plaintiff states that she is confident that the chair that broke on her is the same type of chair as the Superior Centron chair depicted in a photograph which appeared as part of a Chair Inspection Guidelines article published on June 25, 2003, on a TI Attleboro employees' intranet network. Affidavit of Mary Ann King ("King Aff.") ¶¶ 3, 6; see also RA at 121-24 (Chair Inspection/Adjustment Guidelines). Plaintiff additionally states

that the chair that broke on her is the same type of chair as depicted in another photograph which appears on page 1 on the 8D Incident Investigation Report.[18] King Aff. ¶ 6; see also RA at 125. Although the latter document does not explicitly identify the chair as a Centron, the characteristics of the chair shown in the photograph appear to correspond to the characteristics of the Centron chair shown in the first photograph. Compare RA at 125-26 with RA at 122-23. In addition, the document states that the "[c]hair has [a] history of failure (Dallas stopped buying this chair 4 years ago but failed to communicate worldwide)." RA at 126.

Defendants assert that Plaintiff's affidavit cannot be used to create an issue of fact because it "does not show the features of the chair that would allow one to compare it with Mrs. King's sworn deposition testimony, in which she identified features not present on a Superior Centron." Defendants' Reply at 1. Defendants cite no authority for this assertion, and the Court fails to see why this alleged deficiency should result in the exclusion of Plaintiff's affidavit. Similarly, Defendants assert that Plaintiff's statement that she is "confident" the chair in the photographs is the same type of chair is not admissible evidence. The Court disagrees. To the extent that Plaintiff's use of the word "confident" suggests something less than absolute certainty, Defendants are free to argue this point to the factfinder. For purposes of the instant Motion, the Court accepts that Plaintiff is confident in her identification of the photographs of the Centron chair as being the same type of chair that broke and caused her to fall.

---

[18] The Court assumes that the 8D Incident Investigation report to which Plaintiff refers is that which appears in the RA at 125. It is the only document in the RA which has a photograph of a chair on it and which is also numbered page "1." Id.

Somewhat inconsonantly (after stating such comparisons were not possible), Defendants also assert that the "photos actually show functions inconsistent with [Plaintiff's] sworn description." Id. at 4. However, the Court has already considered these alleged inconsistencies and determined either that they are not inconsistent or that the degree of inconsistency is too small to support a finding that Plaintiff's own testimony excludes the Centron chair as the cause of her injuries. For this reason, Defendants' suggestion that Plaintiff's affidavit runs afoul of the rule that a party cannot create a genuine issue of material fact by submitting an affidavit that contradicts her own previous deposition testimony is inapposite. Plaintiff's affidavit is not "clearly contradictory," Colantuoni v. Alfred Calcagni & Sons., Inc., 44 F.3d 1, 5 (1st Cir. 1994), and not all of the answers on which Defendants rely for the claimed inconsistency were the product of "unambiguous questions," id. at 4; see, e.g., King Dep., Vol. II at 37 ("How did you adjust the back?" without specifying the kind of adjustment being referenced). Moreover, Plaintiff testified at her deposition that if she were shown a picture of the same type of chair she would be able to identify it, id. at 142, and, thus, the identification reflected in her affidavit is consistent with her deposition testimony.

Second, McGee, Plaintiff's co-worker in the tool crib, who was present when Plaintiff fell, was shown a photograph of the Centron chair and stated that it resembled the chair which broke beneath Plaintiff. See McGee Dep. at 85-86. While hardly conclusive, this evidence provides at least some support for Plaintiff's identification.

Third, the manner in which the chair failed (the heads of the two screws which attached the J-bar to the seat sheared off, see Loxley Dep. at 22) corresponds exactly to the manner in which

the Centron chair failed the April 1997 test conducted by SGS U.S. Testing, see RA at 15 ("the two screws attaching the control mechanism to the seat base sheared off"); see also Loxley Dep. at 23 ("Those two screws are what failed.").

Fourth, of the approximately 13,000 Centron chairs Defendants sold between 1996 through 2003, 10,000 were sold to TI. See Vukcevich Dep. at 160. Emblematic of TI's status as the leading customer for the Centron, when Defendants became aware of the problem with the seat back they developed a remedial measure which was given the name the "TI Field Fix." RA at 25.

Fifth, there is also evidence that Superior Centron chairs were present at the TI Attleboro plant in abundance. Plaintiff testified that Superior chairs were "pretty much," King Dep., Vol. I at 35, all that the TI Attleboro facility purchased, see id. In addition, Plaintiff testified that the chair was purchased from Staples because "that's where we purchased all, all our chairs."[19] Id. Loxley, who had been repairing chairs at the TI Attleboro plant for several years as part of his job,[20] testified that although he was not "absolutely sure," Loxley Dep. at 11, he believed that most of the chairs at the plant were from Staples, id. His testimony, thus, provides some support for Plaintiff's belief. The fact that the chair likely came from Staples further narrows the field of possible chairs because Drews, the Staples salesperson, testified that he was only allowed to provide two types of chairs to TI, the Miller Axis

---

[19] Plaintiff testified that as part of her duties as a purchasing assistant, she purchased office supplies and chairs from Staples for the manufacturing departments that were in her building, see King Dep., Vol. I at 15, 18, 22, and that to her knowledge Staples was the only company from which TI purchased chairs, see id. at 19.

[20] Loxley testified that he had been repairing chairs at the TI facility for a lengthy period. See Loxley Dep. at 11 ("It could have been ten years.").

chair and the Superior Centron chair, see Drews Dep. at 13, and that as of the date of his deposition, March 7, 2007, he only sold the Superior Centron chair to TI,[21] see id. at 26. Drews additionally testified that he ordered 500 screws for the field fix because he thought that number might be needed to repair all the Centron chairs. Id. at 73.

Given this evidence, it is unnecessary for the Court to attempt to resolve the apparent conflict between Loxley's testimony that he repaired the chair, see Loxley Dep. at 24-25, and put it back together, id. at 26, and the testimony of Brown and Drews that when they viewed the chair the back was not on and it was in two pieces, see Brown Dep. at 27; Drews Dep. at 36.[22] Accordingly, I find that there is sufficient evidence such that it is reasonably probable that Defendants manufactured the chair

---

[21] Drews testified that the name of TI changed to Sensata in 2006. See Drews Dep. at 26.

[22] It bears noting that Brown's memory of the incident appears to have faded by the time of his deposition almost four years later. Although a report of the safety team (of which Brown was a part) prepared June 10, 2003, only five days after Plaintiff's fall, states that "[w]e found that someone from the manufacturing area had removed the chair from the area and attempted to repair it," Brown Dep. at 24 (questioner reading from 8D Investigation Meeting Minutes dated June 10, 2003, see id. at 20), Brown testified at his deposition that he did not "recall it being repaired," id. at 24. The safety team report also stated and Brown testified that the chair was placed back into the "crib," id. at 25, with yellow caution tape around it, id. McGee, who worked in the crib, testified that when the chair was returned to her area "[i]t was all back together," McGee Dep. at 47, and that "they [Brown and Drews] ... put it in the back of the room and taped it off," id. at 67. McGee further testified that Drews later came and took the chair. Id. at 48, 53. Drews, however, testified that when he first saw the chair it was "in the corner of [Plaintiff's] general office area, wrapped or circled off with a yellow tape, as I recall, so that nobody else would use it," Drews Dep. at 30, and that "the back was laying on top of the chair," id. at 31; see also id. at 35, 48, 50, 53, 56, 79. Conflicts such as this are matters for the jury to resolve. See Coyne v. Taber Partners I, 53 F.3d 454, 461 (1st Cir. 1995)("if the evidence conflicts, the ultimate arbiter of the persuasiveness of the proof must be the factfinder, not the lawgiver")(internal quotation marks omitted).

which caused Plaintiff's injuries. Defendants' request for summary judgment on this ground is, therefore, rejected.

**II. Existence of Defect**

In a strict liability action, the burden of proof that the product was in a defective condition at the time it left the hands of a particular seller is upon the injured plaintiff. Ritter v. Narragansett Elec. Co., 283 A.2d 255, 262-63 (R.I. 1971); see also Thomas v. Amway Corp., 488 A.2d 716, 722 (R.I. 1985)("In a strict liability action, the plaintiff has the burden of proving a defect in the design or manufacture that makes the product unsafe for its intended use, and also that the plaintiff's injury was proximately caused by this defect."). "A plaintiff is permitted to draw inferences of fact based on circumstantial evidence; however, simply establishing that use of the product resulted in injury will not satisfy the burden." Olshansky v. Rehrig Int'l, 872 A.2d 282, 287 (R.I. 2005). In order to survive a motion for summary judgment, a plaintiff must introduce evidence that the product was defective when it left the defendant's hands and that any such defect was the proximate cause of the plaintiff's injuries. Id. at 288.

Defendants argue that they cannot be strictly liable for King's injuries because there is no evidence that the defect which caused King's injuries existed at the time of manufacture. The Court disagrees. There is ample evidence that Centron chairs which were manufactured before December 29, 1998, contained a design flaw which made the chair backs susceptible to sudden separation from the seat. The J-bar which attached the back of the chair to the seat was secured only by two screws, and over time pressure on the seat back could cause the tops of those screws to shear off. The existence of this defect was discovered during the testing conducted by SGS U.S. Testing in April of 1997. RA at 15. Defendants also received feedback from

customers concerning "loose Centron backs." Vukcevich Dep. at 33. In September 1998 a decision was made to change the design of the attachment of the J-bar to the chair by adding a third screw. See Vukcevich Dep. at 66. An engineering change notice to that effect was issued which specified that beginning in February 1999 a third screw would be added to secure the J-bar to the chair. See id. Defendants also instituted the so-called "TI Field Fix" to strengthen the attachment of the J-bar to the seat of existing chairs by the addition of a third screw with a heavy fender washer and a drop of Loc-tite. RA at 25-26; Vukcevich Dep. at 71, 73. Thereafter, Defendants changed the hole pattern on the J-bars so that the washer could be eliminated and the J-bars secured simply by three screws. RA at 26. In addition, on September 29, 2000, JSJ sent a letter to its customers, notifying them that Centron chairs manufactured before December 29, 1998, could have problems with "screws attaching the back J-bar to the control ... work[ing] loose." RA at 41, 43.

Defendants assert that "the uncontroverted facts are four square with those of Olshansky," Defendants' Mem. at 11, but in Olshansky there was no evidence of a design defect in the shopping cart. There the only evidence of a defect was the fact that the basket came off the wheels while Mr. Olshansky was using the shopping cart. Olshansky, 872 A.2d at 288. In affirming the defendants' motion for summary judgment, the Rhode Island Supreme Court reiterated "that simply alleging that the use of a product resulted in injury is not enough to establish product liability," id. Here there is clearly sufficient evidence to support a finding that the Centron chair which broke beneath Plaintiff had a design defect when it was manufactured by Defendants. Defendants' argument to the contrary is rejected.

**III. Proximate Cause**

"To prevail in a negligence action, a plaintiff must show

not only that the defendant owed the plaintiff a duty of care and that the duty was breached 'but also that the defendant's negligence was the proximate cause of the plaintiff's injury.'" Russian v. Life-Cap Tire Servs., Inc., 608 A.2d 1145, 1147 (R.I. 1992)(quoting Kennedy v. Tempest, 594 A.2d 385, 388 (R.I. 1991)). Similarly, in a claim for breach of warranty, the burden is on the plaintiff to prove the product was defective when it left the hands of the supplier and the defect was the proximate cause of the plaintiff's injuries. Plouffe v. The Goodyear Tire & Rubber Co., 373 A.2d 492, 495 (R.I. 1977). Proximate causation is also required for claims based on strict liability. See Thomas, 488 A.2d at 722 ("In a strict liability action, the plaintiff has the burden of proving a defect in design or manufacture that makes the product unsafe for its intended use, and also that the plaintiff's injury was proximately caused by this defect.").

While the causal connection between a defendant's negligence and a plaintiff's injury must be established by competent evidence and may not be based on conjecture or speculation, negligence and proximate cause can be established by circumstantial evidence, and specific direct evidence of negligence and proximate cause is not always necessary. Martinelli v. Hopkins, 787 A.2d 1158, 1169 (R.I. 2001). The Rhode Island Supreme Court has stated that "'[c]ausation is proved by inference' and, although '[p]roof by inference need not exclude every other possible cause, *** it must be based on reasonable inferences drawn from facts in evidence.'" Id. (quoting McLaughlin v. Moura, 754 A.2d 95, 98 (R.I. 2000) (quoting Skaling v. Aetna Ins. Co., 742 A.2d 282, 288 (R.I. 1999)))(alterations in original); see also Russian, 608 A.2d at 1147 (noting that "plaintiff fail[ed] to present evidence identifying defendants' negligence as the proximate cause of his injury or from which a reasonable inference of negligence may be

drawn”).

Defendants assert that without the chair, Plaintiffs cannot establish a causal relationship between the alleged chair defect and King’s injury. Defendants note that the screws which allegedly broke were discarded, and they assert that without examining the screws or the chair “we will never know why the chair broke.” Defendants’ Mem. at 2. They suggest that there could have been an error in assembly or a mistake when it was repaired or undergoing maintenance. Defendants contend that without definitive evidence of the condition of the chair at the time of the accident, “we can only speculate [as to the cause of the accident].” Id.

The Court disagrees. The evidence in the record is sufficient to remove the matter of proximate cause from the realm of speculation or conjecture. Plaintiff testified that she leaned back in the chair and the back snapped off and she fell. See King Dep., Vol. I at 44-45. Loxley arrived on the scene very shortly after Plaintiff fell, and he observed that the back was off the chair. See Loxley Dep. at 18, 21. Loxley also observed that the heads of the two screws which attached the J-bar to the bottom of the chair “were gone as if they were sheared,” Loxley Dep. at 22. Loxley concluded that “[t]hose two screws are what failed.” Id. at 23. This failure corresponds exactly to the failure which was observed during the testing of the Centron chair by SGS U.S. Testing in April of 1997. RA at 15. Based on this evidence, it is a reasonable inference that the chair broke because, as Plaintiff leaned back against it, the heads of the two screws which attached the J-bar to the seat sheared off. The fact that Defendants instituted the TI Field Fix and subsequent design change, adding a third screw to the J-bar, is evidence that the original design of the Centron chair which called for the J-bar to be secured by two screws was defective.

The evidence of proximate cause in this case far exceeds that in the cases cited by Defendants. Cf. Russian, 608 A.2d at 1146 (affirming summary judgment where plaintiff did not know what caused him to fall but felt something strike him in the shins immediately prior to falling); Thomas, 488 A.2d at 719 (affirming directed verdict where plaintiff had merely proven the happening of an occurrence, namely that she developed a skin condition after using defendant's soap); id. ("The plaintiff is not bound to exclude every other possible cause of her condition but she is required to show that the probable cause was the soap."); Plouffe, 373 A.2d at 496 (affirming directed verdict for defendants where plaintiff was injured in an automobile accident caused by a tire blowing out and "[t]here was no evidence that the blown out tire had improper tread design or improper sidewall strength or durability").

Defendants additionally argue that Plaintiffs must present expert testimony in opposition to the Motion and that their failure to do so requires that it be granted. See Defendants' Reply at 7. The Rhode Island Supreme Court has not held that expert testimony is required in all instances to withstand a motion for summary judgment. It has held that expert testimony is required to establish any matter than is not obvious to a lay person and thus lies beyond common knowledge. Mills v. State Sales, Inc., 824 A.2d 461, 468 (R.I. 2003); see also, e.g., Olshansky, 872 A.2d at 287 ("Although average lay persons use shopping carts every day, we conclude that only an expert who understands the mechanics of constructing such a cart could understand and explain the mechanics of the cart and whether such defect proximately caused an injury such as Mr. Olshansky's."); Mills, 824 A.2d at 468 (explaining, in case where defendant inspector allegedly failed to detect toxins in medical files belonging to plaintiff, that "[w]ithout providing an expert's

affidavit or other appropriate scientific evidence, there was no evidence capable of substantiating plaintiff's claim that [defendant's] alleged negligence proximately caused her injuries."). Here there is evidence that the back of Plaintiff's chair broke because the heads of the two screws which attached the J-bar to the seat sheared off. The reason that the seat separated from the chair is a matter which would be obvious to a lay person. This contrasts with the situation in Olshansky where there was no evidence why the basket portion of the shopping cart came off the wheels. See Olshansky, 872 A.2d at 288.

Furthermore, the record here contains the report of SGS U.S. Testing regarding the results of the durability testing performed on the early model of the Centron chair. The Court views this evidence as akin to "other appropriate scientific evidence ...," Mills, 824 A.2d at 468. Accordingly, the Court rejects Defendants' argument that Plaintiffs' failure to present any additional expert or scientific evidence at this juncture of the litigation is fatal.

Lastly, Defendants argue that Plaintiffs' strict liability claims cannot survive because there were modifications to the chair and that a manufacturer is not strictly liable where there has been a substantial change in the product after sale. See Defendants' Reply at 7 (citing La Plante v. American Honda Motor Co., 27 F.3d 731, 737 (1st Cir. 1994)("Under [R.I. Gen. Laws § 9-1-32], where a subsequent alteration or modification to a product is a 'substantial cause' of a plaintiff's injuries, the defendant is completely immune from a products liability claim even if the product was defective at the time it left the defendant's control, and the defect was a proximate cause of the plaintiff's injuries."); Simmons v. Lincoln Elec. Co., C.A. No. 86-4840, 1995 R.I. Super. LEXIS 131, at *3 (R.I. Super. June 23, 1995)("a subsequent alteration or modification to a product which is a

substantial cause of a plaintiff's injuries absolves the products liability defendant from liability")). In support of their claim of a substantial modification to the chair, Defendants point to Plaintiff's testimony that "[e]very now and then it would, you know, come out of the locked position a little if I didn't lock it in right," King Dep., Vol. II at 47, and that in response to this she "would tighten it in," id. at 49. Plaintiff estimated that this occurred "[e]very couple [of] months or so," id., and that the total number of times it happened was probably either three or four, see id. at 53, or "only ... a couple of times ...," id. at 55. Defendants also point to Plaintiff's testimony that one of the maintenance men looked at the chair and "tightened it in." Id. at 61. However, Plaintiff later clarified that she did not "think he really did anything. I think he just looked to make sure everything was tight." Id. at 62. She testified that "he did not take it apart -- he said he thought maybe the lever maybe was going a little stripped." Id. at 65.

This evidence is too slim to support a finding that the chair had been altered or modified and that such alteration or modification was a substantial cause of Plaintiff's injuries. Certainly, the controls on an adjustable office chair are made to be operated, and the mere act of operating them cannot be considered to be an alteration or modification of the product. Similarly, insuring that screws are tight on a product does not constitute a modification or alteration of the product. To the extent that Defendants are suggesting that the screws on Plaintiff's chair may have been over-tightened and that this caused them to fail, the present record does not contain such evidence. Here the statement Plaintiff attributed to the maintenance man was that "the *lever* maybe was going a little stripped," id. at 65 (italics added). Moreover, this statement

is hearsay and does not constitute admissible evidence. Cf. Ramírez Rodríguez v. Boehringer Ingelheim Pharms., Inc., 425 F.3d 67, 76 (1st Cir. 2005)("Hearsay evidence is not admissible at trial or for summary judgment purposes ....")(citation omitted); Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005) ("[E]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment."); Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 32 (1st Cir. 2003) (holding that "evidence was not admissible and could not be considered in the summary judgment analysis").

**Summary**

There is direct and circumstantial evidence in the record which makes it reasonably probable that Defendants manufactured the Centron chair which caused King's injuries. The fact that the chair has been lost is not fatal to Plaintiffs' claims. There is also ample evidence that the Centron chairs which Defendants manufactured before December 29, 1998, contained a design flaw in that the J-bar which attached the back of the chair to the seat was secured only by two screws. It can be reasonably inferred from this evidence that this design defect was the proximate cause of King's injuries. Plaintiffs are not required at this point to provide expert testimony where the record already contains the results of laboratory testing on the chair which is akin to scientific evidence. Finally, there is insufficient evidence to conclude that any change or alteration in the chair was a substantial cause of Plaintiff's injuries.

**Conclusion**

For the foregoing reasons, I recommend that Defendants' Motion for Summary Judgment be denied. To the extent that the Motion seeks summary judgment as to JSJ, I recommend that it be

ruled moot.[23]

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10)[24] days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
July 25, 2008

[23] See n.1.

[24] The ten days do not include intermediate Saturdays, Sundays, and legal holidays. See Fed. R. Civ. P. 6(a).